NO. 01-15-00267-CV

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
3/25/2015 12:01:47 PM
CHRISTOPHER A. PRINE
Clerk

IN THE COURT OF APPEALS
FOR THE 1ST JUDICIAL DISTRICT OF TEXAS
AT HOUSTON

IN RE SOLID SOFTWARE SOLUTIONS, INC., d/b/a EDIBLE SOFTWARE

Original Proceeding from the 215th Judicial District
Of Harris County, Texas
Trial Court Cause No. 2013-74668

**RELATOR SOLID SOFTWARE SOLUTIONS INC. d/b/a EDIBLE SOFTWARE' S APPENDIX D TO PETITION FOR WRIT OF MANDAMUS**

Gregg M. Rosenberg
Texas State Bar No. 17268750
Tracey D. Lewis
Texas State Bar No. 24090230
ROSENBERG SPROVACH
3518 Travis, Suite 200
Houston, Texas 77002
Telephone (713) 960-8300
Facsimile (713) 621-6670
gregg@rosenberglaw.com

*Attorneys for Relators*

# TAB D

No.2013-74668

| | | |
|---|---|---|
| ANDREA FARMER | § | IN THE DISTRICT COURT OF |
| | § | |
| V. | § | HARRIS COUNTY, TEXAS |
| | § | |
| HENRI MORRIS and | § | |
| SOLID SOFTWARE SOLUTIONS, INC. | § | |
| d/b/a EDIBLE SOFTWARE | § | 215th JUDICIAL DISTRICT |

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS OR, ALTERNATIVELY TRADITIONAL MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW **Andrea Farmer**, ("Ms. Farmer"), and herewith respectfully responds to the Motion to Dismiss or, alternatively[,] Traditional Motion for Summary Judgment, ("M/MSJ"), heretofore filed herein by Defendants Henri Morris and Solid Software Solutions, Inc. d/b/a Edible Software, ("Morris", "Edible", collectively "Defendants"); and, in support provide the following information, argument and authority:

## I.
## M/MSJ RESPONSE EXHIBITS

In order to properly support her Response to the instant M/MSJ with admissible evidence or other appropriate authority, Ms. Farmer respectfully marks for identification and attaches hereto the following Response Exhibits:[1]

1) Response Ex. "A," file-marked copy of Plaintiff's Original Petition herein, reflecting a file-date of December 13, 2013, attached for ease of reference;

---

[1] Each and all of such are incorporated herein and made a part hereof as if set out in full, pursuant to Tex. R. Civ. P. 58. *See also Malone v. Shoemaker*, 597 S.W.2d 473, 476 (Tex. Civ. App. 1980, no pet.); *Jacox v. Cobb*, 659 S.W.2d 743, 745 (Tex.App.- Tyler 1983, no pet.).

1

2) Response Ex. "B," file-marked copy of Defendant's (*sic*) Original Answer herein, reflecting a file-date of December 18, 2013, attached for ease of reference;

3) Response Ex. "C," file-marked copy of Defendants' Plea to the Court's Jurisdiction, filed in Cause Nos. 2012-65503, 2012-65503-A and 2012-65503-B, styled collectively *Keri Hill, Michelle Barnett and Stacy Stewart v. Henri Morris and Solid Software Solutions, Inc. d/b/a Edible Software,* reflecting a file-date of February 21, 2014;

4) Response Ex. "D," file-marked copy of Plaintiffs' Response to said Plea, in Cause No. 2012-65503, styled *Keri Hill and Michelle Barnett v. Henri Morris and Solid Software Solutions, Inc. d/b/a Edible Software,* reflecting a file-date of February 27, 2014;

5) Response Ex. "E," file-marked copy of the Order **Denying** Defendants' Plea to the Jurisdiction, of Hon. Jeff Shadwick, dated March 3, 2014, in Cause No. 2012-65503, Styled *Keri Hill, Michelle Barnett and Stacy Stewart v. Henri Morris and Solid Solutions, Inc. d/b/a Edible Software;*

6) Response Ex. "F," file-marked copy of the Superseding Indictment entered in Criminal Action No. H-12-255SS, pending in the United States District Court for the Southern District of Texas, Houston Division, styled *United States of America v. Henri De Sola Morris,* (Doc. 67), reflecting a file-date of August 5, 2013;

7) Response Ex. "G," file-marked copy of the Plea Agreement entered in said federal criminal cause, (Doc. 129), reflecting a file-date of December 3, 2014;

8) Response Ex. "H," copy of download of article posted online by the Houston Chronicle, on its officially maintained website, http://www.chron.com/news/houston-texas/article, dated December 3, 2014, entitled "Software Exec Pleads Guilty to Drugging, Abusing Female Employees, quoting comments by Morris' counsel of record in the federal criminal cause;

9) Response Ex. "I," relevant portions of the transcript of the deposition of Ms. Farmer, taken on July 11, 2013 in regard to Cause No. 2012-65503, styled *Hill, et al v. Morris, et al,* pertaining to the matters at issue herein;

10) Response Ex. "J," relevant portions of the transcript of the deposition of Beth Jackson, ("Jackson"), taken on July 24, 2013, in regard to

2

Cause No. 2012-65503, styled *Hill, et al v. Morris, et al,* pertaining to the matters at issue herein.

## II.
## RELEVANT FACTS AND PROCEDURAL HISTORY

### A. Introduction.

Defendants' M/MSJ asserts basically two defenses: (1) Civ. Prac. & Rem. Code tort limitations; and, (2) the failure of Ms. Farmer to conform to the Texas Commission on Human Rights Act's ("TCHRA") administrative requirements. Neither defense has any vitality whatsoever under controlling Texas law or under any reasonable notion whatever of basic human decency, fairness or justice. Ms. Farmer has asserted viable and timely claims and they should be allowed to remain pending in anticipation of a full trial on their merits before a jury of the Parties' peers.

The general facts of this case are succinctly and relevantly summarized in the federal criminal Superseding Indictment pending against Morris, (Response Ex. F). During roughly the period of February 8, 2010, through about February 27, 2012, Morris took various female employees with him on business-related trips to cities outside Texas. On each trip, once his victims were thus isolated, far from home and all the more vulnerable, Morris date-rape drugged and, without their consent, sexually abused, molested and took nude photographs of his unconscious and completely insensate and defenseless victims. Although each trip arose out of Morris' capacity as President and CEO of Edible and the supervisor of each of his victims, and the company should be held liable for the intentionally tortious acts of its principal, Morris' predatory acts had nothing whatever to do with his victims' work conditions. Among his victims was Ms. Farmer and Defendants' instant effort to characterize her claims as workplace complaints is frankly both cynical and delusional.

3

In confirmation of that, it's important for the Court to note that in their instant M/MSJ, Defendants' entire Section II, "Statement of Facts," (M/MSJ, pgs. 2-8), addresses the alleged nature and scope of *Ms. Farmer's* recollections of her violation by Morris, with numerous citations to her Original Petition, (Response Ex. A), her statement to the FBI, (Motion Ex. D), and her deposition, (Motion Ex. A, Response Ex. I), as though those documents constitute the exclusive factual universe upon which this case and Ms. Farmer's claims are based. Moreover, such factual presentation adds much that has no actual role in this case, namely Ms. Farmer's discussions of workplace conditions. First, she discusses such only in response to Defendants' counsel's direct questioning in her discovery deposition. Second, those facts might be very important were Ms. Farmer asserting an employment sexual harassment or discrimination claim. However, regarding her *actual* claims, all of such facts are completely irrelevant.

Conversely, *not a single word or reference* is therein contained regarding the bigger picture of this case, which is, again, critically important to each of the bases Defendants assert in support of their dismissal and/or summary judgment motion. Absent is any reference to the Superseding Indictment, (Response Ex. F), Morris' Plea Agreement, (Response Ex. G), and Morris' persistently cynical denial of any responsibility for his actions whatsoever, as reflected in Response Ex. H.[2] Careful examination of the fuller picture of what Ms. Farmer had to say in her Original Petition, FBI statement and deposition, when considered in the context of the Superseding Indictment, Plea

---

[2] See "Software Exec Pleads Guilty to Drugging, Abusing Female Employees," December 3, 2014, http://www.chron.com/news/houston-texas/article, "Morris's attorney, Dan Cogdell, had said that the women were consenting adults who willingly drank with Morris, and that Morris never drugged anyone or intended to break any laws. He also said they [the women accusers, including Ms. Farmer] were only making accusations against him to bolster civil suits pending in Harris County." (Such article is admissible pursuant to Tex. R. Evid. 902(6)).

4

Agreement and media accounts of Morris' criminal lawyer's summary of Morris' categorical denial of responsibility will demonstrate Morris to be a callous predator, whose actions stunned Ms. Farmer and deeply affected her perceptions of what actually happened to her. Defendants concentrate solely upon her representations in a vacuum because by doing so they cleverly attempt to diminish the emotional and psychological impacts of her victimization. When those serious consequences are reasonably and quite properly factored in, Defendants' statute of limitations and Texas Commission on Human Rights Act, ("TCHRA"), preemption arguments in support of dismissal or summary disposition are revealed to be utterly untenable. Therefore, Ms. Farmer will, as briefly as possible, present the fuller facts of this case and then apply to those facts the controlling law. In doing so, she will demonstrate to the Court's satisfaction that the instant M/MSJ should be denied in each and every particular.

## B. *The __complete facts__.*

In her deposition, (Response-Ex. I),[3] Ms. Farmer testified in relevant part that she went with Morris to Philadelphia and Newark about two weeks after she started working at Edible, (75:18- 76:18), [in May, 2011]. She flew by herself and met Morris at the Philadelphia airport, (77:7-17). Morris had a rental car he used to pick her up, (77:18-21). This was on a Sunday evening, (77:25- 78:3); and, they drove to the hotel, (78:2-4), (a Marriott, (79:23)). Morris wanted to meet in the concierge lounge, but it was closed so they met in the hotel bar, (79:2-8). They stayed there about an hour and a half, (79:18-19); then she went to sleep, (79:20-21). However, the next night, they went to the Newark Marriott, (81:14-17); in order to see a New Jersey client the following day, (81:23-24). Later, she could vaguely remember being at dinner and that a comedian was

---

[3] Transcript citations are by page and line(s).

5

there whose picture Morris kept taking, (84:13-22). She has no idea where they were or what she had for dinner, or any other details, (86: 9-13). She remembered going through a tunnel on the way to dinner, but little else, (89:6-13). That evening, she and Morris had met in the hotel concierge lounge and had drinks, (89:14-18). She drinks wine and asked for a glass of it, but Morris insisted she have a mixed drink, (89:18-25). She insisted on wine and he poured her a glass, but, then he told her they should get another drink to-go and go to dinner in Manhattan and he insisted she have a mixed drink, and he fixed her a drink in a to-go cup, (90:17-25). However, the drink was so strong she couldn't drink it, and she told him that. He then added some soda to it and insisted that she drink it, (91:1-22). Shortly, she began to feel very dizzy, (92:1-10). In the elevator, Morris began to massage her neck and back, which she thought was weird, (93:4-16); she told him that was not necessary as it was making her uncomfortable, and he stopped. But, later he put his hands on her shoulders anyway, (93:16-25). By the time they arrived in Manhattan, she was disoriented, (92:11-13); and, Morris began holding her hand which made her feel very uncomfortable, (93:1-3).

Ms. Farmer has absolutely no memory of anything about the dinner or going to it or getting home, (95:24-96:15). At some point that night, she awoke in her hotel bed with a pillow and some covers over her head and her blanket down around her ankles. Then, she heard the click of a phone camera and she looked and realized she was naked and Morris was standing over her, (81:23- 82:4). She was so tired she had trouble adjusting to what was going on and she muttered, "Wait, I'm not... like what is going on?" Then, she sat up and asked Morris if he had just taken a nude picture of her, (82:5-11); which he hastily denied, (82:12). She became upset and asked him what he was doing there, and she told him to leave and to give her the picture she knew he had taken,

6

(82:12-15). She was disoriented and confused, but she told him he could not have the picture, but he just said "it was fine," (82:19-23). Then, Morris left the room and came right back in to show her his Blackberry, with no picture in it. She tried to index it, but couldn't, (83:8-17). Then, he left again and she went back to sleep for four hours, (84:6-9).

She very vaguely recalls that when she awoke in her hotel room bed nude, with Morris standing over her, it was about 4:00 am, (99:4-8). She only had an apprehension that he was taking nude pictures of her because she heard the click of the Blackberry, (97:15-20). That he actually did so was not confirmed until much later after Morris was arrested and they found several nude photos of her in a locked flash drive in his office, (101:1-13). She clearly remembers him in her room and herself naked in bed, (98:1-5). He left her room about 4:00 am and she then slept until about 8:00 am, (99:4-11). She emphatically denied giving Morris consent to take nude pictures of her, (104:4-24). More importantly, in addition to believing she had been photographed nude, she also feels certain that she was physically violated because she had redness in her vaginal area and bruises on her arm and "hip area". (99:12-22). Although she did not feel she had been raped, she felt like she had "been touched" and she was sore in her "female regions", especially on the outside, (100:1-10).

The next morning, incredibly, Morris was at the door of her hotel room asking why she wasn't ready to see the client! (102:7- 103:8). She met him downstairs and it was she who was apologizing for being unprofessional, (103:11-15); she blamed *herself* for losing control, (103:22- 104:3). In response, Morris dismissed her concern by saying it "was no big deal", (106:11-15). She felt terrible that day and continued to feel disoriented, (107:1-7). Later, he told her he had "never done anything like this before

7

and he really liked her." (113:4-7). Then, he claimed he had a bad marriage, (113:10-12). She told him their relationship had to be professional; but, he told her he would hug her whenever he felt like it, (113:13- 114:1). She started looking for another job immediately, (114:18-20). Ms. Farmer took one more business trip with Morris. On that trip, once again, Morris had her meet him in the concierge lounge of their hotel, (116:9-10). He asked her if she wanted a drink and she asked for a chardonnay. But, after he brought it to her, it tasted disgusting, like strong medicine, with a very bitter alkaline taste, (116:18-25). She said the taste was definitely not a normal taste, (118:3-25). She tried a few sips and then said she couldn't drink it, (119:16-18). They went to dinner; and, afterwards, Morris pressured her to have another drink, but this time she refused, (121:1-6). After they returned to Houston, she shortly learned that Morris refused to talk to her anymore, for a pretextual reason, (124:14-25). And, he remained distant and standoffish to her, (125:6-10).

Contrary to Morris' deceitful representation to Ms. Farmer that "he had never done anything list this before, and his criminal lawyer's comment that Ms. Farmer and the other victims were merely making allegations up to aggrandize their civil suits, (obviously including this one), ((Response Ex. H), it should be noted that in the Superseding Indictment, he was criminally charged with very similarly violating four (4) other female employee victims, (Response Ex. F). And, while charge does not equal conviction, in regard to Ms. Farmer, in the Plea Agreement, (Response Ex. G), Morris explicitly agreed to the truth and validity of the facts alleged in Count Five thereof, that: "On or about May 8, 2011, Morris traveled in interstate commerce and committed, and attempted to commit, the drug-facilitated sexual assault of [Ms. Farmer]." (Id., pg. 6-7). And, Morris further plead guilty to the offenses of "violating 18 U.S.C. § 2421, as well as

8

New Jersey Statutes Annotated 2C:14-9(b), Invasion of Privacy." (Id.). Morris further agreed that he was arrested by the FBI on February 27, 2012, at IAH, when he was attempting to leave on another business trip. He had with him three bottles of the "unknown liquid" he used to dilute the drugs he administered to Ms. Farmer by means of alcoholic beverages he supplied to her. He also had four Viagra tablets and four Cialis tablets for himself and five pills of the type he administered to Ms. Farmer, which included sleeping pills and sedatives, which according to DEA analysis and a supervisory FBI Forensic Chemist and Toxicologist were consistent with the symptoms she described when she was attacked by Morris, which included drowsiness, dizziness, loss of muscle control, slurred speech, decreased inhibitions, memory loss or impairment, loss of consciousness. (Id., pg. 8). Morris agreed that he drugged Ms. Farmer's drink at the New Jersey hotel, just as she testified, and that she suffered all the disorientation and intoxication at dinner she testified to. He also agreed that he took nude, unconsented photographs of Ms. Farmer with his cell phone, and that copies of those pictures were preserved on a thumb drive in his possession at the time of his arrest. Time/date stamps on such confirmed they were taken between 2:00 and 4:00 am. He also confirmed the lies he told her the next morning. She also had physical markings confirming her violation and the photographs were nude and explicit. So, it's imperative for the Court to observe that while she was very confused that night and afterwards, her core story has been confirmed by forensic evidence and the *confession of Morris!*

In Ms. Farmer's statement to the FBI, dated February 22, 2013, (Motion Ex. D), her explanation of the fuzziness and limits of her recollections on the night she was

9

assaulted, (Id., pgs. 29-42; 45-46), are virtually identical to her deposition testimony, in every particular.

During the entirety of discovery in this case and the *Hill* companion case, the total of depositions taken of witnesses in support of Morris has been one, that of Beth Jackson, (Response Ex. J). Jackson testified in her deposition,[4] in relevant part, that She drinks 2-3 mixed drinks daily, (28:3-9); and, she has often been out drinking with Defendant Morris, (22:1-5; 27:19-21; 30:3-8; 33:25- 34:3). She stated that initially, she had a business relationship with Morris, (32:10-12); but, she later conceded that even though she knows he is married to Ruth, whom she has met, (35:3-10), she has travelled with him at least once a month since 2009, (37:4-11), and she had a long-running "personal relationship" with him since about 2005, (49:4-22), lasting into 2011, (51:21- 52:4); which specifically included a sexual relationship with him, (49:20- 50:4). During this time, both of them were married to other people, even though their respective spouses did not know of their illicit relationship, (50:5-20). This relationship included sexual intercourse, (50:1-4), digital penetration, (53:6-8), and allowing him to photograph her nude, (53:21-23), on numerous occasions and in numerous locations, (53:24- 54:5). He took these nude photos with his cell phone, which he would then save by downloading them onto hard drives or flash drives, (55:3-8); her only restriction being that in the fully nude photos, her face not be shown, (54:16- 55:2). She said she intended Morris to use the photos to arouse himself with his wife because while she easily aroused him, his wife did not, (54:9- 56:2; 57:8- 58:5; 58:25- 59:19; 60:5-19). The FBI now has the photos, (61:1-7). ***She also conceded that Morris confided to her that he also took nude photos of Andrea Farmer,*** (61:8-19).

---

[4] Citations to the transcript thereof are by page and line(s).

Jackson said Morris often travels with small "airplane" bottles, (63:8-10); which she assumed he used to "re-cycle" liquor, (63:24- 64:4); and, she has seen Morris often make drinks for others, (68:12-14), including the use of "to-go" cups, (69:1-3). Nevertheless, she obdurately disagrees with Andrea Farmer's testimony "100%", (67:14-16). The Court can evaluate the credibility of such testimony.

Finally, in her Original Petition on file herein, (Response Ex. A), Ms. Farmer made very clear that the factual basis of her claims was that: "Defendant Morris drugged Farmer by putting an unknown substance into a drink, unbeknownst to Farmer. During this time, Morris attempted to sexually assault Farmer and took pictures of her while she was unconscious." (Id., pg. 2). Thus, while the claims asserted are assault and invasion of privacy, the *gravamen* thereof are drug-induced unconsciousness and sexual assault, the very crimes Morris has pled guilty to in federal court.

Therefore, on the basis of this body of supporting evidence and information, it seems remarkably disingenuous that Defendants, in their instant M/MSJ, (filed January 16, 2015, over five (5) weeks after Morris' entry of his sworn guilty plea), are even now contending: (1) "plaintiff was aware of the *alleged* assault and impermissible pictures taken of her at the time the events occurred," (M/MSJ, Pg. 3); (2) "she could remember … Morris *allegedly* engaging in sexually inappropriate and/or offensive behavior with her," (Id.); (3) "she had reason to believe that she had been physically violated," (Id., pg. 4); and, (4) "She allegedly saw, was aware of and observed these things at that time." (Id.). First, there is nothing whatever "alleged" about what Morris did to Ms. Farmer. He has pled guilty to every lurid detail of it under oath! Second, Defendants want to lock Ms. Farmer into specific recollections, when the thrust of her entire testimony was that she was drugged and completely out of it during her violation and has only the vaguest

11

recollections of it. Such a distortion is especially reprehensible where Morris admitted the sophisticated nature of his carefully plotted and executed drugging of Ms. Framer to achieve exactly the intoxication and disorientation Defendants now contend she doesn't have! Third, not only does her testimony support her claims, even Defendants admit that when she was questioned by the FBI, she expressly denied memory or recollection of the pictures taken or what they depicted until the FBI showed them to her, (Id., pg. 5).

## II.
## ARGUMENT AND AUTHORITIES

Given the truly egregious nature of this case, Ms. Farmer and her undersigned counsel believe it's both necessary and appropriate to bluntly respond to the defenses asserted in Defendants' instant M/MSJ, based upon five (5) critically important issues. First, in Defendants' Motion to Dismiss they only *infer* a two (2) year limitations defense, per Civ. Prac. & Rem. Code § 16.003(a), yet the Court should note how strange it is that Defendants *never once cite* that statute, merely discussing case law applying it. If they are so confident of its application, why would they be so coy? Obviously, because in both law and equity, § 16.003(a) does *not* apply. Instead, this case is clearly governed by the provisions of Civ. Prac. & Rem. Code § 16.0045(a), which provides for an applicable five (5) year limitations period, pursuant to which Ms. Farmer's claims are manifestly timely asserted. Second, even if § 16.003(a) did control, which is *not* the case, that statute's two (2) year limitation period has been tolled under the doctrine of fraudulent-concealment. Third, even if § 16.003(a) applied and had been timely asserted as a basis for dismissal, *neither of which is the case,* Defendants' Motion to Dismiss is not timely, pursuant to Tex. R. Civ. P. 91.a3(a). Fourth, in Defendants' Traditional

12

Motion for Summary Judgment, virtually all of the factual assertions are at stark variance with the appalling "Factual Basis for Guilty Plea," as contained in the Plea Agreement Morris has now entered into in his federal criminal prosecution, (Response Ex. G). The *total* facts of this case literally cry out for a jury trial of Ms. Farmer's claims. Fifth, Defendants' attempt to fit this case within the parameters of the TCHRA is a complete distortion of that law. Ms. Farmer is not making any sort of workplace complaint; she was sexually abused, molested and photographed nude by Morris, after her drugged her unconscious in a hotel room in New Jersey!

The fact that the instant M/MSJ has been very professionally prepared is a fitting tribute to opposing counsel's fine professional reputation. But, its glossy polish should not in any way distract the Court from the hard truth that Morris is a convicted sexual predator who, on the one hand, will no doubt tell the federal court how contrite he is at his pending February 27, 2015 sentencing for crimes against *Ms. Farmer* specifically, while here, he is the same smug, arrogant bully who drugged and abused Ms. Farmer and numerous other victims, lying and denying as strongly as ever. How utterly contradictory that he will be undoubtedly remorseful to Ms. Farmer in the court where he faces federal prison and yet, here, he is still denying everything and trivializing Ms. Farmer's humiliation at his cruel hands. Therefore, Ms. Farmer now addresses each of the forgoing five (5) issues *seriatim,* in the fervent hope that this Court will hold Defendants to the same accountability here as Morris has been compelled, by the awful facts *he* authored, to submit to in the federal court.

### A. Ms. Farmer's Claims Are Governed by Civ. Prac. & Rem. Code § 16.0045(a)'s Five (5) Year Limitation Period.

13

Ms. Farmer agrees that in her Original Petition on file herein, (Response Ex. A), she has asserted causes of action against Morris based upon the torts of "intentional physical contact... directly and through the instrumentality of drugs," (Id., ¶ 10), and "intruding on... seclusion when tak[ing] photographs of [Ms. Farmer] when she was unconscious." (Id., ¶ 12). These were further characterized as claims for assault, (Id., ¶ 11), and invasion of privacy, (Id., ¶ 13), as regards Edible. Defendants want to take these terms at face value, in a factual vacuum, to lock them into the two (2) year limitation period provided by Civ. Prac. & Rem. Code § 16.003(a). However, these claims do not arise from a punch in the nose, a car wreck or a routine slip-and-fall. They arise from truly insidious sexual abuse facts which shock the conscious. Therefore, Ms. Farmer vigorously asserts that her claims fall more reasonably within the parameters of Civ. Prac. & Rem. Code § 16.0045(a), which provides for a five (5) year limitation period in cases involving sexual abuse; and, it is this longer period which should control here.

Defendants cite a number of cases regarding the application of § 16.003(a)'s two (2) year limitation period to invasion of privacy claims, but a close reading thereof reveals them to be distinguishable from Ms. Farmer's instant claims. The invasion of privacy cause of action was first recognized by the Texas Supreme Court in *Billings v. Atkinson*, 489 S.W.2d 858, 860 (Tex. 1973). However, it was there defied as "A judicially approved definition of the right of privacy is that it is the right to be free from the unwarranted appropriation or exploitation of one's personality, the publicizing of one's private affairs with which the public has no legitimate concern, or the wrongful intrusion into one's private activities in such manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities." *Id.,* at 859. What happened to Ms. Farmer is far more egregious that any of that. In *Matlock v.*

14

*McCormick,* 948 S.W.2d 308, 311 (Tex.App.- San Antonio 1997, no pet.), § 16.003(a)'s two (2) year limitation was held applicable to an employee's claim arising out of other employees being told she was under investigation for selling drugs at work. In *Stevenson v. Koutzarov,* 795 S.W.2d 313, 318 (Tex.App.- Houston [1st Dist.] 1990, writ denied), it was applied to a third-party claim in a nasty divorce case. In *Covington v. Houston Post,* 743 S.W.2d 345, 347–48 (Tex.App.—Houston [14th Dist.] 1987, no writ), it was held that the two (2) year limitation statute was applicable to a claim based upon a newspaper's article placing a person in a false light.

And, it's particularly interesting to note that Defendants cite *Ramirez v. Mansour,* No. 04-06-00536-CV, 2007 WL 2187103, at *6, (not reported in S.W.3d) (Tex.App.- San Antonio Aug. 1, 2007, no pet.), for the proposition that assault and battery actions are limited by a two-year statute of limitations, (M/MSJ, pg. 9, n. 39). In that case, the San Antonio CCA made very clear that while: "Assault and battery actions are limited by a two-year statute of limitations. Tex. Civ. Prac. & Rem. Code Ann. § 16.003 (Vernon 2006)... ***sexual assault actions are limited to five years. Tex. Civ. Prac. & Rem. Code Ann. § 16.0045 (Vernon 2006).*** (Emphasis added)." *Id.,* at *6. And, *Bros. v. Gilbert,* 950 S.W.2d 213, 215 (Tex.App.- Eastland 1997, pet. den'd), dealt with a simple assault and sexual harassment claim arising out of a workplace unconsented touching. Nothing about that case begins to rise to the level of Ms. Farmer's sexual assault claims while she was drugged unconscious. Similarly, *Marburger v. Jackson,* 513 S.W.2d 652, 654 (Tex. Civ. App. 1974, writ refused n.r.e.), involved a simple physical altercation. When the much more appalling facts of Ms.

15

Farmer's instant claims are considered in the context of the *entire* facts, it becomes readily apparent that far more is involved in the proper limitations analysis here.[5]

§ 16.0045(a)(1) allows a victim to bring a claim within five (5) years if the injury arises as a result of conduct that violates "Section 22.011, Penal Code." Id. § 22.011(a)(1)(A) makes it an offense to penetrate the sexual organ of another person by any means, without that Person's consent. Id. Lack of consent is present where the victim has not consented to such penetration and the perpetrator knows the victim is unconscious or physically unable to resist. Id. Ms. Farmer made very clear in both her FBI statement and her deposition testimony that her vaginal region was red and sore,

---

[5] Defendants are being disingenuous when they characterize Ms. Farmer's claims as based upon simple assault and invasion of privacy, wholly separated from the entire facts of her humiliating sexual abuse. If Ms. Farmer did not plead her claims with sufficiently horrifying detail to make the totality of them understandable to overcome Defendants' feigned myopia has no legal significance. She pled them sufficiently to meet the Texas pleading standard. See Tex. R. Civ. P. 45(petition shall "consist of a statement in plain and concise language" to give "notice to the opponent" of the "allegations as a whole"); Rule 45(a)("An original petition... shall contain (a) a short statement of the cause of action sufficient to give fair notice of the claim involved..."); *see also Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 230 (Tex. 2004)("Rule 45 does not require that the plaintiff set out in his pleadings the evidence upon which he relies to establish his asserted cause of action. *Muhr*, 749 S.W.2d at 494–95."); *Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 617, n.11 (Tex. 2004)("*See Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 896–897 (Tex.2000) ('Texas follows a "fair notice" standard for pleading, which looks to whether the opposing party can ascertain from the pleading the nature and basic issues of the controversy and what testimony will be relevant.... "A petition is sufficient if it gives fair and adequate notice of the facts upon which the pleader bases his claim. The purpose of this rule is to give the opposing party information sufficient to enable him to prepare a defense." *Roark v. Allen*, 633 S.W.2d 804, 810 (Tex.1982).').");); *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 897 (Tex. 2000)("Horizon's intent to invoke the punitive-damages cap found in the Texas Civil Practice and Remedies Code, even though the pleading referred to an incorrect version of the statute. *See, e.g., CKB & Assocs., Inc. v. Moore McCormack Petroleum, Inc.*, 809 S.W.2d 577, 586 (Tex.App.- Dallas 1991, writ denied)('A pleading that gives adequate notice will not fail merely because the draftsman named it improperly.').")). *And, in stark confirmation of Defendants' obdurate refusal to acknowledge Ms. Farmer's entire claims, one of the Movants here, Morris, has pled guilty to the entire gruesome scope of what Ms. Farmer claims!*

16

indicating to her at least some degree of penetration, although she did not believe she had been raped, (see Response Ex. I, 99:20-100:7, [she believed she had been sexually violated and was sore in her "female regions"]). And, the circumstances surrounding her violation and Morris' subsequent arrest absolutely confirm his successful intention to render her unconscious and unable to resist him. Again, in his Plea Agreement, he explicitly confessed to such!

Thus, while he has not been formally charged under Texas criminal law, his federal criminal conviction is the functional equivalent thereof. And, justice requires that victims such as Ms. Farmer should be accorded a reasonably expansive interpretation of the applicable limitations period instead of applying a rigid interpretation, like an Old English form of action, which distinctly favors a craven predator like Morris or his enabling employer, Edible. And, her invasion of privacy claim is actually a part and parcel of her sexual violation. Morris took his salacious liberties with Ms. Farmer while she was in a helpless condition and then took photographs of her nude body, including close-ups of her vaginal area, as proof of his sadistic conquest, which he even bragged about to his mistress Jackson. He was such a coward that he took pains to cover Ms. Farmer's face with a pillow while photographing his "trophy kill" and then repeatedly lied to Ms. Farmer about taking the photos. Thus, he is the *last* person on earth the limitations period should be strictly applied in favor of.

In support of such interpretation, in *Stephanie M. v. Coptic Orthodox Patriarchate Diocese of S. U.S.*, 362 S.W.3d 656, 659 (Tex.App.- Houston [14th Dist.] 2011, rev. den'd), the CCA specifically held, in reversing and remanding the granting of summary judgment to defendants, that:

17

"Focusing on the second portion of subsection (a), the Diocese and Church defendants/appellees argue that the extension of the statute of limitations applies only to suits against the person or persons whose conduct violates the Penal Code. But section 16.0045(a) applies to a 'suit for personal injury,' which includes claims for negligence. ***There is no language restricting this particular limitations statute to certain types of personal-injury claims; hence, there is nothing in the statute to indicate that the legislature intended to limit this provision to causes of action against only the perpetrators of sexual assault.*** Part (c) of section 16.0045 permits a plaintiff to designate unknown persons as defendants in a civil suit based on childhood sexual abuse. *Id.* § 16.0045(c). ***Subsection (a) amends the default limitations provision provided in section 16.003 to extend the limitations period from two to five years. Compare id. § 16.0045(a) (expanding limitations period to five years for victims of various types of sexual assault) with id. § 16.003 ("Except as provided by Sections 16.010, 16.0031, and 16.0045, a person must bring suit for trespass for injury to the estate or to the property of another, conversion of personal property, taking or detaining the personal property of another, personal injury, forcible entry and detainer, and forcible detainer not later than two years after the day the cause of action accrues."). Taken together, the provisions of section 16.0045 unambiguously show a legislative intent to provide victims of sexual assault... more time to seek damages for their injuries.*** (Emphasis added)."

*Stephanie M.,* at 659. *See also Doe v. Catholic Soc. of Religious & Literary Educ.,* No. CIV. A. H-09-1059, 2010 WL 345926, at *16, (not reported in F.Supp.2d), (S.D. Tex. Jan. 22, 2010)("The statute of limitations for a personal injury suit based on sexual assault is five years. Tex. Civ. Prac. & Rem. Code § 16.0045. This five-year limitations period clearly applies to the vicarious liability claims. The five-year limitations period may apply to other claims as well, particularly the direct liability claims that the defendants' negligence allowed the alleged abuse to occur. In interpreting section 16.0045, this court has previously concluded that 'the Texas Supreme Court would join the majority of state courts considering similar statutes and hold that the limitations period of Section 16.0045 applies to claims against nonperpetrators of sexual abuse as

well as to claims against alleged perpetrators.' *Doe I v. Roman Catholic Diocese of Galveston–Houston,* No. 05–1047, slip op. at 21 (S.D. Tex. Mar. 27, 2006)."); *Doe v. Catholic Diocese of El Paso,* 362 S.W.3d 707, 717 (Tex.App.- El Paso 2011, reh'g overruled, rule 53.7(f) motion granted)("Ordinarily the two-year personal injury statute of limitations applies to negligence... *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 16.003(a)... However, a five-year statute of limitations applies where the plaintiff brings suit for personal injury caused by sexual assault or aggravated sexual assault. *See* Tex. Prac. & Rem. Code Ann. § 16.0045(a)."); *Mayzone v. Missionary Oblates of Mary Immaculate of Texas,* No. 04-13-00275-CV, 2014 WL 3747249, at *3, (not reported in S.W.3d), (Tex.App.- San Antonio July 30, 2014, pet. for rev. filed)("When a plaintiff brings suit for personal injury caused by sexual assault or aggravated sexual assault, the five-year statute of limitations applies. *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.0045(a) (West Supp.2014); *Catholic Diocese of El Paso,* 362 S .W.3d at 717 (applying five-year statute of limitations to negligence, breach of fiduciary duty, and intentional infliction of emotional distress claims arising from allegations of sexual abuse); *Stephanie M. v. Coptic Orthodox Patriarchate Diocese of the So. United States,* 362 S.W.3d 656, 659–60 (Tex.App.-Houston [14th Dist.] 2011, pet. denied) (applying five-year statute of limitations to negligence claim arising from allegations of sexual abuse).").

Obviously, if the § 16.0045 limitations period is applied to the instant claims, which occurred in May, 2011, Defendants' limitations argument evaporates. And, justice demands no less.

**B. *Limitation Has Been Tolled In the Instant Facts.***

19

Even were this Court inclined, *arguendo,* to determine that the two (2) year limitation period set out in § 16.003(a) applied to the invasion of privacy claim, (which should *not* be the case where, as here, the taking of such photos was a part and parcel of Ms. Farmer's sexual assault), then the limitations period applicable thereto should commence to run as of February 27, 2012, the date Morris was arrested and the nude photos of Ms. Farmer were found by FBI agents on the flash drive in his possession, or even thereafter, in May, 2012, when the FBI showed them to her (see Response Ex. I, 101:1-18, [she was shown the photos by the FBI, and included pictures of her nude taken in both her first assault and later during a New Orleans trip with Morris]). As mentioned *supra,* on February 22, 2013, Ms. Farmer met with the FBI to give her statement, (M/MSJ Ex. D), and she confirmed to the FBI that while she thought Morris took a picture of her nude, "he won't give me his phone, and then all of a sudden I can't find his phone or what he did with it," (33:13-15), "he was like, I swear, I swear, I swear I didn't take a picture of you. I swear I didn't take a picture of you," (33:20-23), "so he leaves the room and I'm just totally disoriented... he leaves and shuts the door and then he knocks like five seconds later and I open the door and he is like, look, look, I don't – he shows me his phone and he is like, I don't have any pictures. So I take his phone... if I was with it and not like so groggy, I might have been able to find the picture... and I just couldn't even figure out how to, you know, work my way around that phone," (35:3-15). Virtually identically, in her deposition, (Response Ex. I), Ms. Farmer confirmed, "And, so I was like, popped up, and I was like, 'What are you doing? Are you – did you just take a picture of me?' And, he was like, 'What? No, no,'" (82:9-12), "And I was so disoriented and so confused... He was like, 'No, no, no. It's fine. It's fine. I didn't take a picture. I

---

[6] As with depositions, citations are by page and line(s).

20

didn't take a picture,' " (82:16-23), "And so then he, he walks out of the room... And then he knocks, and he's like, 'See, look, I don't have any pictures of you,' " (83:8-11), "I can't like even really figure out how to work the phone. Like I think I was trying to look through the pictures, but I like couldn't think to figure out how to get to where I wanted to go," (83:13-17). Indeed, Morris steadfastly denied he had in any way abused Ms. Farmer or any other of his four victims, until the entry of his Plea Agreement.

Defendants proffer no *facts* which contradict either Ms. Farmer's abject mental confusion on the night of her molestation or her lack of *actual* knowledge of what the pictures of her actually depicted until well after her violation. Defendants contend "[Ms. Farmer] confirmed with the FBI that the pictures found in or around May 2012 were in fact her, but she had knowledge that the pictures were taken at the time of the alleged incidents when they occurred in 2011," citing her deposition, at pgs. 176 and 201. (M/MSJ, pg. 5-6). Respectfully, that's flatly untrue. As noted, Ms. Framer was completely disoriented at the time of her violation. And, in her deposition, at pg. 176, she made clear that it was not until May, 2012, after the pictures had been found, that "I confirmed the pictures were me," (176:21). And, Defendants' proffered quote from her deposition, at pg. 201, that Ms. Farmer had *knowledge* of the photos is a blatant misstatement of what she said. She confirmed she had merely a *belief* that Morris had taken photos, a matter he repeatedly, vehemently denied. Indeed, Ms. Farmer made clear that she first saw the photos only after the FBNI seized them, (101:1-9).

In *S.V. v. R.V.,* 933 S.W.2d 1, 6 (Tex. 1996), the Texas Supreme Court made clear that: "Accrual of a cause of action is deferred in two types of cases. ***In one type, those involving allegations of fraud or fraudulent concealment, accrual is deferred because a person cannot be permitted to avoid liability for his***

21

***actions by deceitfully concealing wrongdoing until limitations has run...
Restated, the general principle is this: accrual of a cause of action is
deferred in cases... in which the wrongdoing is fraudulently
concealed...***(Emphasis added)." *Id.,* at 6. And, very recently, the Court reiterated that:
"We have long held that "fraud prevents the running of the statute of limitations until it
is discovered, or by the exercise of reasonable diligence might have been discovered."
*Ruebeck v. Hunt,* 142 Tex. 167,176 S.W.2d 738, 739 (1943). Generally... 'a person cannot
be permitted to avoid liability for his actions by deceitfully concealing wrongdoing until
limitations has run,' *S.V. v. R.V.,* 933 S.W.2d 1, 6 (Tex.1996). Because 'fraud vitiates
whatever it touches,' *Borderlon v. Peck,* 661 S.W.2d 907, 909 (Tex.1983), limitations
does not start to run until the fraud is discovered or the exercise of reasonable diligence
would discover it, *Marshall,* 342 S.W.3d at 69. The same rule applies to claims of
fraudulent inducement..." *Hooks v. Samson Lone Star, Ltd. P'ship,* No. 12-0920, 2015
WL 393380, at *3, ___ S.W.3d ___, (Tex. Jan. 30, 2015).

And, in *Bertrand v. Bertrand,* 449 S.W.3d 856 (Tex.App.- Dallas 2014, reh'g
overruled Jan. 22, 2015), the Dallas CCA observed that: " 'Fraudulent concealment is
based upon the doctrine of equitable estoppel ... [and] estops a defendant from relying
on the statute of limitations as an affirmative defense to plaintiff's claim.' *Borderlon v.
Peck,* 661 S.W.2d 907, 908 (Tex.1983). A party asserting fraudulent concealment or
equitable estoppel as an affirmative defense to the statute of limitations has the burden
to raise it in a response to the summary judgment motion and to come forward with
summary judgment evidence raising a fact issue on each of the elements of these
defenses. *KPMG Peat Marwick v. Harrison Cnty. Hous. Fin. Corp.,* 988 S.W.2d 746,
749 (Tex.1999).' " *Id.,* at 856. *See also Ward v. Stanford,* 443 S.W.3d 334, 351

22

(Tex.App.- Dallas 2014, reh'g overruled Oct. 3, 2014)("Fraudulent concealment is an affirmative defense to the statute of limitations. *See KPMG Peat Marwick,* 988 S.W.2d at 749. As a party asserting fraudulent concealment, appellant has the burden to raise it in response to the summary judgment motion and to come forward with summary judgment evidence raising a fact issue on each element of that defense. *See id.* A party asserting fraudulent concealment must establish an underlying wrong, and that 'the defendant actually knew the plaintiff was in fact wronged, and concealed that fact to deceive the plaintiff.' *BP Am. Prod. Co. v. Marshall,* 342 S.W.3d 59, 67 (Tex. 2011) (quoting *Earle v. Ratliff,* 998 S.W.2d 882, 888 (Tex.1999)). Fraudulent concealment only tolls the running of limitations until the fraud is discovered or could have been discovered with reasonable diligence. *Id.*"). As the foregoing factual recitations clearly confirm, Ms. Farmer has herein asserted overwhelmingly sufficient facts to justify the application of the fraudulent concealment doctrine to the instant limitations analysis.

## C. *The Instant Motion to Dismiss Is Untimely.*

As this Court is well-aware, the Texas Rules of Civil Procedure have not had, until relatively recently, a procedural equivalent of the Fed. R. Civ. P. 12(b)(6) dismissal motion. Tex. R. Civ. P. 91a, "Dismissal of Baseless Causes of Action," became effective on March 1, 2013, just over nine (9) months prior to the filing of this suit.[7] Therefore, the reported case law applying such is only now beginning to emerge. *See Wooley v.*

---

[7] *See GoDaddy.com, LLC v. Toups,* 429 S.W.3d 752, 754 (Tex.App.- Beaumont 2014, rev. den'd Nov. 21, 2014)("Before Rule 91a, Texas procedure did not have a counterpart to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Fort Bend Cnty. v. Wilson,* 825 S.W.2d 251, 253 (Tex.App.- Houston [14th Dist.] 1992, no writ). In 2011, this deficiency was remedied when the Legislature promulgated section 22.004(g) of the Texas Government Code, which provides that the 'supreme court shall adopt rules to provide for the dismissal of causes of action that have no basis in law or fact on motion and without evidence.' *See* Tex. Gov't Code Ann. § 22.004(g) (West 2013).").

23

*Schaffer*, 447 S.W.3d 71, 74 (Tex.App.- Houston [14th Dist.] 2014, reh'g overruled Oct. 9, 2014)("We must decide as a matter of first impression in this court what standard of review to apply to a trial court's ruling on a motion to dismiss under Rule 91a."); *City of Austin v. Liberty Mut. Ins.*, 431 S.W.3d 817 (Tex.App.- Austin 2014, no pet.); *GoDaddy.com, LLC v. Toups*, 429 S.W.3d at 754. According to the specific language of Rule 91a.3(a), the emerging case law applying it and the federal Rule 12(b)(6) decisions which Texas courts have deemed relevant and "instructive," the instant Motion to Dismiss is **not timely** and must be denied on that basis. Alternatively, limitations has been evasively asserted in this case and in fact and in law, Ms. Farmer had five years to bring her instant claims, not two years, as Defendants claim. Further, alternatively, Ms. Farmer's claims are timely under applicable tolling rules of Texas case law, even assuming the provisions of Civ. Prac. & Rem. Code § 16.003(a) apply, which is **not** the case, as discussed at length *infra*.

In *GoDaddy.com, LLC*, the CCA specifically held that: "Rule 12(b)(6) allows dismissal if a plaintiff fails 'to state a claim upon which relief can be granted[.] ...dismissal is appropriate if the court determines beyond doubt that the plaintiff can prove no set of facts to support a claim that would entitle him to relief. *Scanlan v. Tex. A & M Univ.*, 343 F.3d 533, 536 (5th Cir.2003). Just as a motion to dismiss for failure to state a claim under Rule 12(b)(6) is a proper vehicle to assert a claim of immunity under the federal rules, a motion to dismiss under Rule 91a is a proper vehicle to assert an affirmative defense of immunity..." *Id.*, at 754-55. Thus, by reasonable extension a Rule 91a motion is equally the proper vehicle to assert a limitations defense. Similarly, in *Wooley*, 447 S.W.3d at 75-76, the Houston 14th CCA explained:

24

"Although we acknowledge that Rule 91a motions to dismiss are unique, we find them to be analogous to pleas to the jurisdiction, which require a court to determine whether the pleader has alleged facts demonstrating jurisdiction. *See Tex. Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 225–26 (Tex.2004). In that context, we construe the pleadings liberally in favor of the plaintiff, look to the pleader's intent, and accept as true the factual allegations in the pleadings to determine if the pleader has alleged facts that affirmatively demonstrate the trial court's jurisdiction over a claim. *Id.* at 226. Even though we are construing the jurisdictional facts alleged in the petition, whether a pleader has alleged facts that demonstrate jurisdiction is a question of law that we review de novo. *Id.* This determination is consistent with the requirement in Rule 91a to take the allegations, together with any reasonable inferences as true." *See* Tex. R. Civ. P. 91a.1...

Federal courts also apply a de novo standard of review to a trial court's ruling on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *In re Katrina Canal Breaches Litig.,* 495 F.3d 191, 205 (5th Cir.2007). Rule 91a has unique language allowing dismissal of causes of action with no basis in law or fact. Tex. R. Civ. P. 91a. However, Federal Rule of Civil Procedure 12(b)(6) similarly allows dismissal if a plaintiff fails 'to state a claim upon which relief can be granted"; therefore, we find case law interpreting Rule 12(b)(6) instructive. Fed. R. Civ. P. 12(b)(6); *see also GoDaddy,* 429 S.W.3d at 754..."

*Wooley,* at 75-76.

Thus, federal decisions addressing a defendant's assertion of a limitation defense, as Defendants do here, are very "instructive." In *Whiddon v. Chase Home Fin., LLC,* 666 F. Supp. 2d 681, 686 (E.D. Tex. 2009), the court said:

"Generally, the court may not look beyond the four corners of the plaintiff's pleadings. *See Indest v. Freeman Decorating, Inc.,* 164 F.3d 258, 261 (5th Cir.1999); *Baker v. Putnal,* 75 F.3d 190, 196 (5th Cir.1996); *McCartney v. First City Bank,* 970 F.2d 45, 47 (5th Cir.1992). Furthermore, *'a complaint that shows relief to be barred by an affirmative defense, such as the statute of limitations, may be dismissed for failure to state a cause of action.' Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.,* 677 F.2d 1045, 1050 (5th Cir.1982), *cert. denied,* 459 U.S. 1105 (1983); *accord La Porte Constr. Co. v. Bayshore Nat'l Bank of La Porte,* 805 F.2d 1254, 1255 (5th Cir.1986). ***Thus, a plaintiff's noncompliance with the applicable statute of limitations ' "may support dismissal under Rule 12(b)(6) where it is evident from the plaintiff's pleadings that the action is barred and the pleadings fail to raise some basis for tolling or***

*the like.*' ' *Davis v. Dallas County,* 541 F.Supp.2d 844, 856 (N.D.Tex.2008) (quoting *Jones v. Alcoa, Inc.,* 339 F.3d 359, 366 (5th Cir.2003), *cert. denied,* 540 U.S. 1161(2004)); *see Nationwide Bi–Weekly Admin., Inc. v. Belo Corp.,* 512 F.3d 137, 141 (5th Cir.2007); *Taylor v. Books A Million, Inc.,* 296 F.3d 376, 378–79 (5th Cir.2002), *cert. denied,* 537 U.S. 1200 (2003).

' *"A motion to dismiss under rule 12(b)(6) 'is viewed with disfavor and is rarely granted.'* " ' *Gregson v. Zurich Am. Ins. Co.,* 322 F.3d 883, 885 (5th Cir.2003) (quoting *Collins,* 224 F.3d at 498 (quoting *Kaiser Aluminum & Chem. Sales, Inc.,* 677 F.2d at 1050)); *accord Harrington v. State Farm Fire & Cas. Co.,* 563 F.3d 141, 147 (5th Cir.2009); *Lormand v. U.S. Unwired, Inc.,* 565 F.3d 228, 232 (5th Cir.2009). ' *"The question therefore is whether in the light most favorable to the plaintiff and with every doubt resolved in his behalf, the complaint states any valid claim for relief."* ' *Collins,* 224 F.3d at 498 (quoting 5A Charles A. Wright & Arthur R. Miller, *supra,* § 1357, at 332–36); *accord Lowrey v. Texas A & M Univ. Sys.,* 117 F.3d 242, 247 (5th Cir.1997). 'In other words, a motion to dismiss an action for failure to state a claim "admits the facts alleged in the complaint, but challenges plaintiff's rights to relief based upon those facts." ' *Ramming,* 281 F.3d at 161–62 (quoting *Tel–Phonic Servs., Inc. v. TBS Int'l, Inc.,* 975 F.2d 1134, 1137 (5th Cir.1992))."

*Whiddon,* at 686. Based upon the combined logic of this collective authority, two issues are presented. First, have Defendants waived limitations by failing to timely assert it, by means of a Rule 91a.3(a) motion? Second, even if not, can Ms. Farmer assert a tolling exception to § 16.003(a)? Since the answer to both questions is emphatically *Yes,* the instant Motion to Dismiss should be denied.

Prior to the effective date of Rule 91a, (March 1, 2013), Defendants could have asserted a limitations affirmative defense much like they have attempted here. But, under the specific terms of Rule 91a.3(a), they were procedurally obligated to do so in conformity therewith.[8] Factually, such an oversight seems particularly significant because, since this entire series of appalling events came to light, Morris has steadfastly

---

[8] See Rule 91a.3(a)(motion to dismiss must be filed within "60 days" of movant's service with pleading containing allegedly baseless action).

26

denied every allegation asserted against him. Instead, Defendants now move for dismissal ostensibly pursuant to two-year limitations period set out in Civ. Prac. & Rem. Code § 16.003(a).[9] Such statute does mandate that tort claims based upon "personal injury" must be brought "not later than two years after the day the cause of action accrues." Id. As "personal injury" and "accrues" are not defined in the statute, Texas courts have supplemented it by common law. However, Ms. Farmer's instant claims are *not* time-barred, under the doctrines of equitable estoppel and/or the fraudulent concealment doctrine, as will be discussed at length *infra*. Legally, while the Defendants' having pled limitations in their Answer may have preserved it as an asserted affirmative defense,[10] subject to tolling as hereinafter discussed, they waived the right to move to dismiss this case on the basis thereof, pursuant to Rule 91a.3(a) and the foregoing cases applying such. Consequently, the instant Motion to Dismiss should be denied as untimely.

## D. *The TCHRA Has No Application in the Instant Facts.*

---

[9] Once again, such a position must be inferred, however, as the statute is oddly never once mentioned in the M/MSJ. Instead, Defendants only cite case law, (M/MSJ, pg. 9), which discuss and apply such.

[10] *See Storck v. Tres Lagos Prop. Owners Ass'n, Inc.*, 442 S.W.3d 730, 743 (Tex.App.- Texarkana 2014, reh'g overruled (Sept. 16, 2014), reconsideration en banc den'd (Oct. 7, 2014)("Rule 94 of the Texas Rules of Civil Procedure requires a party to plead affirmatively those affirmative defenses listed in the rule 'and any other matter constituting an avoidance or affirmative defense.' Tex. R. Civ. P. 94. ' "If an affirmative defense is not pleaded or tried by consent, it is waived," and the trial court has no authority to make a fact finding on that issue.' *See Compass Bank v. MFP Fin. Servs., Inc.*, 152 S.W.3d 844, 851 (Tex.App.- Dallas 2005, pet. denied) (quoting *RE/MAX of Tex., Inc. v. Katar Corp.*, 961 S.W.2d 324, 327–28 (Tex.App.- Houston [1st Dist.] 1997, pet. denied)); *Matter of Marriage of Collins*, 870 S.W.2d 682, 685 (Tex.App.- Amarillo 1994, writ denied). 'The party asserting the affirmative defense bears the burden of pleading and proving its elements.' *Compass Bank*, 152 S.W.3d at 851 (citing *Welch v. Hrabar*, 110 S.W.3d 601, 606 (Tex.App.-Houston [14th Dist.] 2003, pet. denied)).").

Defendants' attempt to invoke the provision of the TCHRA as a purported preemptive bar to Ms. Farmer's claims is a complete red herring. In the companion case of *Hill, et al v. Morris, et al,* Defendants trotted out the exact same strategy, (Response Ex. C), and Hon. Jeff Shadwick unequivocally rejected it, (Response Ex. E). The *Hill* plaintiffs' pleading setting out a thorough response thereto, (Response Ex. D, 83 pages), is attached hereto and incorporated herein, so a more succinct response is appropriate here.

The TCHRA is found in Chapter 21 of the Texas *Labor* Code; and, indeed, its very placement there denotes the Legislature's intention that it apply to *workplace* situations, not non-work related intentional torts. In keeping with such, § 21.051 of that Chapter addresses *workplace discrimination* and provides, in relevant part:

> "An employer commits an unlawful employment practice if because of race, color, disability, religion, sex, national origin, or age the employer:
>
> (1) fails or refuses to hire an individual, discharges an individual, or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment; or
>
> (2) limits, segregates, or classifies an employee or applicant for employment in a manner that would deprive or tend to deprive an individual of any employment opportunity or adversely affect in any other manner the status of an employee."

Tex. Labor Code Ann. § 21.051 (Vernon). Basically, as a matter of both legislative intent and the very wording the Legislature employed in the statute, both this sub-section specifically and Chapter 21 generally were designed to apply the anti-discrimination tenants of the federal Title VII to Texas workplaces. (See Tex. Labor Code § 21.001). But, it is critical to note that Chapter 21 applies to actions in the *workplace* which implicate

28

the conditions of employment. In *Nagel Mfg. & Supply Co. v. Ulloa*, 812 S.W.2d 78, 80 (Tex.App.-Austin 1991, writ denied), the CCA explained:

> "Sexual harassment, as the court defined it for the jury, 'means to engage in unwelcome sexual advances, requests for sexual favors, sexually abusive or vulgar language, or other verbal, visual or *physical conduct,*' **if compliance is made a condition of employment or used as a basis for an employment decision or if such conduct interferes with work performance or creates an intimidating, hostile or offensive working environment.** (Emphasis added)."

*Ulloa*, at 80. See also *Wal-Mart Stores, Inc. v. Itz*, 21 S.W.3d 456, 470 (Tex.App.- Austin 2000, reh'g overruled, rev. denied)("Under Title VII and the Texas Human Rights Act, an employer may be held vicariously liable for quid-pro-quo sexual harassment by its supervisor. *See Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 753 (1998); *Ewald v. Wornick Family Foods Corp.,* 878 S.W.2d 653, 659 (Tex.App.-Corpus Christi 1994, writ denied). The elements of the cause of action are as follows: (1) A supervisor (2) because of sex (3) subjects an employee to (4) unwelcome conduct that (5) affects a tangible aspect of the employment relationship. *See Ellerth,* 524 U.S. at 752–54; *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 64–67 (1986); *Ewald,* 878 S.W.2d at 659. An employer's liability in such cases derives from the law of agency. Because discriminatory conduct ordinarily lies outside the agent's scope of authority, for a principal to be held liable it must be shown that the agency relationship aided the supervisor in committing the discriminatory act. *See Burlington Indus.,* 524 U.S. at 759–60.").

In *Waffle House, Inc. v. Williams,* 313 S.W.3d 796, 802-03 (Tex. 2010), the Supreme Court addressed a claim arising out of an unconsented, inappropriate workplace touching. In holding the TCHRA applicable to such claim, the Court determined: "Today's question is whether employer liability for unwanted sexual touching by a coworker (simple assault under Texas law given its 'offensive or

29

provocative' nature) is limited to a tailored TCHRA scheme that specifically covers employer liability for sexual harassment. We think the answer should be yes." *Id.,* at 802-03. That is manifestly distinguishable from the instant facts. Morris didn't abuse Ms. Farmer to "affect a tangible aspect of the employment relationship," a key element of a TCHRA claim, he drugged her unconscious to sexually molest her and photograph her nude for his own deviant gratification, just as he has confessed in federal court.

Also, because Title VII and the TCHRA are designed to achieve identical purposes, federal court decisions with regard to the former are instructive as to claims under the latter. See *Prairie View A & M Univ. v. Chatha,* 381 S.W.3d 500, 504 (Tex. 2012), reh'g denied (Nov. 16, 2012)("***The TCHRA was 'enacted to address the specific evil of discrimination and retaliation in the workplace,' as well as to coordinate and conform with federal anti-discrimination and retaliation laws under Title VII. See City* of Waco v. Lopez,** 259 S.W.3d 147, 153– 55 (Tex.2008). (Emphasis added).")

That the TCHRA has no application here is manifestly evident from the M/MSJ, pg. 10, and cases cited at n.45. Defendants cannot and do not point to a single "term, condition, or privilege of the plaintiff's employment" affected by "harassment." (Id.). And, their mischaracterization of her claims as based solely upon "unwelcome sexual harassment," (Id., pg. 10, n. 46), would be laughable, were it not so offensive. Defendants cite *Padilla v. Flying J, Inc.,* 118 S.W.3d 911 (Tex.App.- Dallas 2003, no pet.), in support of the TCHRA's application. Yet, in that case, the CCA held: "The legislature enacted the Texas Commission on Human Rights Act to correlate state law with federal law in the area of employment discrimination. *See* Tex. Lab. Code Ann. § 21.051 (Vernon 1996); *Schroeder v. Texas Iron Works, Inc.,* 813 S.W.2d 483, 485

30

(Tex.1991). TCHRA prohibits an employer from discriminating against an individual with respect to compensation, or the terms, conditions, or privileges of employment because of race, color, disability, religion, sex, and national origin. Tex. Lab. Code Ann. § 21.051 (Vernon 1996); *Williams v. Vought,* 68 S.W.3d 102, 107 (Tex.App.- Dallas 2001, no pet.). To establish a claim for sexual harassment, a plaintiff must prove (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based on sex; and (4) ***the harassment affected a term, condition, or privilege of her employment.*** *Gulf States Toyota, Inc. v. Morgan,* 89 S.W.3d 766, 770 (Tex.App.- Houston [1st Dist.] 2002, no pet.). (Emphasis added)." *Id.,* at 914-15. There, the entirety of the plaintiff's complaint was offensive comments by her boss to her at work. Neither of Ms. Farmer's claims in this case have *anything whatever* to do with employment decisions or conditions of employment. They have *exclusively* to do with *a confessed pre-meditated, intentional sexual assault* committed well outside the workplace, in fact in a remote state.

Similarly Defendants cite *Willborn v. Formosa Plastics Corp. Of Texas,* No. 13-04-007-CV, 2005 WL 1797022, at *7 (unreported) (Tex.App.- Corpus Christi-Edinburg July 28, 2005, reh'g and reh'g en banc den'd, rev. den'd), (Id., pg. 10, n. 46), although frankly Defendants do not make clear why. There, the CCA considered a Title VII claim and noted: "Willborn includes a claim for sexual harassment, which is one form of prohibited employment discrimination. *Hoffmann-La Roche, Inc. v. Zeltwanger,* 144 S.W.3d 438, 445 (Tex.2004); *see also Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 64 (1986); *Ewald v. Wornick Family Foods, Corp.,* 878 S.W.2d 653, 658 (Tex.App.- Corpus Christi 1994, writ denied)... Courts have traditionally defined 'unwelcome sexual harassment' as 'sexual advances, requests for sexual favors, and other verbal or physical

31

conduct of a sexual nature that is unwelcome in the sense that it is unsolicited or unincited and is undesirable or offensive to the employee.' *Wyerick v. Bayou Steel Corp.*, 887 F.2d 1271, 1274 (5th Cir.1989)." *Id.*, at *7. Respectfully, *so what?!*

Do Defendants *seriously* suggest that what Morris did was no more than an "unwelcome advance"? If so, it seems very strange that in the federal criminal case against him, he confessed to a sexual abuse crime. The Defendants want the TCHRA to apply because it is yet another effort to derail this case based upon a contrived limitations theory. However, the relegation of the sexual molestation of a drugged, insensate woman to a mere employment grievance cannot *possibly* be what the Legislature had in mind in enacting the TCHRA, which is emphasized by the statute's very name: the Texas Commission on *Human Rights* Act! And, Defendants do not, because they cannot, direct the Court to *one single word* in that statute, its legislative history or any decision applying it, which mandates or permits such a cruel and inhuman result.

In a substantial footnote in *Texas Mut. Ins. Co. v. Ruttiger*, 381 S.W.3d 430, 461, n.3 (Tex. 2012), reh'g denied (Sept. 21, 2012), the Supreme Court expressed some serious policy considerations which bear directly upon the validity of Ms. Farmer's instant tort claims:

> "We have repeatedly addressed situations in which common law claims and statutory remedies seem to overlap, and we have embraced a framework to guide our analysis in such cases. The touchstone of this analysis, as in all statutory interpretation, is legislative intent. **We start with the proposition that statutes abrogating common law causes of action are disfavored.** *Cash Am. Int'l Inc. v. Bennett*, 35 S.W.3d 12, 16 (Tex.2000). **A statute banishing a common law right ' "will not be extended beyond its plain meaning or applied to cases not clearly within its purview." '** *Id.* (quoting *Satterfield v. Satterfield*, 448 S.W.2d 456, 459 (Tex.1969)). **Abrogation by implication is disfavored. Id. For that reason, courts must**

32

*examine whether the statute's language 'indicate[s] clearly or plainly that the Legislature intended to replace' a common law claim with an exclusive statutory remedy, and we 'decline [ ] to construe statutes to deprive citizens of common-law rights unless the Legislature clearly expressed that intent.'*[3] *Id.*

[3] We have applied this framework repeatedly. For example, in *Lopez*, which the Court cites but then seems to forget about, we noted that "[w]hether a regulatory scheme is an exclusive remedy depends on whether 'the Legislature *intended* for the regulatory process to be the exclusive means for remedying the problem to which the regulation is addressed.' " *City of Waco v. Lopez*, 259 S.W.3d 147, 153 (Tex.2008) (quoting *In re Sw. Bell. Tel. Co.*, 235 S.W.3d 619, 624–25 (Tex.2007)) (emphasis added). Likewise, in *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 802 (Tex.2010), we held that 'the legislative creation of a statutory remedy is not presumed to displace common-law remedies. To the contrary, abrogation of common-law claims is disfavored.' Acknowledging the centrality of legislative intent, *see id.* at 809 n. 66, we looked at the statute's 'meticulous legislative design,' *id.* at 805. Similarly, we have held that 'absent *clear legislative intent* we have declined to construe statutes to deprive citizens of common-law rights.' *Dealers Elec. Supply Co. v. Scoggins Constr. Co.*, 292 S.W.3d 650, 660 (Tex.2009) (emphasis added). We have also written that 'statutes can modify common law rules, but before we construe one to do so, *we must look carefully to be sure that was what the Legislature intended.' Energy Serv. Co. of Bowie v. Superior Snubbing Servs., Inc.*, 236 S.W.3d 190, 194 (Tex.2007) (emphasis [in original] (Emphasis added)."

*Ruttiger*, at 461, n.3.

And, in *Perez v. Living Centers-Devcon, Inc.*, 963 S.W.2d 870, 872 (Tex.App.-San Antonio 1998, pet. denied), the CCA made clear that: ***The TCHRA prohibits employment discrimination on the basis of 'race, color, disability, religion, sex, national origin, or age.'*** Tex. Lab. Code Ann. § 21.052 (Vernon 1996). ***The act essentially codified federal employment law.*** *Compare* 42 U.S.C. § 2000e (1994) (prohibiting employment discrimination on the basis of race, color, religion, sex or national origin), § 12101-213 (1994) (prohibiting employment discrimination on basis of disability) *and* 29 U.S.C. §§ 621-34 (1994) (prohibiting

employment discrimination on basis of age), *with* Tex. Lab. Code Ann. § 21.052 (Vernon 1996) (prohibiting same conduct)." *Id.,* at 872. Then, in *Jackson v. Creditwatch, Inc.,* 84 S.W.3d 397, 402 (Tex. App.- Fort Worth 2002) rev'd in part, (on unrelated grounds) 157 S.W.3d 814 (Tex. 2005), the CCA noted that: ***"The Perez court examined the legislative history and legislative intent behind the enactment of the TCHRA and concluded: "Notably, neither an intent to serve as an exclusive remedy, nor an intent to preclude common law causes of action, is contained within the stated purposes of the TCHRA. Additionally, the statute contains no provision that implies the TCHRA's administrative review system precludes a lawsuit for common law causes of action. Instead, the opposite proposition can be implied from section 21.211.*** (Emphasis added)." *Id.,* at 402. Therefore, once again, there is *nothing* in the TCHRA's "meticulous legislative design" which purports to justify Defendants' tortured reading of it merely to argue insulation from liability from utterly appalling misconduct. Indeed, their very argument of such is a slap in the face of every mother, wife, sister and daughter in the State of Texas.

Ms. Farmer was not harassed or discriminated against. She was sexually violated, physically abused and emotionally humiliated. This case is not about the legitimate work-related grievances of being patted on the fanny or having a breast brushed against in the workplace, or being made to suffer annoying workplace humor directed disparagingly at women, or not getting a raise or promotion because of a gender-based glass ceiling. Rather it is about truly vile *and criminally confessed* sexual abuse degradation. The Defendants should be held legally and morally accountable in a public trial before a jury of the Parties' peers for their reprehensible conduct.

34

## E. *Defendants Completely Fail to Meet the Traditional Summary Judgment Standard.*

The basis upon which Defendants seek summary judgment on each of Ms. Farmer's claims is solely Civ. Prac. & Rem. Code § 16.003(a)'s two (2) year limitation period. For the reasons discussed at length *supra,* the MSJ should fail. Respectfully, while Defendants are correct that summary disposition may be sought pursuant to Tex. R. Civ. P. 166a, in their pursuit thereof here that's all they are correct about. Defendants cite *Sw. Elec. Power Co. v. Grant,* 73 S.W.3d 211, 215 (Tex. 2002), as the authority upon which they seek summary judgment, (M/MSJ, pg. 13, n. 56), but fail to consider what the Supreme Court therein said: "To prevail on a traditional summary-judgment motion, a movant must show that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c). A movant who conclusively negates at least one essential element of a cause of action is entitled to summary judgment on that claim. *Elliott–Williams Co. v. Diaz,* 9 S.W.3d 801, 803 (Tex.1999). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Science Spectrum, Inc. v. Martinez,* 941 S.W.2d 910, 911 (Tex.1997); *Friendswood Dev. Co. v. McDade & Co.,* 926 S.W.2d 280, 282 (Tex.1996)." *Id.,* at 215. *See also IHS Cedars Treatment Ctr. of DeSoto, Texas, Inc. v. Mason,* 143 S.W.3d 794, 798 (Tex. 2004)(same); *M.D. Anderson Hosp. & Tumor Inst. v. Willrich,* 28 S.W.3d 22, 23-24 (Tex. 2000)("Under Texas summary judgment law, the party moving for summary judgment carries the burden of establishing that no material fact issue exists and that it is entitled to judgment as a matter of law. *See* Tex. R. Civ. P. 166 a(c); *Rhône–Poulenc, Inc. v. Steel,* 997 S.W.2d 217, 222 (Tex.1999); *Wornick Co. v.*

*Casas*, 856 S.W.2d 732, 733 (Tex.1993)... When reviewing a motion for summary judgment, the court takes the nonmovant's evidence as true, indulges every reasonable inference in favor of the nonmovant, and resolves all doubts in favor of the nonmovant. *See Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548–49 (Tex.1985)."). As the CCA noted in *Schronk v. Laerdal Med. Corp.*, 440 S.W.3d 250, 256 (Tex.App.- Waco 2013, rev. den'd Feb. 14, 2014), "The function of a summary judgment is to eliminate patently unmeritorious claims and untenable defenses, not to deprive litigants of the right to a trial by jury. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 228 (Tex.2004)." *Id.*, at 256. Here, the Defendants have negated *nothing*, much less any *prima facie* elements of Ms. Farmer's claims.

At most, what Defendants have demonstrated to the Court that the Defendants and Ms. Farmer will present at trial starkly different aspects of the facts surrounding her sexual abuse. Conflicting evidence gives rise to genuine issue(s) of fact, *Randall v. Dallas Power & Light Co.*, 752 S.W.2d 4, 5 (per curiam); and, so does ambiguous evidence, *Parker v. Yen*, 823 S.W.2d 359, 365 (Tex.App.- Dallas 1991, no writ). See also *Ellert v. Lutz*, 930 S.W.2d 152, 155 (Tex.App.- Dallas 1996, no writ); *Frazin v. Grunning*, 05-01-00492-CV, 2002 WL 84457, *1 (Tex.App.- Dallas Jan. 23, 2002, pet. denied). "[I]n summary judgment proceedings, courts are not to weigh the evidence or determine its credibility. It is the court's duty to determine if there are any fact issues to be tried. *Gulbenkian v. Penn*, 151 Tex. 412, 252 S.W.2d 929." *White v. Cooper*, 415 S.W.2d 246, 250 (Tex. Civ. App.- Amarillo 1967, no writ). And, "summary judgment is to be applied with caution and should not be granted where there is doubt as to the facts." *In re Price's Estate*, 375 S.W.2d 900, 904 (Tex.Sup.1964)(superseded on other grounds in *Stiles v. Resolution Trust Corp.*, 867 S.W.2d 24, 26 (Tex. 1993)); *Kiser v. Lemco*

36

*Indus., Inc.,* 536 S.W.2d 585, 590 (Tex. Civ. App.- Amarillo 1976, no writ). Further, in

*Dan Lawson & Associates v. Miller,* 742 S.W.2d 528, 530 (Tex.App.- Fort Worth 1987,

no writ), the court held that: "Summary judgment should never be granted when the

issues are inherently those for a jury or trial judge, as in cases involving intent, reliance,

reasonable care, uncertainty and the like. *Kolb v. Texas Emp. Ins. Ass'n,* 585 S.W.2d

870, 873 (Tex.Civ.App.- Texarkana 1979, writ ref'd n.r.e.)." *Id.,* at 530.)

Oddly, Defendants cite the federal decisions, *Celotex Corp. v. Catrett,* 477 U.S.

317, 323 (1986), and *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994), in

support of their MSJ, (Id., pg. 13, n. 58). Inasmuch as those cases address Fed. R. Civ. P.

56, they are wholly inapplicable to the instant analysis. Indeed, in *Casso v. Brand,* 776

S.W.2d 551, 555-56 (Tex. 1989), the Texas Supreme Court made it explicitly clear that

Texas courts are guided by different standards altogether from those which bind federal

courts regarding the analysis of summary case disposition:

> "***Summary judgments in federal courts are based on different
> assumptions, with different purposes, than summary
> judgments in Texas.*** In the federal system, '[s]ummary judgment
> procedure is properly regarded not as a disfavored procedural shortcut,
> but rather as an integral part of the Federal Rules as a whole, which are
> designed "to secure the just, speedy and inexpensive determination of
> every action." Fed. Rule Civ. Proc. 1.' *Celotex Corp. v. Catrett,* 477 U.S. 317,
> 327 (1986)...
>
> ***Texas law, of course, is different.*** While the language of our rule is
> similar, our interpretation of that language is not. ***We use summary
> judgments merely 'to eliminate patently unmeritorious claims
> and untenable defenses,'*** *City of Houston v. Clear Creek Basin
> Authority,* 589 S.W.2d 671, 678 n. 5 (Tex.1979), ***and we never shift the
> burden of proof to the non-movant unless and until the movant
> has 'establish[ed] his entitlement to a summary judgment on
> the issues expressly presented to the trial court by conclusively
> proving all essential elements of his cause of action or defense
> as a matter of law.'*** *Id.* at 678. (Emphasis added)."

*Casso,* at 555-56. And, *Casso* remains the rule in Texas, regarding summary judgment consideration.[11]

In *Walton v. Phillips Petroleum Co.,* 65 S.W.3d 262, 271 (Tex.App.- El Paso 2001, rev. den'd, reh'g of pet. for rev. den'd) abrogated [on unrelated grounds] by *In re Estate of Swanson,* 130 S.W.3d 144 (Tex.App.- El Paso 2003, no pet.), the CCA stated that: "A defendant moving for summary judgment on the affirmative defense of limitations has the burden to conclusively establish that defense. *KPMG Peat Marwick v. Harrison County Housing Finance Corp.,* 988 S.W.2d 746, 748 (Tex.1999)... If the movant establishes that the statute of limitations bars the action, the non-movant must then adduce summary judgment proof raising a fact issue in avoidance of the statute of limitations. *Id." Id.,* at 271. Ms. Farmer has herein more than met that obligation by compellingly demonstrating that her claims are governed by Civ. Prac. & Rem. Code § 16.0045(a)(1)'s five (5) year limitation period. Alternatively, even if § 16.003(a)'s two (2) year limitation period applied to Ms. Farmer's invasion of privacy claim, it has been tolled by Morris' fraudulent concealment.

Regarding Ms. Farmer's assault claim, the Court should note that Defendants go to great pains to characterize it as a "civil assault" claim, instead of what it actually is: a *criminally confessed sexual assault* claim. In *Umana v. Kroger Texas, L.P.,* 239 S.W.3d 434, 436 (Tex.App.- Dallas 2007, no. pet.), the CCA made clear what constitutes civil

---

[11] *See also Saenz v. Lower Rio Grande Val. Chamber of Commerce,* 296 S.W.2d 806, 808 (Tex. Civ. App. 1956) disapproved of [on unrelated grounds] by *Texam Oil Corp. v. Poynor,* 436 S.W.2d 129 (Tex. 1968)("[Federal] authorities should not be followed in this State, because there is a difference between Rule 56 of the Federal Rules of Civil Procedure, 28 U.S.C.A. and Rule 166-A of the Texas Rules of civil Procedure, though both rules relate to summary judgments."); *Kihega v. State,* 392 S.W.3d 828, 833-34 (Tex.App.- Texarkana 2013, no pet.)("Federal circuit court opinions may be persuasive authority, but they are not binding authority on Texas courts. *Guzman v. State,* 85 S.W.3d 242, 249 n. 24 (Tex. Crim. App. 2002); *Reynolds v. State,* 4 S.W.3d 13, 20 n. 17 (Tex. Crim. App.1999).").

assault: "The elements for civil assault mirror those required for criminal assault. *See Johnson v. Davis,* 178 S.W.3d 230, 240 (Tex.App.-Houston [14th Dist.] 2005, pet. denied). A person commits an assault if he intentionally or knowingly causes physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative. *See* Tex. Pen. Code Ann.-§ 22.01(a)(3) (Vernon Supp.2007)." *Id.,* at 436. In *Umana,* the assault alleged was a supervisor's snatching an apron string from an employee's neck, an incident lasting no more than "a few seconds," (*Id.*). Here, as discussed at length *supra,* far more egregious conduct was involved. In Ms. Farmer's Original Petition, (Response Ex. A), she made very clear that her assault claim was based upon Morris' intentional drugging of her for the specific and illicit purpose of sexually molesting her and taking unauthorized nude photos of her, all of which he has confessed! (See Response Ex. F). Thus, to attempt to recharacterize her claim as analogous to that involved in *Umana* is, respectfully, wholly without merit.

In the same way, Defendants' citation of *Polly v. Houston Lighting & Power Co.,* 803 F. Supp. 1, 7 (S.D. Tex. 1992), (Id., at pg. 13, n. 59), is inapposite. That federal decision dealt with a Title VII claim and abusive physical contact on the job. It has *nothing* to do with Ms. Farmer's sexual molestation while drugged into unconsciousness. Similarly, Defendants cite *Fisher v. Westmont Hospitality,* 935 S.W.2d 222, 225 (Tex.App.- Houston [14th Dist.] 1996, no pet.), (Id., pg. 13, n. 60), which is equally irrelevant as there the plaintiff asserted a straightforward premises liability slip-and-fall claim. Likewise, *Brothers v. Gilbert,* 950 S.W.2d 213 (Tex.App.-Eastland 1997, reh'g overruled, rev. den'd), (cited at Id., pg. 14, n. 61), considered a workplace sexual harassment case, in which the court specifically noted: "There is no competent evidence of fraudulent concealment..." *Id.,* at 216. That determination readily

39

distinguishes the case from the instant analysis. Finally, *Marburger v. Jackson,* 513 S.W.2d 652, 654 (Tex. Civ. App. 1974, writ refused n.r.e.), (cited Id., pg. 14, n. 61), dealt with a physical assault arising out of a workplace-related scuffle.

Defendants attempt the same self-serving recharacterization of Ms. Farmer's invasion of privacy claim. Defendants contend Ms. Farmer was aware of the nude photos of her on the night they were taken, citing a mere snippet of her deposition testimony, (M/MSJ, pg. 15, n. 70 and 71). First, that's a manifest factual distortion, as already explained in detail, *supra* at pgs. 19-21. Second, as already explained in detail *supra*, this claim should be controlled by Civ. Prac. & Rem. Code § 16.0045(a)(1)'s five (5) year limitation period. Alternatively, the limitation period was tolled under the doctrine of fraudulent concealment, since Morris went to absurd lengths to lie to Ms. Farmer about taking the photos, and she had no actual knowledge of their existence or what they depicted until May, 2012, when Ms. Farmer actually learned about both from the FBI. In that regard, it is most curious that Defendants cite *Bell v. Philadelphia Int'l Records,* 981 F. Supp. 2d 621, 628 (S.D. Tex. 2013), (M/MSJ pgs. 14-15, n. 68). While the *Bell* court did state that the plaintiff's allegations that a record label misappropriated his name, image and likeness for gain was a claim based on invasion of privacy and that since he failed to present evidence or argument as to when the claim arose, but the apparent events occurred "long ago", the claim was time-barred, (*Id.*); the court *also said:* "Closely related to the discovery rule is the doctrine of fraudulent concealment. Unlike the discovery rule, fraudulent concealment is an equitable doctrine that is fact-specific. *Shell Oil Co. v. Ross,* 356 S.W.3d 924, 927 (Tex.2011). To invoke this exception, Bell must show that the defendants 'actually knew a wrong occurred, had a fixed purpose to conceal the wrong, and did conceal the wrong.' *Id.* Even then, '[f]raudulent

40

concealment only tolls the statute of limitations until "the fraud is discovered, or could have been discovered with reasonable diligence." ' *Id.* (quoting *B.P. Am. Prod. Co. v. Marshall,* 342 S.W.3d 59, 67 (Tex.2011))." Thus, *Bell* supports the timeliness of Ms. Farmer's invasion of privacy claim, even were the Court to decide it was not part and parcel of her sexual abuse. She learned of the photos and what they showed only after the FBI seized them from Morris and showed them to her in May 2012. This suit was filed on December 13, 2013, (Response Ex. A), nineteen (19) months thereafter.

In summary, when all of the facts of this case are considered, it becomes crystal clear that Defendants have completely failed to state a proper basis for Tex. R. Civ. P. 166a(c) summary judgment, as a matter of both fact and law.

## CONCLUSION

For each and all of the foregoing reasons, Ms. Farmer respectfully requests this Court to deny Defendants' M/MSJ in every particular. Ms. Farmer has stated completely viable tort claims for sexual assault and invasion of privacy integrally related thereto. Her claims are timely pursuant to Civ. Prac. & Rem. Code § 16.0045(a). Alternatively, even assuming § 16.003(a) applied to her invasion of privacy claim, its limitation period was tolled until May, 2012, when Ms. Farmer actually learned from the FBI that the nude photos of her really existed and what they depicted. Moreover, Ms. Farmer's two tort claims have absolutely nothing to do with the TCHRA. Defendants' Motion to Dismiss is wholly untimely and their Traditional Motion for Summary Judgment fails as having no factual basis and hence no legal vitality. Defendants should not be permitted to unilaterally characterize Ms. Farmer's claims to suit their desire to avoid legal and moral responsibility for her egregious sexual abuse and Ms. Farmer's claims should be fully aired in a public trial upon their merits by a jury of the Parties' peers.

41

Respectfully submitted,

THE LAW FIRM OF ALTON C. TODD

/s/ Jeffery N. Todd

By: _____

        Jeffrey N. Todd
        State Bar No. 24028048
        312 South Friendswood Drive
        Friendswood, Texas 77546
        281-992-8633
        281-648-8633 (Facsimile)
        ATTORNEYS FOR PLAINTIFF

Unofficial Copy Office of Chris Daniel District Clerk

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was forwarded to the counsel listed below, via the method(s) indicated, on this the 20th day of February, 2015:

Gregg M. Rosenberg
3555 Timmons Lane, Suite 610
Houston, Texas 77027
Via Facsimile, Efile or CM/RRR

/s/ Jeffery N. Todd

_____
Jeffrey N. Todd

12/13/2013 7:52:38 AM
Chris Daniel - District Clerk Harris County
Envelope No. 73119
By: Nelson Cuero

**2013-74668 / Court: 215**

No. _____

| | | |
|---|---|---|
| ANDREA FARMER | § | IN THE DISTRICT COURT OF |
| | § | |
| V. | § | HARRIS COUNTY, TEXAS |
| | § | |
| HENRI MORRIS and | § | |
| SOLID SOFTWARE SOLUTIONS, INC. | § | |
| d/b/a EDIBLE SOFTWARE | § | ____ JUDICIAL DISTRICT |

## PLAINTIFF'S ORIGINAL PETITION

TO THE HONORABLE COURT:

Plaintiff, ANDREA FARMER, complains of HENRI MORRIS and SOLID SOFTWARE SOLUTIONS, L.L.C., d/b/a EDIBLE SOFTWARE, and in support hereof would show as follows:

### Discovery Control Plan

1. Pursuant to TEX. R. CIV. P. 190.1, Plaintiff intends to conduct discovery under Rule 190.3, Level 2.

### Parties

2. Plaintiff, ANDREA FARMER ("FARMER"), is a resident of Aransas County, Texas.

3. Defendant HENRI MORRIS is an individual resident of Harris County and may be served at his regular place of business at 3603 Westcenter Drive, Suite 100, Houston, Texas 77042.

4. Defendant SOLID SOFTWARE SOLUTIONS, L.L.C., d/b/a EDIBLE SOFTWARE, is a domestic limited liability company and may be served by serving its



registered agent, Henri Morris, at its registered business address of 3603 Westcenter Drive, Suite 100, Houston, Texas 77042.

**Request Pursuant to Rule 28**

5.     To the extent that Defendants are conducting business under an assumed name or trade name, this suit is brought under TEX. R. CIV. P. 28, and Plaintiff makes demand that, upon answering this suit, Defendants make answer in their correct legal and trade names.

**Jurisdiction & Venue**

6.     This Court has personal jurisdiction over all parties to this suit. The Court has subject matter jurisdiction over this case because the amount in controversy is within the jurisdictional limits of the Court, and no other Court has exclusive jurisdiction over this matter.

7.     Venue is proper because the corporate defendant has its principal place of business in Harris County, and the claims against both corporate and individual defendants arise out of the same transaction or series of transactions.

**Facts**

8.     At all times relevant to her claims asserted in this lawsuit, Plaintiff ANDREA FARMER was an employee of Defendant SOLID SOFTWARE SOLUTIONS, L.L.C., d/b/a EDIBLE SOFTWARE, and Defendant HENRI MORRIS was the President and CEO of the corporate Defendant as well as Plaintiff FARMER's direct supervisor.

9.     In May of 2011, Defendant MORRIS, acting in his capacity and within the scope of his duties as President and CEO of Defendant SOLID SOFTWARE SOLUTIONS directed FARMER to join him on a business trip to New Jersey and New York to meet clients. During this business trip, Defendant MORRIS drugged FARMER by putting an unknown substance into a drink, unbeknownst to FARMER. During this time, MORRIS attempted to sexually assault

2

FARMER and took pictures of her while she was unconscious. Because FARMER was unconscious she did not know and was not able to know that impermissible pictures had been taken of her until she was shown the pictures in or around March of 2012.

### Causes of Action

#### A. Assault as to Defendant HENRI MORRIS

10. Defendant MORRIS intentionally caused physical contact with Plaintiff FARMER directly and through the instrumentality of drugs, while he knew or should reasonably have known that FARMER would find that contact offensive or provocative.

#### B. Assault as to Defendant SOLID SOFTWARE SOLUTIONS, L.L.C.

11. At all times relevant to FARMER's claims Defendant MORRIS was employed in a managerial capacity by Defendant SOLID SOFTWARE SOLUTIONS, L.L.C., and was FARMER's supervisor. At all times relevant to those claims, Defendant MORRIS was acting within the scope of his employment by Defendant SOLID SOFTWARE SOLUTIONS, L.L.C., and exercised control over FARMER by virtue of his managerial authority as President and CEO of Defendant SOLID SOFTWARE SOLUTIONS, L.L.C., and as FARMER's supervisor. Consequently, Defendant SOLID SOFTWARE SOLUTIONS, L.L.C., is vicariously liable for the actions of its President and CEO.

#### C. Invasion of Privacy as to Defendant HENRI MORRIS

12. Defendant MORRIS intentionally intruded on Plaintiff FARMER's seclusion when he took photos of her while she was unconscious, while he knew or should reasonably have known that FARMER would find that intrusion highly offensive or provocative to a reasonable person.

3

**B. Invasion of Privacy as to Defendant SOLID SOFTWARE SOLUTIONS, L.L.C.**

13. At all times relevant to FARMER's claims, Defendant MORRIS was employed in a managerial capacity by Defendant SOLID SOFTWARE SOLUTIONS, L.L.C., and was FARMER's supervisor. At all times relevant to those claims, Defendant MORRIS was acting within the scope of his employment by Defendant SOLID SOFTWARE SOLUTIONS, L.L.C., and exercised control over FARMER by virtue of his managerial authority as President and CEO of Defendant SOLID SOFTWARE SOLUTIONS, L.L.C., and as FARMER's supervisor. Consequently, Defendant SOLID SOFTWARE SOLUTIONS, L.L.C., is vicariously liable for the actions of its President and CEO.

### Damages

14. As a result of the foregoing, Plaintiff FARMER has suffered the following damages for which she seeks recovery:

a. Physical pain, suffering, and impairment from the time of the incidents described herein through trial;

b. Mental anguish and anxiety from the time of the incidents described herein through trial;

c. Mental anguish and anxiety from the time of trial into the future.

d. The loss of earnings and earning capacity sustained from the date of the incident in question up to the time of trial.

### Exemplary Damages

15. Plaintiff FARMER would show that the actions of Defendant MORRIS, individually and as imputed to Defendant SOLID SOFTWARE SOLUTIONS, L.L.C., were done intentionally and with malice and/or gross negligence. Consequently, Plaintiff FARMER

4

seeks exemplary damages in an amount within the discretion of the jury and within the jurisdictional limits of the Court.

## Prejudgment and Post-judgment Interest

16. Plaintiff FARMER further seek prejudgment and post-judgment interest as allowed by law.

## Notice to Maintain Records

17. Notice is hereby given to Defendants MORRIS and SOLID SOFTWARE SOLUTIONS, L.L.C., not to purge, destroy, or delete any documents, whether maintained in hard copy or electronic formats that reference either Plaintiff or their employment with Defendant SOLID SOFTWARE SOLUTIONS, L.L.C.

## Jury Demand

18. Plaintiff FARMER hereby demands a trial by jury on all issues presented in this case.

WHEREFORE, PREMISES CONSIDERED, Plaintiff ANDREA FARMER respectfully request that the Defendants be cited to appear herein and that upon answer and trial of this cause the have judgment against Defendants HENRI MORRIS and SOLID SOFTWARE SOLUTIONS, L.L.C., d/b/a EDIBLE SOFTWARE for their actual damages and exemplary damages as set forth herein, together with pre-judgment and post-judgment interest at the highest lawful rate and that they have such other and further relief, at law or in equity, to which they may show themselves entitled.

5

Respectfully submitted,

THE LAW FIRM OF ALTON C. TODD

By: _Jeffrey N. Todd_

**Jeffrey N. Todd**
State Bar No. 20092000
312 S. Friendswood Drive
Friendswood, Texas 77546
(281) 992-8633
(281) 648-8633 Facsimile No.
ATTORNEYS FOR PLAINTIFF

6

Filed 13 December 18 A11:20
Chris Daniel - District Clerk
Harris County
FAX15672435

CAUSE NO. 2013-74668

| | | |
|---|---|---|
| ANDREA FARMER | § | IN THE DISTRICT COURT OF |
| Plaintiff, | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| HENRI MORRIS and SOLID | § | |
| SOFTWARE SOLUTIONS, INC. d/b/a | § | |
| EDIBLE SOFTWARE | § | 215TH JUDICIAL DISTRICT |
| Defendant. | | |

## DEFENDANT'S ORIGINAL ANSWER

Defendants Henri Morris and Solid Software Solutions, Inc. d/b/a Edible Software (Defendants) now file this Original Answer, and in support thereof, respectfully show the Court the following:

### I. General Denial

Pursuant to Rule 92 of the Texas Rules of Civil Procedure, Defendants generally deny each and every, all and singular allegation in Plaintiff's Original Petition, and respectfully request that Plaintiff provide strict proof of all such allegations by the preponderance of the evidence.

### II. Affirmative Defense

Defendants affirmatively plead that the claims asserted by the Plaintiff are precluded by specific statutes, including but not limited to § 21.001 of the Texas Labor Code.

Defendants also affirmatively plead the defense of limitations.

Defendants reserve the right to amend their Answer pursuant to the Texas Rules of Civil Procedure.

### III. Prayer for Relief

Therefore, Defendants pray that, after a hearing, the court:



EXHIBIT
'B'

Defendants' Original Answer

1.  Enter judgment against Plaintiff dismissing the petition in this case;

2.  Award Defendants costs of suit; and

3.  Grant any other relief that the Defendants are entitled.

Respectfully submitted,

*/s/ Gregg M. Rosenberg*

Gregg M. Rosenberg
State Bar No. 17268750
3518 Travis, Suite 200
Houston, Texas 77002
(713) 960-8300 (Tel)
(713) 621-6670 (Fax)
Attorney-in-Charge for Defendants

Of Counsel:
ROSNEBERG SPROVACH          ATTORNEYS FOR DEFENDANTS

Defendants' Original Answer

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was duly served upon the following by Certified Mail/Return Receipt Requested, Regular Mail, Facsimile, Overnight Delivery and/or Hand Delivery on this the 18th day of December, 2013:

Mr. Jeffrey N. Todd
312 S. Friendswood Drive
Friendswood, Texas 77546
(281) 992-8633 (Tel)
(281) 648-8633

/s/ *Gregg M. Rosenberg*
Gregg M. Rosenberg

Defendants' Original Answer

2/21/2014 2:37:35 PM
Chris Daniel - District Clerk Harris County
Envelope No. 535642
By: JONATHAN PATTON

CAUSE NO. 2012-65503

| | | |
|---|---|---|
| KERI HILL, | § | IN THE DISTRICT COURT OF |
| MICHELLE BARNETT | § | |
| and STACY STEWART | § | |
| *Plaintiffs,* | § | |
| | § | HARRIS COUNTY, TEXAS |
| v. | § | |
| | § | |
| HENRI MORRIS and | § | |
| SOLID SOFTWARE SOLUTIONS, INC. | § | 55th JUDICIAL DISTRICT |
| d/b/a EDIBLE SOFTWARE | | |
| *Defendants.* | | |

CAUSE NO. 2012-65503-A

| | | |
|---|---|---|
| MICHELLE BARNETT | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | HARRIS COUNTY, TEXAS |
| HENRI MORRIS and | § | |
| SOLID SOFTWARE SOLUTIONS, INC. | § | |
| d/b/a EDIBLE SOFTWARE | | |
| *Defendants.* | § | 55th JUDICIAL DISTRICT |

CAUSE NO. 2012-65503-B

| | | |
|---|---|---|
| STACY STEWART | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | HARRIS COUNTY, TEXAS |
| HENRI MORRIS and | § | |
| SOLID SOFTWARE SOLUTIONS, INC. | § | |
| d/b/a EDIBLE SOFTWARE | § | |
| *Defendants.* | § | 55th JUDICIAL DISTRICT |

## DEFENDANTS' PLEA TO THE COURT'S JURISDICTION

COMES NOW, Henri Morris ("Defendant Morris") and Solid Software Solutions, Inc. d/b/a Edible Software ("Defendant Edible Software"), Defendants in the above-styled and numbered cause of action, and files this Plea to the Court's Jurisdiction showing as follows:



EXHIBIT
"C"

## INTRODUCTION

This Court has previously overruled a motion for summary judgment that was filed to address Plaintiffs' common law claims of assault against Defendants all of which allegedly arose in the course and scope of their employment. This motion is asserted because, despite the ruling on the summary judgment motion, this Court does not have subject matter jurisdiction over the claims asserted in this lawsuit. Because of the lack of subject matter jurisdiction, the case must be dismissed.

The Motion for Summary Judgment relied heavily on the Texas Supreme Court's holding in *Waffle House v. Williams*, 313 S.W.3d 796, 803 (Tex. 2010). Subsequent to *Waffle House*, there have been several court of appeals opinions that cited to it, but injected a jurisdictional approach to the analysis in holding for employers in claims where employees assert common law claims that are pre-empted by specifically written employment discrimination statutes. One of these cases, *Pruitt v. International Association of Fire Fighters*, 366 S.W. 3d 740 (Tex. App – Texarkana, 2012 (no pet.) took this approach, holding that in fact patterns such as the ones before this Court, there is no jurisdiction to hear the claims asserted by the Plaintiffs. *Pruitt* relied on several cases that hold that a failure to file employment based discrimination claims, including those alleging egregious instances of sexual harassment, with the proper administrative agency (In this case the Texas Workforce Commission – Civil Rights Division "TWC-CRD") deprives the court of jurisdiction to hear the case.

Defendants' Plea to the Court's Jurisdiction should be granted purely as a matter of law because Plaintiffs have incorrectly brought forth common law claims of assault for alleged conduct that falls within the scope of the Texas Commission for Human Rights Act's ("TCHRA") exclusive remedy for workplace sexual harassment. Defendants are cognizant of

2

the severity of the allegations being asserted by each of the Plaintiffs in this suit. Regardless, even if the allegations of assault of a sexual nature were true, the exclusive remedy lies within the confines of the TCHRA. This court has no jurisdiction to hear them because administrative prerequisites were circumvented by Plaintiff Keri Hill, or in the case of plaintiffs Michelle Barnett and Stacy Stewart, wholly ignored.

## STATEMENT OF FACTS[1]

### I. Plaintiffs' Employment History with Defendant Edible Software

#### a. Barnett's Employment History

Plaintiff Michelle Barnett ("Barnett") began her employment with Defendant Edible Software on August 1, 2011 as an Operations Office Manager.[2] She was transferred from Operations Office Manager to an Implementation role within Edible Software as of November 2011.[3] In the Implementation Role, Barnett was expected to assist new customers with purchased software, either on site or at their facility.[4] She went on two business trips during her employment; (1) a business trip to Atlanta, Georgia to attend a trade show on or about October 15, 2011 and (2) a business trip to New Orleans, Louisiana to meet a prospective client on or about November 14, 2011.[5] Barnett continued to work for Defendant Edible Software until in or about February 2012, when she resigned from her employment.[6]

#### b. Hill's Employment History

---

[1] In this Plea to the Jurisdiction, the Statement of Facts is entirely the same as what has previously been presented to the Court in the Motion for Summary Judgment. They are incorporated here as a matter of convenience. For the purposes of this plea all facts are to be construed most favorably against Defendants.

[2] Barnett Dep., Ex. 1, at 24:5-15.

[3] Barnett Dep., Ex. 1, at 27:11-12.

[4] Barnett Dep., Ex. 1, at 25:12-18.

[5] Barnett Dep., Ex. 1, at 29:17-25; 30:22-31:7; 75-76.

[6] Barnett Dep., Ex. 1, at 11:25-12:5.

3

Plaintiff Keri Hill ("Hill") began her employment with Defendant Edible Software on December 12, 2011 as a Sales and Marketing Manager.[7] As part of her job duties, Hill was required to meet and help secure prospective clients.[8] To that end, she went on two business trips during her employment; (1) a business trip to New York to meet prospective client Anchor Seafood on or about January 8, 2012 and (2) a business trip to Chicago and Peoria, Illinois to meet prospective client Pasqual on or about January 22, 2012.[9] Hill was asked by Defendant Morris to attend the New York business trip.[10] She initiated a request to attend the Chicago trip and told Defendant Morris that if he thought it would be a good learning experience for her she would like to attend.[11] On April 11, 2012, Hill was put on a paid leave of absence and was subsequently notified of her termination approximately two weeks later.[12]

### c. Stewart's Employment History

Plaintiff Stacy Stewart ("Stewart") began her employment with Defendant Edible Software in or about February 2011.[13] Stewart was employed to implement software at customer sites. From March 18, 2011 through March 22, 2011, she attended the Boston Seafood Show. Upon her return, Defendant Morris and Beth Jackson, a management level consultant, met with Stewart to discuss her performance at the show. Defendant Morris commented that Stewart's personality was "like night and day" and that she seemed to have a personality change while working at the Seafood Show.[14] In a meeting with only Defendant Morris and Stewart present, Defendant Morris indicated that he was dissatisfied with Stewart's performance at the

---

[7] Hill Dep., Ex. 2, at 40:3-4; 36:18-19.
[8] Hill Dep., Ex. 2, at 45:24-45:1.
[9] Hill Dep., Ex. 2, at 169:21-170:1.
[10] Hill Dep., Ex. 2, at 46:19-47:2.
[11] Hill Dep., Ex. 2, at 109:20-110:18.
[12] Hill Dep., Ex. 2, at 155:5-13.
[13] Stewart Dep., Ex. 3, at 24:8-23.
[14] Stewart Dep., Ex. 3, at 123:23-25.

4

show including her failure to interact with people.[15] Defendant was then absent in April 2011 to care for her son who was sick and then for her own subsequent illness. Stewart's employment was terminated during the week of April 11, 2011, six weeks into her tenure with the company.[16]

While Stewart was employed by Edible Software, she was taking two physician prescribed medications, Wellbutrin for depression (diagnosed in 1998) and Mirapex for restless leg syndrome (diagnosed in 1993).[17] Stewart was also diagnosed with bi-polar disorder in 2005, 2006, and again as of approximately April 2013.[18]

## II. Incidents Regarding Allegations of Unwanted Sexual Contact

### a. Barnett's Allegations of Unwanted Sexual Contact by Defendant Morris

Plaintiff Barnett alleges that she was drugged by Defendant Morris and subjected to unwanted sexual contact while on a business trip to New Orleans, Louisiana in or about November 2011.[19] On November 14, 2011, Barnett departed from Houston, Texas with Defendant Morris.[20] While on the plane heading to New Orleans, Barnett consumed a glass of red wine.[21] Upon arrival in New Orleans, Barnett and Defendant Morris checked into the JW Marriot hotel in New Orleans' French Quarter and then met in the concierge lounge of the hotel after briefly visiting their individual hotel rooms.[22] At the concierge lounge, Barnett made herself a vodka soda at the self-serve bar.[23] Barnett consumed half of the vodka soda when Defendant Morris offered to put her drink into a to-go cup so they could depart to dinner at Mr.

---

[15] Stewart Dep., Ex. 3, at 126:7-128:14.
[16] Stewart Dep., Ex. 3, at 132:10-12.
[17] Stewart Dep., Ex. 3, at 107:17-110:20.
[18] Stewart Dep., Ex. 3, at 114:14-116:2.
[19] *See* Plaintiffs' Second Amended Petition, at ¶ 9.
[20] Barnett Dep., Ex. 1, at 75-76.
[21] Barnett FBI Interview, Feb. 27, 2012, Ex. 4, at p.13.
[22] Barnett Dep., Ex. 1, at 83:24-84:17.
[23] Barnett Dep., Ex. 1, at 84:20-86:15.

5

B's restaurant.[24] Barnett consumed a few sips from the to-go drink before it was taken by the waitress at Mr. B's restaurant.[25]

During dinner at Mr. B's restaurant, Barnett ordered three (3) Vodka sodas that she consumed over approximately a two hour period.[26] Barnett also consumed a few sips from a fourth drink that was at her table when she returned from the restroom at Mr. B's restaurant.[27] At this time, Barnett had consumed five (5) alcoholic beverages and multiple sips from (2) other alcoholic beverages. Barnett testified during her deposition that at this point she felt "tipsy."[28]

After dinner at Mr. B's restaurant, Barnett and Defendant Morris went to PJ's Piano Bar ("PJ's"). At PJ's, Barnett consumed approximately half of an alcoholic beverage called the "Hurricane."[29] Barnett described the Hurricane as "alcohol intensive" and as being a potent alcoholic beverage.[30] Barnett went to the restroom and when she returned, there was a second Hurricane at her table.[31] She informed Defendant Morris that she did not want to drink anymore. On her own accord, Barnett proceeded to drink approximately ¼ of the second Hurricane drink.[32] Even though Barnett confirmed she felt "tipsy" when she left Mr. B's restaurant, she consumed portions of two more drinks at PJ's. At this point, Barnett had consumed (5) alcoholic beverages 1 red wine, 3.5 vodka sodas, ¾ of a Hurricane) and multiple sips from two (2) other alcoholic beverages.[33]

[24] Barnett Dep., Ex. 1, at 86:18-88:18.
[25] *Id.*
[26] Barnett Dep., Ex. 1, at 92:18-93:1; *See also* Barnett FBI Interview, Feb, 27, 2012, Ex. 4, at p.21-22.
[27] Barnett Dep., Ex. 1, at 93:2-97:24.
[28] *Id.*
[29] Barnett Dep., Ex. 1, at 98:21-103:7.
[30] Barnett Dep., Ex. 1, at103:8-103:11.
[31] Barnett Dep., Ex. 1, at 103:8-103:23; *See also* Barnett FBI Interview, Feb, 27, 2012, Ex. 4, at p. 26-27.
[32] Barnett Dep., Ex. 1, at 104:21-106:5.
[33] Barnett Dep., Ex. 1, at 107:7-16.

Barnett does not remember how she arrived back at the JW Marriot hotel after departing PJ's. The only memory Barnett can recall between consumption of a few sips of the second Hurricane beverage at PJs to her arrival back at the JW Marriot is Defendant Morris pulling her arm at PJ's.[34] Although Barnett admits that she cannot remember clearly anything from that night (November 14, 2011), following the portion of the second Hurricane she consumed at PJs, she testified that: (1) someone attempted to pull off her sweater in a dark room; (2) she stated "oh, no, this is not happening and (3) she disengaged from the sweater and ran into a bathroom because she was sick.[35] Barnett testified that she was only speculating that Defendant Morris was with her in a hotel room.[36] Specifically, Barnett testified that she could not be one hundred percent sure that Defendant Morris assaulted her and confirmed that she was just speculating:

Q:      What was it you felt he did to you at that point?
A:      He assaulted me and tried to ruin my clothing.
Q:      But you said at that point you didn't know it was Henri because he hadn't told you about it yet, and you told me earlier you didn't know who it was. Isn't that correct?
A:      I couldn't be one hundred percent sure because the person was behind me.
Q:      Okay. So at that point you still weren't one hundred percent sure when he's knocking on your hotel door.
A:      No, but I felt it was him.
Q:      You're just speculating.
A:      Yes.[37]

The next morning on November 15, 2011, Barnett text messaged her husband and she spoke with him over the phone.[38] She informed her husband that she felt uncomfortable and did not want to go to the client.[39] She had three (3) conversations with her husband that morning during which he advised her to drive her own car to the client to avoid having to get in the car

[34] Barnett Dep., Ex. 1, at 108:14-109:15.
[35] Barnett Dep., Ex. 1, at 109-116:12.
[36] Barnett Dep., Ex. 1, at 128:21-129:11.
[37] Barnett Dep., Ex. 1, at 128:18-129:11.
[38] Barnett Dep., Ex. 1, at 116:13-123:13; see also Barnett FBI Interview, Feb, 27, 2012, Ex. 4, at p. 28.
[39] Id.

with Defendant Morris and to take notes about everything that occurred.[40] Barnett then text messaged Defendant Morris stating that she felt uncomfortable about what occurred the night before and she did not want to go to the client.[41]

After receiving her text message, Defendant Morris knocked on the door of Barnett's hotel room.[42] Barnett first told Defendant Morris to go away but then came into the hallway to speak with him.[43] At this time, she speculated that Defendant Morris had tried to assault her the night before and ruin her clothing.[44] During their conversation in the hallway of the hotel, Barnett told Defendant Morris that she was uncomfortable about what happened the night before.[45] Defendant Morris responded that he did not understand her accusations and that she had come to his room and laid down.[46] Defendant Morris confirmed that he did not touch her.[47] Defendant Morris asked Barnett to meet with the client as planned. She agreed. After the client meeting, Barnett and Defendant Morris rode together to the airport and Defendant Morris thanked her for her attendance.[48]

b. Hill's Allegation of Unwanted Sexual Contact by Defendant Morris

Plaintiff Hill alleges that she was drugged by Defendant Morris and subjected to unwanted sexual contact while on a business trip in New York on or about January 8, 2012 and again on a business trip in Chicago and Peoria, Illinois on or about January 22, 2012.[49] Hill confirmed that all of the incidents she references are based on speculation, as she cannot confirm

---

[40] Id.
[41] Barnett Dep., Ex. 1, 126:2-127:14.
[42] Id.
[43] Id.
[44] Barnett Dep., Ex. 1, 128:10-20.
[45] Barnett Dep., Ex. 1, 130:12-132:10.
[46] Id.
[47] Id.
[48] Barnett FBI Interview, Feb. 6, 2012, Ex. 4, at p.42.
[49] See Plaintiff's Second Amended Petition, at ¶ 11.

8

that such incidents of unwanted sexual contact actually took place and/or that she was actually drugged by Defendant Morris.[50]

i.    New York business trip allegations

Hill departed from Houston with Defendant Morris to LaGuardia Airport in New York on January 8, 2012. Defendant Morris and Hill visited the President's Club VIP area before take-off. She consumed two (2) "Bloody Mary" alcoholic beverages within a forty-five (45) minute period in the President's Club at the airport.[51]   Defendant Morris and Hill sat together in first class on the airplane. She ordered and consumed two (2) cranberry and vodkas approximately forty-five (45) minutes after take-off.[52]

Upon arrival in New York, Defendant Morris and Hill checked into the Marriot hotel located only 2-3 miles from the airport.[53]  Hill and Defendant Morris met in the concierge lounge of the hotel after briefly visiting their rooms. Defendant Morris fixed himself and Hill cranberry and vodka drinks in the concierge lounge.[54] When it was time to leave the concierge lounge to go to dinner, Defendant Morris transferred his drink and Hill's drink into two go cups.[55]  Hill took her drink to the car and took approximately two (2) sips from it.[56]

Hill alleges that Defendant Morris inserted drugs in her to-go cup drink at the concierge lounge in the hotel.[57]  She never saw Defendant Morris insert anything into her drink. At the point Defendant Morris gave Hill the to-go cup drink, she had consumed four (4) alcoholic beverages and portions of a 5th alcoholic drink. Hill testified that she very rarely drank mixed

---

[50] Hill Dep., Ex. 2, at 126:14-127:6; 130:14-131:4; *see also* Hill FBI Interview, Feb. 24, 2012, Ex. 5, at p. 16.

[51] Hill Dep., Ex. 2, at 53:16-54:4.

[52] Hill Dep., Ex. 2, at 57:16-58:9.

[53] Hill Dep., Ex. 2, at 61:15-23.

[54] Hill Dep., Ex. 2, at 71:16-75:10; *see also* Hill FBI Interview, Feb. 24, 2012, Ex. 5, at p. 21.

[55] Hill Dep., Ex. 2, at 76:2-77:8.

[56] *Id.*

[57] Hill Dep., Ex. 2, at 130:14-131:4.

9

drinks or hard alcohol; she never consumed five (5) alcoholic drinks in a 7-8 hour period before in her life and that she never drank on an airplane before.[58]

After consuming four (4) mixed drinks containing hard alcohol and a portion of a fifth, Hill does not remember anything else that happened during the night except flash memories that only amount to pure speculation.[59] She confirmed that she had no memory of visiting Manhattan on January 8, 2012 as she had planned to do earlier that day with Defendant Morris.[60] She testified that she did remember getting into an elevator, into a car and the car moving as well as some memory of trying to get out of a car, but she did not know whether she was in Manhattan or at the hotel.[61] Hill confirmed that she could not remember if Defendant Morris was with her at this point.[62] Her next memory is trying to find her room and noticing that she had urinated on herself.[63] She does recall that Defendant Morris informed her that he had been looking for her, called her telephone multiple times[64] and was concerned because he could not find her.[65] Hill stated that she could recall responding to Defendant Morris, "I'm fine, you're blowing this out of proportion."[66] Hill asked Defendant Morris to leave her room and he told her to sit down, they would watch TV for a moment and she would feel better. Hill asked him to leave again and Defendant Morris left her room.

The next morning, Hill called her husband and her husband informed her that she had called him the night before and told him that Defendant Morris wanted to watch TV and she was

---

[58] Hill Dep., Ex. 2, at 98:9-100:14; 202:13-24.
[59] Hill Dep., Ex. 2, at 78:2-7; *see also* Hill FBI Interview, Feb. 24, 2012, Ex. 5, at p. 23-25.
[60] *Id.*
[61] Hill Dep., Ex. 2, at 78:2-7; 79:7-25.
[62] Hill Dep., Ex. 2, at 81:24-82:6.
[63] Hill Dep., Ex. 2, at 81:2-18; 194:24-196:11.
[64] Hill Dep., Ex. 2, at 164:2-165:20.
[65] Hill Dep., Ex. 2, at 82:15-83:3.
[66] Hill Dep., Ex. 2, at 82:15-83:3.

uncomfortable.[67]  She testified that she did not feel that she had been physically violated by Defendant Morris at this point.[68]  She apologized to her husband and told him she was embarrassed about her behavior.[69]  Hill did not allege that her conduct was due to anything that Defendant Morris did at this time.  She also apologized to Defendant Morris that morning at breakfast.[70]  Defendant Morris informed Hill that they went downtown Manhattan, she was fine at first and then Defendant Morris had to hold her by the arm to assist her in walking.[71]

The next evening, on January 9, 2012, after meeting with the prospective client, Hill went to Manhattan with Defendant Morris.  Defendant Morris had offered to take her again since she did not remember going to Manhattan the night before.[72]  Hill and Defendant Morris visited Rockefeller Center and NY Times Square.[73]  The following day, Hill and Defendant Morris met with another client.  After the client meeting, Hill, Defendant Morris and another employee of Defendant Solid Software Solutions, Beth Jackson, had dinner at the hotel restaurant.  Hill had one drink in the concierge lounge prior to dinner and one beer at dinner.[74]  Hill did not speak with anyone about the incidents in New York, did not accuse Defendant Morris of drugging her and did not report any such speculation to anyone even when she arrived back at work.

ii.     Chicago/Peoria, Illinois business trip allegations

Hill initiated her attendance on the Chicago/Peoria, Illinois trip with Defendant Morris.  Despite her claim that Defendant Morris allegedly drugged her and subjected her to unwelcome sexual contact on the last business trip in New York, she told Defendant Morris that if he thought

---

[67] Hill Dep., Ex. 2, at 85:9-86:13.
[68] Hill Dep., Ex. 2, at 86:14-87:1.
[69] Hill Dep., Ex. 2, at 94:3-95:14.
[70] Hill Dep., Ex. 2, at 89:2-90:22.
[71] Hill Dep., Ex. 2, at 89:2-90:22.
[72] Hill Dep., Ex. 2, at 97:2-9.
[73] Hill Dep., Ex. 2, at 100-102:3-6.
[74] Hill Dep., Ex. 2, at 103-107.

11

the Chicago trip would be a good learning experience for her she wanted to go.[75] Less than two weeks after the alleged incidents on the New York business trip, Hill left for another business trip in Chicago, alone with Defendant Morris.

Hill met Defendant Morris at the airport. Prior to the plane's departure, she consumed a beer.[76] On the airplane, she ordered a Bacardi and Diet coke.[77] She then went to the restroom on the plane. Hill and Defendant were sitting in a three (3) person row with another woman occupying a seat within the row. Hill alleges that when she went to the restroom, Defendant Morris put drugs into her drink.[78] While she was in the restroom, Defendant Morris and Paulina Sorig, the other woman seated in the row, remained in their seats.[79]

Hill does not remember exiting the plane or the airport upon arrival. She has a series of "flash" memories between the time that she consumed her third alcoholic beverage on the airplane to approximately 10:00 pm the night of January 22, 2012. Hill testified that she remembered (1) Defendant Morris holding her hands; (2) Defendant Morris' face pressed up against hers; (3) Defendant Morris taking her hand and rubbing in her vaginal area and up and down her leg; (4) standing in front of a woman with Defendant Morris and the woman giving them a recommendation for a restaurant to eat dinner; (5) drinks in the refrigerator in her hotel room and (6) Defendant Morris being in her hotel room and asking him to leave.[80] She testified that she also remembered seeing a condom packet but then confirmed that she did not know if what she saw in fact was a condom packet.[81] Hill's flashes of memory include her being in

---

[75] Hill Dep., Ex. 2, at 109:20-110:18.
[76] Hill FBI Interview, Feb. 24, 2012, Ex. 5, at p. 48.
[77] Hill Dep., Ex. 2, at 206:2-12.
[78] Hill Dep., Ex. 2, at 130:14-19.
[79] Hill Dep., Ex. 2, at 211:24-212:19; 214-216.
[80] Hill FBI Interview, Feb. 24, 2012, Ex. 5, at p. 48.
[81] Hill Dep., Ex. 2, at 134:14-16.

12

public places such as the airport, which has a high level of security and the hotel. She does not recall any persons commenting on her behavior or questioning her mental and/or physical state.

Hill confirmed that she did not see Defendant Morris put anything in her drinks.[82] She admitted that she was just speculating as to what happened in New York and in Chicago.[83] She had absolutely no physical proof that Defendant Morris did anything to her person or in any way tampered with her drinks.[84] The day after the alleged incidents of unwelcome sexual contact described above, Hill went with Defendant Morris to see the client in Peoria, Illinois. She did not confront Defendant Morris about any suspicions or concerns.

Hill spoke with her husband after she visited the client and was informed that she had called him the night before. Her husband stated she had slurred speech, told him she had consumed two (2) drinks and said that she was fine.[85] Her husband also informed her that he then stated, "if you've only had two drinks someone's drugged you."[86] Up to this point, Hill had not alleged or even insinuated she had been drugged by Defendant Morris at any time.

### c. Plaintiff Stewart's Allegation of Unwanted Sexual Contact by Defendant Morris

#### i. Boston, Massachusetts Business Trip Allegations

On March 18, 2011, Stewart was informed by Defendant Morris that she was invited to attend the Boston Seafood Show.[87] She welcomed the opportunity to attend the show.[88] Defendant Morris informed Stewart that the reason for her attendance would be to observe and

---

[82] Hill Dep., Ex. 2, at 192:4-17.

[83] Hill Dep., Ex. 2, at 126:4-127:6; 130:14-131:4.

[84] Hill Dep., Ex. 2, at 217:10-219:22.

[85] Hill Dep., Ex. 2, at 145:6-146:3.

[86] *Id.*

[87] Stewart Dep., Ex. 3, at 56:24-58:5.

[88] Stewart Dep., Ex. 3, at 57:23-25.

13

learn the product.[89] Defendant Edible Software provided hotel arrangements at the Marriott hotel.[90]

Stewart departed on March 20, 2011 on a 1p.m. flight headed to Boston, Massachusetts where she would attend the Boston Seafood Show.[91] At the airport, prior to boarding the flight, she ordered and drank a Tanqueray & Tonic drink.[92] On the plane, she ordered and consumed two glasses of wine.[93] When Stewart arrived at the hotel, she was met by Defendant Morris in the lobby area to check-in. After the check-in procedure she briefly went to her room to get settled in. Then she met Defendant Morris along with Beth Jackson and her mother in the concierge lounge. Stewart had another Tanqueray and Tonic drink she fixed herself upon her arrival at the concierge lounge.[94] She had now consumed four (4) alcoholic beverages from the time she arrived at the airport to the time she arrived at the Marriot in Boston. Stewart had her fifth drink of the day, another Tanqueray and Tonic, when Defendant Morris arrived at the concierge lounge and made it for her.[95]

After leaving the concierge lounge, Stewart, Ms. Jackson and her mother, Steve Nysis, another Edible employee, and Defendant Morris went to dinner at Legal Seafood in Copley Mall.[96] Stewart consumed a glass of wine at dinner, her sixth drink for the day.[97] After dinner, Stewart spent about ten (10) minutes shopping for a shirt but was unable to find what she wanted

---

[89] Stewart Dep., Ex. 3, at 58:4-58:12; 85:14-86:9.

[90] Stewart Dep. Ex. 3, at 61:14-23.

[91] Stewart Dep., Ex. 3, at 59:10-23.

[92] Stewart Dep., Ex. 3, at 62:14-24.

[93] Stewart Dep., Ex. 3, at 62:8-13 (Note: In her deposition testimony Stewart first testifies that she only had one glass of wine but when asked whether she had told FBI Agent Gregory that she had two glasses, she confirmed that she had in fact told agent Gregory that.); *see also* Stewart FBI Interview, Mar. 7, 2012, Ex.6, p. 21.

[94] Stewart Dep., Ex. 3, at 64:7:65:1; *see also* Stewart FBI Interview, Mar. 7, 2012, Ex.6, p. 25.

[95] Stewart Dep., Ex. 3, at 65:2-23.

[96] Stewart FBI Interview, Mar. 7, 2012, Ex.6, p.26-27.

[97] Stewart Dep., Ex. 3, at 66:16-67:19.

14

before the mall closed at 9:00 p.m.[98] Stewart has a clear recollection of walking back towards her hotel that night, which was connected to the Copley Mall.[99] She also recalls speaking with her husband that night on the phone in her hotel room around 11p.m.[100] At this time, Stewart was on two medications, one of which her doctor had informed her not to "drink a lot" while taking the medication.[101]

The following morning, March 21, 2011, Stewart sent Defendant Morris a text informing him that she was going to the mall to get a shirt and then she would come to the Seafood Show.[102] She left the hotel before 9:00 a.m. to go shopping at the mall for a white shirt.[103] When she arrived, Stewart realized the retail stores in the mall did not open until 10 a.m. so she decided to get some food and something to drink while she waited.[104] She testified that she was not feeling well and she felt like she had a hangover.[105] Nevertheless, Stewart attended the Seafood Show and stayed for its duration.[106]

After the show ended, Stewart met Defendant Morris, a friend of Defendant Morris and Beth Jackson in the concierge lounge of the hotel. Despite feeling hung over earlier that morning, she had two Tanqueray and Tonic drinks while she was in the concierge lounge; the first one Stewart prepared for herself and the second one allegedly was prepared by Defendant Morris.[107] Stewart testified that she did not see Defendant Morris prepare her drink but he had

---

[98] Stewart Dep., Ex. 3, at 69:10-69:16.
[99] Id.; Stewart Dep., Ex. 3, at 71:23-70:1.
[100] Stewart Dep., Ex. 3, at 70:13-17.
[101] Stewart Dep., Ex. 3, at 165:21-166:5.
[102] Stewart Dep., Ex. 3, at 71:24-72:7.
[103] Stewart Dep., Ex. 3, at 41:5-19.
[104] Id.
[105] Stewart Dep., Ex. 3, at 37:4-15.
[106] Stewart Dep., Ex. 3, at 85:3-86:9.
[107] Stewart Dep., Ex. 3, at 88:3-90:3.

15

asked if anyone wanted another drink and then came back with the drinks requested.[108] After she had consumed the two drinks she went to dinner at California Pizza Kitchen in the Copley Mall and walked back to the hotel with Defendant Morris, Beth and her mother and Steve Nysis. Stewart has a clear recollection of her time in the concierge lounge, consuming the two (2) Tanqueray and Tonics at the concierge lounge, attending dinner, and walking back through the mall to the Marriott hotel after dinner.[109]

Stewart and Defendant Morris stayed in the lounge/bar area of the hotel after they returned from dinner. Defendant Morris and Stewart had a conversation, which included a discussion about Stewart's involvement in the company.[110] She alleges that during this conversation, Defendant Morris massaged her shoulders in the hotel lounge area.[111] Stewart also alleges that Defendant Morris asked her if he could come to her room and finish the massage.[112] When she said no, he did not persist and she went to her room locked the door and did not have any contact or communication with Defendant Morris the rest of the night.[113] Stewart called her husband and informed him that Defendant Morris had massaged her shoulders and asked if he could come to her room and finish the massage.[114] She testified that her husband was mad but she could not recall what he said.[115] Her husband did not advise her to report Defendant Morris' alleged behavior.[116]

The following morning, Stewart sent Defendant Morris a text message to find out what time they would be meeting to board the shuttle to the second day of the Boston Seafood Show.

[108] Id.

[109] Stewart Dep., Ex. 3, at 90:5-91:19.

[110] Stewart Dep., Ex. 3, at 92:12-18.

[111] Stewart Dep., Ex. 3, at 47:11-49:20; 92:12-93:9; see also Stewart FBI Interview, Mar. 7, 2012, Ex.6, p. 39-40.

[112] Stewart Dep., Ex. 3, at 93:10-94:25; see also Stewart FBI Interview, Mar. 7, 2012, Ex.6, p. 42.

[113] Stewart Dep., Ex. 3, at 94:4-14.

[114] Stewart Dep., Ex. 3, at 95:10-97:7.

[115] Id.

[116] Stewart Dep., Ex. 3, at 95:10-97:7.

16

He informed her that they would meet at the concierge at 8:35am for breakfast and then get to show by 9am.[117] Stewart testified that she felt terrible that morning and it was her belief this "terrible" feeling was because Defendant Morris had contaminated her drink the night before.[118] Stewart attended the second day of the show but left a little early so she would make her flight back to Houston.[119]

### III. Reporting of Incidents of Alleged Assault

#### a. Barnett's Failure to Report Alleged Assault

Barnett never reported any of the incidents that she alleged occurred during the New Orleans business trip to any representative at Edible Software. On November 10, 2012, just four (4) days before her trip to New Orleans, Barnett was provided with Defendant Edible Software's sexual harassment policy.[120] After she returned from the New Orleans business trip, Barnett attended a Lunch and Learn on the company's sexual harassment policy.[121] Barnett was well aware of the sexual harassment policy and reporting procedures however she never reported Defendant Morris' alleged actions during the New Orleans trip. It was not until February 2012 that she reported the incidents to the Federal Bureau of Investigation ("FBI").[122]

#### b. Hill's Failure to Report Alleged Assault

Hill never reported the alleged incidents in New York to any representatives at Defendant Edible Software. She also never reported the incidents in Chicago/Peoria to any representative at Edible Software. At her husband's recommendation, Hill spoke with a narcotics agent when she

---

[117] Stewart Dep., Ex. 3, at 100:13-21.
[118] Stewart Dep., Ex. 3, at 100:22-102:2.
[119] Stewart Dep., Ex. 3, at 117:19-118:12.
[120] Hill Dep., Ex. 2, at 67:2-69.
[121] Hill Dep., Ex. 2, at 79:9-14.
[122] Barnett FBI Interview, Feb. 27, 2012, Ex. 4.

17

returned from the Chicago trip.[123] The narcotics agent, a friend of Hill's husband, then referred her to FBI Special Agent Glen Gregory. Hill met with Gregory twice and produced a written statement. The FBI planned with Hill to circumvent the next planned business trip and take Defendant Morris into custody. The FBI met Hill and Defendant Morris at the airport and apprehended Defendant Morris. Even after the FBI apprehended Defendant Morris, Hill lied to Trevor Morris of Defendant Edible Software as to her knowledge of why Defendant Morris was apprehended and that she had reported his alleged conduct to the FBI.[124]

After Hill's employment with Defendant Edible Software was terminated in or about April 2011, she filed a claim with the Equal Employment Opportunity Commission.[125] She received a Notice of Dismissal and Rights from the EEOC dated November 19, 2012 in which the EEOC was unable to find any violation.[126]

c. **Stewart's Failure to Report Alleged Assault**

Stewart took no action regarding her allegation against Defendant Morris or Defendant Edible Software for nine (9) months from March 2011 – January 2012.[127] However, on the day her employment was terminated, she asked Defendant Morris if she was being fired because she turned down "his offer to come to [her] room and finish the massage."[128] She did not make any complaints internally to the Defendant Edible Software's HR Department or file a charge with the EEOC or TCHR.[129] In January 2012, agent FBI Special Agent Gregory contacted Stewart and spoke to her for approximately thirty (30) minutes about her knowledge and/or experience with Defendant Morris.

[123] Hill Dep., Ex. 2, at 147:16-151:9.
[124] Hill Dep., Ex. 2, at 153-154:20; 224:11-227.
[125] Hill Dep., Ex. 2, at 155:18-156:14.
[126] Hill Dep., Ex. 2, at 157:24-159:14.
[127] Stewart Dep., Ex. 3, at 30:3-10.
[128] Stewart Dep., Ex. 3, at 131:25-132:19.
[129] Stewart Dep., Ex. 3, at 131:10-132:4.

18

Specifically, FBI Special Agent Gregory asked Stewart if she recalled any loss of memory or waking up with a hangover while on a business trip with Defendant Morris in Boston in March 2011.[130] She responded that she had not.[131] During that conversation Stewart informed agent Gregory that the Monday night of the Boston Seafood show business trip, she went to the bar with Defendant Morris and had a drink while she sat in the lounge area. Stewart also informed FBI Special Agent Gregory that when Defendant Morris massaged her shoulders and when they got in the elevator at the hotel, he asked if he could come to her room and finish the massage.[132] At the end of that conversation FBI Special Agent Gregory provided his telephone number and told Stewart if she could recall anything else to contact him.[133]

Stewart then called her husband and informed him of the conversation she had with FBI agent Gregory. Her husband told her that she had called him when she was in Boston and told him she was at the mall looking for some Coca Cola and something to eat and drink because she did not feel well.[134] After the conversation with her husband, Stewart called Gregory back and told him the information her husband had allegedly reminded her of; that she had called him while on the Boston business trip in March 2011 and told him she was hung over and looking for something to eat and drink because she didn't feel well.[135]

On March 7, 2012, Stewart gave a recorded statement to the FBI.[136] Also, Stewart contacted a lawyer in March 2012. However, Stewart did not retain him because he declined to accept her case.[137]

---

[130] Stewart Dep., Ex. 3, at 32:4-35:3.
[131] Id.
[132] Stewart Dep., Ex. 3, at 46:1-11; see also Stewart FBI Interview, Mar. 7, 2012, Ex.6.
[133] Stewart Dep., Ex. 3, at 34:11-14.
[134] Stewart Dep., Ex. 3, at 37:4-15.
[135] Stewart Dep., Ex. 3, at 37:4-40:3.
[136] Stewart Dep., 3, at 54:7-55:19.
[137] Stewart Dep., Ex. 3, at 28:21-30:11.

19

<u>**ARGUMENT AND AUTHORITY**</u>

## I.    STANDARD OF REVIEW

A plea to the jurisdiction may be used to challenge the presence of subject-matter jurisdiction. This dilatory plea is used to defeat the alleged claims without regard to whether they have merit. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex.2000). "The purpose of a dilatory plea is not to force [a] plaintiff[ ] to preview [its] case on the merits but to establish a reason why the merits of the plaintiff['s] claims should never be reached." *Id.* In this Plea to the Court's Jurisdiction Defendants will conclusively show that the plaintiffs' circumvention of jurisdictional prerequisites to disguise standard employment discrimination disputes as common law torts deprives this court of jurisdiction to hear the claims.

### a.    Applicability of the Plea to the Court's Jurisdiction at Bar

Defendant's argument throughout remains that because the common law claims brought by all three plaintiffs are inextricably intertwined with claims that are required to be brought under the TCHRA, which requires exhaustion of administrative remedies, the claims asserted, in the fashion that they have been, are preempted.

When a statute, such as the TCHRA requires the exhaustion of administrative remedies before a plaintiff may file suit, the plaintiff bears the burden to show he has met the prerequisite to suit." *Dworschak v. Transocean Offshore Deepwater Drilling, Inc.*, 352 S.W.3d 191, 200 (Tex. App.-Houston [14th Dist.] 2011, no pet.) (citing *Permian Basin Cmty. Ctrs. for Mental Health & Mental Retardation v. Johns*, 951 S.W.2d 497, 502 (Tex. App.-El Paso 1997, no writ); *Rodriguez v. Am. Gen. Fire & Cas. Co.*, 788 S.W.2d 583, 585 (Tex.App.-El Paso 1990, writ denied)). It's undisputed in this case that the Plaintiffs have not exhausted the jurisdictional prerequisite required by the TCHRA.

20

Once the failure to exhaust issue is resolved, it is incumbent upon the trial court being asked to resolve a plea to its jurisdiction review the evidence to determine if a fact issue exists with regard to jurisdiction. *Miranda*, 133 S.W.3d at 227 (citing *Land v. Dollar*, 330 U.S. 731, 735 & n. 4, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947), overruled by implication on other grounds by *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). If the pleadings or evidence affirmatively negate a jurisdictional fact as is the case here, a court may grant a plea to the jurisdiction without allowing the plaintiff to amend her pleadings." *City of Waco v. Lopez*, 259 S.W.3d 147, 150 (Tex. 2008).

## II. ANALOGOUS FACTS POST *WAFFLE HOUSE* SUPPORT DEFENDANTS' JURISDICTIONAL CHALLENGE

In *Pruitt*, the jurisdictional challenge was similar to the one here. There was no claim filed with the Texas Workforce Commission prior to bringing suit. *Pruitt*, 366 S.W. 3d at 743. Though *Pruitt* was not a case grounded in allegations of sexually based assaults[138] in the course and scope of employment, the Fire Chief Plaintiff was claiming racial discrimination.

The THCRA is essentially an elaborate process developed by the legislature to resolve employment discrimination claims. *Pruitt*, 366 S.W. 3d at 745. A plaintiff must comply with mandatory and jurisdictional administrative prerequisites contained within the TCHRA to sustain an employment discrimination cause of action. *Bartosh v. Sam Houston State Univ.*, 259 S.W.3d 317, 321 (Tex.App.–Texarkana 2008, pet. denied).

As the *Pruitt* court observed, there are three reasons why exhaustion of Chapter 21's administrative remedies is a prerequisite to bringing a civil action for discrimination claims. *Schroeder v. Tex. Iron Works, Inc.*, 813 S.W.2d 483, 488 (Tex.1991), overruled in part on other grounds by *In re United Servs. Auto. Ass'n*, 307 S.W.3d 299 (Tex. 2010).

---

[138] Sexual harassment is a form of sexual discrimination. *Meritor Sav. Bank, FSB v. Vinson* 477 US 57, 67, 106 S.Ct. 2399 (1986)

21

Date/Time: Feb. 19. 2015  4:28PM

| File No. | Mode | Destination | Pg(s) | Result | Page Not Sent |
|----------|------|-------------|-------|--------|---------------|
| 0619 | Memory TX | 18664401655 | P. 1 | OK | |

Reason for error
E. 1) Hang up or line fail
E. 3) No answer
E. 5) Exceeded max. E-mail size
E. 2) Busy
E. 4) No facsimile connection

Unofficial copy Office of Chris Daniel District Clerk

# THE LAW FIRM OF ALTON C. TODD

512 S. Friendswood Drive ♦ Friendswood, Texas 77515
www.altontodd.com

February 19, 2015

Chante Simpson
Allstate
Houston Specialty
P.O. Box 802468
Houston, Texas 77280

VIA FACSIMILE-866.440.1655

Re:   Our Client        :   Miracle Russell
      Your Insured      :   Dolly Moufarej
      Date of Loss      :   July 12, 2014
      Claim Number      :   0333883147

FOR SETTLEMENT PURPOSES ONLY

Dear Chante:

I have conveyed the offer of $6,100.00 to my client and she has asked that I kindly reject same. However, in the spirit of compromise, she has authorized me to accept $18,000.00 on her behalf. Please advise at your earliest convenience.

Should you have any questions or need any more information, please feel free to contact my office.

Kindest regards,

N Jeff Todd

Jeffrey N. Todd

JNT/

First, as the *Pruitt* court observed, the various provisions of Chapter 21 strongly indicate a requirement of mandatory exhaustion of administrative remedies.

> For example, the Section entitled "Civil Action by Complainant" reads, "[w]ithin 60 days after the date a notice of the right to file a civil action is received, the *complainant* may bring a civil action *against the respondent.*" TEX. LAB.CODE ANN. § 21.254 (emphasis added). Moreover, "*[a] civil action* may not be brought under this subchapter later than the second anniversary of the *date the complaint* relating to the action is filed." TEX. LAB.CODE ANN. § 21.256 (West 2006) (emphasis added). Additionally, a judicial proceeding under Chapter 21 "*is by trial de novo.*" TEX. LAB.CODE ANN. § 21.262 (West 2006) (emphasis added). *Pruitt*, 366 S.W. 3d at 745.

> Next, although the language of Chapter 21 states that a person "may" file an administrative complaint, the legislation was designed to "encourage [ ] compliance through voluntary resolution, conference, conciliation and persuasion—informal processes other than litigation." *Schroeder*, 813 S.W.2d at 486–87. Thus, the Texas Supreme Court "do[es] not believe the Legislature's comprehensive remedial scheme allows aggrieved employees to proceed on dual tracks—one statutory and one common-law, with inconsistent procedures, standards, elements, defenses, and remedies," since interpreting the statute to allow for simultaneous litigation would frustrate its purpose. *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 799 (Tex.2010); *see Schroeder*, 813 S.W.2d at 486–87.

> Third, because the general purpose of Chapter 21 was to provide for the execution of the policies of Title VII of the Civil Rights Act of 1964 and its subsequent amendments, and "the United States Supreme Court ha[d] made it clear that Title VII include[d]" the requirement to "first fil[ing] a charge with the EEOC" prior to bringing a civil action, the Texas statute should also be interpreted in the same manner. *Schroeder*, 813 S.W.2d at 485–87 (citing *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 47, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 798, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Love v. Pullman Co.*, 404 U.S. 522, 523, 92 S.Ct. 616, 30 L.Ed.2d 679 (1972)); *see* TEX. LAB.CODE ANN. § 21.001(1) (West 2006). Thus, "failure to file a complaint and to pursue ... administrative remedies with the Commission

22

creates a jurisdictional bar to" discrimination claims. *Schroeder,* 813 S.W.2d at 488; *Waffle House,* 313 S.W.3d at 804–05.

*Pruitt* , 366 S.W. 3d at *746,* citing *Schroeder,* 813 S.W.2d at 487.

This precedent from the Texas Supreme Court requires the exhaustion of administrative remedies with the TWC prior to filing suit for intentionally aiding or abetting discrimination. *Pruitt,* 366 S.W. 3d at 746.

The *Pruitt* court cited to *Waffle House* in setting forth a test for the precise pre-emption/exclusion remedy that the Defendants are asking the court to invoke in this case. The task of the court is resolving the jurisdictional issue in *Pruitt* was to determine whether the gravamen of the plaintiff's claim was essentially one for racial discrimination and whether his common law causes of action were based on the same course of conduct giving rise to a statutory discrimination claim. Because Chapter 21 is pre-emptive when the actions forming the complained of torts are entwined with the complained of discrimination, the test for the court was to determine whether or not there were additional facts that were unrelated to the statutory discrimination claim that would independently support a tort claim. *Pruitt,* 366 S.W. 3d at 749, citing *Waffle House,* 313 S.W.3d at 808.

The Texas Supreme Court has held that a plaintiff cannot proceed on a common law track for the alleged assault when such claims are rooted in facts inseparable from a claim of harassment, remedied exclusively by the statutory provisions of the TCHRA. A statutory cause of action will abrogate a common-law claim if there is a "clear repugnance between the two causes of action."[139] If claims involving sexual harassment are pursued as common law torts,

---

[139] *Waffle House v. Williams,* 313 S.W.3d at 802.

23

"the statutory procedures and limitations applicable to such claims would be rendered superfluous."[140]

Plaintiffs base their common law claims on Defendant Morris' alleged actions of unwanted sexual contact during business trips where both Defendant Morris and Plaintiffs were acting in their capacity as employees of Defendant Edible Software. Such sexual harassment allegations occurring within the employment relationship are exclusively governed by the TCHRA. This Court has no jurisdiction because the TCHRA is the exclusive remedy for workplace sexual harassment, and the plaintiffs have not satisfied the jurisdictional prerequisites to bringing suit.[141]

a. **Plaintiffs' claim that Defendant Edible Software is liable for the alleged unwanted sexual touching by Defendant Morris is limited to the TCHRA scheme for such employer-employee relations.**

Plaintiffs admit in their petition that the incidents of assault complained of all occurred when, "Defendant Morris was employed in a managerial capacity by Defendant Solid Software Solutions, L.L.C.," and that "Defendant Morris was acting within the scope of his employment."[142] An employer's liability for unwanted sexual touching by another employee is limited to the tailored TCHRA scheme that specifically covers employer liability for sexual harassment.[143] Even though unwanted sexual touching is considered simple assault under Texas law due to its "offensive and provocative" nature, such claims arising in the workplace are exclusively governed by statutory regime.[144] A reading of the Petition in this case clearly reveals

---

[140] *Id.* at 802.
[141] *Id.* at 801 (The court agreed with Defendant's assertion that the common law claims asserted by Plaintiff should fail as a matter of law because the TCHRA is the exclusive remedy for workplace sexual harassment).
[142] Plaintiffs' Second Amended Petition, at ¶¶18-19.
[143] *Waffle House v. Williams*, 313 S.W.3d at 803.
[144] *Id.*

24

that the alleged conduct occurred while Defendant Morris was acting in his capacity as an employee of Defendant Solid Software Solutions.[145]

Additionally, Plaintiffs attended the business trips as part of a function of their employment with Defendant Solid Software Solutions. Hill was required to meet and help secure prospective clients as part of her job duties.[146] Therefore Hills' attendance on the business trip to New York to meet prospective client Anchor Seafood on or about January 8, 2012 and the business trip to Chicago and Peoria, Illinois to meet prospective client Pasqual on or about January 22, 2012 was within the scope of her employment.[147] In the Implementation Role, Barnett was expected to assist new customers with purchased software, either on site or at their facility, therefore she attended business trip/shows to meet with clients as a part of her job.[148] Stewart described the reason for her attending the Boston Seafood show business trip, the event in which she alleges the incidents of assault occurred, as related to the scope of her employment. Stewart testified that when she was invited on the trip, she was told by Defendant Morris that her duties and responsibilities while on the trip was to "observe and learn the product," a function of her job.[149]

All Plaintiffs in the claim attended the business trips as part of their work and as a part of their employment with Defendant Edible Software. The allegations of unwanted sexual contact allegedly took place while on business trips within the employer-employee relationship. Thus, Plaintiffs claims regarding employer liability for alleged sexual harassment must be governed by the TCHRA.

---

[145] *See e.g., Mosley v. Wal-Mart Stores Texas LLC,* 2011 WL 2893086 (N.D. Tex. June 20, 2011).

[146] Hill Dep., Ex. 2, at 45:24-45:1.

[147] *See Waffle House v. Williams,* 313 S.W.3d at 803; *See also* Hill Dep., Ex. 2, at 169:21-23;169:24-170:1.

[148] Barnett Dep., Ex. 1, at 25:12-18.

[149] Stewart Dep., Ex. 3, at 57:23-58:12; 86:2-9.

25

**b. Plaintiffs' claims of assault stem from the same facts that support a sex discrimination (sexual harassment) claim exclusively governed by the TCHRA.**

Plaintiffs' common law claims of assault are preempted because the TCHRA provides the exclusive remedy for workplace sexual harassment. The Texas Supreme Court has recognized that a plaintiff is barred from recovery based on a common law tort where a statutory remedy is available for the same conduct that underlies the tort claim.[150] The TCHRA confers both the right to be free from sexual harassment and the remedy to combat it.[151] When the gravamen of a plaintiff's case is TCHRA – covered harassment, the Act forecloses common-law theories predicated on the same underlying sexual harassment facts."[152]

The TCHRA provides a specific statutory scheme and remedy for sexual harassment.[153] This includes discriminatory conduct in the form of unwanted sexual touching creating a hostile work environment.[154] The elements of a hostile work environment claim as a result of sexual harassment include plaintiff being a member of a protected class, an allegation of being subjected to unwanted sexual advances, harassment based on sex and harassment affecting a term or condition of employment.[155] Claims with facts that give rise to those elements fall under the TCHRA which provides an avenue for a plaintiff to assert a claim of liability on an employer when subjected to sexually offensive verbal and physical contacts in the workplace.

Plaintiff Barnett alleged that Defendant Morris, "attempted to sexually assault" and "attempted to forcefully remove her [Barnett's] clothing."[156] Plaintiff Hill stated that she "awoke

---

[150] *Waffle House v. Williams*, 313 S.W.3d 796, 802 (Tex. 2010).
[150] *Id.*
[152] *Waffle House v. Williams*, 313 S.W.3d 796, 813 (Tex. 2010)(citing *Pruitt v. Int'l Assoc. of Fire Fighters, et al.,* 366 S.W.3d 740, 747 (Tex. App. 2012)(citing Black's Law Dictionary 770 (9th ed. 2009)([T]he gravamen is "the substantial point or essence of a claim, grievance, or complaint.").
[152] Tex. Lab. Code §21.051.

[154] *Hardy v. Fleming Food Co., Inc.* 1996 WL 145463 (S.D. Tex. 1996).
[155] *Prigmore v. Houston Pizza Ventures, Inc.*, 189 F. Supp. 2d 635, 642 (S.D. Tex. 2002).
[156] Plaintiff's Second Amended Petition, at ¶ 9.

26

with memories of Morris' face pressed against her and being sexually assaulted by Morris."[157] Plaintiff Stewart alleged that Defendant Morris massaged her shoulders and propositioned to finish the massage in her hotel room. Plaintiffs allege that these actions took place during business trips where Defendant Morris was acting in his capacity and within the scope of his duties as President and CEO of Defendant Solid Software.[158] According to Plaintiffs, Defendant Morris' alleged conduct was "offensive or provocative."[159] Additionally, in their deposition testimony, the Plaintiffs allege the following incidents of unwanted sexual touching.

Plaintiff Hill's speculations of unwanted sexual touching during the Chicago business trip include:

- Defendant Morris holding her hands.[160]

- Defendant Morris' face pressed against the side of Plaintiff Hill's face.[161]

- Defendant Morris held Plaintiff Hill's hand and rubbed in her vaginal area and up and down her leg.[162]

Plaintiff Barnett's speculations of unwanted sexual touching during the New Orleans business trip include:

- Defendant Morris pulled Plaintiff Barnett's sweater off.[163]

Plaintiff Stewart specifically stated that she believes she was sexually harassed while working for Defendant Edible Software in her deposition testimony as follows:

Q:      Do you know what the term sexual harassment means?
A:      Yes.
Q:      Do you believe you were sexually harassed working at Edible Software?

---

[157] Plaintiff's Second Amended Petition, at ¶ 12.
[158] Plaintiff's Second Amended Petition, ¶¶ 8-9, 10-11.
[159] D's First Amended Petition, at ¶¶15-17.
[160] Hill Dep., Ex. 2, at 122:1-123:22.
[161] Hill Dep., Ex. 2, at 123:11-20.
[162] Hill Dep., Ex. 2, at 123:18-124:15.
[163] See Plaintiffs Second Amended Petition; Barnett Dep., Ex. 1, at 109-116:12.

27

A:    Yes.

Q:    Okay. And your complaint against Edible Software in the civil suit is for sexual harassment, correct?

A:    Yes.[164]

Stewart also testified:

Q:    ...When you contacted the lawyer named Bashinski, what was it that you though you had?

A:    Sexual harassment.

Q:    Okay. So even as earlier—as early as April of 2011 you knew you had a sexual harassment claim, correct? That's why you went to see a lawyer?

A:    Yes.[165]

...

Q:    Okay. In other words, you know, in your lawsuit you allege that you were, as you say, sexually harassed, right? Correct?

A:    Yes.[166]

Stewart's assertions of unwanted sexual touching during the Boston Seafood Show business trip include:

• Defendant Morris allegedly massaged her shoulders in the hotel lounge area on March 21, 2011.[167]

• Defendant Morris allegedly asked Stewart if her could come to her room and finish the massage after they left the hotel lounge area and headed back to their separate hotel rooms.[168]

The alleged "unwanted sexual touching" described by Plaintiffs as the essence of their claims is exactly the type of behavior addressed by the statutory provisions of the TCHRA. Texas case law has unequivocally recognized unwanted physical touching within the employer employee relationship as sexual harassment under the TCHRA. Stewart even specifically stated

---

[164] Stewart Dep., Ex. 3, at 55:20-56:4.

[165] Stewart Dep., Ex. 3, at 56:16-23.

[166] Stewart Dep., Ex. 3, at 118:18-22.

[167] Stewart Dep., Ex. 3, at 92:12-93:9

[168] Stewart Dep., Ex. 3, at 93:10-20.

28

that when she sought legal representation she knew she had a sexual harassment claim.[169] Therefore, Plaintiffs cannot "moonlight," as the basis for an assault claim, alleged acts that fall within actionable harassment under the TCHRA.[170]

### c. Plaintiffs' failure to adhere to the administrative requirements of the TCHRA for claims governed by its statutory scheme render Plaintiffs claims time-barred.

Plaintiff attempts to avoid the administrative requirements mandated for sex discrimination sexual harassment claims under the TCHRA by asserting common law claims of assault. Plaintiffs asserted claims are time-barred under the Texas Labor Code which requires that Charges of Discrimination be brought no later than 180 days of the last discriminatory event.

Claims brought under the TCHRA require the exhaustion of administrative remedies as a mandatory prerequisite to the filing of a suit by an individual.[171] The event which triggers both the administrative and legal remedies provided by the TCHRA is the filing of a proper complaint with the Commission. To be properly filed, section 6.01(a) of the TCHRA requires that the complaint be both verified and filed within 180 days of the alleged unlawful employment practice.[172] The time for bringing a civil action is based on the date the complaint is filed.[173] The complainant must satisfy the requirements of section 6.01(a) as a jurisdictional prerequisite to pursuing the private judicial remedy allowed in section 7.01(a). Subject matter jurisdiction cannot be waived; either a court has jurisdiction, or it does not.[174]

---

[169] Stewart Dep., Ex. 3, at 56:16-23.

[170] *Waffle House,* 313 S.W.3d at 813 ("As the complained of acts constitute actionable harassment under the TCHRA they cannot moonlight as the basis of a negligence claim, a claim that presents far different standards, procedures, elements, defenses and remedies.")

[171] *Brammer v. Martinaire, Inc.,* 838 S.W.2d 844, 847 (Tex. App.-Amarillo 1992, no writ).

[172] *See Brammer,* 838 S.W.2d at 846.

[173] Tex. Rev. Civ. Stat. Ann. art. 5221k, § 7.01(a) (Vernon 1987).

[174] *Qwest Microwave, Inc. v. Bedard,* 756 S.W.2d 426, 434 (Tex. App.-Dallas 1988, no writ).

29

The aforementioned facts giving rise to Plaintiffs common-law assault causes of action are inextricably intertwined with the facts giving rise to a sexual harassment complaint that should have been resolved through TCHRA administrative procedures.

Plaintiff Hill filed a charge of discrimination with the EEOC however the EEOC issued a Notice of Dismissal finding it was unable to conclude that the information obtained established a violation of the statutes.[175] To satisfy the jurisdictional prerequisite required under the TCHRA, Plaintiff Hill was required to file a complaint within either the Texas Workforce Commission or the EEOC within 180 days of the alleged sexual harassment.[176] Because the Texas Labor Code provides a statutory remedy for the alleged sexually harassing conduct, Plaintiff's common law claims for assault is preempted.[177]

With regard to Plaintiff Barnett, the alleged sexual harassment occurred on November 14, 2011. Barnett never filed a charge of discrimination with the EEOC or the Texas Workforce Commission.[178]

The alleged sexual harassment that Plaintiff Stewart complains of occurred in March 2011. She never filed a charge of discrimination with the EEOC even though she was aware the EEOC addressed harassment issues. She also never filed a charge of discrimination with the Texas Workforce Commission. In fact, she initiated no legal action regarding the alleged sexual harassment until March 2012, when she contacted a lawyer who declined to accept her case.[179]

If Plaintiffs are allowed to pursue their claims under the asserted "assault" cause of action, they would be allowed to unjustly side-step the standards and procedures set by the

---

[175] Hill Dep., Ex. 2, at 155:18-156:14.

[176] Tex. Lab. Code §21.202; Texas Youth Commission v. Garza, No. 13-11-00091-CV, 2009 WL 1238582 (Tex. App. – Corpus Christi 2009).

[177] Waffle House, 313 S.W.3d at 802.

[178] Barnett Dep., Ex. 1, 197:2-23.

[179] Stewart Dep., Ex. 3, at 28:21-30:11.

30

TCHRA for sexual harassment claims. In essence, Plaintiffs would be able to evade the, "statutory requirements of exhaustion of administrative remedies and the purposes behind the administrative phase of proceedings, the relatively short statute of limitations, the limits on compensatory and punitive damages, the requirement that the plaintiff prove an abusive working environment, and all other special rules and procedures governing the statutory sexual-harassment claim."[180]

Other courts have consistently held that claims such as the ones asserted by the plaintiffs in this case, when addressed by a statutory remedy, must yield to that remedy. If the gravamen of a plaintiff's complaint is the type of wrong that the statutory remedy was meant to cover, a plaintiff cannot maintain an intentional infliction claim regardless of whether he or she succeeds on, or even makes, a statutory claim." *Hoffmann–LaRoche Inc. v. Zeltwanger*, 144 S.W.3d 438, 448 (Tex. 2008)

In *Taylor v. Seton Healthcare*, 2012 WL 13680 (W.D. Tex. 2012) several employees brought assault and offensive physical contact claims based on theories of respondeat superior, ratification, and negligence against a former co-worker and against their employer for sexual harassment and retaliation under both Title VII and the TCHRA. Similar to what the Plaintiffs here are alleging, the *Taylor* plaintiffs claimed that they were sexually harassed by the co-employee from the time they each began working for the employer.

In addition to asserting claims under Title VII and the TCHRA they alleged that the co-employee's conduct constituted assault and offensive physical contact; that the employer ratified the co-employee's tortious acts; and that the employer was negligent in its employment of the offending employee.

---

[180] *Waffle House*, 313 S.W.3d at 807.

Predictably, the *Taylor* court observed that the Texas Supreme Court's holding that the TCHRA is the exclusive remedy for workplace sexual harassment and preempts common law claims of assault against employers where the claims are predicated on the same conduct underlying a TCHRA claim. *Taylor*, citing *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 803 (Tex.2010) ("employer liability for unwanted sexual touching by a coworker (simple assault under Texas law given its 'offensive or provocative' nature) is limited to the TCHRA scheme that specifically covers employer liability for sexual harassment").

Both in *Taylor*, the case at Bar and *Waffle House*, the Plaintiffs' assault claims are predicated on the same conduct that underlies their TCHRA claims. The Court in *Waffle House* held:

> [s]exual harassment as a legal claim is a statutory creation of legislators, not a common-law creation of judges. As [plaintiff's] tort claim is grounded on sexual harassment, it would impose liability for failing to prevent a harm not cognizable under Texas common law. Further, recognizing a common-law cause of action in this context would negate the Legislature's carefully balanced and detailed statutory regime applicable to sexual-harassment claims, and effectively repeal the TCHRA in sexual-harassment cases where physical contact occurs. *Id.* at 811–812.

Interestingly, in *Taylor*, there was an agreement by both parties that the common law claims against the employer were barred under *Waffle House*. The distinguishing factor in *Taylor* was that the plaintiffs argued that if one of the plaintiffs failed to establish a sexual harassment claim under the TCHRA, then their common law claims should be permitted to go forward. The Court ruled that this position misinterpreted *Waffle House*.

The misinterpretation in *Taylor* is instructive as to the disposition of the Pleas to the Jurisdiction presently before the Court. In *Waffle House*, the Texas Supreme Court held that, if common law and statutory claims based on the same underlying sexual-harassment facts are allowed to coexist:

32

the panoply of special rules applicable to TCHRA claims could be circumvented in any case where the alleged sexual harassment included even the slightest physical contact. In any such case, the plaintiff could claim that a physical contact, even if not actionable as statutory sexual harassment, and even if not normally actionable as a common-law battery, was 'offensive or provocative' because it occurred in the context and course of the coworker's sexual harassment of the plaintiff.

Any excuse that the Plaintiffs would advance as an explanation for not meeting the requirements of a TCHRA claim based on the same gravamen would allow them to circumvent its unique standards and procedures, including the statutory requirements of exhaustion of administrative remedies, the relatively short statute of limitations, the limits on compensatory and punitive damages, and the requirement that the plaintiff prove an abusive working environment. *Id.* at 807. The Texas Supreme Court rejected this very result in *Waffle House*, stating that "[w]here the gravamen of a plaintiff's case is TCHRA-covered harassment, the Act forecloses common-law theories predicated on the same underlying sexual-harassment facts." *Id.* at 813. It is for this reason that the Court in *Taylor* dismissed all of the common law claims asserted by the employees. *Taylor v. Seton Healthcare*, 2012 WL 13680 (W.D. Tex. 2012)

In the context of upholding arbitration agreement between the parties a court aligned a sexual assault claim with a sexual harassment claim. For purposes of arbitration, a sexual assault claim was "related to" plaintiff's employment when the assault was committed by a member of her company's upper management, occurred at a work conference attended by plaintiff as part of her responsibilities for the company, and contributed to an alleged pattern of sexual harassment that had occurred at work. *Forbes v. A.G. Edwards & Sons, Inc.*, No. 08–CV–552, 2009 WL 424146, at *8 (S.D.N.Y. Feb. 18, 2009).

In essence, any claim that is in any way intertwined with a statutory remedy will yield to the statutory cause of action. In *Jones v. Halliburton Company*, 791 F.Supp.2d 567 (S.D. Tex. 2011)

33

affirmed on other grounds, 583 F.3d 228 (5th Cir. 2009), the court, relying on *Waffle House*, ruled that negligence and negligent undertaking claims including claims for the failure to train, supervise, and maintain employees, the failure to provide a safe working environment, and the failure to supervise the project and premises were all intertwined factually with the plaintiff's underlying allegations of sexual harassment. *Jones*, citing *Waffle House*, 313 S.W.3d at 800.

Lastly, Texas courts have gone to great pains to respect the specificity of a statute, even at the expense of a claim potentially being brought under a different statute. In *City of Waco v. Lopez*, 259 S.W.3d 147, 149 (Tex.2008), the plaintiff filed suit under the Whistleblower Act alleging retaliatory discharge for reporting age and race discrimination. Although Lopez did not invoke the TCRA in his pleadings, the court decided that his claims fell within the TCHRA's ambit. *Id.* The court wrote "the touchstone is not availment, but availability of the TCHRA remedies." *Id.* at 151. Because Lopez's claims could have been raised under the TCHRA the Texas Supreme Court found that the lower courts erred in not granting a plea to the jurisdiction.. *Id.* at 156.

### CONCLUSION & PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendants move that the Court grant summary judgment in its favor as to all such claims as to which the Court finds it proper to do so, award Defendants its costs of court, and grant Defendants all such other and further relied, at law or in equity, as to which Defendants may show itself to be justly entitled.

Respectfully submitted,

**/s/ Gregg M. Rosenberg**
Gregg M. Rosenberg
Texas State Bar No. 17268750
ROSENBERG & SPROVACH
3518 Travis Street, Suite 200
Houston, Texas 77002
(713) 960-8300
(713) 621-6670 (Facsimile)
Attorney-in-Charge for Defendants

OF COUNSEL:
ROSENBERG & SPROVACH                    ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing instrument has been forwarded via Texfile.gov Electronic Service on this the 21st day of February 2014 to:

Jeffrey N. Todd
312 S. Friendswood Drive
Friendswood, Texas 77546
(281) 992-8633 (Tel)
(281) 648-8633 (Fax)

**/s/ Gregg M. Rosenberg**
GREGG M. ROSENBERG

Cause Number: 2012-65503

| | | |
|---|---|---|
| KERI HILL AND MICHELLE BARNETT | ( | IN THE DISTRICT COURT OF |
| | ( | |
| VS. | ( | HARRIS COUNTY, TEXAS |
| | ( | |
| HENRI MORRIS AND SOLID SOFTWARE | ( | |
| SOLUTIONS, INC. D/B/A EDIBLE SOFTWARE | ( | 55TH JUDICIAL DISTRICT |

## PLAINTIFFS' RESPONSE TO DEFENDANTS' PLEA TO THE COURT'S JURISDICTION

**Plaintiffs Keri Hill, Michelle Barnett and Stacy Stewart,** ("Plaintiffs", "Assault Victims"), herewith respectfully respond to the Defendants' Plea to the Court's Jurisdiction, heretofore filed herein by Defendants Henri Morris and Solid Software Solutions, Inc. d/b/a Edible Software, ("Morris", "Edible", collectively "Defendants"); and, in support provide the following information, argument and authority:

## I.
## RELEVANT FACTS AND PROCEDURAL HISTORY

The Assault Victims filed their Third Amended Petition on August 23rd, 2013. Following relevant discovery, Defendants filed a Motion for Summary Judgment, ("MSJ"), which this Court properly denied. On February 21st, 2014, Defendants filed their Plea to the Court's Jurisdiction, ("Plea"), to which the Assault Victims herein respond. To quote the inimitable Yogi Berra, "It's like deja-vu all over again."[1] In their instant Plea, exactly as they did in their previously denied MSJ, Defendants obdurately cling to the self-serving distortion that this case involves nothing more than routine workplace discrimination claims and not the appalling reality that the Assault Victims were surreptitiously drugged, completely incapacitated and then sexually molested and otherwise violated. The *single* grudging reference to that awful truth in Defendants' Plea

---

[1] http://www.baseball-almanac.com/quotes.



EXHIBIT

1

is renounced in the very next sentence: "Defendants are cognizant of the severity of the allegations being asserted by each of the Plaintiffs in this suit. Regardless, even if the allegations of assault of a sexual nature were true, the exclusive remedy lies within the confines of the TCHRA."[2] As the Assault Victims will clearly show in their following analysis, that is a denial of established fact and a manifestly incorrect statement of controlling Texas law; and, consequently, the Plea should be denied in each and all of its particulars.

## II.
## ARGUMENT AND AUTHORITIES

The Defendants' Plea *sub judice* is premised upon three fatal flaws: (1) this case is most certainly *not* controlled by the Texas Commission for Human Rights Act, ("TCHRA"), or the presumptive preemption it has been seemingly accorded by the Texas Supreme Court, in *Waffle House v. Williams*, 313 S.W.3d 796 (Tex. 2010)[3], as discussed in *Pruitt v. Int'l Ass'n of Fire Fighters*, 366 S.W.3d 740, 745-46 (Tex.App.- Texarkana 2012, no pet.), regarding all claims arising out of *workplace* discrimination, consequently the Assault Victims had no statutory procedural obligation to exhaust TCHRA administrative remedies before commencing the instant suit; (2) while the question of whether this Court has discretion to exercise its jurisdiction to consider the merits of the matters at issue herein is properly procedurally raised by means of a plea to the

---

[2] Plea, pgs. 1-2.

[3] As discussed in detail *infra*, Defendants fundamentally misread *Waffle House*. In the opinion's second paragraph, the Supreme Court makes very clear that it is considering a core question of first impression: "may a plaintiff recover negligence damages for harassment covered by the TCHRA?" 313 S.W.3d at 798-99. Plaintiffs herein bring no such claim. In the very next paragraph, the Court admonishes: "the TCHRA does not foreclose an assault-based negligence claim arising from independent facts unrelated to sexual harassment." *Id.*, at 799. Here, Plaintiffs assert assault claims against Morris and negligence claims against Edible for allowing a predator to victimize them. Neither claim is in any way precluded by the TRCHA or its application in *Waffle House.*

2

jurisdiction, see *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225-26 (Tex. 2004), see also *Comunidad Balboa, LLC v. City of Nassau Bay*, 402 S.W.3d 479, 482-83 (Tex.App.- Houston [14th Dist.] June 13, 2013, no pet.), a proper reading of *Miranda* and its progeny mandate that the Court keep this case; and, (3) even if the Court were to somehow determine the Assault Victims' claims are presently deficient in supporting jurisdiction, the Court should afford them the opportunity to amend their pleadings to do so. The Assault Victims will treat each of these Plea defects separately.

## I.    *Plaintiffs' Claims Are Not Covered by the TCHRA or Waffle House:*

Like Br'er Rabbit's clever ploy of constantly requesting his adversaries, Br'er Bear and Br'er Fox to "throw me into the Briar Patch,"[4] where he would be quite comfortably at home, the Defendants' expert discrimination law counsel has throughout this case insisted that the instant claims are mere workplace discrimination claims and not egregious, humiliating sexual assaults. As proof of how fallacious such a characterization is, the Court should note that based in large part upon the facts asserted by the Assault Victims in their Third Amended Petition on file herein, Morris was indicted by a federal Houston Grand Jury, (see the Superseding Indictment, dated Aug. 5, 2013, in Criminal Cause No. H-12-255SS, styled *United States of America vs. Henri De Sola Morris*, now pending in the Houston Division of the U.S. District Court for the Southern District of Texas, attached hereto as Exhibit "A", and incorporated herein and made a part hereof by reference, as if set out in full, pursuant to Tex. R. Civ. P. 58. Morris has now pled guilty to the federal criminal charges arising from crossing state lines to put drugs into the drinks

---

[4] *Uncle Remus: His Songs and His Sayings*, Harris, Joel Chandler, D. Appleton & Co., New York, N.Y., 1880.

3

of four female employees to allow him to sexually abuse them while they were thereby rendered helpless and totally vulnerable.[5] When directly asked on the record by the presiding federal district judge, during Morris' criminal plea hearing, whether he put the incapacitating drugs in the women's drinks, Morris replied, "Judge, that is an accurate summary of what happened. I agree with it."[6]

This Court may consider such evidence in evaluating the instant Plea. See *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000)("[A] court deciding a plea to the jurisdiction is not required to look solely to the pleadings but may consider evidence and must do so when necessary to resolve the jurisdictional issues raised."); *County of Cameron v. Brown*, 80 S.W.3d 549, 555 (Tex. 2002)(court may not weigh the claims' merits but must consider only the plaintiffs' pleadings and the evidence pertinent to the jurisdictional inquiry); *State v. Lueck*, 290 S.W.3d 876, 880 (Tex. 2009)(trial court must consider evidence necessary to resolve the jurisdictional issues raised); *City of Elsa v. Gonzalez*, 325 S.W.3d 622, 625 (Tex. 2010)("[W]e consider the plaintiff's pleadings and factual assertions, as well as any evidence in the record that is relevant to the jurisdictional issue."); *Heckman v. Williamson County*, 369 S.W.3d 137, 150 (Tex. 2012). So, to enable

---

[5] See: Houston *Chronicle*, *Software Company Chief Admits to Drugging Female Employees for Sex Abuse*, November 1, 2013: New York Daily News, *Software Chief Admits to Raping Four Women on Business Trips*, November 2, 2013, attached hereto as Exhibits "B" and "C" and admissible under Tex. R. Evid. 902(6), *Hardy v. Hannah*, 849 S.W.2d 355, 359 (Tex.App.-Austin 1992, writ denied); *Donaldson v. Taylor*, 713 S.W.2d 716, 717 (Tex.App.- Beaumont 1986, no writ).

[6] This confession of relevant facts is admissible under Tex. R. Evid. 902(4), 609(a), 803(22). See *Benton v. State*, 336 S.W.3d 355, 357 (Tex.App.- Texarkana 2011, pet. ref'd)(copies of public records admissible), *Reese v. State*, 273 S.W.3d 344, 349 (Tex.App.- Texarkana 2008, no pet.)(judgment regarding previous conviction admissible) and *Hardy*, 849 S.W.2d at 359.

the Court to perform that evidentiary analysis, the following relevant facts are provided from Plaintiffs' pleadings and discovery herein undertaken to date.

**a. The evidentiary facts the Court may and should consider.**

In their Plaintiffs' Third Amended Petition, the specific assault/battery claims asserted by the Assault Victims are as follows:

1. During a November, 2011 trip to New Orleans, Louisiana, Morris drugged Plaintiff Michelle Barnett by putting an unknown substance into her drink, unbeknownst to her. During this time, Morris attempted to sexually assault Barnett and attempted to forcefully remove her clothing, ( Petition ¶ 9);

2. During a January, 2012 trip to New York, New York, Morris drugged Plaintiff Keri Hill by putting an unknown substance in her drink, unbeknownst to her. Hill lost consciousness and awoke some five to six hours later, having no memory of the intervening time period, (Petition ¶ 11). Later in January, 2012, during a trip to Chicago, Illinois, Morris again drugged Hill by putting an unknown substance into her drink, unbeknownst to her. This time, she awoke from being unconscious to find Morris' face pressed against hers while she was being sexually assaulted, (Petition ¶ 12);

3. During a March, 2011 trip to Boston, Massachusetts, Morris drugged Plaintiff Stacy Stewart by putting an unknown substance into her drink, unbeknownst to her. While she was semi-conscious, Morris attempted to sexually assault her and attempted to forcefully remove her clothing, (Petition ¶ 14);

4. On the basis of these respective factual allegations, each and all of said Plaintiffs claimed that Morris, individually, intentionally caused physical contact directly or

5

through the instrumentality of drugs, while he knew or reasonably should have known that each Plaintiff would find that contact offensive or provocative;

5. Further, each Plaintiff claimed against Edible because the basis for each trip arose out of Morris' capacity as President and CEO of Edible and the supervisor of each Plaintiff and the company should be held liable for the intentionally tortious acts of its principal; (Petition ¶¶ 18-20, inclusive). However, no Plaintiff asserted any claim against either Morris, individually, or Edible arising out of *any* contention of sexual discrimination. Instead, every claim asserted arises directly out of intentionally tortious conduct of Morris and the sexual *assault* of each of the victims; and,

6. As a result of these several intentional sexual assault torts, each Plaintiff claims damages for: physical pain, suffering and impairment from the time of the incidents described through trial; mental anguish and anxiety from the time of the incidents through trial; mental anguish and anxiety to be experienced in the future; and, loss of earnings and earning capacity sustained from the date of each incident to time of trial. Each Plaintiff also seeks exemplary damages for Morris' outrageous, malicious and intentional conduct, (Petition ¶¶ 21-26, inclusive).

And, each and all of the Assault Victims' claims and their asserted damages are copiously supported by deposition testimony obtained in the discovery which has thus far been undertaken herein.[7]

---

[7] In Defendants' Plea, the deposition transcripts of the three Assault Victims are appended, as Exhibits "1", (Barnett), "2", (Hill), and "3" (Stewart"). To avoid confusion, the same exhibits are adopted and incorporated herein by reference, per Tex. R. Civ. P. 58. Citations thereof are to page and line. As did Defendants, the Assault Victims set out virtually the same factual summary as was contained in their Response to Defendants' Motion for Summary Judgment. They apologize for this seeming imposition upon the Court's time and precious judicial resources, but, feel that for completeness and ease of analysis such facts are here relevant as well.

6

In her discovery deposition, Plaintiff Michelle Barnett testified that she is a January, 2000 graduate of San Francisco State University, with a bachelor's degree in history, (10:19-24). She lives in Cypress, Texas with her husband and two children, an 8-year-old daughter and a 6-year-old son, (13:13- 14:2). She resigned from Edible late in February, 2012, (12:2-5); having been hired in about June, 2011, (16:2-4). She became aware of the company from use of its software at a prior job, beginning in about January, 2009, (17:1-10). She interviewed for her job at Edible with Defendant Henri Morris and his son Trevor, (20:20-23). She began work at Edible on August 1st, 2011, as the Operations Office Manager, (24:5-8). She understood that travel would be a part of her job, (27:13-20). Her first trip for the company was to Atlanta, in October, 2011, (29:17-25); she was accompanied by Morris, Trevor, and Beth Jackson, (30:1-6). Beth was a software implementation specialist, (30:7-9). Ms. Barnett reported to Defendant Morris, (30:13-16). They left on the trip on a Friday, (30:17-24); and, they returned the following Sunday, (31:4-7). She flew to Atlanta by herself and stayed in a Marriott hotel; the travel arrangements having been made by someone else, (31:7-16). Trevor, Morris and Beth were already there when she arrived at the hotel, (32:6-9).

Ms. Barnett went to dinner that Friday night with Trevor and Morris, (34:17-25). She had two alcoholic drinks, (35:3-18). She also went to a buffet dinner on Saturday, with a lot of people from the trade show, (35:25- 36:10); and, there was drinking there too, although she could not remember what she drank or the number of drinks, although she assumed it was wine or vodka, her usual choices, (36:10- 37:10). These two dinners were the only occasions when she drank alcohol on that trip, (37:15- 38:6). Both Morris and Trevor drank at the Friday night dinner, (38:7-16), and at the Saturday buffet, (38:17-20); but, she could not recall what the two men drank at those functions, (38:15-16, 21-22).

7

She was not under the influence of alcohol on Friday night, (39:2-8); but, on Saturday night, she did, (39:9-10). She felt "tipsy", (39:11-12). She was driven back to the hotel from the buffet by Morris, (16-19). Trevor was with them and he might have driven, (39:21-40:10). But, she was neither drugged nor had any complaints about that trip, (40:16-25). When she returned to work, everything was fine, (41:6-8).

In response to very adroit questioning by seasoned opposing counsel, Ms. Barnett admitted that she had harassment training at the company, (55:17-22); and if she observed it, she was supposed to report it, (57:5-10). She was given a copy of the company's written harassment policy, (67:2-21); and, she knew who to report problems to, (68:18- 69:23). She went to a "lunch and learn" about it, (70:1-11). Early in her time with the company, (17 days after beginning), she observed Andrea Farmer at work when she appeared to be intoxicated, and she emailed Beth about it, (65:12- 66:7). She understood the policy and what workplace sexual harassment was, which included unwanted sexual advance, touching, comments, (70:15- 71:8). She understood the policy applied to anyone she worked with, (71:12-23). But, very importantly, she did not feel that the policy had an effect regarding the president of the company, Morris, (73:25- 74:8). In fact, she expressly felt she could not be protected if the sexual harassment came from Morris, (74:19); so, after she was attacked in New Orleans, she decided to not to report it to the company, which she believed would be futile, (75:7-16); and, instead she reported it to the FBI, (74:23- 75:1). However, even that report was not made until the following February, (75:2-3), three month after she was attacked in New Orleans, because it took her that long to sum up the courage to do so!

In this regard, it is imperative that the Court understand two critical aspects of such testimony. First, the deposition of Ms. Barnett was not to preserve her trial

8

testimony; rather it was for *discovery* purposes only. Undersigned counsel for Ms. Barnett reserved all question until time of trial, (281:19-21). Thus, all of her testimony was in response only to the questions opposing counsel artfully chose to ask. Second, even so, during her protracted deposition, which began at 9:33 am, (6:1), and concluded more than seven hours later at 4:36 pm, (281:25), the magnitude of what happened to her and the devastatingly traumatic effect it had upon her come vividly through even in response only to wily interrogation by opposing counsel. In the face of an outright physical attack by company president and CEO Morris, all of the normal rules regarding workplace sexual harassment went completely out the window. Therefore, to hold Ms. Barnett to solely those rules in analyzing this case can only serve to work a manifestly gross injustice. The superb skills of opposing counsel in framing his inquiries simply cannot be allowed to mask over the horrific nature of Morris' depredations and the injuries it proximately caused.

About two or three weeks after the Atlanta trip, Ms. Barnett was asked to travel again, in November, 2011, (41:17- 42:3); this time to New Orleans, (42:4-5). Morris told her that the purpose of her participation on this trip was to implement software for Aunt Sally's Pralines, (42:6-17). She was excited about the trip because it was her first client implementation, (42:18-22); and, also it was her first trip there, (77:13-17). Morris made the travel arrangements, (57:24-25). They departed on November 14th, 2011, in the afternoon, (58:17-22); she flew with Morris, (58:23-24), on Southwest, (58:25- 59:2). She though it was unusual that the trip details were not given to her until just before the trip, (59:3-21). She asked Morris about it and he told her not to worry and seemed annoyed that she asked, (59:22- 60:2).

9

They left on a Monday, (60:12-13); she and Morris drove separately from work to the airport, (60:14-25). On the flight to New Orleans, she sat next to Morris, (77:20-25; 78:22-24; 79:3-9). During that flight both she and Morris had one drink, hers a red wine, (79:9-24). Once they arrived, Morris rented a car, (81:25- 82:2), and they drove to the Marriot hotel in the French Quarter, (80:8-20). When they arrived at the hotel, Morris checked them both in, (82:3-25). Then, they went up to their respective rooms, on the same floor, (83:1-23). They had rooms on the concierge floor, (81:6-11); and, this was the first time she had ever been to a concierge lounge, (81:12-18). There, the hotel provided a TV, hor d'oeuvres, and drinks, (81:18-22). By the time they met in the lounge it was early evening, (84:2-8); and, they stayed there about 30 minutes or less, (84:9-13). She went to a setup buffet and obtained some appetizers on a plate, (84:18-19), and she poured herself a vodka soda drink, (84:20-23), at a self-serve cart, (85:2-14). However, she only drank about half of it, (86:16-19).

That day, before arriving in the lounge, Ms. Barnett had eaten breakfast, a salad for lunch and two bags of peanuts on the plane, (85:16-25); , then, in the lounge, she had the appetizers, (85:19-21). Once Morris arrived in the lounge, they only stayed there a short time, (86:12-16). Morris wanted to go to a restaurant for dinner and he made to-go cup drinks to take on the drive there, (86:19- 87:10). Morris poured the remaining half on her drink into the to-go cup and then he added to it, (87:9-16); and, he prepared a to-go drink for himself too, (88:4-5). Importantly, Morris took her drink from her to make her to-go cup drink, (88:6-9); and, during the time he made it, he went behind her so that she could not see what he was doing, (88:6-20). They did not have reservations, (89:7-18); so, they then went to Mr. B's for dinner, which was across the street from the hotel, (88:19- 89:6). There was no wait at the restaurant and they were seated immediately, (89:19-25).

10

Ms. Barnett only had a sip or two of her to-go drink because it was very strong, (90:8-11). When they went into the restaurant, the drinks were taken from them, (89:24-90:7); so, they ordered more drinks, hers again being a vodka soda, (90:15-18). Up until that time, Morris had done nothing assaultive, (91:25- 92:6); but, near the end of their meal, significant events occurred, (93:8-11). During the course of her dinner, both of them drank and she consuming a total of three drinks, (92:10-24); the dinner lasting about two hours, (92:25- 93:1). Near the end of dessert, a waitress asked them if they wanted more drinks, and she said no, (93:8-14); however, she excused herself to go to the restroom and when she returned to the table, two drinks were sitting there, one for her, (93:14-16; 95:13-16). Morris claimed the waitress had just brought them, (93:19-24). Since she didn't want this new drink, she only had a few sips of it, (94:12-24); then she dumped it out into her water glass, (94:21-25; 95:17-24), because she didn't want it, (95:22-25).

Then, they left to walk on Bourbon Street to look at the customer's building, (96:20-24); but they never got there, going into a piano bar called PJ's instead, (96:25-97:7). (She later corrected the name to Pat O'Brien's, (145:15- 146:2)).Going in was Morris' idea, (97:8-21); she was tipsy when they arrived there, (97:22-24). Morris ordered more drinks even though he did not ask her if she wanted one of, if she did, what kind, (98:18-25). The drink she received, she later learned, was a "Hurricane", (99:1-15). She didn't refuse the drink, but she felt Morris was intentionally trying to get her to drink more than she wanted to, (99:20- 100:4), because she had specifically told him at the end of dinner that she didn't want to drink more because they had to see the client in the morning, (100:5-10). But, she felt compelled to drink more at the piano bar because she was with her boss and she was trying to "go along", (100:17-21; 101:19-23). The Hurricane was a very big drink, (100:22- 101:8); and, she didn't know he was ordering it and

11

therefore didn't have a chance to say she didn't want it, (102:6-21). Once it came, she a third to a half of it, (103:6-7), because it was very "alcohol intensive", (103:8-13); but, even so, while she was again in the restroom, Morris ordered another one, (103:16-23). This time, she told him directly she didn't want another and asked him why he had ordered it, (104:21-24); in response, he told her to drink the new, full Hurricane and he moved the half-full one away from her, (104:25- 105:3)!

She again told him she didn't want it, (105:6-8); but, she felt compelled to drink some of it and she drank about a quarter of it, (106:2-5). She later learned that the principle alcohol in such drinks is Bacardi 151 proof rum (106:7-17); and, she could not recall ever before having drunk such potent alcohol, (107:1-6). She has no recollection of leaving the piano bar; she can only remember an arm pulling her out of her chair and that is the last thing she remembers, (105:17-24; 108:9-13). Later, she discovered the next morning that it was Morris, who had pulled on her arm, (108:18-23). The next thing she remembers is Morris pulling her sweater off, (109:19-22); then, she remembers running to the bathroom in her hotel room to throw up, (110:1-5; 110:25- 111:3). She remembers saying, 'Oh, this isn't happening to me." (111:7-9); and she remembers someone pulling her clothing off and she felt fearful for her safety, (111:10-14). But, she doesn't have a vivid recollection of anything else, (116:10-12). And, it is here that the real horror of her experience becomes exquisitely clear. This good and decent woman was rendered incoherent by the intentional drugging of Morris; and, she is left now to forever wonder about what vile things he did to her while she was unconscious. Did he rape her? Sodomize her? Photograph her naked as he did others? Share those salacious photos with others? The possibilities are extensive and the implications foul and odious. And, despite Defendants' persistent assertions to the contrary, her awful victimization is not erased

12

because she has no memory of it; in the same way that a surgeon's malpractice blunders are not negated by the fact that the patient was asleep when his tort occurred!

In the morning, she called her husband, (116:13-15). She told him about the previous evening and that she felt uncomfortable and didn't want to go see the client, (117:12-15). Her husband advised her to go to the client's in a separate car and to write what she could remember down and to tell Morris that what had happened made her very uncomfortable, (117:18- 118:1); which she did, (118:2-3). Later, the notes upset her so much she threw them out, (118:4- 119:3). Opposing counsel pressed Ms. Barnett about why she didn't call 911 or otherwise report that night; but, she said she couldn't be sure a crime had been committed, 122:3-23); and, she just wanted to go home and make the evening go away, (123:12-18). But, she didn't go home immediately; she prepared herself for the day ahead even though she didn't want to, (123:19- 124:25); and, then she texted Morris that she was uncomfortable about the previous night and she wanted to go home and would get herself to the airport, (125:1-4; 126:10). Morris' breathtakingly deceitful response was to show up immediately at her door indicating that *he* was very unhappy, (126:11-25)! He knocked on her door, but at first she didn't answer because she wanted him to go away, (127:1-3); but, he kept knocking "like forever", (127:4-5). Through the door, she told him to go away, (127:11-14); but, as she entered the hallway with her packed bag, he was still there, so she had to talk to him, (127:13-25).

She told him she was uncomfortable and wanted to go home, (127:25- 128:5); she was not 100% sure it had been Morris; but, she felt that he had assaulted her and tried to ruin her clothing, (128:13-25). She was certain she was with him and left the piano bar with him, (129:1); and, she felt he had done this to her, (129:7-9). In response to her discomfort, suave predator that he is, he told her he didn't understand her concern

13

because she had come to his room and laid in his bed, where he didn't touch her, (129:18-20); but, she adamantly disagreed with this version of the events because she didn't even know where his room was, (129:21-24; 131:9-14); and, she told him so, (131:6-14). He responded that he "respected her and didn't want to lose her", 131:15-18). Very interestingly, Morris gave her back the sweater he had taken off her, offering no explanation as to why he had it, (136:14-19). He asked her to go see the client, and though she didn't want to, she finally agreed to do so, (132:1-10); and she did, (132:11-12). However, because of their conversation they were late arriving at the client's, so Morris lied and said they had problems getting the car out of the garage, (134:1-7).

Defendants, just as they did in their MSJ, make much of the fact that Ms. Barnett testified that her claims against Morris arise from his role as her supervisor in the course and scope of employment, (137:18-21); but, respectfully, she is not a legal expert and has no basis to make such a legal assertion. They also focus on her testimony that her claims concern her employment and Morris' conduct in a work context, (198:11-16); but, again, she is not qualified to make such a determination. Ms. Barnett is the highly traumatized victim of a vicious assault and she is not a qualified expert on Texas or federal employment law. Moreover, Defendants offer not one word of explanation as to how drugging a woman at dinner for purposes of sexual molestation relates in any conceivable way to job performance or workplace conditions; for the obvious reason that it does *not*.

When she returned home, she talked to her husband, (145:7-9); because she just couldn't understand how she went from being in control of herself to having no recollection, (145:10-14). She decided then she needed to look for another job, (146:8-14); and, she began to look for one, (146:15-16). She liked Beth Jackson, but didn't trust her and they did not discuss what happened, (147:22- 148:10); and, she not discuss it with

14

any other Edible employees until a few weeks later, when she talked with a new employee, Erin Bjork, (148:11-22). She specifically told her she thought she had been drugged and that Morris had attempted to sexually assault her, (149:25- 150:18). She also told her husband that, (150:19-21). She made no attempt to preserve a urine sample or other evidence because she just didn't have the opportunity to do so, (151:5-13). She had no further conversations with Morris about the matter until about a week later, which he initiated, (153:21-25); he said he was concerned for her and she replied she was fine, (154:1-7). A similar exchange occurred on another occasion, (154:8-14). She just tried to avoid him, (155:11-19), unless contact with him was required, (155:20-22).

Ms. Barnett never discussed the matter with fellow employee Michelle Byrd, who dealt with sexual harassment matters, because she felt it would be unsafe to do so as Morris was the company president, 158:17- 159:2); thus the anti-harassment plan was "unsafe" for her, (159:9-24). She thought the idea that Morris would lose his job while she kept hers was ridiculous, (159:3-8); He owned the company and she was a hireling, and any complaint she made would have gone directly to him, (160:1-24). After Morris had been arrested for the criminal charges against him, (including one flowing from her complaint), she told Mr. Frank Lettieri, with her former employer, what happened to her, (163:4-8). After reporting her assault to the FBI, she had a difficult time, (170:6-7). But, she couldn't just quit until she found another job because she couldn't afford it, (172:21-173:1). Later, when she did quit, she needed family assistance to make ends meet, (187:15-22). She finally talked to Keri Hill about her assault, at the suggestion of Erin Bjork, (173:8-16). Their mutual allegations were remarkably similar: both traveled with Morris early in their tenure with the company; both met Morris in a hotel concierge lounge; both received to-go cups from him, containing drinks he had mixed; both completely lost their

15

memories; both had no history of excessive drinking; and, both were terribly uncomfortable about what happened to them, (174:14-25; 175:1-6). Ms. Hill specifically told her about Morris pressing his face to hers and telling her what a good employee she was and that he wanted her to be with him for a long time, (175:11-14). However, even when she resigned from the company, she did not give the attack as a reason because she feared for her physical safety, (190:7-16).

After she left the company, she sought unemployment benefits and told the Texas Workforce Commission she had been a crime victim, (193:14-24), (*not* a victim of workplace discrimination). She told them all she could remember, (193:22- 194:6); she is now certain she was drugged by Morris because she lost consciousness and later when he was arrested, blackout drugs were reported in the news to be on him, (194:18- 195:19). Again, opposing counsel pressed Ms. Barnett on the fact that she really has no memory of what happened to her, (199:4- 200:13); but, that speaks to the efficacy of his assault technique, it doesn't negate its occurrence or legitimate claims arising therefrom. Indeed, she eloquently explained that every day since the attack, she has suffered panic attacks, anxiety, fear, panic, being distant from her family, having to think about this "shit" every single day and not being there for her children when they need her, (201:12-21; 204:6-20); for which she has seen the FBI counselor, (203:1- 204:3). She has also lost work, (204:23-25). Therefore, her testimony completely supports the *prima facie* assault/battery claims she herein asserts.

Plaintiff Keri Hill testified in her eight and a half hour long discovery deposition, (in which undersigned counsel for Ms. Hill again reserved all questions until time of trial), in relevant part, that she lives in Houston, with her husband and two children, a 13-year-old son and a 5-year-old daughter, (5:15- 6:8). She graduated from Texas Tech University

16

with a bachelor's degree in social work, (27:14-23; 28:4-5). She left her employment at Edible on April 30, 2012, (20:3-8); and, did not find a new job until August 2, 2012, (18:10-12). She first learned of a job at Edible in November, 2011, (31:13-15). Slightly later, she had an interview and met Defendant Morris, (37:10-15). They hired her, but before she began working there, on December 12, 2011, (40:3-4), she attended their office Christmas party, (39:17-25). There was drinking at the party, (43:12-25).

About a month after she began working there, a trip to New York came up, (45:9-19). Morris made all the travel arrangements, (48:6-7). They flew to New York on a Sunday, (50:12-14), and she drove herself to the airport and met Morris in the Continental President's Club, (50:21- 51:5). She got to the airport first and ate lunch by herself, (51:10-17). As soon as they entered the VIP lounge, Morris ordered two Bloody Marys, (52:1-5); Morris obtained the drinks at a bar and brought hers to her, (52:10-15). The choice of drinks was Morris', (53:7-12); and, she wound up drinking two of them, over about 30-45 minutes, both ordered by Morris, (53:16- 55:1). She also ate a plate of snacks during that time, (55:2-4). On the plane, she sat next to Henri in first class, (55:7-10); as he had upgraded her to ticket, (55:11-20). During the flight, she drank two vodka and cranberry drinks, 57:22- 58:9); but, despite having four drinks during that day, she felt fine, (58:6-12), as she also ate a meal during the flight, (58:13-25).

When the plane landed, they obtained a rental car, (59:10- 60:12); which Morris got to pick, and in doing so she felt he was showing off, (60:16- 61:9). Then, they drove to a Marriott hotel, which was so close to the airport she thought it would have been just as easy to walk there from the airport, (61:15- 62:1). When they checked in, Morris was very jovial, knew many of the employees by name and went behind the counter to hug several people, (63:3-8); from this she assumed he traveled there a lot, (63:20-24). During such,

17

Morris advised her that Beth Jackson would also be arriving, (63:8-17). He checked both of them in, (64:11-20); they had rooms on the same floor, (64:21-22). They got to their rooms at about 5 pm, (65:13-15). Since she had never been to Manhattan before, Morris said he would drive her there for diner, (65:18- 66:23). She wanted to see the Lincoln Center skating rink, (67:10-20).; and, since there was business planned that night, they had time, (68:10-24). Weirdly, there was a single photo of it in her phone the next day, but, she had no memory of being there, (111:1- 5).

Before dinner, Ms. Hill called her husband to tell him she had arrived safely and that they were going into the city to eat at a deli, (69:1-15); and, she also talked with her kids, (70:3-7). After that, as instructed, she met Morris in the hotel's concierge lounge, (70:22). There were a lot of snacks there and she wanted some; but, Morris told her not to fill up because they would be eating a big dinner, (71:16-22). During that time, Morris ordered two vodka and cranberry and he mixed both his and hers and handed her drink to her, (71:21-25). She drank about half of her drink, (72:14-15); when Morris told her it was time to leave for dinner, and he went up to the bar and got two to-go cups, (72:16- 25). He said the cups would let them take their drinks in the car, (73:1-4). Importantly, he took her half-empty drink from her and replaced it with a new drink which she didn't want and didn't ask for; then he turned his back to her and made the to-go cup drinks while she couldn't see what he was doing, (73:7-11). She knew drinking in a car was not a good idea and she said she wouldn't have done it herself, but, she was with her boss in a new job, so she didn't protest about it, (73:22- 74:24). Morris brought three cups, on which he had written his name on one, her name on another and "spare" on the third, which struck her as very odd, (74:25- 75:4). Morris carried two and she carried her own, (75:8-10); and, they walked to the car, (75:11- 76:1). She had two sips from her drink

during this walk, (76:2-7). After that, she has absolutely no recollection of the entire evening, until she remembered trying to get out of the car back at the hotel, much later, and trying to find her room, (77:1-19). She has a vague recollection of getting into the car and the car moving, but none of anything else that night, (78:2-25).

She has a one-two second flash memory of trying to get out of the car, (79:9-18). She can't recall eating or drinking anything that entire night, (79:21-25). She remembers trying to find her room because she felt uncomfortable and lost and couldn't figure out where she was, (80:1-13). She felt like a little kid who was asleep and dreaming; saying, "I had zero ability or control over what was happening, and I remember that I don't know where I was, but I remember that I wet my pants." (81:5-10). The next recollection she has is standing in her hotel room, with Morris standing over her saying he had been looking for her, (82:15-20). She had no idea how he got into her room, (82:21-22). Opposing counsel asks her if it is true that Morris was expressing concern for her, and she agrees that this is what he said, (83:17- 84:6); but, with due respect to opposing counsel for doing his job, the total picture which emerges from this nightmare is horrific. Ms. Hill, a wife, mother and college graduate, on her first company trip, has been reduced to a terrified, confused, incontinent mess because she was drugged into insensibility; and, here is her attacker expressing his crocodile tear concern for the awful predicament *he* has maliciously intentionally put her in! Bluntly, it's difficult to imagine a more fiendish exploitation of trust or the dignity of another human being. Moreover what he did to her on still another trip only confirms her darkest fears of what he did to her on this one.

Ms. Hill remembers asking him to leave, (84:14-15); he responded by telling her to sit on the bed and watch TV with him so she would feel better, (84:16-21). She refused and asked him again to leave, and he did. (85:5-8). But, he likely did so because by then,

19

she had her husband on the phone, (85:9-13). She was later told by him that she said Morris was in her room and she had walked into the bathroom because she felt very uncomfortable that he wanted to stay to watch TV. Her husband told her to ask Morris to leave; but, she has no direct memory of that conversation, (85:14-25). At that point, she didn't feel physically violated or in danger, (86:14-25); but the next morning, Monday, Morris made a comment about her drinking the previous evening and she felt terribly embarrassed that she had ruined her new job, (89:2-6); so, she apologized profusely, (89:7-8; 89:22- 90:3; 90:16-19). Morris told her he had to help her walk around the previous evening, but, she had no memory of that, (89:9-15).

After breakfast, they went to see the client, (91:15-24); and, she was functional that day, (93:17-20). Late that afternoon, they returned to the hotel and Morris decided he wanted to take her back into Manhattan again for dinner, which he did, (94:3-11). Before they went, she again talked to her husband and apologized as she had never before had an "alcohol issue" before, (94:17- 95:9). Her husband was perplexed about what had happened because that was not who she was", (95:10-21). Even then, she didn't believe Morris was responsible for the previous night, (95:22- 96:1); but after her trip with him to Chicago, she completely changed her mind, (96:2-6). However, that second night in Manhattan was uneventful, (96:24- 97:12); although when he again brought up the previous evening, she told him what happened to her was scary as it was so out of character for her, (97:17-21). Also, while she did agree to have a beer in the concierge lounge, Morris offered to make her stronger drinks a couple of times which this time she flatly refused, (98:10-18).

The next day they worked with another client and Beth Jackson arrived at the airport late that day and they went to pick her up, (102:23- 103:16). She met Beth the first

20

time then, (103:20-21). That evening, she, Morris and Beth met in the hotel restaurant for dinner; but, during the meal, Morris left and when he returned, he had drinks he said he got from the concierge lounge, which she again thought was very odd, (105:23- 106:6, 106:23-25). She left the next morning by herself and didn't see Morris again until later that week, (107: 10-19).

Her next trip with Morris was to Chicago, to meet a client in Peoria, (108:12-20). He initially asked Erin Bjork to go; but, she refused, (109:8-18); so, Ms. Hill volunteered, (109:19- 110:18). This trip was in February and they flew on Southwest, (113:6-12). At the airport, she ate lunch and had a beer, (114:4-17). She had a rum and coke on the plane, (115:5-6), and Morris had a drink too, (116:3-4). Then, when she went to the restroom, Morris ordered her another drink and was pouring it into a new cup when she returned, (117:8-21). After that, she has no more recollections of the rest of the day, (119:10-16), except that she could recall that the new drink looked "muddy" or "foggy" and that Morris poured it really quickly and handed the first cup off to the flight attendant, (119:19-23; 120:3-15; 120:24). She finally began to be conscious of her surroundings again about 10 pm that night, (121:20-25). She has flash memories of Morris had her hands intertwined or locked together with Morris', (122:1-6); and, this may have happened a couple of times, (123:1-2). She also remembers Morris' face being pressed against the side of her face and her feeling very uncomfortable physically and emotionally. He told her she had a long career and that she was a valuable member of his team, and he "had ahold of my hand that was now rubbing in my vaginal area as well as up and down my leg." (123:9-20; 124:1-8). This contact was outside of her clothing, (123:24-25). During this attack, she got physically sick several times and she felt the need to try to get up and get away from where

21

she was, and she again felt like a little kid, (124:19-25). When his face was pressed against hers, she also recalled seeing a square condom packet, (132:1-7).

This time, she was certain she had been drugged because she was on a business trip in the daytime and she got on a plane to go to Peoria, yet she was there without any memory of how she got there; and it definitely was not a dream or nightmare, (125:7-20). She firmly believes her drink was drugged, (126:9-10). And, again, Morris' criminal attorney, Chip Lewis admitted in a news broadcast that Morris was arrested with such drugs on his person, (126:20-25). Her next recollection was being in her hotel room and Morris was there too and a to-go cup was on her dresser. She asked Morris to leave and he did so, (129:17-23). Based upon his drugging her on the flight on this trip, she concluded that he had drugged her before in the New York concierge lounge before they went to dinner, (130:14-24). The government told her that tests confirmed such drugs on Morris' person, (131:10-16).

The next day was spent with the client, (135:9-10); and throughout the day, Morris made several sarcastic comments that the trip took a long time because "they had to stop seven times" for her, (135:17-22). That night, they went to dinner with the client and she had a glass of wine, (136:9-19). On the way to dinner, Morris grabbed her hand and she pulled it back quickly because she felt extremely uncomfortable and he told her she was being silly, (137:3-9). Then, as they entered the restaurant, he told her he would hold her hand during dinner under the table, but she ignored him, (137:18-23). When they got back to the hotel, he asked her to go to the casino. When she refused, he got very frustrated and sarcastic and began whining and pouting that he would have to sit by himself, so she relented and said she would have one drink with him, (138:6-15). They went into a bar and Morris ordered two drinks; but, when they came, he took them behind a dessert menu

22

with his back to her, so she walked over and got her drink, a glass of wine, and sat down. He was on the phone. (138:16- 139:5). She was worried he might do something to it, (139:10-15). She knew at that point that something was seriously wrong, but she had trouble "getting her head around it", (139:16-23).

Even so, she was scared to report what had happened, (140:4-10), and, she was very confused and trying hard to make sense of what had actually happened to her, (140:17-22). However, she told her husband about it when she got home, (140:11-16). In the meantime, she went with Morris back to Chicago from Peoria to see another client, (141:2-25); and, there were no more problems, (142:10-15). When she did talk to her husband, he saw a bruise on her arm; but, she told him she hit a wall because she wanted to "wrap my head around a much bigger conversation that I knew we were going to have to have." (143:12-15). She first noticed the bruise when she awoke in Peoria the morning after her bizarre previous day, (144:7-14). Finally, she and her husband discussed the matter frankly, (15-17). They met for lunch and she told him she was very upset about having major memory losses on two successive business trips, (145:3-11). He told her that when they talked on the phone while she apparently was in the car with Morris enroute to dinner, her speech was slurred and he was astonished at the extent of her very uncharacteristic drinking, if that was what the problem was; and even then he told her she might have been drugged, (145:15- 146:1). She had no recollection of even having that phone conversation, (146:4-13).

She then told her husband all the rest that had happened in both New York and Chicago; and, he became very sad and upset and suggested that she discuss the matter with a friend of theirs who is a narcotics investigators with the Houston Police Department, (146:15-24). She did have that conversation and was referred to the FBI,

(147:16- 148:9). As a result of that, a sting was arranged with her at the Houston airport, so Morris could be arrested, (149:23- 150:3). Not surprisingly, the day after Morris was arrested, she was placed on leave of absence and less than two weeks later, she was fired, (154:23- 155:13). Needless to say, her abrupt termination for reporting Morris' repeated, depraved violations of her stands as profound and eloquent validation of her apprehensions about ever reporting Morris' conduct. She believed that would be both pointless and dangerous and she was absolutely right! Since these incidents, Ms. Hill has suffered lots of anxiety, panic attacks and "fear of movement" (87:11-16).

Both Morris' civil and criminal lawyers pressed Ms. Hill for long hours on many details surrounding these matters; but, while Defendants seized upon various aspects of her answers in their MSJ and continue to do so in the instant Plea, they at the very most present only a broad range of relevant facts about which reasonable minds could differ. Ms. Hill has presented more than enough testimony to support her *prima facie* liability allegations. Therefore, the Plea is fatally defective as a matter of both fact and law and should be denied in all of its particulars.

Plaintiff Stacy Stewart testified in relevant part, in her discovery deposition which lasted in excess of five hours, that she lives in Austin, (4:23-24), with her husband and two children, (8:21-22), a 13-year-old daughter and a 12-year-old son, (9:3-12). She worked at Edible only about six weeks, (11:4-7). She was a software implementation specialist, (9:14-15). She graduated from the University of Texas at Austin in 1993, with a bachelor's in business administration, concentrating in business information management computing systems, (18:8-19). To get her job at Edible, she interviewed with Morris, (21:7-25). The meeting lasted an hour and she also met Trevor Morris and Beth Jackson, (23:14-18); and, she understood travel would be required in this job, (23:3-10).

24

She was offered the job there and she accepted, (24:3-10); and, this was in late February, 2011, (24:12-20).

Her testimony in regard to her abuse by Morris is a bit curious in that opposing counsel chose to question her in the context of what she told the FBI when she was subsequently interviewed by them about it; so in transcripted form it has a third-party feel. But, in that contest, she stated that she travelled to Boston with Morris to attend the Boston Seafood Show, (46:1-8), on March 18, 2011, (57:3-11), she went at Morris' invitation, (57:12- 58:8). Morris made all of the travel arrangements, 59:10-15). They stayed in a Marriott hotel while there, (61:2-6). At the Houston airport, she drank a Tanqueray & tonic, (62:14-21); and, during the flight to Boston, she had a glass of wine, (61:24- 65:7).

After she arrived in Boston, she met Morris in the lobby and they checked in together, (63:3-6); then, as instructed, she met him in the hotel's concierge lounge for drinks, (63:10-16). There, she met Morris, Beth Jackson and Beth's mother, who lives in the Boston area, (64:2-10). She had another Tanqueray & tonic, (64:8-11). She made that drink herself; but, a short while later Morris made her another one and brought it to her, (64:22- 65:3). She also ate some snacks, (65:19-20; 66:2-4). Then, they went to dinner at Legal Seafood, (66:11-21). At dinner, she had a glass of wine, (67:8-9). They left the restaurant at about 8:45 pm because she wanted to walk to an adjacent mall to buy a shirt before the stores closed, (67:12- 68:2). From then on, her recollections were very sketchy, (69:15- 70:1).

The next morning, she woke up with a severe hangover, (46:18-19; 47:3-6); and, she went to a nearby mall to look for a Coke and some food to make herself feel better, (52:14-16). She explicitly stated that her hangover was caused by Morris' drugging her by

25

putting something in her drink, (73:3-24; 73:25- 75:7). Her hangover felt like she had been run over by a truck, (75:8-13). She did not see Morris put the substance in her drink, (83:25- 842); but, she is certain that he did, (84:3-7).

Later that morning, she attended the food show, which lasted all day, (85:3- 86:9). When they all returned to the hotel, they, (meaning herself, Morris, Beth Jackson and another man), again gathered in the concierge lounge, (87:4- 88:8). There, she had two Tanqueray & tonics, (88:11-17). Morris made the second drink out of her sight and brought it to her, (89:4-9; 89:23- 90:4). Then, they went to dinner at a pizza restaurant, (90:4-10). Beth's mother joined them at dinner, (90:11-21). There was no drinking at dinner, (90:22-25); and, she could recall that she returned to the hotel where Morris instructed her to join him in the bar while he told the others to "go ahead", (91:2-9). They had a conversation during which Morris told her how important she was to the company, (92:10-14); then, the conversation turned weirdly to another woman's breasts, (92:15-18).

Then, Morris went to get drinks for them at the bar; and, after he returned, he began to massage her shoulders, (92:18-21). This was out of the blue, (48:17-20; 11-14); and, it made her very uncomfortable. But, before she could protest about it, he stopped, (49:17-20). Later, when they went up to their respective rooms, Morris asked if he could come into her room to continue the massage, (44:19- 45:4; 46:1-6; 51:3-9; 93:13-18). She quickly declined and Morris left, (51:10-15); although she thinks he may have tried to get into her room, (93:21-25). During that evening, she had two Tanqueray & tonic drinks, both of which Morris brought to her, (46:9- 47:2). The next morning, she again awoke with a severe hangover, (99:14-18); which she again attributes to being drugged, (101:12-17; 101:24- 102:15).

26

It deeply upsets her that about the first night she no recollections and has no idea what happened to her; and, on the second night, Morris offensively touched and propositioned her, and on both following mornings, she awoke with severe hangovers, (102:8-12). Also, she feels that because Morris' arrest "with drugs that could do that" on his person proves her darkest fears, (103:8-11). It worries her that she doesn't know if she was raped, (104:10-11). Once again, opposing counsel asked Ms. Stewart if she was sexually harassed and she agreed, (55:20-25; 93:5-12; 116:13-22; 135:5-15); however, she is not qualified to make that purely legal determination. Indeed, she conceded that she doesn't even understand what the specific legal goals of her suit are, (149:18- 150:7); therefore, she is not qualified to discuss its legal merits. She can only speak to the facts she knows. Moreover, it is unfortunate in the extreme that while she is plagued by the haunting fear that she was raped while insensate and totally vulnerable through no fault of her own, Defendants' only focus is to dismiss the matter as a routine matter of workplace misconduct which should be disposed of on irrelevant technicalities.

After she returned to Houston, from the Boston trip, Morris criticized her performance, (125:7-22); and, she didn't tell him she was offended by his conduct because "she felt the time to do so was with a lawyer in a courtroom", (129:3-22). While the company had a human resources department, she felt it would have been futile to talk to it because it was headed by Allen, Morris' son, (129:23- 130:17); and, she never received the company's sexual harassment policy, (130:18- 131:9). However, when Morris fired her in April, only six weeks after she began, she bluntly asked him if it was because she declined the massage proposition and he cut her off, saying, "We're not going there." (131:25- 132:19). In regard to her overall testimony, it should be noted that there are disturbing consistencies in the facts alleged by all three of the Plaintiffs: each was isolated

27

on a trip with Morris shortly after beginning work at Edible; drinking was a prominent feature of every trip; Morris encouraged the drinking and brought drinks he made to each woman; each suffered blackouts and memory loss; each alleges physical offensive contact; each was primed with virtually identical soothing assurances; each was made to feel very uncomfortable; and, each fears she was raped while unconscious. And, all of this was at the hands of the company president and CEO, many years their senior and married. Individually and in toto, they clearly state viable *prima facie* assault/battery claims against the Defendants, which have nothing whatever to do with workplace discrimination.

In addition to the facts presented in the discovery depositions of the three Assault Victims, additional depositions have been herein obtained as well. Interestingly, Defendants made no mention whatever of them in their previously denied Motion for Summary Judgment and they persist in that glaring omission in their instant Plea. However, their testimony is very relevant to the Court's instant analysis, so they too are succinctly summarized.

Andrea Farmer testified[8] that Morris was frequently inappropriate in the office, such as hugging women employees and drank excessively, (22:6-15); and, she saw him pour something into Beth Jackson's drink in Chicago, (22:16-19). Indeed, she felt he was "constantly inappropriate", (24:3-5). She worked at Edible for three months, (24:14-15); (May, 2011- August, 2011, (68:23- 69:2)), and, in fact she complained to Morris' sons, Trevor and Allen and she was told, "That's just the way he is. Just ignore him." (24:16-26:6). On two trips, she observed him being sexually inappropriate with Beth Jackson,

---

[8] Deposition transcript of Farmer is attached hereto as Exhibit "D". Citations thereto are by page and line.

28

clients and herself, (27:13-16). She told the FBI she saw Morris pour something in Beth Jackson's drink in Chicago and she decided that, "Oh my gosh, something's gone terribly wrong." She felt that pouring something into a woman's drink without her knowledge was deeply immoral, (29:8-20). They were in Chicago for a convention, including Morris, his son Trevor, Beth Jackson and herself, (32:3-14). At the end of one day, they gathered for drinks, (32:22-25). Morris had been drinking liquor out of a Pepsi bottle during the day and was quite drunk, (35:16- 36:2). They ordered drinks and when they came to the table, Morris made a big deal of yelling for them to all look out the window; while they did so, he poured something in Beth's drink, (37:5- 38:10). She started to question him about it because she was alarmed, and he said, "Shh, it's fine, it's okay, don't say anything." (38:11-17). Then, Beth mentioned that the dink tasted stronger and she stopped drinking it, (38:18-21).

At the time, she thought he might have just added alcohol to Beth's drink, (43:23-44:1); but, later she decided it was a drug. This was based upon seeing Beth with Morris in Washington, D.C. in such a stupor she could barely hold herself up and another time in Houston when Beth was with him and appeared very ill, grayish-green and looking terrible, (44:2- 45:20). She said Morris' encouragement of excessive drinking by others seemed very suspicious, (47:11-19). On another occasion, she observed Morris and the female comptroller at Aunt Sally's pralines in New Orleans. They met for drinks in the concierge lounge of their hotel. Shortly after that, they went out to walk on Bourbon Street and the woman appeared so drunk she could barely walk, which made her very uncomfortable. They went to Pat O'Brien's and Morris left her there, saying he was going to find the woman a cab, (53:13- 55:15); but, he was gone for over an hour and he had been inappropriately touching her, so she believed he took her back to his hotel room for

29

illicit purposes, (59:3-18). This suspicion was enhanced when later he told her he had taken the woman back to the hotel, which made no sense because she wasn't staying there, (61:16-22). Also, when they got back together, Morris' clothes were disheveled, he was very sweaty and his hair was amuck, and he was over-excited and almost disoriented about where they had been, (63:1-10). Then, when she talked to the comptroller two days later, the woman apologized profusely for being so drunk, adding that she had no memory of that night or how she wound up getting home and into bed, (64:11-20). She mentioned that to Morris and he got excited and pressed her to remember that they saw her in the hotel lobby later; but, she remembered no such thing, (64:21- 65:3).

Ms. Farmer went with Morris to Philadelphia and Newark about two weeks after she started working at Edible, (75:18- 76:18). She flew by herself and met Morris at the Philadelphia airport, (77:7-17). Morris had a rental car he used to pick her up, (77:18-21). This was on a Sunday evening, (77:25-78:3); and, they drove to the hotel, (78:2-4), (a Marriott, (79:23)). Morris wanted to meet in the concierge lounge, but it was closed so they met in the hotel bar, (79:2-8). They stayed there about an hour and a half, (79:18-19); then she went to sleep, (79:20-21). However, the next night, they went to the Newark Marriott, (81:14-17); in order to see a New Jersey client the following day, (81:23-24). They went to dinner that evening, but she has absolutely no memory of anything about the dinner or going to it or getting home, (95:24- 96:15); and, the next morning, she woke up in her hotel room bed with a pillow and some covers over her head and her blanket down around her ankles. Then, she heard the click of a phone camera and she looked and realized she was naked and Morris was standing over her, (81:23- 82:4). She was so tired she had trouble adjusting to what was going on and she muttered, "Wait, I'm not... like what is going on?" Then, she sat up and asked Morris if he had just taken a nude picture

30

of her, (82:5-11); which he hastily denied, (82:12). She became upset and asked him what he was doing there, and she told him to leave and to give her the picture she knew he had taken, (82:12-15). She was disoriented and confused, but she told him he could not have the picture, but he just said it was fine, (82:19-23). Then, Morris left the room and came right back in to show her his Blackberry, with no picture in it. She tries to index it, but can't, (83:8-17). Then, he left again and she went back to sleep for four hours, (84:6-9).

Morris denied it, but, she was certain he took nude pictures of her in her hotel room, (97:15-20). And, of course this was confirmed after Morris was arrested and they found several nude photos of her in a locked flash drive in his office, (101:1-13). She clearly remembers him in her room and herself naked in bed, (98:1-5). He left her room about 4:00 am and she then slept until about 8:00 am (99:4-11). More importantly, she also feels certain she was raped because she had redness and bruises on her arm and "hip area". (99:12-22). She also felt like she had "been touched" and she was sore in her "female regions", especially on the inside, (100:1-10).

Ms. Farmer took one more trip with Morris. On that trip, once again, Morris had her meet him in the concierge lounge of their hotel, (116:9-10). He asked her if she wanted a drink and she asked for a chardonnay. But, after he brought it to her, it tasted disgusting, like strong medicine with a very bitter alkaline taste, (116:18-25). She said the taste was definitely not a normal taste, (118:3-25). She tried a few sips and then said she couldn't drink it, (119:16-18). They went to dinner; and, afterwards, Morris pressured her to have another drink, but this time she refused, (121:1-6). After they returned to Houston, she shortly learned that Morris refused to talk to her anymore, for a pretextual reason, (124:14-25). And, he remained distant and standoffish to her, (125:6-10).

31

Later, she could vaguely remember being at dinner and that a comedian was there whose picture Morris kept taking, (84:13-22). She has no idea where they were or what she had for dinner, or any other details, (86: 9-13). She remembered going through a tunnel on the way to dinner, but little else, (89:6-13). That evening, she and Morris had met in the hotel concierge lounge and had drinks, (89:14-18). She drinks wine and asked for a glass of it, but Morris insisted she have a mixed drink, (89:18-25). She insisted on wine and he poured her a glass, but, then he told her they should get another drink to-go and go to dinner in Manhattan and he insisted she have a mixed drink, and he fixed her a drink in a to-go cup, (90:17-25). However, the drink was so strong she couldn't drink it, and she told him that. He then added some soda to it and insisted that she drink it, (91:1-22). Shortly, she began to feel very dizzy, (92:6-10). In the elevator, Morris began to massage her neck and back, which she thought was weird, (93:4-16); she told him that was not necessary as it was making her uncomfortable, and he stopped. But, later he put his hands on her shoulders anyway, (93:16-25). By the time they arrived in Manhattan, she was disoriented, (92:11-13); and, Morris began holding her hand which made her feel very uncomfortable, (93:1-3).

This next morning, incredibly, Morris was at the door of her hotel room asking why she wasn't ready to see the client! (102:7- 103:8). She met him downstairs and it was she who was apologizing for being unprofessional, (103:11-15); she blamed herself for losing control! (103:22- 104:3). This is a creepy aspect of every one of Morris' victims: what happened to them is so outlandish and bizarre; it is always *they* who take responsibility. And, that is one of the most heartrending aspects of this case. Morris *has already confessed* to federal felonies; but, even now he refuses to take any moral or civil legal responsibility whatever for these heinous attacks. She emphatically denied giving Morris

32

consent to take nude pictures of her, (104:4-24). In response, Morris dismissed her concern by saying it "was no big deal", (106:11-15). She felt terrible that day and continued to feel disoriented, (107:1-7). They went to dinner in Connecticut that night, but there were no problems, (108:2- 110:8). On the final night of the trip, Morris mentioned the night of her attack by saying he "didn't want her to feel uncomfortable because they had done nothing wrong." (111:24- 112:3); he added that he felt a considerable "attraction" to her, and that he wanted her to stay with the company for a long time, (112:4-9). She replied that even if she had consented to what had happened, it was wrong because he was married, (112:10-15); but, he said he had "never done anything like this before and he really liked her." (113:4-7). Then, he claimed he had a bad marriage, (113:10-12). She told him their relationship had to be professional; but he told her he would hug her whenever he felt like it, (113:13- 114:1). She started looking for another job immediately, (114:18-20).

Erin Bjork testified[9] that she worked for Edible from November, 2011, to mid-February, 2012, (7:3-13). She frequently interacted with Defendant Morris, (14:14-16). He made her feel very uncomfortable, (15:2-5); for instance, one day he came into her office, shut the door and began discussing her bathroom habits, (15:9-11; 15:16-21). On a day trip, he asked her if she wanted a sandwich in her room or whether she wanted to "go out because they were on the road", which she thought was very weird, (17:1-6). Morris asked her to travel with him, but she firmly declined, (18:20- 19:13). He did not come onto her, but, she received a detailed complaint that he had from Michelle Barnett, which shocked her and made her sad, (20:12- 22:17). She was certain that the complaint was true, (23:10-

---

[9] Deposition transcript of Bjork is attached hereto as Exhibit "E". Citations thereto are by page and line.

22). She told her husband the story and he advised her to leave the company and she told her mother, who was equally shocked, (24:20- 25:8). She felt Ms. Barnett should report the matter, because she had been violated and she believed her, but it wasn't her call, (25:9- 26:1).

Then, later, Keri Hill came back from a trip with Morris, looking "bloated and all out of sorts". At first, she denied any problems, but then said she was troubled because on the trip she blacked out and had no memory, (30:19- 31:14). She had a rape kit done and said her husband told her she had been drugged, (31:23- 32:5); and, she was very distraught, (32:17-19). This second story about Morris deeply disturbed her, (32:9-10); because the two stories were so similar, (34:4-8). After that, she refused to travel with Morris, and she was let go by him, (35:6-16; 37:11-16).

Further, Samantha Gluck testified in her discovery deposition, in relevant part, that Defendant Morris assaulted her by touching her and trying to get her to do things she didn't want to do and she reported that to the FBI, (29:2-10). Very interestingly, opposing counsel asked most of the witnesses about sexual harassment, which is a manifestly legal term; yet, when Ms. Gluck said she had been assaulted, he questioned her at length about the fact that she had no legal training to allow her to define that term, (29:11- 30:1). She countered that she meant that Morris had tried to kiss her and had touched her breasts, rubbed his hands up and down her sides and grabbed her, "on her breasts, everywhere", (30:2-8). He also tried to get her to both drink alcohol and to drink more of it than she wanted, (30:13-16). All of these things happened on out-of-town trips, (30:17-20).

---

[10] Deposition transcript of Gluck is attached hereto as Exhibit "F". Citations thereto are by page and line.

In Philadelphia, after they exited the elevator after dinner, to go to their respective rooms, Morris tried to "really" kiss her and he grabbed her breasts with both hands and told her to come to his room to "talk and have champagne". She was very shocked and pushed him away and said no; but, he was very persistent and kept grabbing her. She told him to stop, but, he just kept at it. Finally, he stopped and she went to her room devastated, (66:11- 67:25). She called her husband, crying and upset, (69:5-13); and, he too became upset, (69:13-14). He said he "wanted to kill the bastard", (76:2-17). But, the next day, she did not talk to Morris about the matter because she was afraid, (80:25- 81:6). However, she was adamant that he attacked her and she didn't initiate the contact, (81:18- 82:2). Morris was quiet all day, (82:8-17).

Then, there was a second trip to Philadelphia, (89:12-14). And, the first incident was essentially repeated: Morris invited her to his room after dinner and when she arrived, he had his shirt off and started in on her again, (95:19-23). He had earlier made her a drink, but it didn't taste right, (96:23- 97:6). (Later, she came to believe he had drugged it, (109:4-12)). Even so, he kept telling her, drink up, drink up, no matter how badly it tasted, (97:17-18); and, he continued to pressure her about it, which she found very odd, (99:9-10). As soon as she got to his room, he tried to get to sit on the bed and he began aggressively kissing her and touching her all over. She repeatedly told him no; but, he said nobody would know. Finally, she bolted out of the room, (107:4-18). She drank very little that night, but the next morning, she felt terrible, so she believes Morris put something in her funny tasting drink, (109:25- 110:14). But, she never reported these incidents because of fear, (137:19-24).

35

Still later, Morris resuscitated her after she fainted; and, when she awoke, her bra was undone; he said that was to allow her to breathe easier, which she thought ridiculous, (142:16-24).

During the discovery deposition of Ms. Beth Jackson, the only one of those discussed herein in which the undersigned counsel for Plaintiffs asked questions, she testified[11] in relevant part that she is a graduate of Boston College, with a bachelor's in finance, (8:9-12). She never worked for Edible; instead she consulted for them, (13:10-16). She first dealt with Defendant Morris in March/April 2004, (15:16- 16:1). She has a cozy relationship with Edible: she met with Defendants' counsel for three hours before he deposition; she attended Andre Farmer's deposition as a "company representative" even though she is not employed by the company: her only consulting client and only source of income for the last several years has been Edible; and, they have often discussed her working there, (22:11- 24:12). Initially she said she reviewed no documents before her deposition, (26:13-15); but, then, she conceded that before her own deposition, she in fact read the statements of Keri Hill, Michelle Barnett, Andrea Farmer, Stacy Stewart, Brannen DeVille, Diedra MacLeoud and Samantha Gluck, as well as the depositions of Keri Hill and Michelle Barnett, (26:13- 27:14). She also referred to Charles Butler as "our" vice-president of sales, Allan Morris as "our" human resources director and Trevor Morris as "our" CEO, even though those men work for Edible and she does not, (32:1-14). Further, when asked how Edible has been doing, she replied, "We are doing very well", (40:18-20; and, she considers herself "a part of the team", (40:23- 41:3).

---

[11] Deposition transcript of Jackson is attached hereto as Exhibit "G". Citations thereto are by page and line.

36

She drinks 2-3 mixed drinks daily, (28:3-9); and, she has often been out drinking with Defendant Morris, (22:1-5; 27:19-21; 30:3-8; 33:25- 34:3). She stated that initially, she had a business relationship with Morris, (32:10-12); but, she later conceded that even though she knows he is married to Ruth, whom she has met, (35:3-10), she has travelled with him at least once a month since 2009, (37:4-11), and she had a long-running "personal relationship" with him since about 2005, (49:4-22), lasting into 2011, (51:21- 52:4); which specifically included a sexual relationship with him, (49:20- 50:4). During this time, both of them were married to other people, even though their respective spouses did not know of their illicit relationship, (50:5-20). This relationship included sexual intercourse, (50:1-4), digital penetration, (53:6-8), and allowing him to photograph her nude, (53:21-23), on numerous occasions and in numerous locations, (53:24- 54:5). He took these nude photos with his cell phone, which he would then save by downloading them onto hard drives or flash drives, (55:3-8); her only restriction being that in the fully nude photos, her face not be shown, (54:16- 55:2). She said she intended Morris to use the photos to arouse himself with his wife because while she easily aroused him, his wife did not, (54:9- 56:2; 57:8- 58:5; 58:25- 59:19; 60:5-19). The FBI now has the photos, (61:1-7). She also conceded that Morris confided to her that he also took nude photos of Andrea Farmer, (61:8-19).

She said Morris often travels with small "airplane" bottles, (63:8-10); which she assumed he used to "re-cycle" liquor, (63:24- 64:4); and, she has seen Morris often make drinks for others, (68:12-14), including the use of "to-go" cups, (69:1-3). Therefore, though she disagrees with Andrea Farmer's testimony "100%", (67:14-16); and also 100%, (83:12-13), with that of Keri Hill, (76:22- 80:15), and even with that of Stacy Stewart, (85:17- 88:3), Samantha Gluck, (88:8-25) and, even Ms. Farmer's allegations about the

37

Aunt Sally's comptroller, (91:20- 93:2); such multiple disagreement must be filtered through her obvious bias in favor of her longtime lover, (107:20- 108:8), Defendant Morris.

On the basis of this mass of testimony, it was clear to the Court in its denial of Defendants previously filed MSJ and its should continue to be clear in the instant analysis of Defendants' equally flawed Plea that, as set out in their Third Amended Petition claims, what Morris did to the Assault Victims is morally and legally monstrous. Morris didn't discriminate against the Assault Victims, whether in or out of the workplace; rather, he physically attacked and sexually violated them! Morris has expressly confessed that he invited or induced the deferential and trusting Assault Victims across state lines; where in remote cities he mendaciously drugged each and all of them into intentional insensibility, with the explicit intent of forcefully removing their clothing, photographing them naked and sexually assaulting them while they were completely inert and vulnerable. He treated each of them as slabs of meat, to be abused while completely insensate and defenseless, for the sole purpose of gratifying his perverse, deviant sexual appetites. And, because his often-practiced drugging technique was very effective, he now comes to this Court asking that the claims of the Assault Victims be trivialized and disposed of under the rubric of the TCHRA, which was intended by the Legislature to provide an orderly mechanism to deal with workplace discrimination and most certainly never intended as a procedural means to protect deviant sexual predators. In seeking such a result, the Defendants brazenly ask for perfect immunity from personal, moral and legal responsibility for Morris' overtly criminal and intentionally tortious acts. What an astonishing extremis to twist a "Human Rights Act" into!

Both the previously denied MSJ and the instant Plea are factually predicated upon the Assault Victims' physical inability to remember all of the details of their victimization. But, such chemically induced diminished memory does not erase either the occurrence or magnitude of their violation; it only emphasizes just how appallingly awfully they were treated. Defendants' persistent pursuit of summary and/or procedural relief on this dismissive basis defies logic and common sense and is fatally defective for four important reasons. First, the stories of all of the Assault Victims are nearly identical, even though they were separate in time, place and victim; which very convincingly establish Morris' *modus operandi,* as well as his malevolent, *confessed intentional* conduct. Second, these allegations are further confirmed by the depositions of Erin McMullan, Andrea Farmer, and Samantha Gluck, the latter two being additional assault victims who do not happen to be plaintiffs in this case. So, thus far, fully five victims corroborate Morris' vile conduct.[12] Third, no less than a grand jury of the United States of America considered the fractured memories of the thoroughly traumatized Assault Victims and came to the polar opposite perception of such, which Defendants now urge upon this Court; finding sufficient cause to indict Morris on multiple federal felony charges which precisely mirror the actual claims each Plaintiff makes. And, fifth, Morris has already pled guilty to this entire disgusting scenario!

**b. Plaintiffs assert valid assault claims against Morris under Texas law.**

Thus, it should be clear that not one single Plaintiff asserted any claim whatsoever which is based upon or arises out of sexual harassment in the workplace; and, Defendants'

---

[12] Still other victims have rendered statements to the FBI; but, as they have not been deposed in discovery herein, there stories are not herein discussed. However, they are out there as further corroboration of Morris' heinous conduct.

39

persistent contentions that their claims are all so intertwined with sexual harassment in the workplace as to be controlled by the TCHRA and *Waffle House* is a distortion of the facts and claims herein and a misstatement of that law. It is true that each Plaintiff was enticed, directed or induced to travel with Morris on a "business trip". But, his intentional drugging of each Assault Victim had nothing to do with work or job duties whatsoever. If Morris had travelled to each of the stated cities on business; and, while there he had gone out into the night and knocked some stranger on the head and while that person was unconscious he sexually assaulted him or her, it would be ridiculous to allege that he did so as a part of his business. The exact same logic applies to the instant claims. Morris wholly deviated from any arguable job purpose when he elected to drug and violate his victims for his *confessed* personal, sociopathic sexual gratification; and, for Defendants to persist in arguing that he should be able to do so with impunity, hiding behind a Texas statute designed *solely* to address job place discrimination, is completely unavailing. Alternatively, even if Morris was somehow in the course and scope of his employment when he committed the assaults, they were *assaults*, not acts of discrimination; and *Waffle House* explicitly preserved "an assault-based negligence claim arising from independent facts unrelated to sexual harassment." 313 S.W.3rd at 799. And, as discussed *infra*, under venerable Texas Supreme Court authority, both Defendants remain fully liable for both actual and exemplary damages for the damages proximately caused to each and all of the Plaintiffs.

Moreover, Defendants' contention that the TCHRA and *Waffle House* control this analysis is fundamentally misplaced for a second important reason. If Texas substantive law does control these actions, there is a considerable body of such which supports the Plaintiffs' assault/battery claims, expressly preserved to them by *Waffle House*, at 799.

40

In *In re VarTec Telecom, Inc.,* 335 B.R. 631, 642 (Bankr. N.D. Tex. 2005), the court

noted that:

> **"Texas courts also adhere to the principle that a remedy is provided for every legal wrong.** *See Payant v. Corpus Christi Plaza Hotel Co.,* 149 S.W.2d 665–667 (Tex.Civ.App—El Paso 1941, *writ dism'd*). However, the Texas Supreme Court is not keen on recognizing new torts, and 'treads cautiously' in this area. *See Trevino v. Ortega,* 969 S.W.2d 950, 951 (Tex.1998). The Texas Supreme Court in *Trevino* stated:
>
>> This Court treads cautiously when deciding whether to recognize a new tort. *See generally Kramer v. Lewisville Mem'l Hosp.,* 858 S.W.2d 397, 404–06 (Tex.1993); *Graff v. Beard,* 858 S.W.2d 918, 920 (Tex.1993); *Boyles v. Kerr,* 855 S.W.2d 593, 600 (Tex.1993). While the law must adjust to meet society's changing needs, we must balance that adjustment against boundless claims in an already crowded judicial system. We are especially averse to creating a tort that would only lead to duplicative litigation, encouraging inefficient relitigation of issues better handled within the context of the core cause of action.
>> *Id.* at 952.(Emphasis added)."

*In re VarTec Telecom, Inc.,* at 642. Therefore, the initial inquiry is whether Plaintiffs

assert viable claims under Texas law; and, if so, as to each, what is that claim?

Defendants once again argue in their Plea that the only claim available to each

Plaintiff is workplace sexual harassment stated under the TCHRA. But, respectfully, that

is far too narrow a view and simply wrong. In *Rockwell v. Brown,* 664 F.3d 985, 993 (5th

Cir. 2011) *cert. denied,* 132 S. Ct. 2433 (U.S. 2012), the 5th Circuit ruled that: "In Texas...

'A person... commits civil assault if he "intentionally or knowingly causes physical contact

with another when the person knows or should reasonably believe that the other will

regard the contact as offensive or provocative." ' *Id.* (quoting Tex. Penal Code Ann. §

22.01(a)(3))." *Id.,* at 993. The 5th Circuit, in *Cotroneo v. Shaw Env't & Infrastructure,*

*Inc.,* 639 F.3d 186, 195 (5th Cir. 2011) *cert. denied,* 133 S. Ct. 22 (U.S. 2012), further ruled

that: "An 'offensive contact' claim is a type of battery claim under Texas law. '[R]ather

41

than physical injury, offensive contact is the gravamen of the action; consequently, the defendant is liable not only for contacts which cause actual physical harm, but also for those which are offensive and provocative.' *Foye v. Montes,* 9 S.W.3d 436, 441 (Tex.App.—Houston [14th Dist.] 1999, pet. denied); *see also Price v. Short,* 931 S.W.2d 677, 687 (Tex.App.—Dallas 1996, no pet.) ('Battery requires only an offensive touching ….'). Thus, an 'offensive contact' claim does not require a plaintiff to prove that the battery caused any physical injury. *Foye,* 9 S.W.3d at 441." *Id.,* at 195. Therefore, it would appear clear that each Plaintiff may properly assert an "assault/battery" claim for offensive contact. Morris physically touched each Plaintiff through the instrumentality of drugging them into unconsciousness; and, he further sexually assaulted each and forcefully attempted to remove their clothing and/or photographed them naked. Any notion that such contact was not "offensive" or "provocative" defies logic, common sense and any rational interpretation of human decency.

While the Texas Supreme Court might be reluctant to create new torts, as noted in *In re VarTec Telecom, Inc.,* Plaintiffs do not urge that. Instead, they assert assault/battery claims which the Supreme Court recognized *forty-five years ago,* in its lengthy treatment of such in *Fisher v. Carrousel Motor Hotel, Inc.,* 424 S.W.2d 627, 629-30 (Tex. 1967):

> "[I]t has long been settled that there can be a battery without an assault, and that actual physical contact is not necessary to constitute a battery, so long as there is contact with clothing or an object closely identified with the body. 1 Harper & James, The Law of Torts 216 (1956); Restatement of Torts 2d, ss 18 and 19. In Prosser, Law of Torts 32 (3d Ed. 1964), it is said:
>
>> 'The interest in freedom from intentional and unpermitted contacts with the plaintiff's person is protected by an action for the tort commonly called battery. The protection extends to any part of the body, or to anything which is attached to it and practically identified with it. Thus contact with the plaintiff's clothing, or with a cane, a paper, or any other object held in his hand will be sufficient; * * * The

42

plaintiff's interest in the integrity of his person includes all those things which are in contact or connected with it.'

'To constitute an assault and battery, it is not necessary to touch the plaintiff's body or even his clothing; knocking or snatching anything from plaintiff's hand or touching anything connected with his person, when, done is an offensive manner, is sufficient.' *Morgan v. Loyacomo*, 190 Miss. 656, 1 So.2d 510 (1941).

The rationale for holding an offensive contact with such an object to be a battery is explained in 1 Restatement of Torts 2d s 18 (Comment p. 31) as follows:

'Since the essence of the plaintiff's grievance consists in the offense to the dignity involved in the unpermitted and intentional invasion of the inviolability of his person and not in any physical harm done to his body, it is not necessary that the plaintiff's actual body be disturbed. Unpermitted and intentional contacts with anything so connected with the body as to be customarily regarded as part of the other's person and therefore as partaking of its inviolability is actionable as an offensive contact with his person. There are some things such as clothing or a cane or, indeed, anything directly grasped by the hand which are so intimately connected with one's body as to be universally regarded as part of the person.'

In *Harned v. E-Z Finance Co.*, 151 Tex. 641, 254 S.W.2d 81 (1953), this Court refused to adopt the 'new tort of intentional interference with peace of mind which permits recovery for mental suffering in the absence of resulting physical injury or an assault and battery... However, it is not necessary to adopt such a cause of action... The *Harned* case recognized the well established rule that mental suffering is compensable in suits for willful torts 'which are recognized as torts and actionable independently and separately from mental suffering or other injury.' 254 S.W.2d at 85. Damages for mental suffering are recoverable without the necessity for showing actual physical injury in a case of willful battery because the basis of that action is the unpermitted and intentional invasion of the plaintiff's person and not the actual harm done to the plaintiff's body. Restatement of Torts 2d s 18. Personal indignity is the essence of an action for battery; and consequently the defendant is liable not only for contacts which do actual physical harm, but also for those which are offensive and insulting. Prosser, supra; *Wilson v. Orr*, 210 Ala. 93, 97 So. 123 (1923). We hold, therefore, that plaintiff was entitled to actual damages for mental suffering due to the willful battery, even in the absence of any physical injury. (Emphasis added)."

*Fisher*, at 629-30.

43

Moreover, based on *Fisher*, the Supreme Court, in *Moore v. Lillebo*, 722 S.W.2d 683, 684-85 (Tex. 1986), made clear that:

> "Generally, before awarding mental anguish damages, the majority of states, including Texas, requires proof of a physical injury resulting from mental anguish, or a physical manifestation of mental anguish... In some cases, however, we have recognized exceptions to this general rule. *See Fisher v. Carrousel Motor Hotel, Inc.*, 424 S.W.2d 627, 630 (Tex.1967).

> These exceptions have involved cases of intentional torts, gross negligence, or a willful and wanton disregard for another's rights. *See, e.g., Brown v. American Transfer & Storage Co.*, 601 S.W.2d 931, 939 (Tex.1980) (rule stated)... We held damages for mental anguish recoverable for a willful and unwarranted invasion of privacy in *Billings v. Atkinson*, 489 S.W.2d 858, 861 (Tex.1973). And, in a case of assault and battery, we approved mental anguish damages without forcing the plaintiff to demonstrate any resulting physical injury. *Fisher*, 424 S.W.2d at 630...

> Similarly, in *Fisher* we applied the same rule because 'personal indignity is the essence of an action for battery; and consequently the defendant is liable not only for contacts which do actual physical harm, but also for those which are offensive and insulting.' 424 S.W.2d at 630. Each of these decisions rejected arguments that proof of physical injury should be required. This is because torts inherently involving mental anguish claims demand proof of mental anguish, not physical pain. (Emphasis added)."

*Moore*, 684-85.

## c. Plaintiffs assert valid exemplary damages claims against Edible.

Further, in *Fisher*, the Supreme Court recognized the liability of a tortfeasor's employer for exemplary damages in certain circumstances, *including* the precise facts of the instant case:

> "We now turn to the question of the liability of the corporations for exemplary damages. In this regard, the jury found that Flynn was acting within the course and scope of his employment on the occasion in question; that Flynn acted maliciously and with a wanton disregard of the rights and feelings of plaintiff on the occasion in question... The jury further found that the defendant Carrousel did not authorize or approve the conduct of Flynn.

> The rule in Texas is that a principal or master is liable for exemplary or punitive damages because of the acts of his agent, but only if:

44

(c) *the agent was employed in a managerial capacity and was acting in the scope of employment...*

The above test is set out in the Restatement of Torts s 909 and was adopted in King v. McGuff, 149 Tex. 434, 234 S.W.2d 403 (1950). (Emphasis added)."

*Fisher*, at 630. See also *Moore v. Lillebo*, 722 S.W.2d 683, 685 (Tex. 1986); *City of Tyler v. Likes*, 962 S.W.2d 489, 495 (Tex. 1997); *Pleasant Glade Assembly of God v. Schubert*, 264 S.W.3d 1, 16 (Tex. 2008); *Texas Dept. of Pub. Safety v. Cox Texas Newspapers, L.P.*, 343 S.W.3d 112, 115 (Tex. 2011).

### d. Even if Texas law did not authorize assault claims, under its choice of law rules, such claims still exist under the law of relevant states.

Assuming *arguendo that* the TCHRA and *Waffle House* are somehow determined to bear on the instant claims, the intentional torts Morris committed against each of the Plaintiffs occurred in states other than Texas; and, as confirmed by the Superseding Indictment now pending against Morris, and his confessed guilt, such intentional torts give rise to claims governed by the law of the state in which each attack occurred. Therefore, under Texas' choice of laws rules, the law of the respective assault *situs* states should control; and, as hereinafter discussed, each state's law allows for the claims here asserted.

In *Gutierrez v. Collins*, 583 S.W.2d 312, 318 (Tex. 1979), the Texas Supreme Court overruled *lex loci delicti*, in tort actions. In its place, the Court parsed the many available alternative theories and ultimately decided that: "in the future all conflicts cases sounding in tort will be governed by the 'most significant relationship' test as enunciated in Sections 6 and 145 of the Restatement (Second) of Conflicts." *Id.*, at 318.

Each case's contacts must be considered individually and, although being often fact-intensive, is a matter of law to be decided by the court. *Id.*, at 319. More, in subsequent

45

decisions, the Supreme Court emphasized that the application of the contact factors is not a mathematical calculation of totaling contacts; but, instead must focus on the *most significant* contacts.

In 1984, the Supreme Court decided *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414 (Tex. 1984). That case involved a tort, a fatal air crash; but, it also contained a significant contract issue, the issue of enforceability of a release. Pertaining to that issue, the trial court determined that New Mexico law controlled. The Austin C.C.A. reversed and ruled that Texas law governed the release as it was executed in Texas; and that the rule of *lex loci contractus* required the law of the place of the making of the contract. Both parties appealed that decision, arguing that: "the correct approach is the most significant relationship methodology of the *Restatement (Second) of Conflict of Laws,* which w[as] adopted in *Gutierrez v. Collins,* 583 S.W.2d 312 (Tex.1979), for tort choice of law issues." *Id.,* at 420.

The Supreme Court reiterated its holding in *Gutierrez* that the rule of *lex loci delicti,* (application of the law where the wrong occurred), was simplistic and arbitrary and often led to inequitable results in a modern, highly mobile society. It noted that the "significant relationship methodology" of §§ 6 & 145 of the Restatement (Second) of Conflicts "offers a rational yet flexible approach to conflicts problems, ... represents a collection of the best thinking on this subject ... [and] include [s] "most of the substance" of all the modern theories.' [*Gutierrez*], at 318." *Duncan,* 665 S.W.2d at 421. Therefore, for uniformity and because all of the *lex loci* rules presented impermissible problems, the Court abandoned all such rules for Texas conflicts analysis:

> "Consequently, the *lex loci* rules will no longer be used in this state to resolve conflicts problems. Instead, in all choice of law cases, except those contract cases in which the parties have agreed to a valid choice of law

46

clause, the law of the state with the most significant relationship to the particular substantive issue will be applied to resolve that issue."

*Duncan v. Cessna Aircraft Co.*, 665 S.W.2d at 421.See also *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 848 (Tex.2000); *Drennen v. Exxon Mobil Corp.*, 367 S.W.3d 288, 294 (Tex.App.- Houston [14th Dist.] 2012, reh'g denied, review granted Aug. 23, 2013).

Thus, the trial court must decide the issue in the first instance, (a determination of the facts, to which the Restatement sections are then applied); but, that decision of whether to apply Texas law is reviewed on appeal *de novo*. (*See Minnesota Mining & Mfg. Co. v. Nishika Ltd.*, 955 S.W.2d 853, 856 (Tex.1996)). The number of contacts is not determinative; as some contacts are more important than others because they "implicate state policies underlying the particular substantive issue. Consequently, selection of the applicable law depends on the qualitative nature of the particular contacts. [*Gutierrez*], at 319." *Duncan*, at 421.

Then, in *Hughes Wood Products, Inc. v. Wagner*, 18 S.W.3d 202, 205 (Tex. 2000), the Court added that:

> "[T]he *Restatement* requires the court to consider which state's law has the most significant relationship *to the particular substantive issue to be resolved. See* restatement (Second) of Conflict of Laws § 145(1) (1971). Section 145(1) specifically provides that '[t]he rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, *with respect to that issue,* has the most significant relationship to the occurrence and the parties under the principles stated in § 6.' *Id.* (emphasis [the court's]); *see Duncan*, 665 S.W.2d at 421."

*Wagner*, at 205. As stated in *Duncan*, "In applying § 6 to this case, we must first identify the state contacts that should be considered. Once these contacts are established, the question of which state's law will apply is one of law. *Gutierrez*, 583 S.W.2d at 319. Moreover, the number of contacts with a particular state is not determinative. Some contacts are more important than others because they implicate state policies underlying

47

the particular substantive issue. Consequently, selection of the applicable law depends on the qualitative nature of the particular contacts. *Id.* at 319." *Id.*, at 421.

In performing a *Restatement* Sec. 145 analysis of the contact factors involved in this case, it is true that the relationship between Morris and Edible and the Assault Victims is centered in Texas and all of the parties are residents of Texas as well. However, the specific confessed criminal conduct of Morris which give rise to the Plaintiffs' claims and the place they were each injured is the remote location where each was attacked. While Plaintiffs firmly believe Texas substantive law affords them viable assault/battery claims; in the event it does not, clearly the most significant contacts militate for the application of the law of the state where the attacks occurred. Each of those states has strong criminal sanctions and fully viable tort law to which authorize these claims; and, justice requires the application of that tort law which affords to Plaintiffs the fairest and fullest opportunity to be made whole.

However, in *Vanderbilt Mortg. & Fin., Inc. v. Posey*, 146 S.W.3d 302, 313 (Tex. App.-Texarkana 2004, no pet.), the court noted that before a conflict of laws analysis commences:

"The first step in deciding choice of law is whether the laws of the various jurisdictions conflict. When a party contends that the law of another jurisdiction should apply, Texas courts will first examine if the applicable laws conflict. If the laws do not conflict, there is no need to resolve the choice of law problem. *Vandeventer v. All Am. Life & Cas. Co.*, 101 S.W.3d 703, 711–12 (Tex.App.-Fort Worth 2003, no pet.); *Saint Paul Surplus Lines Ins. Co. v. Geo Pipe Co.*, 25 S.W.3d 900, 903 n. 2 (Tex.App.-Houston [1st Dist.] 2000, pet. dism'd by agr.); *see Duncan*, 665 S.W.2d at 419–21. There are no conflicts if there are no differences between the laws of the respective states concerning the issues relevant to the case. *See Duncan*, 665 S.W.2d at 419–21; *Vandeventer*, 101 S.W.3d at 711–12; *Young Ref. Corp. v. Pennzoil Co.*, 46 S.W.3d 380, 385 (Tex.App.-Houston [1st Dist.] 2001, pet. denied); *Saint Paul Surplus Lines Ins. Co.*, 25 S.W.3d at 903 n. 2."

*Vanderbilt Mortg. & Fin., Inc. v. Posey*, 146 S.W.3d at 313. Further, in a conflicts analysis, it may be determined that "Texas law may apply to some claims, but not other claims. *See, e.g., Snyder Gen. Corp. v. Great Am. Ins. Co.*, 928 F.Supp. 674, 678 (N.D.Tex.1996)." *Scottsdale Ins. Co. v. Nat'l Emergency Services, Inc.*, 175 S.W.3d 284, 291 (Tex. App.-Houston [1st Dist.] 2004, reh'g overruled, rev. denied). Therefore, under such choice of laws rules, having established the instant claims under Texas law, it is necessary to consider the assault/battery law of each state where the attacks occurred.

### e. The assault/battery laws of relevant states permit the instant claims.

Once again, Plaintiffs vigorously maintain that they have viable intentional tort claims against Defendants based upon the foregoing analysis of Texas assault/battery tort law. But, if for some reason they don't, a fair application of Texas choice of laws rules mandates that they be able to assert viable tort claims pursuant to the law of the state where each sexual attack occurred. In the Superseding Indictment, attached hereto as Exhibit A, the United States Attorney's Office and the grand jury of the Houston Division of the Southern District of Texas have made clear that taking nude photographs of a person without that person's knowledge and/or consent is "Improper Photography" in violation of Texas Penal Code § 21.15, and "Sexual Abuse in the First Degree", in violation of New York Penal Law § 130.65. Further, the transportation of a person from Texas to New York for such purpose is a violation of Title 18, United States Code, Sec. 2421. (See Indictment, Count 1).

Further, unconsented sexual activity with another person is also "Sexual Abuse in the First Degree", in violation of New York Penal Law § 130.65; and, the transportation of a person from Texas to New York to attempt such is a violation of Title 18, United States Code, Section 2421. (See Indictment, Counts 2 and 3).

49

Further, unconsented sexual activity with another person in "Indecent Assault" in violation of Pennsylvania Consolidated Statutes § 3126; and, the transportation of a person from Texas to Pennsylvania to attempt such is a violation of Title 18, United States Code, Section 2421. (See Indictment, Count 4).

Finally, unconsented sexual activity with another person is an "Invasion of Privacy", in violation of New Jersey Statutes Annotated 2C:14-9 (b); and, the transportation of a person from Texas to New Jersey to attempt such is a violation of Title 18, United States Code, Section 2421. (See Indictment, Count 5).

A closer examination of those various state criminal statutes, as well as analogous ones from Louisiana, Illinois and Massachusetts and the case law interpreting and applying such will fully demonstrate that every single one of these acts, of which Defendant Morris is most certainly guilty, are felonies and very serious offenses. And, there is not one shred of authority in any of these states, in federal law or in the law of Texas which supports the astonishing proposition, which Defendants persist in glibly asserting, that the consequences of such should be nullified and set aside merely because the *Defendants* choose to characterize them as incidences of mere workplace sexual harassment. Indeed, it is incomprehensible that the Texas Legislature, in passing the TCHRA, part of the Labor Code, ever in its wildest imagination envisioned that a statue designed solely to make workplace discrimination law in Texas uniform and compatible with the federal Title VII would be asserted to prevent criminal convictions for heinous sexual offenses or to thwart valid tort claims for depraved, intentional sexual depredations. To the contrary, such a notion shocks the conscience and offends every reasonable notion of decency, respect for women and human dignity. Moreover, criminal

50

law aside, the civil tort law of each state where an attack took place authorizes the very assault/battery claims here asserted, just as Texas law does.

Plaintiff Michelle Barnett claims that Morris intentionally drugged her while she was in New Orleans, Louisiana; and, after she was rendered unconscious, he stripped off her clothing without her knowledge or consent. (This is what she explicitly knows; God only knows what else happened, which she cannot remember and which she can only imagine. But, for purposes of this claim, the law is conservatively examined only in relation to what she actually knows). In Louisiana, "battery" is defined as "the intentional use of force or violence upon the person of another; or the intentional administration of a poison or other noxious liquid or substance to another." La. Rev. Stat. Ann. § 14:33. Simple battery is a battery committed without the consent of the victim, La. Rev. Stat. Ann. § 14:35; this carries a penalty of a thousand dollar fine and/or six months' imprisonment. In *State v. Chehardy*, 2012-1337 (La. App. 3 Cir. 5/1/13), 2013 WL 1809891, ___ So.3d ___, the court noted that: "The offense of aggravated battery requires 'physical contact whether injurious or merely offensive.' *State v. Dauzat*, 392 So.2d 393, 396 (La.1980)." And, in *State v. Schenck*, 513 So. 2d 1159, 1165 (La. 1987), the Louisiana Supreme Court held that: "An essential element of battery is 'physical contact whether injurious or merely offensive', and it may be committed by touching another through clothing. [Citing *Dauzet*]." Indeed, in *Redmon v. Bi-Lo Supermarket*, 2002-888 (La. App. 3 Cir. 2/19/03), 846 So. 2d 820, 823, the court affirmed that even "spitting on another is wrong and is an actionable battery even though there is no real physical damage." Therefore, it would appear axiomatic that drugging a person with a substance powerful enough to induce deep unconsciousness is manifestly "noxious"; and, that forcefully stripping the clothes off an unconscious person is battery. Even if a battery attempted is

51

uncompleted, Louisiana has determined that: "Assault is an attempt to commit a battery, or the intentional placing of another in reasonable apprehension of receiving a battery." La. Rev. Stat. Ann. § 14:36. And, respectfully, it is difficult to imagine either such charge being dismissed by a Louisiana court because the defendant said, *Oh no, I was just sexually harassing her.*

In *Griffith v. Young*, 46,184 (La. App. 2 Cir. 4/13/11), 62 So. 3d 856, 859, reh'g denied (May 12, 2011), the court made clear that: "Under La. C.C. art. 2315, a person is liable for acts which cause damage to another. The intentional tort of battery is a harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff to suffer such a contact. *Touchet v. Hampton*, 2008-833 (La. App. 3d Cir.12/11/08), 1 So.3d 729, *writ denied*, 2009–0076 (La.3/27/09), 5 So.3d 141." The court further noted that to prevail, the plaintiff need only show that the tort's *prima facie* elements have been met and that there was an absence of consent. *Id.*, at 859. That means, according to *Goldman v. Doe*, 12-531 (La. App. 5 Cir. 3/27/13), 113 So. 3d 376, 383, that: "It is not necessary for the act to intend to inflict actual damage, rather, it is 'sufficient if the actor intends to inflict either a harmful or offensive contact without the other's consent.' " *Mattingly*, 720 So.2d at 1230 (citing *Caudle*, 512 So.2d at 391)." Thus, drugging a woman unconscious and while she is so, stripping off her clothes meets the elements for the assertion of a claim for intentional battery; and Ms. Barnett should be entitled to do so. And, since Ms. Barnett filed suit within one-year of her assault, her claim is timely. See *Chaverri v. Dole Food Co., Inc.*, 896 F. Supp. 2d 556, 567 (E.D. La. 2012) aff'd, 12-31026, 2013 WL 5274446 (5th Cir. Sept. 19, 2013)("Louisiana Civil Code article 3492 provides a one-year liberative prescription period for delictual actions. La. Civ. Code art. 3492. Prescription begins to

52

run from the day the plaintiff's injury is sustained. *Id.*"); see also *Elzy v. Roberson,* 868 F.2d 793, 794 (5th Cir.1989); *Jacobsen v. Osborne,* 133 F.3d 315, 319 (5th Cir. 1998).

Plaintiff Keri Hill asserts that she was drugged and sexually assaulted by Morris in New York and Illinois. As noted, *supra,* such conduct clearly violates New York law and gives rise to a well-recognized claim for assault/battery; and, the law of Illinois is no less forgiving. Therefore, she clearly states viable assault/battery claims as set out in the Third Amended Petition on file herein. Regarding New York, Penal Law § 130.00(3) provides that: " 'Sexual contact' means any touching of the sexual or other intimate parts of a person for the purpose of gratifying sexual desire of either party. It includes the touching of the actor by the victim...". § 130.00(6) states: " 'Mentally incapacitated' means that a person is rendered temporarily incapable of appraising or controlling his conduct owing to the influence of a narcotic or intoxicating substance administered to him without his consent, or to any other act committed upon him without his consent." N.Y. Penal Law § 130.00 (McKinney). Indeed, even supposing for a moment that Ms. Hill voluntarily rendered herself unconscious from her own drinking, (which she most certainly did *not*), in *People v. Bjork,* 105 A.D.3d 1258, 1260, 963 N.Y.S.2d 472, 476 (N.Y. App. Div. 2013) leave to appeal denied, 21 N.Y.3d 1040 (2013), the court firmly ruled that:

> We reject defendant's contention that the People did not meet their burden to prove that the victim was physically helpless. For purposes of defendant's convictions for sexual abuse in the first degree... a person is physically helpless when he or she 'is unconscious or for any other reason is physically unable to communicate unwillingness to an act' (Penal Law § 130.00[7]; *see...* 130.65[2] ). A person who is asleep or unable to communicate as a result of voluntary intoxication is considered to be physically helpless (*see People v. Morrow,* 304 A.D.2d 1040, 1042, 758 N.Y.S.2d 215 [2003], *lv. denied* 100 N.Y.2d 564, 763 N.Y.S.2d 821, 795 N.E.2d 47 [2003]; *People v. Himmel,* 252 A.D.2d 273, 275–276, 686 N.Y.S.2d 504 [1999], *lv. denied* 93 N.Y.2d 899, 689 N.Y.S.2d 711, 711 N.E.2d 987 [1999] )."

*Bjork,* at 1260.

53

Further, Penal Law § 130.65 prohibits "Sexual Abuse in the First Degree", in relevant part, as: "A person is guilty of sexual abuse in the first degree when he or she subjects another person to sexual contact: 2. When the other person is incapable of consent by reason of being physically helpless..." N.Y. Penal Law § 130.65 (McKinney). Pursuant to Penal Law §70.02(c), such offense is a Class D felony, for which Penal Law § 70.80 4(a)(iii) mandates a prison term of not less than two, nor more than seven years. Thus, New York treats actions such as those of Defendant Morris very seriously; and, careful research reveals no excuse, under the New York Penal Code, for such conduct, based upon an asserted defense that such conduct merely constitutes workplace sexual harassment. And, its relevant civil law is no less tolerant of such depredations.

In *Stanley v. Amalithone Realty, Inc.*, 31 Misc. 3d 995, 1006, 921 N.Y.S.2d 491, 501 (N.Y. Sup. Ct. 2011) appeal dismissed, 94 A.D.3d 140, 940 N.Y.S.2d 65 (N.Y. App. Div. 2012) leave to appeal denied, 20 N.Y.3d 857, 983 N.E.2d 771 (2013), the court held: "Assault is defined as an intentional attempt or threat to do injury or commit a battery. To sustain a cause of action to recover damages for assault, there must be proof of physical conduct placing the plaintiff in imminent apprehension of harmful contact *(see Holtz v. Wildenstein & Co.*, 261 A.D.2d 336, 693 N.Y.S.2d 516 [1st Dept. 1999] ). A battery is intentional and wrongful physical contact with a person without his or her consent (*see id.; see also Pope v. State*, 192 Misc. 587, 79 N.Y.S.2d 466 [N.Y.Ct.Cl. 1948] *affd.* 277 App. Div. 1015, 99 N.Y.S.2d 1019 (1950); *Clayton v. Keeler*, 18 Misc. 488, 42 N.Y.S. 1051 [Sup. Ct., N.Y. County 1896] )." *Id.*, 1006. In *Oteri v. Vill. of Pelham*, 100 A.D.3d 725, 726, 954 N.Y.S.2d 171, 172 (N.Y. App. Div. 2012), the court affirmed that: " '[O]nce intentional offensive conduct has been established, the actor is liable for assault and not negligence' *(Panzella v. Burns*, 169 A.D.2d 824, 825, 565 N.Y.S.2d 194; *see Thomas v. Fayee*, 302

54

A.D.2d 451, 452, 756 N.Y.S.2d 584; *Wrase v. Bosco*, 271 A.D.2d 440, 706 N.Y.S.2d 434; *Barraza v. Sambade*, 212 A.D.2d 655, 622 N.Y.S.2d 964; *see also Ciminello v. Sullivan*, 65 A.D.3d 1002, 885 N.Y.S.2d 118)." *Id.*, at 726. Then, in *Holland v. City of Poughkeepsie*, 90 A.D.3d 841, 846, 935 N.Y.S.2d 583, 590 (N.Y. App. Div. 2011), the court confirmed that: " 'To recover damages for battery, a plaintiff must prove that there was bodily contact, that the contact was offensive, i.e., wrongful under all of the circumstances, and intent to make the contact without the plaintiff's consent' (*Higgins v. Hamilton*, 18 A.D.3d 436, 436, 794 N.Y.S.2d 421)." *Id.*, at 846.

Thus, the facts of Morris' attack of Ms. Hill in New York clearly give rise to a viable assault/battery claim under applicable New York tort law. Moreover, as she was assaulted in January, 2012 and her Original Petition was filed in November, 2012, she properly, timely asserted such claim within the one-year limitation period provided by New York's applicable statute of limitations, N.Y. C.P.L.R. 215 (McKinney), which states: "The following actions shall be commenced within one year: 3. an action to recover damages for assault, battery..." Id. See also *Yong Wen Mo v. Gee Ming Chan*, 17 A.D.3d 356, 358, 792 N.Y.S.2d 589, 590 (N.Y. App. Div. 2005)("The Supreme Court correctly determined that the causes of action alleging assault and battery are governed by the one-year statute of limitations... (see CPLR 215[3]; *Matter of Plaza v. Estate of Wisser*, 211 A.D.2d 111, 118, 626 N.Y.S.2d 446).").

Regarding her violation by Morris in Illinois, pursuant to that state's relevant criminal statute, 720 ILCS 5/12-3, § 12-3, "Battery" is defined as follows: "(a) A person commits battery if he or she knowingly without legal justification by any means (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual." See also *U.S. ex rel. Leyva v. Walls*, 230 F. Supp. 2d 847, 855

55

(N.D. Ill. 2002)("Under Illinois law, '[a] person commits battery if he intentionally or knowingly without legal justification and by any means, (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual.' 720 ILCS 5/12–3(a)."). Such an offense is a Class A misdemeanor. 720 ILCS 5/2-11, § 2-11 defines a "misdemeanor" as "any offense for which a sentence to a term of imprisonment in other than a penitentiary for less than one year may be imposed." 720 ILCS 5/2-11.

In *People v. Grieco*, 44 Ill. 2d 407, 410, 255 N.E.2d 897, 899 (1970), the Illinois Supreme Court ruled that: "The term 'battery' is one of common usage and understanding, and the statute itself sets forth all elements necessary to constitute the offense intended to be punished, viz., causing bodily harm to an individual, intentionally and knowingly without legal justification."*Id.*, at 899. Further, in *People v. Smith*, 19 Ill. App. 3d 704, 707, 312 N.E.2d 355, 357 (Ill. App. Ct. 1974), the court noted that: "Blows... are not necessary to the commission of the offense of battery. Battery may be committed by any physical contact of an insulting, provoking nature. Ill. Rev. Stat., 1969, ch. 38, para. 12—3(a)(2)." *Id.*, at 357.

With regard to civil liability for Morris' attack of Ms. Hill in Illinois, in *Curtis v. Jaskey*, 326 Ill. App. 3d 90, 93, 759 N.E.2d 962, 964 (Ill. App. Ct. 2001), the court held that: "A battery has been defined as the unauthorized touching of the person of another. *Gaskin v. Goldwasser*, 166 Ill.App.3d 996, 1011-12, 117 Ill. Dec. 734, 520 N.E.2d 1085 (1988)." *Id.*, at 964; and, in *McNeil v. Carter*, 318 Ill. App. 3d 939, 944, 742 N.E.2d 1277, 1281 (Ill. App. Ct. 2001), the court held that: "A claim of assault must include an allegation of a reasonable apprehension of an imminent battery. *Rosenberg v. Packerland Packing Co.*, 55 Ill.App.3d 959, 13 Ill. Dec. 208, 370 N.E.2d 1235 (1977). The elements of a battery

56

must include an intentional act on the part of the defendants and a resulting offensive contact with the plaintiff's person. *McNeil v. Brewer*, 304 Ill.App.3d 1050, 238 Ill. Dec. 183, 710 N.E.2d 1285 (1999)." *Id.*, at 944.

Further, in *Flores v. Santiago*, 2013 IL App (1st) 122454, 986 N.E.2d 1216, 1219-20, in an opinion particularly enlightening in light of relatively analogous facts, the court stated that:

> "Generally, battery is committed by an individual if: ' "(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results." ' *Bakes v. St. Alexius Medical Center*, 2011 IL App (1st) 101646, ¶ 22, 352 Ill. Dec. 902, 955 N.E.2d 78 (quoting Restatement (Second) of Torts § 13 (1965)). Illinois courts have stated that battery may be defined as the wilful touching of the person of another or a successful attempt to commit violence on the person of another. *Bakes*, 2011 IL App (1st) 101646, ¶ 22, 352 Ill. Dec. 902, 955 N.E.2d 78 (and cases cited therein). We have also defined battery as involving defendant performing some affirmative act intended to cause an unpermitted contact. *Id.* ' "[T]he gist of the action for battery is not the hostile intent of the defendant but rather the absence of consent to the contact on the part of the plaintiff." ' *Country Mutual Insurance Co. v. Olsak*, 391 Ill.App.3d 295, 306, 330 Ill. Dec. 433, 908 N.E.2d 1091 (2009) (quoting *Cowan v. Insurance Co. of North America*, 22 Ill.App.3d 883, 890, 318 N.E.2d 315 (1974)).
>
> Plaintiff argues that any consent was vitiated in this case because the defendant allegedly plied her with illegal drugs on almost every occasion of sexual contact. Defendant does not deny that severe intoxication may render a person unable to consent to sexual contact. See *People v. Vaughn*, 2011 IL App (1st) 092834, ¶ 37, 356 Ill. Dec. 498, 961 N.E.2d 887; see also *Doe v. Psi Upsilon International*, 2011 IL App (1st) 110306, ¶ 4, 357 Ill. Dec. 374, 963 N.E.2d 327...
>
> Illinois law recognizes that episodes of nonconsensual sex may occur within a generally consensual relationship, even if they are difficult to prove. See *People v. M.D.*, 231 Ill.App.3d 176, 192, 172 Ill. Dec. 341, 595 N.E.2d 702 (1992)."

*Flores*, at 1219-20.

57

Thus, it appears crystal clear that Ms. Hill states a viable claim for assault/battery pursuant to Illinois law. Moreover, given its particular nature, it is timely asserted pursuant to Illinois' applicable limitations period, per *Williams v. Ali*, 145 Ill. App. 3d 458, 460, 495 N.E.2d 1052, 1053 (Ill. App. Ct. 1986), in which the court held:

> Section 13-202 of the Illinois Code of Civil Procedure states in part that:
>
> 'Actions for damages for an injury to the person, or for false imprisonment, or malicious prosecution, or statutory penalty, or for abduction, or for seduction, or for criminal conversation, shall be commenced within two years next after the cause of action accrued* * *.' (Ill.Rev.Stat.1981, ch. 110, par. 13-202.)
>
> It has long been a tenet of Illinois law that a civil action for sexual assault falls within this two-year limitation period. (*Thomas v. Morgan* (1901), 96 Ill. App. 629..."

*Williams,* at 1053. See also *Akins-Brakefield v. Philip Envtl. Services Corp.,* 08-CV-710-DRH, 2010 WL 1032632 (S.D. Ill. Mar. 17, 2010)("[U]nder Illinois law, causes of action for assault, battery and negligent supervision are subject to a two-year limitations period. *See Hollander v. Brown,* 457 F.3d 688, 692 (7th Cir.2006) (stating that assault and battery claims are considered personal injury actions and applying two-year statute of limitation set forth in 735 Ill. Comp. Stat.. 5/13–202); *see also Williams v. Ali,* 145 Ill.App.3d 458, 99 Ill. Dec. 317, 495 N.E.2d 1052, 1053 (Ill.App.Ct.1986) (applying same for civil claim of sexual assault)...").

Moreover, the Illinois Supreme Court, in *Jones v. Jones,* 71 Ill. 562, 566 (1874), stated that, "If appellant was guilty [of assault/battery], he was bound, at all events, for an amount of damages that would compensate appellee for the injury sustained, and if the acts on the part of appellant were wanton and wilful, the jury, according to well and uniformly recognized rules, had the right to give punitive damages..." *Id.,* at 566. Consequently, Ms. Hill states a viable claim for assault/battery under applicable Illinois

58

law; which has been timely submitted and for which the full measure of her actual and exemplary damages may be recovered.

Finally, Plaintiff Stacy Stewart asserts that on a March, 2011 trip to Boston, Massachusetts with Morris, he drugged her into unconsciousness and while she was so compromised, he attempted to sexually assault her and to forcefully remove her clothing. Pursuant to that state's criminal law, in *Com. v. Eberhart,* 461 Mass. 809, 818, 965 N.E.2d 791, 798 (2012), the court held that: "The statutory crime of assault and battery, G.L. c. 265, § 13A, encompasses three common-law crimes: harmful battery, reckless battery, and offensive battery. *Commonwealth v. Burke,* 390 Mass. 480, 482, 457 N.E.2d 622 (1983); *Commonwealth v. Boyd,* 73 Mass.App.Ct. 190, 194–195, 897 N.E.2d 71 (2008)... Offensive battery occurs when 'the defendant, without justification or excuse, intentionally touched the victim, and ... the touching, however slight, occurred without the victim's consent.' *Commonwealth v. Hartnett,* 72 Mass.App.Ct. 467, 476, 892 N.E.2d 805 (2008). 'The affront to the victim's personal integrity is what makes the touching offensive.' *Commonwealth v. Burke, supra* at 483, 457 N.E.2d 622." *Id.,* at 798. See also *United States v. Sumrall,* 690 F.3d 42, 43, n.1 (1st Cir. 2012) *cert. denied,* 133 S. Ct. 894, 184 L. Ed. 2d 694 (U.S. 2013)("In all events, the Massachusetts Supreme Judicial Court has noted that '[o]ffensive battery is a form of intentional battery.' *Eberhart,* 965 N.E.2d at 798 n. 13; *see also id.* at 798 (characterizing offensive battery as an intentional touching without the victim's consent that is an 'affront to the victim's personal integrity').").

Further, in *Com. v. Marzilli,* 457 Mass. 64, 67, 927 N.E.2d 993, 996 (2010), the court noted that:

> "An indecent assault and battery is 'an intentional, unprivileged and indecent touching of the victim.' *Commonwealth v. Mosby,* 30 Mass.App.Ct. 181, 184, 567 N.E.2d 939 (1991), quoting *Commonwealth v.*

59

*Perretti,* 20 Mass.App.Ct. 36, 43–44, 477 N.E.2d 1061 (1985). Thus, to prove the intent element, the Commonwealth must prove that the defendant intended—had a conscious purpose, see *Commonwealth v. Gunter,* 427 Mass. 259, 268–269, 692 N.E.2d 515 (1998)—to commit an indecent or offensive touching of the complainant without her consent. See *Commonwealth v. Burke, supra* at 482–484, 457 N.E.2d 622...

General Laws c. 274, § 6, criminalizes an 'attempt' to commit a 'crime,' without limiting its application (insofar as is relevant here) to particular substantive crimes. While a defendant may not be prosecuted under G.L. c. 265, § 13H, for indecent assault without a completed battery, *Eaton, supra,* the fortuity that the defendant failed in his attempt to complete a crime does not absolve him from responsibility for it. An attempted indecent assault and battery under § 13H, may serve as a predicate offense under G.L. c. 274, § 6."

*Marzilli,* at 996. Regarding civil liability, Mass. Gen. Laws Ann. ch. 260, § 4 (West), provides that an action arising from assault and battery must be commenced within three years; thus, Ms. Stewart asserts a timely claim.

Therefore, even assuming *arguendo* that Texas substantive law does not provide a viable basis for the assertion of each Plaintiff's assault/battery claim, (which is not the case), the laws of the states where each attack occurred certainly does. However, no matter what state's law applies to the claims herein asserted, the TCHRA is *not* the controlling law in this case; instead, the Plaintiffs' claims are predicated upon vicious intentional sexual assaults and not in any way whatsoever upon legitimate notions of workplace discrimination, which is all that statute addresses. The Defendants' strained reading of the TCHRA for the sole purpose of imposing its short limitation period is manifestly unjust and factually and legally insupportable. The Supreme Court's decision in *Waffle House* explicitly preserves claims predicated upon assault/battery. Plaintiffs have stated and viably supported just such claims and they are entitled to their day in court on all legal and evidentiary matters asserted.

**f. Neither the TCHRA nor *Waffle House* controls this case.**

60

In the face of the controlling Texas substantive law clearly supporting the assault/battery claims of Plaintiffs, discussed *supra*, Defendants attempt to run for cover under the TCHRA. They have repeatedly contended that the sole claim available to each Plaintiff is under that Act; but, a careful reading of such will quickly reveal how insupportable such a contention is. The TCHRA is found in Chapter 21 of the Texas *Labor Code*; and, indeed, its very placement there denotes the Legislature's intention that it apply to *workplace* situations, not non-work related intentional torts. In keeping with such, § 21.051 of that chapter addresses ***workplace discrimination*** and provides, in relevant part:

> "An employer commits an unlawful employment practice if because of race, color, disability, religion, sex, national origin, or age the employer:
>
> (1) fails or refuses to hire an individual, discharges an individual, or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment; or
>
> (2) limits, segregates, or classifies an employee or applicant for employment in a manner that would deprive or tend to deprive an individual of any employment opportunity or adversely affect in any other manner the status of an employee."

Tex. Labor Code Ann., § 21.051 (Vernon). Basically, as a matter of both legislative intent and the very wording the Legislature employed in the statute, both this sub-section specifically and Chapter 21 generally were designed to apply the anti-discrimination tenants of the federal Title VII to Texas workplaces. (See Tex. Labor Code § 21.001). But, it is critical to note that Chapter 21 applies to actions in the *workplace* which implicate the conditions of employment. In *Nagel Mfg. & Supply Co. v. Ulloa*, 812 S.W.2d 78, 80 (Tex.App.-Austin 1991, writ denied), the CCA explained:

> "Sexual harassment, as the court defined it for the jury, 'means to engage in unwelcome sexual advances, requests for sexual favors, sexually abusive or

61

vulgar language, or other verbal, visual or *physical conduct,' if compliance is made a condition of employment or used as a basis for an employment decision or if such conduct interferes with work performance or creates an intimidating, hostile or offensive working environment.* (Emphasis added)."

*Ulloa*, at 80. See also *Wal-Mart Stores, Inc. v. Itz*, 21 S.W.3d 456, 470 (Tex.App.- Austin 2000, reh'g overruled, rev. denied)("Under Title VII and the Texas Human Rights Act, an employer may be held vicariously liable for quid-pro-quo sexual harassment by its supervisor. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 753 (1998); *Ewald v. Wornick Family Foods Corp.*, 878 S.W.2d 653, 659 (Tex.App.-Corpus Christi 1994, writ denied). The elements of the cause of action are as follows: (1) A supervisor (2) because of sex (3) subjects an employee to (4) unwelcome conduct that (5) affects a tangible aspect of the employment relationship. *See Ellerth*, 524 U.S. at 752–54; *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64–67 (1986); *Ewald*, 878 S.W.2d at 659. An employer's liability in such cases derives from the law of agency. Because discriminatory conduct ordinarily lies outside the agent's scope of authority, for a principal to be held liable it must be shown that the agency relationship aided the supervisor in committing the discriminatory act. *See Burlington Indus.*, 524 U.S. at 759–60."). Absolutely *none* of the claims Plaintiffs herein assert has *anything whatever* to do with employment decisions or conditions of employment. They have *exclusively* to do with **confessed pre-meditated, intentional sexual assaults** committed well outside the workplace, in fact in remote states.

In that regard, a close reading of the Texas Supreme Court's decision in *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 802 (Tex. 2010), in terms of the Defendants' contention of the limits it allegedly imposes upon workplace sexual harassment claims, immediately demonstrates just how off-base their reliance upon and interpretation of it

62

is in their instant Plea, just as it was in their previously denied MSJ. They completely ignore the critical, relevant portion of the opinion which leaves intact the very claims Plaintiffs herein assert:

> *"The issue before us is not whether Williams has a cause of action for battery against Davis, her coworker.* Although trivial, everyday physical contacts do not necessarily result in a battery. 'Offensive contacts, or those which are contrary to all good manners, need not be tolerated.' Hence, *'[t]aking indecent liberties with a person is of course a battery.' Neither side questions the jury's finding that Davis assaulted Williams.*
>
> *The issue before us, however, is not whether Williams has a viable tort claim against a coworker. The issue is whether a common-law negligence action should lie against her employer for allowing the coworker's tortious or criminal conduct to occur, or whether, instead, a statutory regime comprehensively addressing employer-employee relations in this context should exclusively govern.* We have recognized generally that employers 'have a duty to use ordinary care in providing a safe work place.' However, Texas courts have also held that the exclusive statutory workers' compensation scheme sometimes provides the remedy against an employer for the assault on or sexual harassment of an employee. *Today's question is whether employer liability for unwanted sexual touching by a coworker (simple assault under Texas law given its 'offensive or provocative' nature) is limited to a tailored TCHRA scheme that specifically covers employer liability for sexual harassment.* We think the answer should be yes. (Internal citations omitted; emphasis added)."

*Waffle House, Inc. v. Williams*, at 802-03. See also *Rodriguez v. Boerjan*, 399 S.W.3d 223, 230 (Tex.App. San Antonio 2012, rule 53.7(f) motion filed Oct. 15, 2012)("[A] person commits civil assault if he intentionally or knowingly causes offensive physical contact with another. *See Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 801 n. 4 (Tex.2010) (citing *Umana v. Kroger Tex., L.P.*, 239 S.W.3d 434, 436 (Tex.App.-Dallas 2007, no pet.); *Johnson v. Davis*, 178 S.W.3d 230, 240 (Tex.App.-Houston [14th Dist.] 2005, pet. denied).");and, *Rollerson v. City of Freeport, Tex.*, CIV.A. H-12-1790, 2013 WL 2189892, *9 (S.D. Tex. May 16, 2013)("The elements of assault are the same in a

63

criminal or civil matter. To establish a claim for assault, a plaintiff must show that the defendant (1) intentionally, knowingly, or recklessly caused him bodily injury, (2) intentionally or knowingly threatened him with imminent bodily injury, or (3) intentionally or knowingly caused physical contact with him when the defendant knew or should have reasonably believed that he would regard the contact as offensive or provocative. *Cox v. Waste Management of Texas, Inc.*, 300 S.W.3d 424, 439 (Tex.App.-Fort Worth 2009), *citing* Tex. Penal Code Ann. § 22.01 (Vernon Supp.2009). 'Although trivial, everyday physical contacts do not necessarily result in a battery, "offensive contacts, or those which are contrary to all good manners, need not be tolerated." Hence "[t]aking indecent liberties with a person is of course a battery." '*Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 802–03 & nn. 15 and 16 (Tex.2010), *citing* W. Page Keeton, *et al., Prosser and Keeton on the Law of Torts* 42 (5th ed.1984).").

Also, because Title VII and the TCHRA are designed to achieve identical purposes, federal court decisions with regard to the former are instructive as to claims under the latter. See *Prairie View A & M Univ. v. Chatha*, 381 S.W.3d 500, 504 (Tex. 2012), reh'g denied (Nov. 16, 2012)("The TCHRA was 'enacted to address the specific evil of discrimination and retaliation in the workplace,' as well as to coordinate and conform with federal anti-discrimination and retaliation laws under Title VII. *See City of Waco v. Lopez*, 259 S.W.3d 147, 153–55 (Tex.2008).").In *Young v. Houston Lighting & Power Co.*, 11 F. Supp. 2d 921, 932 (S.D. Tex. 1998)(Kent, J.), the court made clear that:

> "Plaintiff asserts a claim of hostile environment sexual harassment under Title VII. For such a claim, Young must prove the following elements:
>
> (1) she belongs to a protected group;
>
> (2) she was subject to unwelcome sexual harassment,

(3) the harassment was based upon sex;

(4) the harassment affected a term, condition or privilege of employment,

(5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action.

*See Waltman v. International Paper Co.*, 875 F.2d 468, 477 (5th Cir.1989)."

*Young*, at 932. In the instant analysis, the intentional sexual assault of each Plaintiff had *nothing* to do with a "term, condition or privilege of employment". Absent such, neither Title VII nor TCHRA have any applicability thereto. The Plaintiffs' claims rest upon intentional sexual assault remote from the workplace.

The facts and focus in *Waffle House* are entirely distinguishable from the instant analysis. There the Supreme Court made it very clear that the core issue there was whether an employer may be held *negligent* in permitting workplace sexual harassment, (*Id.*, 798-99); and, that: **"A statutory remedy is not always the sole remedy, and the TCHRA does not foreclose an assault-based negligence claim arising from independent facts unrelated to sexual harassment.**(Emphasis added)." *Id*, at 799. The plaintiff, a waitress, was subjected to repeated incidences of sexual harassment by a cook, *Id.* He rubbed against her breasts with his arm; he made offensive sexual comments with his hands in his pants, blocked her exit from a storeroom and held her arms down with his body, *Id.* All of these events occurred in the kitchen area where the two worked together and directly involved the conditions of employment. She complained several times to her superiors and called a company hotline; but, no action was taken to remedy the situation, *Id.*

These events, while obnoxious and offensive, are *light years* from the intentional drugging of a woman in a remote state and while she was unconscious, sexually assaulting

65

her, trying to forcefully remove her clothing and photographing her naked. Moreover, the sole question the Supreme Court considered in *Waffle House* was whether the employer could be held liable for *negligence;* making it explicitly clear that the plaintiff's right to assert a battery claim was a given and not the subject of the Court's consideration! (*Id.,* at 802). Moreover, in separating out the battery claim which was not before it, the Court noted that: "We have recognized that the legislative creation of a statutory remedy is not presumed to displace common-law remedies. To the contrary, abrogation of common-law claims is disfavored." *Id.,* at 802.

*Waffle House* also discussed two other Supreme Court decisions which are facially irrelevant to the instant claims. The Court noted that in *City of Waco v. Lopez,* 259 S.W.3d 147 (Tex. 2008), it held "that an employee claiming he was terminated in retaliation for complaining of age and race discrimination could not bring a claim under the Whistleblower Act. [Tex. Govt. Code § 554.001-010]." *Id.,* at 807. Obviously, such a claim is irrelevant here. And, in "*Hoffmann–La Roche Inc. v. Zeltwanger,* [144 S.W.3d 438 (Tex. 2004)] we held that a common-law claim for intentional infliction of emotional distress was not available to an employee complaining of sexual harassment by a supervisor." *Id.,* at 808. That decision was limited to the unique aspects of that particular tort and the relative facts of that case did not implicate the instant issues in any way.

Therefore, respectfully, Defendants' Plea contention that Plaintiffs have incorrectly asserted common law claims of assault for alleged conduct that falls within the scope of the TCHRA's exclusive remedy for workplace sexual harassment, (Plea, pgs. 2-3, 23), is flatly, absolutely *wrong.* Assault claims do *not* fall within the ambit of the TCHRA and, they are *not* incidences of workplace sexual harassment. Therefore, Defendants' reliance upon *Pruitt v. Int'l Assn. of Fire Fighters,* 366 S.W.3d 740 (Tex.App.- Texarkana,

2012 no. pet.) is all the more inexplicable. There, the plaintiff was an African-American municipal fire chief who alleged a conspiracy to deprive him of his job. Such obviously discriminatory facts have absolutely nothing to do with the instant analysis; and, the authority the CCA cites in *Pruitt* "when a statute requires the exhaustion of administrative remedies before a plaintiff may file suit," *Id.*, at 743, is wholly irrelevant.

Likewise, when Defendants claim that: "because the common law claims brought by all three plaintiffs (*sic*) are inextricably intertwined with claims that are required to be brought under the TCHRA, which requires exhaustion of administrative remedies, the claims asserted, in the fashion that they have been, are preempted", (Plea pgs. 20, 30); respectfully, they are literally making up self-serving rules as they go along, devoid of the offer of any supporting authority whatever. And their citation to *Waffle House,* for the contention that: "If claims involving sexual harassment are pursued as common law torts, the 'statutory procedures and limitations applicable to such claims would be rendered superfluous' ", (Plea, pgs. 23-24); is equally unavailing. First, the Plaintiffs' claims herein have nothing to do with workplace harassment; second, in the language they quote the Supreme Court was referring to the employer's liability, *not the assault assailant's.* As the Court made clear in *Waffle House,* "The TCHRA contemplates discrimination affecting the 'terms, conditions, or privileges of employment.' [Citing Labor Code § 21.051(1)]." *Id.,* at 805. It says not one *single* word about intentional, non-workplace *confessed* criminal assaults! And Defendants' contention that: "An employer's liability for unwanted sexual touching by another employee is limited to the tailored TCHRA scheme that specifically covers employer liability for sexual harassment", citing to *Waffle House,* at 803," (Plea, pg. 24), is equally unavailing.

67

In the first place, Plaintiff's claims for sexual assault are against Morris, not the employer; second, *Waffle House*, at 802 explicitly preserved the Assault Victims' claims of tortious battery. Morris wasn't "acting in his capacity as an employee," (Plea, pgs. 24-25), he was acting as a deviant, sexual predator which had nothing to do with his job whatsoever! Indeed, if the Court steps back to view these claims with simple, objective common sense, Defendants' entire reliance upon characterizing all of the appalling facts of these claims are mere workplace discrimination completely evaporates and Defendants' strategy is exposed as no more than a cruel deceit. Should this Court properly deny the Plea and assert its entirely appropriate jurisdiction over the Assault Victims' claims, they are not being "allowed to unjustly side-step the standards and procedures set by the TCHRA for sexual harassment claims," (Plea, pgs. 30-31), they are being allowed to hold a cowardly rapist accountable.

In that regard, the authority cited by Defendants in support of denying the Assault Victims their right to assert their claims is singularly unavailing. In *Hoffman-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 448 (Tex. 2008), the Texas Supreme Court considered a clearly workplace situation where a worker's supervisor repeated made off-color jokes and remarks to her and after she complained, he retaliated in the workplace by screaming at her and otherwise belittling her. The Court determined that the plaintiff there could not assert both a sexual harassment claim and an intentional infliction of emotional distress tort. As Defendants note, (Plea, pg. 31), the Court did say, "If the gravamen of a plaintiff's complaint is the type of wrong that the statutory remedy was meant to cover, a plaintiff cannot maintain an intentional infliction claim regardless of whether he or she succeeds on, or even makes, a statutory claim." *Id*, at 448. But, they miss the point of that quote entirely. The operative factor was the type of wrong a

68

"statutory remedy was meant to cover." Here, there is no such statutory remedy mandatorily applicable!

Similarly, every single decision Defendants' cite in purported support of the applicability of *Waffle House* is distinguishable from or inapposite to the instant analysis. In *Taylor v. Seton Healthcare,* 2012 WL 13680 (W.D. Tex. 2012), the plaintiffs were hospital employees who alleged hair pulls, smelling of hair, shoulder touches, hugs, brushing contact, a possible buttocks touching, touching of breasts, sexual innuendo comments, inappropriate private questions and suggestive movements, which all occurred on the job, in the context of daily duties in the physical workplace. After complaints were made, severe disciplinary repercussions followed against the complainants. While certainly serious allegations, these are classic workplace sexual harassment contentions. Therefore, the Court's decision that such complaints supported TCHRA claims, but not assault claims simply has no relevance to the instant claims. *Forbes v. A.G. Edwards & Sons, Inc.,* No. 08-CV-552, 2009 WL 424146, at *8 (S.D.N.Y. Feb. 18, 2009), is distinguishable because there the court's primary focus was the enforcement of a broad arbitration clause, which is of course not present in this case. Likewise, in *Jones v. Halliburton Co.,* 791 F. Supp. 2d 567, 581 (S.D. Tex. 2011), the court applied the Defense Bases Act, (DBA), which extends the LHWCA, 33 U.S.C. § 901, *et seq* to injuries or deaths occurring on overseas military bases. The plaintiff alleged she was raped on base by a fellow contractor employee and the court determined that her remedy was under the exclusive provisions of the Act. Once again, that simply has nothing to do with the instant analysis, where the TCHRA does *not* apply. Finally, in *City of Waco v. Lopez,* 259 S.W.3d 147, 149 (Tex. 2008), the Supreme Court considered a claim by the City's Chief Plumbing Inspector, who was transferred and demoted. The Court noted that

69

any claim he had was under the TCHRA and not the Texas Whistleblower Act. Respectfully, so what? That factual scenario has absolutely no relevance whatever to the instant analysis. Indeed, Defendants fail to cite *one single case* in which the TCHRA was applied in facts such as those involved here. The reason for that is obvious: there are *none!*

Why do Defendants work so hard to bring Plaintiffs' claims under the TCHRA? Defendants make clear that these claims must fall within the TCHRA in order to argue that they are time-barred. (Plea, pgs. 29-34). Under Civ. Prac. & Rem. Code § 16.003(a), the Plaintiffs each have two (2) years from date of injury to bring their assault/battery claims. See *Etan Indus., Inc. v. Lehmann*, 359 S.W.3d 620, 623 (Tex. 2011), reh'g denied (Mar. 30, 2012)("The applicable [tort] statute of limitations runs for two years from the day the cause of action accrues. Tex. Civ. Prac.& Rem. Code § 16.003. Generally, a cause of action accrues when a wrongful act causes a legal injury. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 221 (Tex.2003). The date a cause of action accrues is normally a question of law. *Id.; Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 202 (Tex.2011)."). See also *Schaefer v. Gulf Coast Reg'l Blood Ctr.*, 10 F.3d 327, 331 (5th Cir. 1994)("In Texas, causes of action for personal injuries are governed by a two-year statute of limitations, which specifically provides in pertinent part that 'a person must bring suit for ... personal injury ... not later than two years after the day the cause of action accrues.' TEX.CIV.PRAC. & REM.CODE ANN. §§ 16.003(a) & (b)."); *In re Neely*, BR 04-44898-H5-7, 2013 WL 3148676, *19 (S.D. Tex. June 19, 2013).

But, under the TCHRA, Plaintiffs arguable sexual harassment claims would be time-barred unless brought within "the 180th day after the date the alleged unlawful employment practice occurred." Labor Code § 21.202(a). Moreover, it has been held that: "Under the TCHRA, a person claiming to be aggrieved by an unlawful employment

70

practice... must file a complaint with the Texas Workforce Commission not later than the 180th day after the date the alleged unlawful employment practice occurred. *See* Tex. Labor Code § 21.202(a). This administrative step is required before the person may seek relief in a civil action. *Schroeder v. Tex. Iron Works, Inc.,* 813 S.W.2d 483, 487–88 (Tex.1991) (concluding that 'exhaustion of administrative remedies is a mandatory prerequisite to filing a civil action alleging violations of the [TCHRA]), *overruled in part on other grounds by In re United Servs. Auto. Ass'n,* 307 S.W.3d 299 (Tex.2010); *see also Waffle House, Inc. v. Williams,* 313 S.W.3d 796, 804 (Tex.2010) (citing *Schroeder,* 813 S.W.2d at 487)." *Dworschak v. Transocean Offshore Deepwater Drilling, Inc.,* 352 S.W.3d 191, 199-200 (Tex.App.- Houston [14th Dist.] 2011, no pet.).

Within the facts of the Assault Victims' particularly poignant claims arising out of uniquely egregious facts, the result of an improper application of the TCHRA (Labor Code) limitation period would be singularly pernicious. The Supreme Court has admonished that: "Only 'in the most unusual of circumstances' is conduct so extreme and outrageous that it is removed from the realm of ordinary employment disputes. *GTE Southwest [, Inc. v. Bruce],* 998 S.W.2d [605,]at 613 [Tex.1999]." *Wal-Mart Stores, Inc. v. Canchola,* 121 S.W.3d 735, 741 (Tex. 2003); *Dworschak,* 352 S.W.3d at 198. However, it is difficult to imagine conduct more extreme or outrageous that what Morris did to the Plaintiffs. And, respectfully, to argue the application of a completely irrelevant statute for the avowed purpose of contorting the assault/battery claims into mere workplace sexual harassment claims for the self-serving, sole purpose of extinguishing completely valid and especially serious claims would be the height of injustice. Once again, the relegation of the raping of drugged, insensate women to a mere employment grievance cannot *possibly* be what the Legislature had in mind in enacting the TCHRA, which is emphasized by the

71

statute's very name: the Texas Commission on *Human Rights* Act! And, Defendants do

not, because they cannot, direct the Court to *one single word* in that statute, its legislative

history or any decision applying it, which mandates such a cruel and inhuman result.

In a substantial footnote, in *Texas Mut. Ins. Co. v. Ruttiger*, 381 S.W.3d 430, 461,

n.3 (Tex. 2012), reh'g denied (Sept. 21, 2012), the Supreme Court expressed some serious

policy considerations which bear directly upon Plaintiffs' instant assault/battery claims

and neatly concur with every argument Plaintiffs herein make:

> "We have repeatedly addressed situations in which common law claims and statutory remedies seem to overlap, and we have embraced a framework to guide our analysis in such cases. The touchstone of this analysis, as in all statutory interpretation, is legislative intent. *We start with the proposition that statutes abrogating common law causes of action are disfavored. Cash Am. Int'l Inc. v. Bennett*, 35 S.W.3d 12, 16 (Tex.2000). *A statute banishing a common law right ' "will not be extended beyond its plain meaning or applied to cases not clearly within its purview." ' Id. (quoting Satterfield v. Satterfield*, 448 S.W.2d 456, 459 (Tex.1969)). *Abrogation by implication is disfavored. Id. For that reason, courts must examine whether the statute's language 'indicate[s] clearly or plainly that the Legislature intended to replace' a common law claim with an exclusive statutory remedy, and we 'decline [ ] to construe statutes to deprive citizens of common-law rights unless the Legislature clearly expressed that intent.'*[3] *Id.*

> 3 We have applied this framework repeatedly. For example, in *Lopez*, which the Court cites but then seems to forget about, we noted that "[w]hether a regulatory scheme is an exclusive remedy depends on whether 'the Legislature *intended* for the regulatory process to be the exclusive means for remedying the problem to which the regulation is addressed.' " *City of Waco v. Lopez*, 259 S.W.3d 147, 153 (Tex.2008) (quoting *In re Sw. Bell Tel. Co.*, 235 S.W.3d 619, 624–25 (Tex.2007)) (emphasis added). Likewise, in *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 802 (Tex.2010), we held that 'the legislative creation of a statutory remedy is not presumed to displace common-law remedies. To the contrary, abrogation of common-law claims is disfavored.' Acknowledging the centrality of legislative intent, *see id.* at 809 n. 66, we looked at the statute's 'meticulous legislative design,' *id.* at 805. Similarly, we have held that 'absent *clear legislative intent* we have declined to construe statutes to deprive citizens of common-law rights.' *Dealers Elec. Supply Co. v. Scoggins Constr. Co.*, 292 S.W.3d 650, 660

72

(Tex.2009) (emphasis added). We have also written that 'statutes can modify common law rules, but before we construe one to do so, *we must look carefully to be sure that was what the Legislature intended.' Energy Serv. Co. of Bowie v. Superior Snubbing Servs., Inc.*, 236 S.W.3d 190, 194 (Tex.2007) (emphasis added); *see also, e.g., Emps. Ret. Sys. of Tex. v. Duenez*, 288 S.W.3d 905, 919 (Tex.2009) (the proper inquiry is legislative intent); *Pruett v. Harris Cnty. Bail Bond Bd.*, 249 S.W.3d 447, 454 (Tex.2008) (same); *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 208 (Tex.2002) (same). (Emphasis added)."

*Ruttiger*, at 461, n.3.

And, in *Perez v. Living Centers-Devcon, Inc.*, 963 S.W.2d 870, 872 (Tex.App.- San Antonio 1998, pet. denied), the court made clear that: ***The TCHRA prohibits employment discrimination on the basis of 'race, color, disability, religion, sex, national origin, or age.'*** Tex. Lab. Code Ann.§ 21.052 (Vernon 1996). ***The act essentially codified federal employment law.*** *Compare* 42 U.S.C. § 2000e (1994) (prohibiting employment discrimination on the basis of race, color, religion, sex or national origin), § 12101–213 (1994) (prohibiting employment discrimination on basis of disability) *and* 29 U.S.C. §§ 621–34 (1994) (prohibiting employment discrimination on basis of age), *with* Tex. Lab. Code Ann. § 21.052 (Vernon 1996) (prohibiting same conduct)." *Id.*, at 872. Then, in *Jackson v. Creditwatch, Inc.*, 84 S.W.3d 397, 402 (Tex. App.—Fort Worth 2002) rev'd in part, (on unrelated grounds) 157 S.W.3d 814 (Tex. 2005), the CCA noted that: ***The Perez court examined the legislative history and legislative intent behind the enactment of the TCHRA and concluded: "Notably, neither an intent to serve as an exclusive remedy, nor an intent to preclude common law causes of action, is contained within the stated purposes of the TCHRA. Additionally, the statute contains no provision that implies the TCHRA's administrative review system precludes a lawsuit for common law causes of action. Instead, the opposite proposition can be***

73

*implied from section 21.211.* (Emphasis added)." *Id.,* at 402. Therefore, once again, there is *nothing* in the TCHRA's "meticulous legislative design" which purports to justify Defendants' tortured reading of it merely to argue insulation from liability from utterly appalling misconduct; indeed the very argument of such is a slap in the face of every mother, wife, sister and daughter in the State of Texas.

The Assault Victims were not harassed or discriminated against; they were sexually violated, physically abused and emotionally humiliated. This case is not about being patted on the fanny in a kitchen, as occurred in *Waffle House,* or being made to suffer annoying locker room humor directed disparagingly at women, or not getting a raise or promotion because of a gender-based glass ceiling. Rather it is about the vilest degradation imaginable for which the law provides significant criminal sanctions in addition to civil liability. Morris and Edible *must* be made to answer, to take responsibility, to be held legally and morally accountable in a court of law for their reprehensible conduct. As the El Paso CCA said so eloquently in the fearful days just months before the Japanese attack on Pearl Harbor plunged the nation into the darkness and terror of world war: *"It is the purpose of the law to provide a remedy for every legal wrong, and the desire of the courts to see justice done and litigants given their day in court. It is too often the regret of the courts that they are powerless to protect against the oversight and omissions of litigants and their counsel. When it may be done without doing violence to established rules of law, then a sense of justice and duty compels it." Payant v. Corpus Christi Plaza Hotel Co.,* 149 S.W.2d 665, 667 (Tex. Civ. App.- El Paso 1941, writ dism'd judgm't cor.). See also *In re VarTec Telecom, Inc.,* 335 B.R. at 642. In conformity with that noble mandate, the Assault Victims most earnestly request this Court to allow

them to seek true and fair justice in the resolution of their legitimate claims on their merits by denying Defendants' Plea.

## II. Under _Miranda_ the Plea Should Be Denied:

Defendants' contention that _Miranda's_ analytic rubric mandates dismissal of the Assault Victims' claims herein in incorrect as explained in not only _Miranda_, itself, but in three very recent Houston C.C.A. decisions applying it as well.

In _Miranda_, the Supreme Court did articulate the analytical rubric Texas courts must apply in determining jurisdiction. To proceed with any case, the trial court must have jurisdiction over the parties and the subject matter, _Id.,_ at 226; and, that determination is a question of law, _Id.;_ but, importantly, "disputed evidence of jurisdictional facts that also implicate the merits of the case may require resolution by the finder of fact." _Id.,_ at 227. In that regard, the Court made clear that: "... if a plea to the jurisdiction challenges the existence of jurisdictional facts... [which] require[es] the examination of evidence... the trial court exercises its discretion in deciding whether the jurisdictional determination should be made at a preliminary hearing or await a fuller development of the case." _Id._ And, pursuant to U.S. Supreme Court mandate, "[internal citations omitted], ... if the evidence creates a fact question regarding the jurisdictional issue, then the trial court **cannot grant the plea to the jurisdiction, and the fact issue will be resolved by the fact finder**. (Emphasis added)." _Id.,_ at 228.

On the basis thereof, _Miranda_ made clear that such standards only impose a persuasion burden on each party, which "mirrors that of a summary judgment." _Id._ "However, by reserving for the fact finder the resolution of disputed jurisdictional facts that implicate the merits of a claim or defense, **we preserve the parties' right to present the merits of their case at trial**. (Emphasis added)." _Id._

75

In *Kubosh v. Harris Cnty.*, 01-12-00214-CV, 2013 WL 1844217, \*2, \_\_\_

S.W.3d\_\_\_ (Tex.App.- Houston [1st Dist.] May 2, 2013, pet. for rev. filed June 17, 2013),

in reliance upon *Miranda's* teaching, the court made clear that while:

> "The plaintiff must allege facts that affirmatively establish the trial court's
> subject matter jurisdiction. *Id.; City of Pasadena v. Kuhn*, 260 S.W.3d 93,
> 95 (Tex.App.-Houston [1st Dist.] 2008, no pet.). In determining whether
> the plaintiff has satisfied this burden, *we construe the pleadings*
> *liberally in the plaintiff's favor and deny the plea if the plaintiff*
> *has alleged facts affirmatively demonstrating jurisdiction to*
> *hear the case. Miranda*, 133 S.W.3d at 226–27; *Smith v. Galveston Cnty.*,
> 326 S.W.3d 695, 697–98 (Tex.App.-Houston [1st Dist.] 2010, no pet.).
> (Emphasis added)."

*Kubosh*, at 2013 WL 1844217, \*2.

In *Univ. of Texas M.D. Anderson Cancer Ctr. v. King*, 417 S.W.3d 1, 5 (Tex.App.-

Houston [14th Dist.] 2013, no pet.), citing to *Miranda*, the CCA stated:

> "If a plea to the jurisdiction challenges the existence of jurisdictional facts,
> courts must consider relevant evidence submitted by the parties. [*Miranda*]
> at 227. The standard of review for a jurisdictional plea based on evidence
> generally mirrors that of a traditional summary judgment. *Id.* at 228. Under
> this standard, we credit as true all evidence favoring the nonmovant and
> draw all reasonable inferences in the nonmovant's favor. *Id.* The movant
> must assert the absence of subject-matter jurisdiction and present
> conclusive proof that the trial court lacks subject-matter jurisdiction. *Id.* If
> the movant discharges this burden, the nonmovant must present evidence
> sufficient to raise a genuine issue of material fact regarding jurisdiction, or
> the plea will be sustained. *Id.* As with a traditional motion for summary
> judgment, if the movant fails to present conclusive proof of facts negating
> subject-matter jurisdiction, the burden does not shift to the nonmovant to
> establish the existence of an issue of material fact. *See id.*"

*King*, at 5.

Further, in *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 897 (Tex.

2000), the Supreme Court stated that:

> "Texas follows a 'fair notice' standard for pleading, which looks to whether
> the opposing party can ascertain from the pleading the nature and basic
> issues of the controversy and what testimony will be relevant. *See Broom v.*
> *Brookshire Bros., Inc.*, 923 S.W.2d 57, 60 (Tex.App.—Tyler 1995, writ

76

denied)... 'A petition is sufficient if it gives fair and adequate notice of the facts upon which the pleader bases his claim. The purpose of this rule is to give the opposing party information sufficient to enable him to prepare a defense.' *Roark v. Allen*, 633 S.W.2d 804, 810 (Tex.1982).

*Auld,* at 897.

*Miranda* merely amplifies the long-prevailing standards for a trial court's evaluation of a plea to the jurisdiction; which standards remain very much intact, post-*Miranda*, as the following case law explains. In *City of Austin v. Lamas*, 160 S.W.3d 97, 100 (Tex. App.- Austin 2004, reh'g overruled), (relying on *Miranda*), the court noted that:

> "In reviewing a trial court's ruling on a plea to the jurisdiction, we do not look at the merits of the case; rather, we construe the pleadings in favor of the plaintiff, look to the pleader's intent, and accept the pleadings' factual allegations as true. *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 443 (Tex.1993). A jurisdictional challenge may implicate the merits of the plaintiff's cause of action. *See Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 227 (Tex.2004). If evidence raises a fact issue concerning the court's jurisdiction, it would be inappropriate for the court to grant a plea to the jurisdiction. *Id.* at 227–28."

*Id.,* at 100. Similarly, in *Tirado v. City of El Paso*, 361 S.W.3d 191, 194-95 (Tex. App.- El Paso 2012, no pet.), the court reiterated that:

> "The existence of subject matter jurisdiction is a legal question which we review *de novo. Miranda,* 133 S.W.3d at 226–27; *State Dept. of Highways and Public Transp. v. Gonzalez,* 82 S.W.3d 322, 327 (Tex.2002). In conducting our review, we do not look at the merits of the case but construe the pleadings liberally in favor of the plaintiff, look to the pleader's intent, and accept the pleadings' factual allegations as true. *Texas Dept. of Transp. v. Ramirez,* 74 S.W.3d 864, 867 (Tex.2002); *Texas Assn. of Business,* 852 S.W.2d at 446; *Arnold v. University of Texas Southwestern Medical Center at Dallas,* 279 S.W.3d 464, 467 (Tex.App.-Dallas 2009, no pet.); *City of Austin v. Lamas,* 160 S.W.3d 97, 100 (Tex.App.-Austin 2004, no pet.)...
>
> If the evidence shows a fact question regarding the jurisdictional issue, a plea to the jurisdiction may not be granted and the fact finder should resolve the fact issue. [*Miranda*], at 228."

*Tirado,* at 194-95.

77

Further, *Miranda* did nothing to disturb the principles regarding jurisdiction which the Supreme Court set out in *Peek v. Equip. Serv. Co. of San Antonio,* 779 S.W.2d 802, 804-05 (Tex. 1989):

> "[A] liberal construction of the pleadings is appropriate. As we wrote in *Pecos & Northern Texas Railway Co. v. Rayzor,* 106 Tex. 544, 548, 172 S.W. 1103, 1105 (1915): 'In any doubtful case all intendments of the plaintiff's pleading will be in favor of the jurisdiction.' Unless it is clear from the pleadings that the court lacks jurisdiction of the amount in controversy, it should retain the case. *Dwyer v. Bassett & Bassett,* 63 Tex. 274, 276 (1885). As one court recently said: *'[W]e must presume in favor of the jurisdiction unless lack of jurisdiction affirmatively appears on the face of the petition.'* *Smith v. Texas Improvement Co.,* 570 S.W.2d 90, 92 (Tex.Civ.App.—Dallas 1978, no writ).
>
> The failure of a plaintiff to state a jurisdictional amount in controversy in its petition, without more, thus will not deprive the trial court of jurisdiction. *See* W. Dorsaneo, 1 *Texas Litigation Guide* § 11.02(4)(a) (1989); Newton, *Conflict of Laws,* 33 Sw.L.J. 425, 431–32 (1979). *Even if the jurisdictional amount is never established by pleading, in fact, a plaintiff may recover if jurisdiction is proved at trial.* Dorsaneo, *supra,* § 2.01(4)(b); 2 R. McDonald, *Texas Civil Practice in District and County Courts* § 6.09.1 (rev.1982)(Emphasis added)."

*Peek,* at 804-05. See also *Sadeghian v. Hudspeth,* 02-11-00095-CV, 2012 WL 3758084, *3 (Tex. App.- Ft. Worth Aug. 30, 2012), reh'g overruled (Nov. 1, 2012); *Buethe v. O'Brien,* 03-09-00363-CV, 2010 WL 2643087, *3 (Tex. App.- Austin June 30, 2010, no pet.).

### III. If Plaintiffs' Pleadings Are Deficient, They Should Be Allowed to Amend:

Defendants' reliance upon *City of Waco v. Lopez,* 259 S.W.3d 147, 150 (Tex. 2008), discussed *supra,* for the proposition that they are entitled to the granting of the Plea without Plaintiffs being given an opportunity to amend their pleadings, (Plea, pg. 21), is misplaced. There, the Supreme Court authorized dismissal without granting leave to a plaintiff to amend only where "the pleadings or evidence affirmatively negate a jurisdictional fact." *Id.,* at 151. This mirrored the Court's prior ruling in *Miranda,* "If the

pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the plaintiffs an opportunity to amend." *Id.*, at 227. But, no such negation has here occurred and the Assault Victims' Third Amended Petition clearly states the viable claims of each of them. See *Kessling v. Friendswood Indep. Sch. Dist.*, 302 S.W.3d 373, 380 (Tex.App.- Houston [14th Dist.] 2009, pet. denied)("To avoid the justiciability challenges, Kessling is only required to plead sufficient facts to support jurisdiction. *See City of Waco v. Lopez*, 259 S.W.3d 147, 150 (Tex.2008)."); *Willie v. Comm'n for Lawyer Discipline*, 14-10-00900-CV, 2011 WL 3064158 (Tex.App.- Houston [14th Dist.] July 26, 2011, pet. denied)(plea to jurisdiction sustained without right to amend pleading because disciplinary proceeding against judge did not waive sovereign immunity); *Univ. of Texas M.D. Anderson Cancer Ctr. v. King*, 417 S.W.3d 1, 11 (Tex.App.- Houston [14th Dist.] 2013, no pet.)(exercise of medical judgment does not sovereign immunity so granting of plea to jurisdiction without leave to amend pleading proper).

In *Schwartzott v. Etheridge Prop. Mgmt.*, 14-11-00950-CV, 2013 WL 1802628, *2 (Tex.App.- Houston [14th Dist.] Apr. 30, 2013, no pet.), in virtually the same terms and also relying upon *Miranda*, the court stated:

> ***"When a party has filed a plea to the jurisdiction challenging the pleadings, a reviewing court must construe the pleadings liberally in favor of the pleader and look to the pleader's intent. See [Miranda, 133 S.W.3d at 226] If the facts alleged affirmatively demonstrate the trial court's jurisdiction to hear the cause, the plea to the jurisdiction must be denied. See id. If the pleadings do not contain sufficient facts to affirmatively demonstrate the trial court's jurisdiction, but do not affirmatively demonstrate incurable defects in the jurisdiction, the issue is one of pleading sufficiency and the plaintiffs should be afforded the opportunity to amend.*** (Emphasis added)."

*Schwartzott,* at 2013 WL 1802628, *2. See also *Texas A & M Univ. Sys. v. Koseoglu,* 233 S.W.3d 835, 840 (Tex. 2007)(plaintiff deserves the opportunity to amend pleadings if defects can be cured). Moreover, the *Schwartzott* court also reiterated the Supreme Court's important ruling, in *Miranda,* that: *"If the evidence creates a fact question regarding the jurisdictional issue, then the plea to the jurisdiction must be denied. See [Miranda],* at 227–28. (Emphasis added.)" *Id.*

And, in *Univ. of Texas Med. Branch at Galveston v. Tatum,* 389 S.W.3d 457, 461 (Tex.App.- Houston [1st Dist.] 2012, no pet.), the court held that:

"If the facts affirmatively demonstrate the trial court's jurisdiction to hear the case, the plea to the jurisdiction must be denied. *See id.* at 226–27; *see also Kamel v. Univ. of Tex. Health Sci. Ctr. at Houston,* 333 S.W.3d 676, 681 (Tex.App.-Houston [1st Dist.] 2010, pet. denied) ('[W]e are required to construe the allegations in favor of jurisdiction unless, on its face, the petition affirmatively demonstrates a lack of jurisdiction.'). If the pleadings do not demonstrate incurable defects in the jurisdiction, but also fail to allege sufficient facts to demonstrate the trial court's jurisdiction, the issue is one of pleading sufficiency and the plaintiff should be afforded an opportunity to amend. *Miranda,* 133 S.W.3d at 226–27."

*Tatum,* at 461. See also *Houston Belt & Terminal Ry. Co. v. City of Houston,* 14-13-00273-CV, 2014 WL 258557, *3, ___ S.W.3d ___, (Tex.App.- Houston [14th Dist.] Jan. 23, 2014, no. pet. h.); *Dallas County, Tex. v. Logan,* 05-11-00480-CV, 2014 WL 69038, *5, ___ S.W.3d ___, (Tex.App.- Dallas Jan. 9, 2014, no. pet. h.); and, *City of San Antonio v. Rogers Shavano Ranch, Ltd.,* 383 S.W.3d 234, 241 (Tex.App.- San Antonio 2012, rev. denied).

## CONCLUSION

For all of the foregoing reasons, the Defendants' Plea to the Jurisdiction of the Court is fundamentally deficient and Plaintiffs request the Court to deny such Plea in each and all of its particulars. The Assault Victims have properly pled and thereby assert completely viable claims over which this Court can and should exercise jurisdiction,

allowing such claims to be decided upon their merits. Plaintiffs further request any additional relief to which they may have shown themselves justly entitled to receive.

Respectfully submitted,

The Law Firm of Alton C. Todd

BY: /s/ Jeffrey N. Todd
Jeffrey N. Todd
State Bar No. 24028048
312 S. Friendswood Drive
Friendswood, Texas 77546
281.992.8633
281.648.8633 (Facsimile)
ATTORNEYS FOR PLAINTIFFS

81

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served upon the following defense counsel on the 27th day of February, 2014 via e-file:

Gregg M. Rosenberg
3555 Timmons Lane, Suite 610
Houston, Texas 77027

/s/ Jeffrey N. Todd
Jeffrey N. Todd

2/21/2014 2:37:35 PM
Chris Daniel - District Clerk
Harris County
Envelope No: 535642
By: PATTON, JONATHAN R

CAUSE NO. 2012-65503

| | | |
|---|---|---|
| KERI HILL, | § | IN THE DISTRICT COURT OF |
| MICHELLE BARNETT | § | |
| and STACY STEWART | § | |
| *Plaintiffs,* | § | |
| | § | HARRIS COUNTY, TEXAS |
| v. | § | |
| | § | |
| HENRI MORRIS and | § | |
| SOLID SOFTWARE SOLUTIONS, INC. | § | 55th JUDICIAL DISTRICT |
| d/b/a EDIBLE SOFTWARE | | |
| *Defendants.* | | |

CAUSE NO. 2012-65503-A

| | | |
|---|---|---|
| MICHELLE BARNETT | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | HARRIS COUNTY, TEXAS |
| HENRI MORRIS and | § | |
| SOLID SOFTWARE SOLUTIONS, INC. | § | |
| d/b/a EDIBLE SOFTWARE | § | |
| *Defendants.* | § | 55th JUDICIAL DISTRICT |

CAUSE NO. 2012-65503-B

| | | |
|---|---|---|
| STACY STEWART | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | HARRIS COUNTY, TEXAS |
| HENRI MORRIS and | § | |
| SOLID SOFTWARE SOLUTIONS, INC. | § | |
| d/b/a EDIBLE SOFTWARE | § | |
| *Defendants.* | § | 55th JUDICIAL DISTRICT |

## DENYING ORDER ~~GRANTING~~ DEFENDANTS' PLEA TO THE JURISDICTION

Pending before the Court is the Plea to the Court's Jurisdiction filed by Henri Morris and

Solid Software Solutions, Inc. d/b/a Edible Software. After considering the pleadings on file and

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging


EXHIBIT
"E"

Order Granting Defendants' Plea to the Jurisdiction

the arguments of counsel it is this Court's opinion that ~~due to the Plaintiffs' failure to exhaust their jurisdictional prerequisites, this court does not have subject matter jurisdiction to hear the cases. The cases are hereby~~ DISMISSED WITH PREJUDICE. *the motion is DENIED.*

SIGNED THIS __3__ DAY OF MARCH, 2014

_____
JUDGE PRESIDING

Unofficial Copy Office of Chris Daniel District Clerk

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED

AUG ~ 5 2013

David J. Bradley, Clerk of Court

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § | |
| VS. | § § | CRIMINAL NO. H-12-255SS |
| HENRI DE SOLA MORRIS | § § | |

## SUPERSEDING INDICTMENT

THE GRAND JURY CHARGES THAT:

## COUNT 1

On or about February 27, 2012, within the Southern District of Texas, and elsewhere,

## HENRI MORRIS

defendant, knowingly attempted to transport, an individual, KH, between Texas and New York,

with intent that KH engage in sexual activity for which any person could be charged with a

criminal offense, specifically "Improper Photography" in violation of Texas Penal Code § 21.15

and "Sexual Abuse in the First Degree," in violation of New York Penal Law § 130.65.

All in violation of Title 18, United States Code, Section 2421.



EXHIBIT

\\ F ''

## COUNT 2

On or about January 8, 2012, within the Southern District of Texas, and elsewhere,

**HENRI MORRIS**

defendant, knowingly transported, and attempted to transport, an individual, KH, between Texas and New York, with intent that KH engage in sexual activity for which any person could be charged with a criminal offense, specifically "Sexual Abuse in the First Degree," in violation of New York Penal Law § 130.65.

All in violation of Title 18, United States Code, Section 2421.

## COUNT 3

On or about November 8, 2010, within the Southern District of Texas, and elsewhere,

**HENRI MORRIS**

defendant knowingly transported, and attempted to transport, an individual, DM, between Texas and New York, with intent that DM engage in sexual activity for which any person could be charged with a criminal offense, specifically "Sexual Abuse in the First Degree," in violation of New York Penal Law § 130.65.

All in violation of Title 18, United States Code, Section 2421.

## COUNT 4

On or about February 8, 2010, in the Southern District of Texas, and elsewhere,

**HENRI MORRIS**

2

defendant, knowingly transported, and attempted to transport, an individual, SG, between Texas and Pennsylvania, with the intent that SG engage in sexual activity for which any person could be charged with a criminal offense, specifically "Indecent Assault," in violation of Pennsylvania Consolidated Statutes § 3126.

All in violation of Title 18, United States Code, Section 2421.

## COUNT 5

On or about May 8, 2011, in the Southern District of Texas, and elsewhere,

### HENRI MORRIS

defendant, knowingly transported, and attempted to transport, an individual, AF, between Texas and New Jersey, with the intent that AF engage in sexual activity for which any person could be charged with a criminal offense, specifically "Invasion of Privacy," in violation of New Jersey Statutes Annotated 2C: 14-9 (b).

All in violation of Title 18, United States Code, Section 2421.

A TRUE BILL

ORIGINAL SIGNATURE ON FILE

FOREPERSON OF THE GRAND JURY

Kenneth Magidson
United States Attorney

By: _____
John D. Jocher
Assistant United States Attorney
713-567-9450

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CRIMINAL NO. 12-255SS |
| | § | |
| HENRI DESOLA MORRIS, | § | |
| Defendant. | § | |

## PLEA AGREEMENT

The United States of America, by and through Kenneth Magidson, United States Attorney for the Southern District of Texas, and Sherri L. Zack and Suzanne Elmilady, Assistant United States Attorneys, and the defendant, Henri Morris ("Defendant"), and Defendant's counsel, Dan Cogdell, pursuant to Rule 11(c)(1)(A) of the Federal Rules of Criminal Procedure, state that they have entered into an agreement, the terms and conditions of which are as follows:

### Defendant's Agreement

1. Defendant agrees to plead guilty to Count Five of the Superseding Indictment. Count Five charges Defendant with Transportation, in violation of Title 18, United States Code, Section 2421. Defendant, by entering this plea, agrees that he is waiving any right to have the facts that the law makes essential to the punishment either charged in the indictment, or proved to a jury or proven beyond a reasonable doubt.

### Punishment Range

2. The **statutory** maximum penalty for each violation of Title 18, United States Code, Section 2421, is imprisonment of not more than 10 years and a fine of not more than $250,000.00. Additionally, Defendant may receive a term of supervised release after imprisonment of at least 5 years and up to Life. *See* Title 18, United States Code, sections 3559(a) and 3583(k). Defendant



Unofficial Copy Official Copy of Chris Daniel District Clerk

acknowledges and understands that if he should violate the conditions of any period of supervised release which may be imposed as part of his sentence, then Defendant may be imprisoned for the entire term of supervised release, without credit for time already served on the term of supervised release prior to such violation. *See* Title 18, United Stated Code, sections 3559(a) and 3583(e) and (k). Defendant understands that he cannot have the imposition or execution of the sentence suspended, nor is he eligible for parole.

3.     The defendant understands that under the Sex Offender Registration and Notification Act, the defendant must register and keep such information current in the jurisdictions where the defendant resides, is employed, and is a student. The defendant further understands that the requirement to keep the registration current includes informing such jurisdictions not later than three (3) business days after any change of the defendant's name, residence, employment or student status. The defendant understands that failure to comply with these obligations subjects the defendant to prosecution for failure to register under federal law, specifically, Title 18, United States Code, Section 2250, as well as applicable state statutes.

## Mandatory Special Assessment

4.     Pursuant to Title 18, United States Code, section 3013(a)(2)(A), immediately after sentencing, Defendant will pay to the Clerk of the United States District Court a special assessment in the amount of one hundred dollars ($100.00) per count of conviction. The payment will be by cashier's check or money order, payable to the Clerk of the United States District Court, c/o District Clerk's Office, P.O. Box 61010, Houston, Texas 77208, Attention: Finance.

2

### Immigration Consequences

5. Defendant recognizes that pleading guilty may have consequences with respect to his immigration status if he is not a citizen of the United States. Defendant understands that if he is not a citizen of the United States, by pleading guilty he/she may be removed from the United States, denied citizenship, and denied admission to the United States in the future. Defendant's attorney has advised Defendant of the potential immigration consequences resulting from Defendant's plea of guilty.

### Waiver of Appeal and Collateral Review

6. Defendant is aware that Title 28, United States Code, section 1291, and Title 18, United States Code, section 3742, afford a defendant the right to appeal the conviction and sentence imposed. Defendant is also aware that Title 28, United States Code, section 2255, affords the right to contest or "collaterally attack" a conviction or sentence after the judgment of conviction and sentence has become final. Defendant knowingly and voluntarily waives the right to appeal or "collaterally attack" the conviction and sentence, except that Defendant does not waive the right to raise a claim of ineffective assistance of counsel on direct appeal, if otherwise permitted, or on collateral review in a motion under Title 28, United States Code, section 2255. In the event Defendant files a notice of appeal following the imposition of the sentence or later collaterally attacks his conviction or sentence, the United States will assert its rights under this agreement and seek specific performance of these waivers.

7. In agreeing to these waivers, Defendant is aware that a sentence has not yet been determined by the Court. Defendant is also aware that any estimate of the possible sentencing range under the sentencing guidelines that he may have received from his counsel, the United

3

States or the Probation Office, is a prediction and not a promise, did not induce his guilty plea, and is not binding on the United States, the Probation Office or the Court. The United States does not make any promise or representation concerning what sentence the defendant will receive. Defendant further understands and agrees that the United States Sentencing Guidelines are "effectively advisory" to the Court. *See United States v. Booker*, 543 U.S. 220 (2005). Accordingly, Defendant understands that, although the Court must consult the Sentencing Guidelines and must take them into account when sentencing Defendant, the Court is not bound to follow the Sentencing Guidelines nor sentence Defendant within the calculated guideline range.

8. Defendant understands and agrees that each and all waivers contained in the Agreement are made in exchange for the concessions made by the United States in this plea agreement.

## The United States' Agreements

9. The United States agrees to each of the following:

(a) If Defendant pleads guilty to Count Five of the superseding indictment and persists in that plea through sentencing, and if the Court accepts this plea agreement, the United States will move to dismiss any remaining counts of the superseding indictment at the time of sentencing;

## Agreement Binding - Southern District of Texas Only

10. The United States agrees that it will not further criminally prosecute Defendant in the Southern District of Texas for offenses arising from conduct charged in the superseding indictment. This plea agreement binds only the United States Attorney's Office for the Southern District of Texas and Defendant. It does not bind any other United States Attorney. The United

4

States will bring this plea agreement and the full extent of Defendant's cooperation to the attention of other prosecuting offices, if requested.

## United States' Non-Waiver of Appeal

11. The United States reserves the right to carry out its responsibilities under guidelines sentencing. Specifically, the United States reserves the right:

(a) to bring its version of the facts of this case, including its evidence file and any investigative files, to the attention of the Probation Office in connection with that office's preparation of a presentence report;

(b) to set forth or dispute sentencing factors or facts material to sentencing;

(c) to seek resolution of such factors or facts in conference with Defendant's counsel and the Probation Office;

(d) to file a pleading relating to these issues in accordance with section 6A1.2 of the United States Sentencing Guidelines and Title 18, United States Code, section 3553(a); and

(e) to appeal the sentence imposed or the manner in which it was determined.

## Sentence Determination

12. Defendant is aware that the sentence will be imposed after consideration of the United States Sentencing Guidelines and Policy Statements, which are only advisory, as well as the provisions of Title 18, United States Code, section 3553(a). Defendant nonetheless acknowledges and agrees that the Court has authority to impose any sentence up to and including the statutory maximum set for the offense(s) to which Defendant pleads guilty, and that the sentence to be imposed is within the sole discretion of the sentencing judge after the Court has consulted the applicable Sentencing Guidelines. Defendant understands and agrees that the parties' positions regarding the application of the Sentencing Guidelines do not bind the Court and that the sentence imposed is within the discretion of the sentencing judge. If the Court should

5

impose any sentence up to the maximum established by statute, or should the Court order any or all of the sentences imposed to run consecutively, Defendant cannot, for that reason alone, withdraw a guilty plea, and will remain bound to fulfill all of the obligations under this plea agreement.

### Rights at Trial

13. Defendant understands that by entering into this agreement, he surrenders certain rights as provided in this plea agreement. Defendant understands that the rights of a defendant include the following:

(a)     If Defendant persisted in a plea of not guilty to the charges, defendant would have the right to a speedy jury trial with the assistance of counsel. The trial may be conducted by a judge sitting without a jury if Defendant, the United States, and the court all agree.

(b)     At a trial, the United States would be required to present witnesses and other evidence against Defendant. Defendant would have the opportunity to confront those witnesses and his attorney would be allowed to cross-examine them. In turn, Defendant could, but would not be required to, present witnesses and other evidence on his own behalf. If the witnesses for Defendant would not appear voluntarily, he could require their attendance through the subpoena power of the court; and

(c)     At a trial, Defendant could rely on a privilege against self-incrimination and decline to testify, and no inference of guilt could be drawn from such refusal to testify. However, if Defendant desired to do so, he could testify on his own behalf.

### Factual Basis for Guilty Plea

14. Defendant is pleading guilty because he is in fact guilty of the charges contained in Count Five of the superseding indictment. If this case were to proceed to trial, the United States could prove each element of the offense beyond a reasonable doubt. The following facts, among others would be offered to establish Defendant's guilt:

On or about May 8, 2011, HENRI DESOLA MORRIS (MORRIS) traveled in interstate commerce and committed, and attempted to commit, the drug-facilitated sexual assault of A.F.

6

violating Title 18, United States Code, Section 2421.   In the process of attempting to commit the sexual assault against this woman, MORRIS violated the law of New Jersey.   Specifically, as to Count Five, MORRIS violated New Jersey Statutes Annotated 2C:14-9(b), Invasion of Privacy.

Based on their investigation, the FBI obtained a search warrant for MORRIS and his belongings to be executed at IAH on February 27, 2012 when he was scheduled to travel for business.

During the execution of the warrant, several items of evidentiary value were found.   Three (3) fifty (50) milliliter Jack Daniel's bottles containing a clear liquid, which lab tested negative for controlled substances, were located in MORRIS' carry on suitcase.   MORRIS, having heard a conversation between two agents about the fact that Jack Daniels is not a clear liquid, stated something to the effect of "..., there could be a perfectly reasonable explanation for that."
MORRIS used the unknown liquid to dilute the drugs he administered to A.F. by adding it to the alcoholic drinks he supplied to her.

The search also uncovered blister packages containing pills.   One package contained, within four (4) individual blisters, blue diamond shaped tablets marked "VGR 50" or "VGR 5.0" imprinted on one side.   These pills appear to be the erectile dysfunction drug sold commercially as Viagra.   A four section blister pack with one missing tablet was found which contained Tadalafil.   This is a physician's sample of the drug commercially known as Cialis, another erectile dysfunction drug.

In an unmarked prescription bottle, located in MORRIS' belongings but not contained in the compartmentalized pill box he also possessed, were 5 pills. These pills were analyzed by the Drug Enforcement Administration.   Two of the pills were determined to be Zolpidem which is

7

commercially known as Ambien.   One of the pills was determined to be Oxazepam, a benzodiazepine.   The remaining two pills were determined to be diphenhydramine; this drug is commercially known as Benadryl.   FBI Supervisory Forensic Chemist/Forensic Toxicologist Marc Lebeau, an expert in drug facilitated sexual assault, reviewed the facts of this case and the toxicology results and determined the symptoms described by the victim are consistent with her being administered these drugs in combination with the ingestion of alcohol.

The Society of Forensic Toxicologists defines drug-facilitated sexual assault (DFSA) as "when a person is subjected to nonconsensual sexual acts while they are incapacitated or unconscious due to the effect(s) of ethanol, a drug and/or other intoxicating substance and are therefore prevented from resisting and/or unable to consent." The Society of Forensic Toxicologists further identify the following as typical symptoms of DFSA: drowsiness, dizziness, loss of muscle control, slurred speech, decreased inhibitions, memory loss or impairment, loss of consciousness, and vomiting.   The Society of Forensic Toxicologists compiled a list of drugs, in addition to ethanol, as known to have been associated with DFSA.   The drugs found on MORRIS at IAH are on that list.

A.F. was employed by Edible Software from May 2011 through August 2011. Approximately one week after beginning hired and pursuant to a work assignment she had received from MORRIS, A.F. traveled with MORRIS to Philadelphia, Pennsylvania.   Continental Airlines confirmed that MORRIS utilized his Continental frequent flyer miles to purchase a ticket for A.F. on United flight #3274, which departed from Houston Intercontinental Airport, Houston, Texas to Philadelphia International Airport, Philadelphia, Pennsylvania on May 8, 2011. Continental Airlines also confirmed that MORRIS traveled on May 8, 2011 on Continental

8

Airlines flight 1676 from Houston Intercontinental Airport, Houston, Texas to Philadelphia International Airport, Philadelphia, Pennsylvania.

Upon arrival in Philadelphia, MORRIS and A.F. met up and checked into a Marriott hotel in close proximity to the airport.

The following day MORRIS and A.F. met with two different clients in the Philadelphia metropolitan area before traveling in a rental car to Newark, New Jersey. Upon arrival in Newark, MORRIS and A.F. checked into a Marriott hotel, in Newark, New Jersey. MORRIS instructed A.F. to meet him in the concierge lounge at the Marriott. A.F. met MORRIS in the concierge lounge. MORRIS asked A.F. if she wanted to have dinner in Manhattan and if she wanted to see the city. MORRIS told A.F. to have a "real drink" and she agreed to have a vodka and soda. MORRIS prepared a drink for A.F. which he drugged and presented it to A.F. in a travel cup. A.F. recalled the drink being extremely strong.

After MORRIS prepared A.F.'s drink and added crushed Ambien pills to it, she and MORRIS departed the hotel in the rental car. A.F. stated after consuming an unknown amount of the drink she began feeling "really, really tipsy" while driving into Manhattan. A.F. described feeling inexplicitly "very intoxicated" when she and MORRIS arrived in Manhattan. A.F. recalled parking on the street in Manhattan, exiting the vehicle, and walking into a train station that had murals on the ceiling. MORRIS stood behind A.F. and had his hands on her shoulders while he talked to her about the murals. A.F. and MORRIS walked to a restaurant to eat dinner. A.F. lost her memory after recalling having their picture taken in the restaurant.

The next memory A.F. had was awakening on her bed in her hotel room. A.F. was completely naked and a pillow was covering the side of her face. The covers were pulled down

9

around A.F.'s ankles. A.F. heard a "click" sound and observed MORRIS standing over her holding his cellular telephone. MORRIS had been taking pictures of her with his cellular telephone. A.F. never gave MORRIS permission to photograph her nor did she consent to the photographs being taken. These photos were recovered on a thumb drive found in MORRIS' possession during the execution of the search at IAH. The date/time stamps contained in the EXIF data embedded in the photographs corresponds to the date of travel and the time A.F. believes the images were taken between approximately 2am and 4am.

A.F. recalled feeling very "disoriented," "groggy" and "really tired". A.F. stated she was very familiar with operating and navigating through files on a Blackberry phone but was so disoriented and groggy she was unable to properly inspect the phone.

The following morning A.F. observed scratch marks on each of her hips. A.F. described the scratches as being from the front to the back [horizontal, as viewed in a standing position]. A.F. further recalled having some bruising on the back of her upper left arm.

After meeting with clients in Newark, MORRIS and A.F. drove to meet with a client in Connecticut. At the conclusion of the meeting, MORRIS and A.F. drove to the Marriott hotel at LaGuardia Airport. While driving to LaGuardia MORRIS told A.F. that he did not want her to feel awkward about what had occurred in the hotel room in Newark, that he did not want her to feel like she should look for another job, that he wanted her to be part of the company for a long time, and that she had done a great job working with the client in Connecticut. MORRIS told A.F. that he wanted A.F. to feel comfortable to travel with him again. MORRIS told A.F. that he had never "done anything like this before." MORRIS told A.F. that he was "lonely" and that "sometimes I just need a hug."

10

After the search warrant was executed in February of 2012, thumb drives found in the Defendant's belongings were searched. This search revealed photographs of A.F. taken in New Jersey. The photographs taken in New Jersey depict A.F. on a bed. There are full body nude images with her face completely covered by a pillow. There are images of A.F.'s breasts as well as close up images of her vagina. Based on A.F. identifying the images and comparisons on distinct markings on A.F. it was proven that the images are in fact of A.F. These photographs are date and time stamped corresponding to the New Jersey incident charged in the superseding indictment.

Records show that MORRIS and/or his company, Edible Software purchased or redeemed miles to pay for the travel in interstate commerce including airfare and rental car fees. It is clear based on the information provided by the victim, the marks found on A.F., the drugs found during the search, the photos found during the search, and the behavior of MORRIS, that MORRIS transported A.F. in interstate commerce with the intent to engage with him in a sexual activity for which he could be charged with a criminal offense, specifically he took photographs of her exposed intimate parts without her consent for which he did not have a license/privilege to do so in violation of New Jersey law.

## Breach of Plea Agreement

15. If Defendant should fail in any way to fulfill completely all of the obligations under this plea agreement, the United States will be released from its obligations under the plea agreement, and Defendant's plea and sentence will stand. If at any time Defendant retains, conceals, or disposes of assets in violation of this plea agreement, or if Defendant knowingly

11

Unofficial Copy Office of Christi Daniel District Clerk

withholds evidence or is otherwise not completely truthful with the United States, then the United States may move the Court to set aside the guilty plea and reinstate prosecution. Any information and documents that have been disclosed by Defendant, whether prior to or subsequent to this plea agreement, and all leads derived therefrom, will be used against defendant in any prosecution.

### Restitution, Forfeiture, and Fines – Generally

16. This Plea Agreement is being entered into by the United States on the basis of Defendant's express representation that he will make a full and complete disclosure of all assets over which he exercises direct or indirect control, or in which he has any financial interest. Defendant agrees not to dispose of any assets or take any action that would effect a transfer of property in which he has an interest, unless Defendant obtains the prior written permission of the United States.

17. Defendant agrees to make complete financial disclosure by truthfully executing a sworn financial statement (Form OBD-500 or similar form) within 14 days of signing this plea agreement. Defendant agrees to authorize the release of all financial information requested by the United States, including, but not limited to, executing authorization forms permitting the United States to obtain tax information, bank account records, credit histories, and social security information. Defendant agrees to discuss and answer any questions by the United States relating to Defendant's complete financial disclosure.

18. Defendant agrees to take all steps necessary to pass clear title to forfeitable assets to the United States and to assist fully in the collection of restitution and fines, including, but not limited to, surrendering title, executing a warranty deed, signing a consent decree, stipulating to facts regarding the transfer of title and the basis for the forfeiture, and signing any other documents

12

necessary to effectuate such transfer. Defendant also agrees to direct any banks which have custody of his assets to deliver all funds and records of such assets to the United States.

19. Defendant understands that forfeiture, restitution, and fines are separate components of sentencing and are separate obligations.

## Restitution

20. Defendant agrees to pay full restitution to the victim(s) regardless of the count(s) of conviction. Defendant understands and agrees that the Court will determine the amount of restitution to fully compensate the victim(s). Defendant agrees that restitution imposed by the Court will be due and payable immediately and that Defendant will not attempt to avoid or delay payment. Subject to the provisions above, Defendant waives the right to challenge in any manner, including by direct appeal or in a collateral proceeding, the restitution order imposed by the Court.

## Fines

21. Defendant understands that under the Sentencing Guidelines the Court is permitted to order Defendant to pay a fine that is sufficient to reimburse the government for the costs of any imprisonment or term of supervised release, if any. Defendant agrees that any fine imposed by the Court will be due and payable immediately, and Defendant will not attempt to avoid or delay payment. Subject to the provisions contained in the plea agreement, Defendant waives the right to challenge the fine in any manner, including by direct appeal or in a collateral proceeding.

## Complete Agreement

22. This written plea agreement, consisting of 16 pages, including the attached addendum of Defendant and his attorney, constitutes the complete plea agreement between the United States,

13

Defendant, and Defendant's counsel. No promises or representations have been made by the United States except as set forth in writing in this plea agreement. Defendant acknowledges that no threats have been made against him and that he is pleading guilty freely and voluntarily because he is guilty.

23. Any modification of this plea agreement must be in writing and signed by all parties.

Filed at __Houston__, Texas, on __December 3__, 2014.

_____
Defendant

Subscribed and sworn to before me on __December 3__, 2014.

DAVID J. BRADLEY, Clerk
UNITED STATES DISTRICT CLERK

By: _____
Deputy United States District Clerk

APPROVED:

Kenneth Magidson
United States Attorney

By: _____
Sherri L. Zack
Assistant United States Attorney
Southern District of Texas

_____
Dan Cogdell
Attorney for Defendant

14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CRIMINAL NO. 12-255SS |
| | § | |
| HENRI DESOLA MORRIS, | § | |
| Defendant. | § | |

## PLEA AGREEMENT – ADDENDUM

I have fully explained to Defendant his/her rights with respect to the pending indictment. I have reviewed the provisions of the United States Sentencing Commission's Guidelines Manual and Policy Statements and I have fully and carefully explained to Defendant the provisions of those Guidelines which may apply in this case. I have also explained to Defendant that the Sentencing Guidelines are only advisory and the court may sentence Defendant up to the maximum allowed by statute per count of conviction. Further, I have carefully reviewed every part of this plea agreement with Defendant. To my knowledge, Defendant's decision to enter into this agreement is an informed and voluntary one.

_____
Attorney for Defendant

12/3/14
Date

15

I have consulted with my attorney and fully understand all my rights with respect to the indictment pending against me. My attorney has fully explained, and I understand, all my rights with respect to the provisions of the United States Sentencing Commission's Guidelines Manual which may apply in my case. I have read and carefully reviewed every part of this plea agreement with my attorney. I understand this agreement and I voluntarily agree to its terms.

X _____    12/3/14
Defendant                              Date



NOTICIERO HOUSTON
LUNES A VIERNES 4:30PM, 5PM Y 10PM
SABADO Y DOMINGO 4:30PM Y 10PM
telemundohouston.com

Get a HoustonChronicle.com digital subscription
SUBSCRIBE ▶

Subscribe to the Houston Chronicle | Shopping | Classifieds | Obits | Place an Ad | La Voz          Like  ‹123›   Register | Sign In

Friday February 20, 2015                                              68°F   Overcast | Houston Weather

Search
◉Chron.com ○Local Directory

Home | Local | US & World | Sports | Business | Entertainment | Lifestyle | Jobs | Cars | Real Estate   ◢SAVE

News > Houston & Texas

# Software exec pleads guilty to drugging, abusing female employees

By Dane Schiller | December 3, 2014 | Updated: December 3, 2014 1:08pm

Comments .    E-mail    Print        Share (65)    Tweet  17    8+1  1        0

Texas Home Insurance                                              ▷
texashomepolicy.com



## She's 53, But Looks 23


53-yr-old mom angers doctors by revealing h
her simple anti-wrinkle treatment trick. Read

AdChoices ▷

Photo By Gary Coronado/Houston Chronicle                            1 of 9

Henri Morris arrives at the Federal Courthouse Monday, Sept. 29, 2014, in Houston, Texas. The Houston software company executive is accused of drugging female colleagues then sexually assaulting them. ( Gary Coronado / Houston Chronicle )

  

## She's 53, But Looks 23


53-yr-old mom angers doctors by revealing her her simple anti-wrinkle treatment trick. Read

A former Houston software company executive pleaded guilty Wednesday to drugging and sexually abusing a female employee - stopping a federal trial before the first of as many as a half dozen women were to testify against him.

Henri Morris, formerly the head of Edible Software Solutions, now faces up to 10 years in prison and a $250,000 fine. He also has to register for the rest of his life as a sex offender.

Morris, 67, was slumped forward in his chair in the courtroom, appeared to have trouble breathing, and was shaking as his lawyers huddled with prosecutors to hammer out an agreement with prosecutors.

By admitting to what he did to one of the women, prosecutors dropped the other charges - and spared all of them from having to publicly testify about the ordeal as well as what looked to be a grueling cross-examination by Morris's legal team.

While Morris was shaken, his victims and their families comforted each other and shared a feeling of vindication.

"The truth comes out," said one of the women allegedly victimized by Morris. "He got away with it for a long time and now everybody knows who he truly is."

### Related Stories

Trial starts for ex software exec accused of drugging, sexually abusing employees
Judge revokes bond for exec accused of drugging female employees
Software company chief admits to drugging four female employees for sex abuse; updated: read plea agreement

### Latest Videos

WhatYouMissed_02192015_MAIN
Houston Chronicle

HC MEDIA

### More videos:



### You Might Also Like


Jennifer Aniston's Bikini Bod Through the Ages!
(Us Weekly)


Celebrity Moms Who Bare All On Instagram
(StyleBlazer)



EXHIBIT
"H"

## Obamacare Sign Up

gohealthinsurance.com/Obamacare

### You May Still Qualify To Enroll!
### Explore Your Options Today.

She sat beside several other women and their families who lined the first two rows of the courtroom visitor seating area.

U.S. District Judge Melinda Harmon, who told Morris he would be back in her courtroom in February for sentencing, had rejected a plea agreement last year that would have capped his prison time at one year. After hearing his victims testify at a sentencing hearing, Harmon said the case would instead proceed to trial.

During opening arguments Tuesday, prosecutor Sherri Zack told jurors that Morris was a calculating sexual predator who took a "rape kit" on business trips to taint employee's drinks with drugs and later abuse them physically, including take photographs of their nude bodies.

He was arrested in 2012 at Bush Intercontinental Airport as he prepared to leave on another business trip with a woman who had complained to the FBI about him, and pretending to be going along on the trip so that agents could gather evidence.

Morris's attorney, Dan Cogdell, had said that the women were consenting adults who willingly drank with Morris, and that Morris never drugged anyone or intended to break any laws. He also said they were only making accusations against him to bolster civil suits pending in Harris County.

Morris specifically pleaded guilty to one count of taking a person across state lines to commit a sex crime.

# Tennessee Mtn Property

inland.com

## Waterfalls, Views & Level Mtn Land Only Minutes From Chattanooga, TN.

Contribute to this story. Send us a tip  Suggest a Correction

Comments    E-mail    Print    Share { 65 }    Tweet : 17    +1    0




Dane Schiller | Reporter, Houston Chronicle
Email Me

### You Might Also Like






Hot Celebrity Bikini Photos You've Never Seen
StyleBlazer

Nicki Minaj Got Nothing On Rayon Payano
Lossip

Is the 4% Retirement Rule Still Appropriate?
Charles Schwab

Still Crazy — for Each Other — After All These Years
AARP

### From Around the Web

- The "Blurred Lines" Babe Speaks! (MadeMan)
- How Covering Up Your Grays Could Impact Your Cancer Risk (Health Central)
- Rihanna's Outfit Leaves Little To The Imagination (StyleBistro - Look Books)
- 14 Biggest Cheaters in Sports History...#6 Will Shock You? (PressroomVIP)
- Carissa Rosario's Explosive Instagram Pics (Lossip)
- The Most Beautiful Celebrity Women over the age of 50 (She Budgets)
- 8 Celebs You Won't Believe Went To Rehab (Interesticle)

### We Recommend

- DSK trial: Prostitute said orgy was like 'antiquity'
- Dentist charged in death of patient getting 20 teeth pulled
- Rusty Yates sees 'eerie' similarities between Andrea Yates, new Pittsburgh...
- Woman smuggles gun into jail in her vagina
- Katy High School Alumni Association has new website
- Study warns of mega drought to come
- Two Houston neighborhoods called most dangerous in U.S.

Recommended by

---



Was Charlie Sheen on the 'Men' Finale?



This Forgotten Day: A-Lister Directs 1st Film in Houston



Will Smith Busts Out 'Gettin' Jiggy Wit It' Like It's 1997!

### Top Stories

Would you accept a free ride into space?

30 weirdest Minor League team names, logos

The 7-year itch is real & other surprising divorce facts

'Kit' homes attempt to shake up Houston housing

In 'American Sniper' trial, prosecution expert cites 'Seinfeld'

ESPN's Bobby Knight goes off on SMU fans (w/video)

Drake sets an intimate rap date for Houston

MSNBC axes two shows to boost lineup

Two NFL teams ponder shared $1.7B stadium

Teacher-sex scandal prompts federal lawsuit at Texas school district

See what Sports Illustrated swimsuit models really look like

Cool NFL concept helmets for teams

Tejano band's lead singer trashes the Houston rodeo

### Hot Topics




Who is Amber Rose anyway?

Famous people who are Catholic




Longtime celebrity couples: Then and now

ICYMI: Beyonce not looking 'flawless'

### #WeAreHouston



Photos: Mardi Gras takes over Galveston



Restaurant-finding app launches in Houston



Woman burns fat to become bodybuilding champ



Houston man transcribes WWII love letters

---

- Bus driver struggles to support 9 children
- Family dreams of having their own home again
- Rockets bring smiles to the needy
- Healthy kids is Goodfellows mom's sole wish
- Goodfellows helps siblings get gifts they deserve

1

CAUSE NO. 2012-65503

KERI HILL and                    §    IN THE DISTRICT COURT
MICHELLE BARNETT                 §
          Plaintiffs             §
                                 §
VS.                              §    55TH JUDICIAL DISTRICT
                                 §
HENRI MORRIS and SOLID           §
SOFTWARE SOLUTIONS, INC.,        §
d/b/a EDIBLE SOFTWARE            §
          Defendants             §    HARRIS COUNTY, TEXAS

*******************************

ORAL AND VIDEOTAPED DEPOSITION OF

ANDREA FARMER

JULY 11, 2013

*******************************

ORAL AND VIDEOTAPED DEPOSITION of ANDREA FARMER, produced as a witness at the instance of the Defendants, and duly sworn, was taken in the above-styled and numbered cause on the 11th of July 2013, from 10:09 a.m. to 3:56 p.m., before Molly Carter, CSR in and for the State of Texas, reported by machine shorthand, at the offices of U.S. Legal Support, 802 North Carancahua, Suite 2260, Corpus Christi, Texas, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

2

APPEARANCES

FOR THE PLAINTIFF(S):
    MR. JEFFREY N. TODD
    The Law Firm of Alton C. Todd
    312 South Friendswood Drive
    Friendswood, Texas 77546
    Phone: (281) 992-8633
    Fax:   (281) 648-8633
    jeff@actlaw.com

FOR THE DEFENDANT(S):
    MR. GREGG M. ROSENBERG
    Rosenberg & Sprovach
    3555 Timmons Lane, Suite 610
    Houston, Texas 77027
    Phone: (713) 960-8300
    Fax:   (713) 621-6670
    gregg@rosenberglaw.com

FOR THE DEFENDANT HENRI MORRIS:
    MR. DAN COGDELL
    Cogdell Law Firm
    402 Main Street, 4th Floor
    Houston, Texas 77002
    Phone: (713) 426-2244
    Fax:   (713) 426-2255
    dan@cogdell-law.com

ALSO PRESENT:
    MR. TOMMY KLING, VIDEOGRAPHER
    MR. DESTRY QUIROZ, VIDEOGRAPHER
    MR. TREVOR MORRIS
    MS. BETH JACKSON (Present from 10:09 to 10:38)

3

INDEX

Appearances ............................................. 2

ANDREA FARMER
    Examination by Mr. Rosenberg .................. 5
    Examination by Mr. Cogdell ................... 148
    Re-Examination by Mr. Rosenberg ............. 222

Certified Question ............................ 143
Signature and Changes ....................... 239
Reporter's Certificate ...................... 241

EXHIBITS

NUMBER    DESCRIPTION                          PAGE
Exhibit 1   Photo of Andrea and Comedian ............ 85
Exhibit 2   Photo of Henri and Comedian ............ 95
Exhibit 3   Email from Andrea to Henri ............. 125
Exhibit 4   Handwritten Notes on Back of Statement .. 149
Exhibit 5   5/9/11 Facebook Post .................... 193
Exhibit 6   5/9/11 Facebook Post .................... 193
Exhibit 7   5/10&11/11 Facebook Posts ............... 222
Exhibit 8   5/9/11 Facebook Post .................... 222
Exhibit 9   5/11&12/11 Facebook Posts .............. 222

4

Exhibit 10  5/12 & 7/27/11 Facebook Posts ........... 222
Exhibit 11  7/27&29/11 Facebook Posts .............. 222
Exhibit 12  8/2/11 Facebook Post .................... 222
Exhibit 13  8/2&8/11 Facebook Posts ................ 222
Exhibit 14  8/8/11 Facebook Post .................... 222

**EXHIBIT I**

73

Q. Okay. How long did it take for you to be offered a position?

A. I was offered the position that same day.

Q. Did you accept?

A. I officially accepted on that Friday, when I took in my offer letter to sign.

Q. So it was Wednesday when you had the interview, they offered you the position then, and then there was a process in which you obtained an offer letter?

A. Yes, I -- and I can't recall if it was that Wednesday evening or that Thursday evening that I received the offer letter. And I was kind of waiting -- to me, I didn't officially accept until I signed the offer letter, or they didn't officially offer me the position until I signed the offer letter.

Q. You wanted it in writing?

A. Right, and I wanted to see the salary and, I mean, that's just how you get a job.

Q. What was the salary?

A. It was 48,000 a year, with commission, 3 percent on each net sale of the software.

Q. How did that compare to what you were making at the Mattress Firm?

A. It was more. And I was making about the same in salary, and then I -- but I was going to be making the

74

additional commissions at Edible Software. So it was substantially more.

Q. What were your duties and responsibilities when you first started?

A. To set up all of our social media, to maintain and learn how to maintain the website, to learn how to demo the software, to make calls to clients, like cold calls. I would cold call a lot of clients who had, they had been talking to or had reached out to us saying they were interested in the software. And, and I would write different pieces, sales and marketing type pieces about Edible Software.

Q. Do you have experience doing that type of work?

A. Uh-huh.

Q. From where?

A. On the sales side, I sold with Mattress Firm, and I did sales training with them. And when I was in Learning Development at Mattress Firm, I wrote content, training sales content there.

And from a accounting and inventory standpoint, I, in college, had worked at the Crowne Plaza Hotel and did their inventory and accounting for food and beverage, which was the bar, restaurant and room service.

So I guess all of those facets combined. And I did trade shows for Mattress Firm as well.

75

Q. Did you, did you graduate from the University of Texas?

A. I'm one credit away from graduating, so no.

Q. Okay. One credit away?

A. Uh-huh.

Q. Right now?

A. (Nodding head.)

Q. What -- assuming you get that credit, what do you expect your degree to be conferred in?

A. A BA in sociology with a minor in business.

Q. Okay. When was the last time you've taken courses towards your degree?

A. In 2010. I started a course and didn't finish it.

Q. That was before you gave your statement to the FBI. Correct?

A. Yes.

Q. From the time you began at Edible until the -- let me ask it this way: How much time did, were you, was it that you were working at Edible until you took your first trip?

A. Oh, two weeks.

Q. Okay. How did that come about? How did the trip come about?

A. Well, Henri had planned on going to visit a

76

couple of clients there, and two of which were --

Q. Where?

A. In -- there's a client he wanted to visit in Philadelphia, and then one in New Jersey, one in Newark. Or I guess that's New Jersey as well. Somewhere in the like country of New Jersey and then down in the ports of Newark. So the first two were prospects. They weren't Edible Software clients. And then that he wanted to visit a current and very old client in Newark, and then a prospect in Connecticut, and then we were supposed to visit another client in New York as well, but that ended up cancelling.

Q. Okay.

A. So he, upon this trip coming up, he said that he thought it would be a really good learning experience for me and suggested that I go.

Q. Were you excited to be going?

A. Yes, absolutely.

Q. Had you ever been to the East Coast before?

A. I had been to the East Coast, like southeast, but not Manhattan, New York area.

Q. So it was an opportunity for a new, a new experience or to visit some place you hadn't been?

A. Yeah, but I mean, I've been a lot of places, so you know, and I certainly -- it was a work trip, so I did

**77**

understand that it was going to be like in the ports of New York as well, so, yes.

Q. Which is where the clients are?

A. Right.

Q. Especially the seafood people.

A. Right.

Q. How did you -- what was your first stop on the trip?

A. The hotel. What client was my first stop?

Q. No. What city was first?

A. Philadelphia.

Q. How did you get there?

A. By airplane.

Q. Did you travel with Henri or by yourself?

A. I traveled by myself.

Q. Okay. Where did you first meet up with Henri?

A. At the Philadelphia airport.

Q. He picked you up, I take it.

A. Yes. He, I think, had gotten in a little earlier than I had, so he went and got the rental car and then picked me up outside.

Q. Okay. About what time of day was it that you arrived?

A. It was evening, probably like 8:00.

Q. What day of the week?

**78**

A. Sunday.

Q. Okay. After he picks you up from the airport, where did you all go?

A. We went to the hotel.

Q. Were you present at the check-in process?

A. I don't think I was like standing over him.

Q. All right. He checked you in?

A. Yes.

Q. You got situated in your room?

A. Uh-huh.

Q. Did you know what room he was in?

A. No.

COURT REPORTER: I'm sorry?

Q. (By Mr. Rosenberg) Did you know -- my question was, do you know what room he was in? And then your answer to that question was?

A. No.

Q. Do you know if he knew what your room was?

A. I assume he did. He checked us in.

Q. After you got situated in your room, I imagine you just got to your room, did what you had to do, and went somewhere.

A. Uh-huh.

Q. Correct?

A. Yes.

**79**

Q. Where did you go?

A. We went -- Henri wanted to go to the concierge lounge, but since it was Sunday, it was closed. That's how I remembered it was Sunday. And he -- so we ended up going to the bar and ordering food from the bar, because that was the only thing that was open at that time. So I went down on my own, and then Henri met me like a couple of minutes later.

Q. When -- how long were you there before Henri was there?

A. Two minutes.

Q. Did you visit with Henri during that time you were there?

A. Yes.

Q. Ordered some snacks or food or something like that?

A. Uh-huh.

Q. How long were y'all there?

A. Maybe an hour-and-a-half.

Q. And what happened next?

A. I went to sleep.

Q. Okay. With regard to that encounter at this non-concierge bar at the Philadelphia Marriott --

A. Uh-huh.

Q. -- are you, do you have any information or

**80**

testimony about anything sexually inappropriate or sexually offensive that happened between you and Mr. Morris then?

A. No.

Q. What was your conversation like?

A. It was just polite conversation between two people who didn't know each other that well. We talked about our flight. He was talking to the bartender as well. She was a blonde lady. I think there was some sort of sports game on. So nothing substantial.

Q. Okay. This is a Sunday night y'all are getting in there.

A. Uh-huh.

Q. How long was the business trip to last?

A. Okay, let me think. I guess we were to be back that Thursday evening.

Q. Okay. Without going through every bit of detail about the trip and the clients and the customers you've seen, I want you to tell me the first thing that happened on that trip. So it's the one that ended, you believe, the Thursday evening?

A. Uh-huh. Well, we ended up getting back that Thursday morning, because the last client canceled, so we took an earlier flight that Thursday.

Q. I'd like you to tell me anything that happened

**81**

during that trip that you believe to be sexually offensive or sexually inappropriate between you and Mr. Morris.

A. Can you be more specific?

Q. I mean, do you have any recollection of Mr. Morris engaging in anything during that trip that was sexually offensive or inappropriate with you?

A. Yes. I don't have a recollection of dinner or getting back to the hotel.

Q. On what day?

A. On -- this would have been Monday night.

Q. Okay. So your second night of the trip?

A. My second night there.

Q. And that's a different hotel than where you were the first time?

A. It's a different hotel. It's a Marriott in Newark.

Q. Downtown Newark, or by Newark airport?

A. I don't know.

Q. You just know it was in Newark.

A. Right.

Q. Okay.

A. Because the client that we were meeting the next day was in Newark. So we went to dinner, and I blank out, and I don't remember anything up until waking

**82**

up with like a pillow and some covers over my face and some blankets around my ankles and hearing somebody take a picture. And when I moved the covers to see, Henri's standing over me, and I'm naked.

And so I was so tired, and I just couldn't even really register what was going on. So I think I like looked and then closed my eyes again, and then I was like, "Wait, I'm not" -- like "What's going on?"

And so I was like, popped up, and I was like, "What are you doing? Are you -- did you just take a picture of me?"

And he was like, "What? No, no."

And I was like, "Why are you in here? What are you doing?" Like "Get out of here, get out of here." I was like, "No, I have to get the picture."

And I was so disoriented and so confused, and the bed was just like really, like the covers were all fluffed up and there were pillows all around. And so I was just like looking around, and I had the covers pulled around me, and I was like, "You need to give me that camera. You can't have that picture."

He was like, "No, no, no. It's fine. It's fine. I didn't take a picture. I didn't take a picture."

So then I don't see the phone anywhere, and it's kind of dark in the room. And so I'm like kind of trying

**83**

to like pat and like feel on his like pants pockets where his phone is, and I can't find it.

He's like, "Hey, stop. What are you doing? Stop, stop, stop that."

And I'm like, "No, you have to give -- you cannot have a picture of me like that. Why are you in here? What's happening?"

And so then he, he walks out of the room, and I shut the door, and I'm just like -- I have no idea what's going on. And then he knocks, and he's like, "See, look, I don't have any pictures of you," and he hands me his BlackBerry.

Well, I start trying to look through it, but I can't like even really figure out how to work the phone. Like I think I was trying to look through the pictures, but like I couldn't think to figure out how to get to where I wanted to go.

And it was really frustrating, I remember, because like I've had BlackBerry forever, and I know how to like look in secret folders and -- or not secret folders, but --

Q. Hard to access folders?

A. Hard to access folders, right, and look in the files. And so that's what, in my mind, I wanted to do, but I just couldn't think about like what I was doing or

**84**

how to do it or even like -- you know, I just remember having this phone in my hand like "I've got to get this picture off of here," but I couldn't even think to work the BlackBerry.

So I just handed it back to him, and I was like, "You need to leave." And I shut the door and locked it, and then went back in bed and like laid there for a second thinking like, "What in the world just happened?" And then I fell back asleep for like four hours.

Q. Okay. I appreciate your recollection of the transaction, but I want to go back.

A. Uh-huh.

Q. The last recollection you have before waking up with the blanket around you, and as you've described for us, without any clothes on --

A. Uh-huh.

Q. -- what's the last recollection you had?

A. I remember being at dinner, and I, it's like really fuzzy. Like I really don't remember a lot, but I remember there was some comedian there, and that Henri liked him, and he was like taking pictures of him and talking to him.

But it feels like, like I remember it and I know I was present and I know I was talking, but I don't know what I was talking about or if I was making any sense or

85

anything. But I know that there was a comedian there, and I know that I was sitting at like a table.

(Exhibit 1 marked for identification.)

Q. (By Mr. Rosenberg) Take a look at Exhibit 1 to your deposition.

A. Uh-huh.

Q. What is that?

A. Me and a man.

Q. Do you know who the man is?

A. No.

Q. Is that -- do you recall that as being the comedian you're referring to?

A. I mean, obviously it is who it -- like --

Q. I'm just asking.

A. Based on what I'm wearing and the fact that I remember being there and taking pictures and the context of this conversation, yes.

Q. I'm asking you --

A. Yeah.

Q. You know, I know who this person is because he's a public figure. But I'm asking you.

A. I don't know who this person is.

Q. I understand that. Is this the man who was identified to you as a comedian that night?

A. So that question's confusing, because I'm

86

telling you I don't remember who the comedian was.

Q. And I'm not asking for his name.

A. I don't even remember his face. Like I vaguely remember I know he looked like he had like a prominent nose and kind of reddish hair, and there was another gentleman with him that was maybe like didn't have a lot of hair, but I don't -- suffice to say I have a good memory.

Q. Uh-huh.

A. And I can't think of details.

Q. Okay.

A. I can't even think of what I had for dinner or the restaurant that I was at.

Q. Let me ask this, is this you?

A. Yes.

Q. Okay. Is this what you were wearing that night?

A. Yes.

Q. All right. I'm not trying to trick you. I'm just trying to --

A. No, I'm just trying to figure out what you want me to -- how you would like me to answer the question.

Q. I just want you to answer the questions as it happened, truthfully, to the best of your knowledge.

A. That's what I'm trying to do.

87

Q. All right. We know three things. We know that this is a picture of you and somebody. Right?

A. (Nodding head.)

Q. Correct?

A. Uh-huh.

Q. Yes?

A. Yes.

Q. And we know that this picture was taken the night you're talking about, because this is what you were wearing.

A. Yes.

Q. Okay. Where were you before that? Whatever place this picture was taken in, where were you before it?

A. At the -- well, we were a lot of places. Do you want me to start from the beginning?

Q. No. What I want to get at, the clothing, you said you recall what you were wearing.

A. Uh-huh.

Q. To me it looks like a top.

A. Right.

Q. All right. But you know which one it was.

A. Yes.

Q. Was that what you were wearing all day?

A. No.

88

Q. So you changed into this article of clothing --

A. Yes.

Q. -- before y'all went out to dinner.

A. Yes.

Q. After the work day, you changed outfits.

A. Yes.

Q. Okay. When you changed outfits, you were at that airport -- I'm sorry -- you were at that hotel in Newark?

A. In Newark, right.

Q. And then you went into Manhattan.

A. Yes.

Q. Did you take the train to Manhattan?

A. No. Henri drove the tan rental car.

Q. You remember it being a tan rental car.

A. Uh-huh.

Q. Now, from Newark, there are three ways to get into Manhattan. You could have taken the Lincoln Tunnel, the Holland Tunnel, or the George Washington Bridge. Do you remember?

A. Took a tunnel.

Q. But you don't know which one it was?

A. Do they both go underwater?

Q. Both tunnels go -- yeah. You go actually under the Hudson River.

89

A. What are the two names of the tunnels?

Q. Lincoln and Holland. The Lincoln Tunnel gets you out at 42nd Street. The Holland Tunnel gets you out at 14th Street.

A. I don't know. I'm not familiar.

Q. All right. You remember taking -- do you remember, do you remember going over a bridge?

A. We went under a, we went in a tunnel.

Q. Okay.

A. And we were on a bridge, yes.

Q. Do you remember going through the tunnel?

A. Kind of. It starts getting fuzzy when we were driving there.

Q. Okay. Prior to driving there, did you have anything to drink?

A. Yes.

Q. What?

A. I met Henri in the concierge lounge. I asked for a glass of wine. Henri was always very like persistent that I have a real cocktail, and I like to drink wine. And I don't really do very well with real liquor. And --

Q. When you say "real liquor," you mean vodka, gin, bourbon?

A. Yeah, hard liquor.

90

Q. Okay.

A. And so I remember the night before, I was having a glass of wine with dinner at the Philadelphia restaurant, the bar at the hotel. He was like, "Oh, you're not going to have a real cocktail."

And I was like, "I just really like to drink wine."

And so then again, I asked for a glass of wine. I assume it was a red wine. And so he poured me the glass of wine, and then we were talking and eating some appetizers.

And he was like, "Well, let's, you know, we can go either to Atlantic City or we can go into Manhattan. What do you want to do?"

And I was like, "Well, I want to go to Manhattan then." Like I have no interest in going to Atlantic City.

And he's like, "Okay." And he was like, "Well, let's get another drink before we go. But have a real drink, and I'll fix it for you."

And, and so he fixed me this drink, and it was in like a cup just like that.

Q. It's the court reporter's cup, but it looks like a --

A. It's a coffee cup.

Q. -- to-go cup, coffee cup.

91

A. It's a to-go coffee cup. Like that you have in the hotel, probably about this tall. Twelve ounces maybe, or ten ounces. And I asked for vodka soda. And so he makes it for me. And it was so strong, like so strong I couldn't even drink it. All I could taste was, it tasted like I was drinking a cup of vodka.

And I was telling Henri, I was like, "I cannot drink this. This is too strong." I was like, "Let's make two drinks out of it."

He was like, "No, no, no. It's fine. It's fine. Here, let me get you another bottle of soda, and you can just kind of add to it."

And I was like, "No, I think we should just make this two drinks."

He's like, "No, no, no, just here."

And so I asked the lady -- there wasn't any soda right there, I don't think. And so I asked the lady that like helps the attendant at the concierge lounge, and she brought me a bottle, like a little glass bottle of soda, and I was pouring into it.

So then we're driving, and I'm drinking this drink and kind of like pouring into it at the same time. And I just remember like -- it was kind of a long drive, and it was still light outside, so I guess it was still right around rush hour.

92

And I remember going under the tunnels and through the bridges, and we were stuck in traffic, and the tolls, and just feeling really fuzzy, and like, "Oh, my gosh, I'm getting really tipsy off of this drink, and maybe I haven't eaten a lot today," and just kind of do like a mental check on myself.

And I think that that -- I always try and do that when I'm drinking and I'm starting to feel light-headed, just kind of, okay, recognize how I feel, slow it down, and know that I need to kind of be aware of myself.

But by the time we got into the city and parked by, I guess we parked by Times Square, I was feeling very, like really tipsy and disoriented I guess.

Q. So you have recollection of getting through the tunnel, parking at least to recognize it was Times Square, or something you thought was Times Square.

A. Yes.

Q. Okay.

A. And then Henri showed me this, it was like a subway or a train station where there were these men carrying this beam. And then it's like it was like an optical illusion painting, where if you look from like two different sides, that it's the same, like they're each carrying the same bench or log or whatever it was. I can't remember.

93

And so he's showing this to me, and he's being kind of like really hands on with me, and I remember it making me feel uncomfortable.

And I remember when we were leaving the concierge lounge, we were in the elevator, and I was kind of like standing like kind of tense. And he was like, "Oh, you have like your -- you look tense right here." And he like kind of pressed on my shoulder.

And I was like, "Oh, yeah, I guess I am, from sleeping in a hotel bed."

And he was like, "Oh, well, I studied anatomy, and I was like -- started to get my degree in massage therapy when I was in Israel, before I was in the Army and I fought in the war."

So I was like, "Okay." And I was like, that's weird, but I don't really want him to rub my back. So I'm just like, "Oh, I'm fine," like "I'm not tense," you know.

And so that was like the first time that he was like kind of touching me. And I was like, ooh, this makes me uncomfortable.

Q. That was in the hotel before you left?

A. That was in, that was in the elevator. And then when we were at the subway station, he kind of like had his hands on my shoulders and was like pointing, and

94

like "Look up, look up." And that made me feel uncomfortable too.

Q. Now, the thing you're referring to is the subway station where the murals were?

A. Where the murals were, or the train station. And then -- do we need to take a break?

Q. I'm sorry? Not yet. We're going to get it in about two or three minutes.

A. Okay. So then he stopped and wanted to get a drink at some little bar, like some side-bar, like a side street. And I at that time was like, "I can't drink anything else, I'm already feeling like I can't walk."

And so he got a drink, and he wanted to walk with it on the street. I was like Henri, "I don't think that you're allowed to do that."

And he was like, "Oh, no, it's fine. It's fine."

But then I think the bartender or the bouncer at the door ended up telling him, "No, you can't," so he kind of like guzzled it down.

And then we continued to walk, and then I remember him giving me the option between two restaurants. And I guess I picked one. I don't remember that. Or I don't remember which one it was, but there was like a -- I, it doesn't matter. I couldn't describe it.

But -- and that's where I remember sitting -- and

95

this is where it just starts losing it.

Q. Okay.

A. Like I can't remember anything. I remember the comedian being there. I remember us taking pictures. But I don't remember leaving. I don't remember eating. I don't remember getting into the car.

Q. So if I ask you what you had for dinner, you couldn't tell me?

A. No, I couldn't tell you.

(Exhibit 2 marked for identification.)

Q. (By Mr. Rosenberg) Can you identify Exhibit 2?

A. This is Henri Morris.

Q. Okay.

A. And I don't know who this man is.

Q. But it's the same person as in Exhibit 1?

A. It's the same person as the picture that I'm in.

Q. Very simple, do you recall Henri wearing a shirt that looked kind of like that in this terrible reproduction that night?

A. No. I mean --

Q. Okay.

A. It's a man's shirt, so --

Q. I understand. So you, your testimony is you don't remember anything from that point forward that you

96

just described --

A. Uh-huh.

Q. -- until you get back to the hotel?

A. Right.

Q. So you don't remember driving back to the --

A. No.

Q. -- to New Jersey or anything of that nature?

A. No.

Q. You don't remember what you ate?

A. No.

Q. Don't remember what you might have drank at dinner that night?

A. No.

Q. Or anything like that?

A. (Shaking head.)

Q. All right. This is probably a good time to take a break.

A. Okay.

THE VIDEOGRAPHER: Time is 12:21 p.m. We're off the record.

(Recess from 12:21 p.m. to 12:54 p.m.)

THE VIDEOGRAPHER: The time is 12:54. We are recording.

Q. (By Mr. Rosenberg) Okay. Ms. Farmer, we've had a break. And before the break, we stopped the

97

questioning at, I believe you told me everything you remembered about the dinner in Manhattan --

A. Uh-huh.

Q. -- the night you believe you met someone who was purported to be a comedian who you can't identify.

A. Right.

Q. And you don't remember anything about the trip back to Newark.

A. No.

Q. But you do remember -- you shared with us what you did remember when you did return, when you were at the hotel, and that is Henri in your room with you had no clothes on.

A. Uh-huh.

Q. And you believed he was taking pictures. Correct?

A. I heard like the sound of a BlackBerry camera.

Q. Like a clicking type of a sound?

A. Like a clicking, like the picture sound that a BlackBerry makes when it's taking a picture.

Q. Do you recall with any degree of specificity how much time Henri was in your room?

A. No.

Q. You just know he was there?

A. I mean, I saw him there.

98

Q. So that's how you know he was there, because you saw him?

A. Right.

Q. You said you had no clothes on.

A. Correct.

Q. But the pillows in the bed were situated in a fashion you were able to describe to me.

A. They were, like I guess they were, there was like a lump on -- maybe there was a couple of pillows at the end of the bed, and then most of the pillows were kind of like around me and over my face.

Q. At any point in this transaction -- I know your testimony is that Henri took pictures -- did you take any pictures to, for example, to preserve what the room looked like, or where you were, or anything that would help anybody looking back to reconstruct the scene?

A. No.

Q. You owned a cell phone at that time. Correct?

A. Right.

Q. Was it a phone that had a camera feature in it?

A. Yes.

Q. You told me you don't remember what time this was.

A. Uh-huh.

Q. Right?

99

A. Correct.

Q. But after Henri left, you remember sleeping for about four more hours?

A. Yeah. Because I feel like -- I think I looked at the clock and it was around 4:00 a.m. I believe the question I answered was, "Do you know how long Henri was in your room?" No, I don't know how long he was in my room. When I woke up, I believe it was around 4:00 a.m. And then I remember him knocking on the door and waking me up at around 8:00. That's how I came up with four more hours.

Q. Did you have any reason to believe at that point that you had been physically violated?

A. Yes.

Q. Okay. In what fashion?

A. It was really like red, and I had some bruises on my arm, the top of my arm and on my like hip area.

Q. You didn't take any pictures to preserve that?

A. No.

Q. Okay. Do you believe you had been sexually violated?

A. Yes.

Q. In what fashion?

A. I was having pictures taken of me with my clothes off.

100

Q. Okay. Anything else that would lead you to believe you were sexually violated?

A. I felt like I had been like touched, but not like -- like it didn't feel like anybody had sex with me.

Q. All right.

A. But I was kind of like sore in my female regions.

Q. You believed you were sore in your female regions?

A. Yeah, but not -- like on the outside.

Q. Okay. Where was the bruising? I'm sorry.

A. I had bruising on my hips, and then at the top of my left arm, like on the back side of it.

Q. And without belaboring this, so I can move on, none of this was documented by terms of photographs or other ways to preserve the fact that you had been, experienced some trauma.

A. Well, other than the picture that Henri took.

Q. I'm talking about the bruising. Did the pictures depict bruising?

A. Yes.

Q. Okay. At that point, when did you -- at that point, you never -- you never reported it to anybody at that point. Correct?

A. No.

101

Q. How did you -- tell me how you obtained the pictures.

A. The FBI showed them to me after they had taken them from Henri.

Q. All right. Up until the point of the FBI showing them to you, you had never seen them?

A. No.

Q. And you were able to identify them?

A. Yes.

Q. Did the FBI tell you how they obtained them?

A. They had a search warrant for the technology on Henri's computer and in his office, and they found them on a locked flash drive.

Q. To your knowledge, are those the only pictures he had, that he took of you?

A. No.

Q. Okay. What other pictures were taken of you?

A. There were pictures taken of me in New Orleans.

Q. Okay. New Orleans was a couple of trips later. Correct?

A. Yes.

Q. Because it was the last trip out of a sequence of four that you were --

A. Five.

Q. -- with Henri alone.

102

A. With Henri -- no, I was only with Henri twice alone.

Q. Okay. The New York trip.

A. New York trip.

Q. And the New Orleans trip.

A. And the New Orleans trip.

Q. The next morning, you wake up and Henri calls you?

A. He knocks on my door.

Q. What did you discuss when he knocked on your door?

A. He was like, "Where are you? Are you ready? We have to be at this client." And I guess he had been trying to call me, but I was asleep. And so he knocked on the door, and I kind of cracked the door open. He was like, "You're not ready."

And I was like, "Oh, my gosh, no, I'm not ready." So I just like hopped out of bed and was still -- because I had slept for, you know, a good amount of time between that, still kind of like getting my whereabouts together. And I just quickly threw on my clothes and like ran downstairs and hopped in the car with him.

Q. Okay. So he, you cracked open the door. He's asking --

A. "Are you ready?"

103

Q. -- if you're ready.

A. Uh-huh.

Q. You realize you weren't ready.

A. Uh-huh.

Q. Didn't say anything to him other than you were going to get ready and then you got -- as you described, got dressed?

A. I said, "I'll be down in ten minutes."

Q. Okay. At any point that morning, did you ask him about the previous night?

A. I didn't ask him about it. I said, "I don't know what happened. That was so inappropriate. This is not like who I am. That's completely unprofessional. I don't know what happened between us, but I know that it was wrong."

And I was putting on my makeup in the car, and I felt like that was inappropriate, to be out drinking the night before, and then wake up and your boss is in your room, and then I slept late, and then I was in the car driving to a client and putting my makeup on in front of him.

Like I just felt like the whole situation was incredibly inappropriate and incredibly unprofessional on both of our parts. And I didn't know what had happened, but I knew that at some point I lost control, and I felt

104

like -- what happened? Like I just, I didn't know. I knew it was a mistake, and I knew it was wrong, but I didn't understand how I got from Point A to Point B.

Q. So you don't, you're not in a position to tell us whether or not what happened between you and Henri that night was consensual. You can't tell us, because you don't remember. Is that fair?

MR. TODD: Form.

THE WITNESS: No.

Q. (By Mr. Rosenberg) Why not?

A. If you -- I did not consent to those pictures being taken.

Q. How do you know? You don't remember them being taken.

A. I feel like I don't have to answer this question.

Q. I feel like you do.

A. The photos were taken without my knowledge. Whether I was drugged by Henri, I'm not sure. But I can tell you in my life, I've never taken pictures like that. I can tell you I would never consent to taking pictures like that. I would never consent to having a sexual relationship with my boss, being in a sound state of mind.

Q. Did you have a sexual relationship with your

105

boss that night?

A. I don't know.

Q. Okay. So you don't know if you consented to one or not, because you don't know whether or not you had one.

A. Now I --

MR. TODD: Leading.

THE WITNESS: -- do.

Q. (By Mr. Rosenberg) How do you know?

A. Based on the pictures. Don't you think a sexual relationship is up to and containing somebody taking very explicit naked pictures of you? And don't you think it is not consensual if I was un -- completely unaware of those pictures being taken at the time?

Q. I understand and respect your testimony that you don't recall it. My question to you, and what I'm examining you about is to determine how you know, since you don't remember, what you consented to and what you didn't consent to.

A. There's no way of knowing.

Q. The next day, you're -- do you remember how far the drive was from the hotel in Newark to -- was it a client on the docks?

A. Uh-huh.

Q. So we're talking maybe 15 minutes, if I'm

106

recalling correctly?

A. Maybe a little bit, maybe like 30 minutes.

Q. Okay. You had -- you had conversations with Henri about what happened the night before.

A. I, I talked about it, and saying that it was wrong and inappropriate. And he -- and that I needed to find a different job.

Q. You said that?

A. Uh-huh.

Q. And what did he say?

A. He said, "No, no, no." He was like, "Don't worry about it, Andrea. It's not a big deal. No, no," He was like, "What's inappropriate? It's not inappropriate. There's nothing inappropriate. It's fine. It's fine."

Q. Anything else between the time you got to -- was this a client or a prospect?

A. Client.

Q. Anything else between the time you got to the client?

A. Huh-uh.

Q. At any point did you just, did you come out and say to him, with specifics, "You took pictures of me without my clothes on," or anything pinpointing the exact conduct that you're describing?

107

A. No, because at that time, I still didn't really remember waking up, because I had been back asleep, and because of like the hustle and bustle of me waking up and just, you know, going to get ready with this client and trying to get ready and feeling so sick and nauseous and just very disoriented. I didn't, wasn't thinking about the picture or waking up.

Q. Is it fair to say that you didn't recall the pictures or remember the pictures until the FBI showed them to you?

A. No.

Q. When was the first time you remembered them?

A. I think I remembered it when we were in the Connecticut hotel, once I had kind of calmed down and was thinking back on it. But then I remembered -- I didn't question him on it, because I remembered looking through his phone and not seeing it. So I thought maybe it didn't happen, maybe I imagined it, or maybe it was something else that I heard.

Q. During a, during a visit with this client, was it business as usual?

A. Uh-huh.

Q. Yes?

A. Yes.

Q. I hate to keep doing that to you.

108

A. That's okay.

Q. That night, did you go to dinner?

A. Yes.

Q. Where did you go to dinner?

A. This like Italian place somewhere in Connecticut.

Q. Oh, so you drove from the docks --

A. To Connecticut.

Q. -- into Connecticut?

A. Uh-huh.

Q. Do you remember where in Connecticut?

A. No, wherever the Davidson is.

Q. I'm sorry?

A. Wherever Davidson Foods -- it's a company. It's a big --

Q. The client is named Davidson?

A. Right.

Q. And the city where they're in is the city you were in?

A. Yes.

Q. Okay. You had dinner at an Italian restaurant --

A. Uh-huh.

Q. -- in that area?

A. Uh-huh.

113

Second of all, you have a wife." And I was like, "And it is" -- and I was like, "I don't know how often you do this, but this is not the sort of thing that I do."

And he was like, "I've never, ever, ever done anything like this before, ever." Like stressing. He was like, "This is the first one and, you know, I really like you."

And I'm like, "No, this can never happen again, and we can never talk about this again."

And he's like, "Well, you know, my marriage has been over for a really long time, and we don't talk, and we have problems."

And I was like, you know, "It really just doesn't matter to me, any of that. It's wrong, and I don't want it to happen again, and I don't want to talk about it ever again."

And he's like, "Well" -- I was just like, "I just want to keep our relationship strictly professional."

And he was like, "Well, but I'm lonely, and I'm an affectionate person. And if I want to give you a hug, then I still want to be able to give you a hug."

I was like, "You know, I really just don't feel comfortable with that. I really just want to keep our relationship professional."

And so he said, "Okay, but I still, I'm still going

114

to give you a hug."

And I was like, "Probably not."

And so that was kind of that, like he just -- I expressed to him that I thought that it was wrong and inappropriate and that it could never happen again. And he told me that he and his wife were having problems, and that they didn't really have a marriage anymore, and that he had never done anything like this before, and that -- kind of almost expressing to me like -- well, I don't know. I don't want to assume anything. But it, I got the impression he didn't feel that it was as wrong as I felt it was, and I was not the married one in that situation.

So that kind of made me feel like -- it really did change my opinion of him, if the night before had not, or two nights before had not already, that I like started seeing through his facade of like stuff.

Q. At any point after that, did you start putting feelers out looking for another job?

A. Yes.

Q. In what, in what manner?

A. Well, I mean, I would look online, and I was talking to a friend at Mattress Firm, and also I was interviewing with ADP. It's another like sales company. But that was like later.

115

Q. Later, like when?

A. It was like in August or -- yeah, it was in August that I started interviewing with ADP.

Q. That was at the time your employment with Edible was ending.

A. I was still working there.

Q. Close to the end, right?

A. Close to the end. I had checked out at that point with them.

Q. When you say you checked out --

A. Like I didn't want to go there. I didn't want to be there. I didn't want to see Henri. I didn't want anything to do with them at all.

Q. And when did you check out?

A. After the New Orleans trip.

Q. Which was -- remind me when it was. I'm sorry.

A. It was the beginning of August.

Q. When you went from Davidson to LaGuardia, and we're talking about the Marriott --

A. Right.

Q. -- in LaGuardia, what time of day did you arrive there?

A. It was late evening. I think it was like probably around like 9:00, because the concierge lounge was still open, and there was a basketball game playing.

116

Q. On the television?

A. On the television. And there were a few people up there watching the basketball game. And we had to change our flights, because the other customer that we were supposed to meet that Thursday canceled on us. So we were going to try and take an earlier flight out.

And so I want to say Henri was there before -- at some point we took the rental car back, and we took the shuttle back from the rental car. And then we were up in the concierge lounge, and Henri couldn't get the computer to work.

And so he was like, "Oh, you know, help me. I can't figure this out. It's not working." So I'm like kind of getting where he needs to go.

Q. Computer in the concierge?

A. In the concierge. And there's like these pillars and these big round tables. And I'm kind of like watching the game and figuring this out. And Henri's like, "Oh, do you want a glass of wine?" And like -- or he's like, "Do you want something to drink?"

I was like, "Sure, I'll have a Chardonnay."

So he goes and gets me a Chardonnay, and I take a sip of it, and it just tastes disgusting, like so strong, like alcohol, or medicine, or just very, very like bitter, like alkaline bitter. And --

117

Q. Alkaline bitter?

A. Yeah, like soap or -- what I originally thought, like I was like, "Is there like" -- I was like, "Henri, did you put vodka in this?"

And he was like, "No, no."

And I was like, "Is this like the end of a wine bottle?" I was like maybe somebody else -- I don't know. I was like, "This just doesn't taste right."

He was like, "No, I poured it out -- I got a brand new bottle."

And I was like, "Okay."

So I went and looked at the bottle, and it was a Woodbridge Chardonnay, which is like a regular house that -- I mean, we carried it at the hotel that I worked at for five years. I'm very familiar with the way that it tastes. And I was like, "Oh, this tastes so gross," you know,

So I'm kind of like holding it and not drinking it, and helping Henri and kind of talking to some other people about the basketball game and the concierge, and then we decide to go downstairs for dinner.

Q. Let me stop you for a second.

A. Uh-huh.

Q. I don't mean to interrupt you. But have you -- you've been in the food and beverage business

118

tangentially in different places. Right?

A. Uh-huh.

Q. Have you ever had wine that's been oxidized? Chardonnay?

A. Yes.

Q. Okay. You know what that tastes like?

A. Right.

Q. Have you ever had wine that's been, using the term "corked"?

A. Yes.

Q. Okay. You know what that is?

A. Yes.

Q. Describe what corked wine is.

A. It's kind of like a, it tastes dirty.

Q. That's not the taste you had?

A. No.

Q. But oxidized?

A. Oxidized is like a stronger taste, but this is not the taste.

Q. So you, you're telling the, whoever is reading this or listening to it --

A. I feel like oxidized is almost like a sour taste.

Q. Right.

A. But this is not that taste.

119

Q. All right. So you're, you're, so you're -- because of your knowledge and experience, you're able to rule out corked. Right?

A. Uh-huh.

Q. And you're able to rule out oxidized?

A. Right.

Q. Okay. Just wanted to make sure. Go on. I'm sorry.

A. That's why, and that's why I also checked, like maybe the bottle had been in there for a while, or -- I don't know. I was just so, just why does this -- like trying to figure it out kind of, you know. Like if you have a glass of wine that's kind of vinegared and you're like tasting it, like is it vinegared or is it not vinegared?

So I had a few sips of it just trying to figure out what was going on with it, and then I was like, "No, I just can't drink this."

So we got down to the bar, the hotel restaurant/bar area, and I gave it to the waitress and asked her to bring me something else, and she brought me a glass of red wine.

Q. So you didn't drink the bad wine?

A. No. Well, I had a few sips of it.

Q. Okay. A few sips is --

120

A. Three.

Q. -- not a big quantity?

A. No, no.

Q. Okay.

A. It was like barely any -- you couldn't even tell that I had any out of it.

Q. And then you chose varietals altogether -- you switched varietals altogether.

A. Right.

Q. Anything else unusual happen that night?

A. Well, Henri was like -- the concierge lounge was about to close, and we ended up having dinner with these other two gentlemen. They were like, work for this public speaking company.

Q. Did you know them before you got there?

A. Huh-uh. We just started talking to them, and I don't know how I started talking to them. But I think maybe we were still wearing our Edible Software shirts, and they asked about it. And so we just got in a conversation about public speaking, and they ended up joining us for dinner.

And so then we were going back up, because I guess Henri told the lady to like put a piece of dessert out for him in the concierge lounge so he could go get it when he finished.

121

He was like, "Oh, well, come up and have one more drink. Have one more drink."

And I'm like, "I can't, Henri. I'm just so tired."

And so I went upstairs and went to sleep. And then we woke up really, really early the next day for our flight.

Q. And flew back to Houston?

A. And flew back to Houston together.

Q. Do you remember what airline?

A. Continental.

Q. Did you sit first class?

A. No.

Q. Did he?

A. No.

Q. You sat together?

A. Uh-huh.

Q. Was there drinking on the plane?

A. No.

Q. Okay. When was -- this was in May. Right?

A. Uh-huh.

Q. Around May what, would you think, would you believe?

A. The last week of May.

Q. The last week of May?

A. No.

122

Q. Memorial Day?

A. No, no, no. That was the Chicago trip. This was probably the second, first or second week of May. I started the very beginning of the month with them. So May 7th? I don't know.

Q. Was there ever a time after that, within close proximity to it, but after that, that you learned that Henri didn't want to speak with you for one reason or another?

A. Will you expand on that?

Q. I will in a bit, but I just want to see if I can test your recollection. Do you remember any instance after the tri-state trip, New York, New Jersey and Connecticut, that you recall learning that Henri did not wish to speak to you?

A. Yes.

Q. What was that?

A. We had gotten back at like 10:00 a.m., and I told Henri that I wanted to go home and take a nap, because I just felt so tired from the trip and everything.

And he was like, "Oh, sure, sure, sure."

Well, it was my understanding at the time, and it was similar to this at Mattress Firm, and I had discussed this with them upon hiring me, that if I was going to be

123

traveling over a weekend day, as I did on Sunday, that I could flex that time.

So you know, a travel day is a travel day. You don't necessarily have to go back into work. You can if you want to. That day we weren't due back into the office, because we were supposed to come in late from our flight.

So I was like, you know, I'm going to go take a nap, and then I'll go back up, maybe later. On my accord, like deciding if I was going to go up there, it was because I needed to do a few things, not that I had to go back up.

So I took a nap, and I had a missed call from Henri, and he was asking for the notes. And so I called back a little bit later, and I --

Q. What notes?

A. That I had been taking at Davidson. Sorry. I guess I didn't mention that. I took a bunch of notes at Davidson.

Q. For what purpose?

A. I'm a note taker. And he wanted the notes. Or a lot of times he's like, "Write this down." And so I write it down, because I'm already taking notes.

And so I guess he had called me or texted me and said that he wanted the notes. And then -- I don't know

124

If I e-mailed him back that I wasn't planning on coming in, that I would bring him the notes tomorrow. And then he -- I can't remember exactly what happened, but somehow I knew that he was mad that I wasn't bringing him the notes that day.

Q. Okay.

A. Maybe it was based on the message that he left me.

Q. And what was that message?

A. Very heated, like, "I -- this is urgent." Like "I need you to bring me those notes immediately." And so I called the office, and Marlene, the front desk --

Q. Finkelstein?

A. Yes. She answered, and she was like, "I'm supposed to tell you that Henri doesn't wish to talk to you."

And I was like -- I thought, I honestly thought she was joking. Like whatever, like okay, he just must be busy or joking around or something.

And so I was like, "Oh, ha ha. Okay. No, seriously let me talk to Henri."

She was like, "No, he doesn't want to talk to you."

And I was like, "What for?"

And she was like, "Because you didn't come back into the office."

241

CAUSE NO. 2012-65503

KERI HILL and                §    IN THE DISTRICT COURT
MICHELLE BARNETT             §
        Plaintiffs           §
                             §
VS.                          §    55TH JUDICIAL DISTRICT
                             §
HENRI MORRIS and SOLID       §
SOFTWARE SOLUTIONS, INC.,    §
d/b/a EDIBLE SOFTWARE        §
        Defendants           §    HARRIS COUNTY, TEXAS

- - - - - -

REPORTER'S CERTIFICATE/FILING CERTIFICATE
ORAL AND VIDEOTAPED DEPOSITION OF ANDREA FARMER
JULY 11, 2013
- - - - - -

I, MOLLY CARTER, Certified Shorthand Reporter in and for The State of Texas, hereby certify to the following:

That the witness, ANDREA FARMER, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on _____ to the witness or to the attorney for the witness for examination, signature and return to U.S. Legal Support by _____;

That the amount of time used by each party at the deposition is as follows:

    MR. JEFFREY N. TODD: (00:00)
    MR. GREGG M. ROSENBERG: (03:15)
    MR. DAN COGDELL: (01:26)

242

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes all parties of record:

    MR. JEFFREY N. TODD, Attorney for Plaintiff(s)
    MR. GREGG M. ROSENBERG, Attorney for Defendant(s)
    MR. DAN COGDELL, Attorney for Defendant(s)

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceedings was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Further certification requirements pursuant to Rule 203 of TRCP will be certified to after they have occurred.

Certified to by me this 22nd day of July 2013.

_____
MOLLY CARTER, CSR, RPR, CRR
CSR NO. 2613, Expires 12-31-13
U.S. LEGAL SUPPORT
Firm No. 342
802 North Carancahua, Suite 2280
Corpus Christi, Texas 78401
Telephone: (361) 883-1716
Fax:      (361) 888-6550

243

FURTHER CERTIFICATION UNDER RULE 203

The original deposition was/was not returned to the deposition officer on _____;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor; if returned, the original deposition was delivered to MR. GREGG M. ROSENBERG, Custodial Attorney;

That $_____ is the deposition officer's charges to the Defendant(s) for preparing the original deposition transcript and any copies of exhibits;

That the deposition was delivered in accordance with Rule 203.3, and that a copy of this certificate was served on all parties shown herein and filed with the Clerk.

Certified to by me this _____ day of _____ 2013.

_____
MOLLY CARTER, CSR, RPR, CRR
CSR NO. 2613, Expires 12-31-13
U.S. LEGAL SUPPORT
Firm No. 342
802 North Carancahua, Suite 2280
Corpus Christi, Texas 78401
Telephone: (361) 883-1716
Fax:      (361) 888-6550

## Page 1

NO. 2012-65503

KERI HILL and MICHELLE BARNETT     * IN THE DISTRICT COURT OF

V.     * HARRIS COUNTY, TEXAS

HENRI MORRIS and SOLID SOFTWARE SOLUTIONS, INC., d/b/a EDIBLE SOFTWARE     * 55TH JUDICIAL DISTRICT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION
OF BETH JACKSON
JULY 24, 2013

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF BETH JACKSON, produced as a witness at the instance of the Plaintiffs and duly sworn, was taken in the above styled and numbered cause on July 24, 2013, from 10:02 a.m. to 12:38 p.m., before Amy J. Doubenmier, CSR, in and for the State of Texas, reported by machine shorthand, at the offices of Rosenberg & Sprovach, 3555 Timmons Lane, Suite 610, Houston, Texas, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record herein.

## Page 2

APPEARANCES

FOR THE PLAINTIFFS:
MR. JEFFREY N. TODD
STATE BAR NUMBER 24028048
THE LAW FIRM OF ALTON C. TODD
312 South Friendswood Drive
Friendswood, Texas 77546
Telephone 281.992.8633
Fax 281.648.8633
E-mail jeff@actlaw.com

FOR THE DEFENDANTS:
MR. GREGG M. ROSENBERG
ROSENBERG & SPROVACH
3555 Timmons Lane, Suite 610
Houston, Texas 77027
Telephone 713.960.8300
Fax 713.621.6670
E-mail gregg@rosenberglaw.com

THE VIDEOGRAPHER:

MR. JOSEPH TAYLOR
FOX REPORTING
4550 Post Oak Place, Suite 201
Houston, Texas 77027
Telephone 713.622.1580

ALSO PRESENT:
MR. TREVOR MORRIS

## Page 3

INDEX

Stipulations.................................. 1
Appearances.................................. 2

BETH JACKSON

Examination by Mr. Todd.................. 4

Signature and Changes........................ 128
Reporter's Certificate........................ 130

EXHIBITS
NO. DESCRIPTION     PAGE
(No exhibits marked)

REQUESTED DOCUMENTS/INFORMATION

NO. DESCRIPTION     PAGE

(None)

CERTIFIED QUESTIONS

NO.     PAGE/LINE

(None)

## Page 4

THE VIDEOGRAPHER: Today's date is July 24th, 2013. The time is 10:02 a.m., and we're on the record.

BETH JACKSON,
having been first duly sworn, testified on her oath as follows:

(The time is 10:03 a.m.)

EXAMINATION

BY MR. TODD:

Q. Good morning, ma'am.

A. Good morning.

Q. Can you, please, state your full name for the record?

A. Beth Ann Jackson.

Q. And, Mrs. Jackson, my name is Jeff Todd, and you and I met briefly at Andrea Farmer's deposition, correct?

A. That is correct.

Q. And I know you sat in for some of that, so you kind of saw a little bit about what all is involved with a deposition, correct?

A. Yes, sir.

Q. Have you ever given a deposition?

A. No, sir.

Q. Okay. I'm sure, after seeing that with Andrea


EXHIBIT

1 (Pages 1 to 4)

Electronically signed by Amy Doubenmier (201-083-983-524)

75b08e32-ddf1-4f70-ab20-067220224a62

Page 21

A. Yes, sir.

Q. And is Edible Software still located there -- here in Houston?

A. In Houston, yes.

Q. Okay. And where are you -- where do you currently reside?

A. Cumming, Georgia.

Q. Okay. Where your company is?

A. Yes, sir.

Q. How many employees were there at Edible Software, if you know, at the time you came down in December of 2004?

A. Ten, 12. I mean, that's a guesstimation.

Q. That's fine. So, you meet Henri in person at Thanksgiving. You come down in December. Did you come by yourself or with anybody else from Culinary Masters?

A. By myself.

Q. Okay. And did you meet with Trevor on that occasion?

A. I don't recall meeting with Trevor. I was there for training, specific training, on how to get the software up and running.

Q. Okay. And how long did that trip take?

A. I think I was there for two days, if I remember correctly.

Page 22

Q. Okay. Did you go out to dinner with Henri or anyone else?

A. With Henri, yes, I did.

Q. Did y'all have drinks?

A. Yes.

Q. Do you recall where y'all went to dinner?

A. No, sir, I do not.

Q. Did he ever handle any of your drinks that evening?

A. No, sir.

Q. Okay. Other than talking to counsel kind of generally about what a deposition is, did you do anything else to prepare for your deposition here today?

A. I met with Mr. Rosenberg yesterday, and that was it.

Q. For how long?

A. I was here three hours -- was I -- approximately.

Q. Okay. Had you ever met with Mr. Rosenberg or Mr. Cogdell at any other time, prior to yesterday, in preparation for your deposition?

A. No, sir.

Q. Okay. Other than you traveled with them for Andrea Farmer's deposition. But that had nothing to do

Page 23

with prepping you for this deposition. Is that correct?

A. No, sir.

Q. What was the purpose of you attending Andrea Farmer's deposition?

A. As a corporate representative.

Q. Okay. Are you actually employed by Edible Software?

A. No, sir.

Q. How would you be a corporate representative of Edible Software, if you're not employed by Edible Software?

MR. ROSENBERG: Object to form.

Q. (BY MR. TODD) I'm just trying to understand -- because I hear you say, "we" and things like that.

A. Okay.

Q. I'm just trying to understand the relationship.

A. I have a longstanding working relationship with this company. I do a lot of consulting internally for the company as well as the clients of Edible Software.

Q. Okay. Do you have any other consulting jobs, other than Edible Software?

Page 24

A. Currently, no.

Q. Okay. Have you in the last couple of years?

A. No, sir.

Q. So, Edible Software has been your sole client?

A. Right now, yes.

Q. And Edible Software has been your sole source of income for the last couple of years?

A. Yes.

Q. Okay. Has there ever been a discussion about actually being brought on as an employee of Edible Software?

A. Yes.

Q. And when did those discussions take place?

A. They've taken place over the -- our period of our vendor relationship. Yes.

Q. Okay. Is there -- what's the -- is there a sticking point, so to speak, or what's the -- it just never really progressed further than discussing it?

A. There's no real sticking point, no. It just -- we talk about it and then do something else. You know what I mean? You get hung up with another client or whatever and just -- no sticking point as to why it hasn't happened. No, sir.

Q. Okay. Do you have any idea why it hasn't happened?

6 (Pages 21 to 24)

Electronically signed by Amy Doubenmier (201-083-983-5249)          75b08e32-ddf1-4f70-ab20-067220224a62

Page 25

A. It's just -- no. I mean, there's no particular reason. No, sir.

Q. I mean, if you became an employee of Edible Software, would you get benefits, health benefits, if you know?

MR. ROSENBERG: Form.

A. Yes.

Q. (BY MR. TODD) Do you have any health benefits through your current company?

A. I have health benefits through my husband.

Q. Okay. Do you know of any other additional benefits, other than health benefits, that may be available through Edible Software?

A. I'm aware of what they have for health plans and dental plans. Yes.

Q. But any 401(k)s or any profit sharing or anything like that?

A. I'm not a hundred percent familiar with everything that they have to offer.

Q. Do you expect to continue having discussions with Edible Software about having a more permanent relationship as an employee?

A. I anticipate we will.

Q. Okay. Do you know when that may occur?

A. No, sir.

Page 26

Q. Other than meeting with counsel, did you go over any documents in preparation for today's deposition?

A. No, sir.

Q. And bear with me. I'll tell you that I tend to jump around.

A. That's fine.

Q. You've already seen that, that I've gone from one thing to another. I mean, normally attorneys ask about preparation at the very beginning, and, you know, I'm several questions in.

A. That's okay.

Q. But you didn't go over any documentation in preparation for today's deposition?

A. Nothing.

Q. Okay. Have you reviewed any of the statements that have been provided by Keri Hill, Andrea Farmer, Michelle Barnett or anyone else involved in this matter?

A. Yes.

Q. Okay. Whose statements have you read?

A. The women you just listed.

Q. Okay. Keri Hill's, correct?

A. Yes.

Q. Michelle Barnett's?

Page 27

A. Yes.

Q. Andrea Farmer's?

A. Yes.

Q. And that's it?

A. Stacy Stewart --

Q. Okay.

A. -- Brannen DeVille --

Q. Okay.

A. -- Diedre MacLeoud, Samantha Gluck.

Q. Okay. Have you reviewed any of the deposition testimony that has been provided in this case to date?

A. A little bit of it, not all of it.

Q. Which deposition testimony have you reviewed?

A. Keri Hill and Michelle Barnett.

Q. Okay. You haven't reviewed Andrea Farmer's?

A. No, sir.

Q. Okay. Okay. Now, I'm jumping back to -- you come to Houston. You have the training for two days. You go to dinner with Henri. You did have drinks with Henri.

A. Yes.

Q. What -- do you recall what you drank?

A. I drank vodka and cranberry. So, I have to assume. But, I mean, that's just the drink I drink.

Q. Got you. Any particular vodka or just kind of

Page 28

house or whatever they have on hand?

A. ABSOLUT.

Q. Okay. And I don't mean to -- like, I hate asking uncomfortable questions. But when you say you drink vodka and cranberry, how often do you drink?

A. I drink on a daily basis.

Q. Okay. And how many drinks a day would you say?

A. Two to three drinks.

Q. Have you ever thought to yourself or has anyone else said to you that you may have a drinking problem?

A. No, sir.

Q. Okay. Have you ever attended an AA meeting?

A. No, sir.

Q. Have you ever gone into any other treatment or anything else to discuss drinking, as far as a possible problem?

A. In reference to myself?

Q. Yes, ma'am.

A. No, sir.

Q. Okay. How about with anyone else?

A. I am familiar with the AA program due to family members. Yes.

Q. Okay. And I don't want to delve into

7 (Pages 25 to 28)

Electronically signed by Amy Doubenmier (201-083-983-5249)
75b08e32-ddf1-4f70-ab20-067220224a62

Page 29

individuals, but has there -- is there alcoholism within your family?

A. Yes, sir, there is.

Q. Okay. Do you think alcohol has negatively impacted your life in any way?

A. No, sir.

Q. Okay. How about drugs? Do you take illegal drugs?

A. No, sir.

Q. Okay. And are you under any medications here today that may affect your ability to tell the truth or understand my questions?

A. No, sir.

Q. Okay. Are you under any medication at all?

A. I take a thyroid medicine.

Q. Okay. And is that a daily medication?

A. It's an every-other-day.

Q. Okay. You go to dinner with Henri, and then you head back to Atlanta?

A. Yes, sir.

Q. When was the next occasion you met with Henri or Trevor in person?

A. Like I said before, I believe Henri visited our offices in 2005, shortly after we went through an implementation.

Page 30

Q. Okay. And was he alone?

A. Yes, sir, he was.

Q. Okay. And after that meeting with Henri, did -- or when he came to the offices in 2005, did y'all go out to dinner?

A. Yes, sir. I believe we did.

Q. Okay. And did y'all have drinks?

A. I believe we did.

Q. And I know vodka and cranberry is your drink of choice. Does Henri have a drink of choice?

A. He's normally a bourbon drinker --

Q. Okay.

A. -- or a gin drinker.

Q. And kind of going back to you: I know that you've indicated you drink on a daily basis. Do you know what I mean when I speak about, like, tolerance levels?

A. Uh-huh.

Q. You're a very fit, in-shape person. Do you consider yourself to have a low tolerance, average tolerance, or high tolerance, as far as alcohol is concerned?

A. I have a decent tolerance for alcohol.

Q. Okay. Despite your slight frame, you think you can handle a couple of drinks?

Page 31

A. Absolutely.

Q. Okay. How would you describe Henri's tolerance, if you can, for alcohol?

A. Very good.

Q. Okay. Meaning: Do you notice any changes in Henri after three drinks?

A. No.

Q. Okay. Do you notice any changes in Henri after five drinks?

A. I can't say that I recall ever seeing him consume five drinks, but -- I've never seen a change in his demeanor when I have traveled with him drinking.

Q. Ever?

A. Not that I can recall. No, sir.

Q. Okay. Do you think he has been with you and he has seen a change in you from your drinking?

MR. ROSENBERG: Object to form.

A. I can't answer that.

Q. (BY MR. TODD) Okay. When you've been in his presence, have you felt different after consuming alcohol?

A. No different than when I would drink by myself.

Q. Okay. You indicated you gave a statement to the FBI. And that was in their offices?

Page 32

A. Yes, sir.

Q. Did you give any other testimony?

A. I've given a grand jury testimony.

Q. Okay. When you went to dinner with Henri Morris in 2005, did he handle your drinks at all?

A. No, sir. We were in a restaurant.

Q. Okay. And at that point you have only met Henri two times in person?

A. In person, yeah. Probably that is correct.

Q. And how would you describe y'all's relationship at that point?

A. A business relationship.

Q. Okay. After that meeting, did you ever meet with Trevor or Henri in person again, prior to leaving Culinary Masters?

A. I don't believe I've ever met with Trevor. I -- well, I take that back. Trevor and Charles and Henri were in town for a trade show. I believe I met them. It was in the fall -- it would have had to have been in the fall. But, yes. I met with Henri several times before I left Culinary Masters.

Q. In person?

A. Yes, sir.

Q. Okay. In Atlanta or here in Houston or both?

A. It was in Atlanta.

8 (Pages 29 to 32)

Electronically signed by Amy Doubenmier (201-083-983-5249)          75b08e32-ddf1-4f70-ab20-067220224a62

Page 33

Q. Okay. Tell me who Charles is.

A. Charles Butler is our vice president of sales.

Q. Okay. And is he still working for Edible Software?

A. Yes, sir.

Q. Who is Allan Morris?

A. Allan Morris is Henri Morris's son.

Q. Okay. And does he work at Edible Software?

A. Yes, sir.

Q. And what's his job title?

A. He's our human resource director.

Q. And what is Trevor Morris's job title, if you know?

A. He is our CEO.

Q. Okay. When did he become the CEO?

A. Within the last, I think, 90 days. Sixty days probably is more accurate -- 60 days.

Q. Okay. Who was the prior CEO?

A. That was Henri's title.

Q. Okay. And, again, let me just talk briefly about some of these. When they came in in the fall for the trade show, it was just those three gentlemen that you recall?

A. Yes, sir, that I recall.

Q. Did y'all go out to dinner?

Page 34

A. Yes, sir, we did.

Q. Did y'all have drinks?

A. I believe so.

Q. Okay. Do you recall how many days they were in Atlanta?

A. They would have been there for three days.

Q. Okay.

A. I believe I was out of town that weekend on a business trip myself.

Q. So, you didn't meet with them?

A. No, I did.

Q. Okay.

A. When I returned back into Atlanta, they were still -- I met them for dinner upon my return.

Q. Okay. Sorry about that. Pardon my confusion. And then after that trade show meeting, when did you next meet with Henri?

A. Henri had been to our offices in 2005 and 2006. I don't recall the exact months.

Q. And on those occasions, did he travel alone, or did he have another individual with Edible Software?

A. He was traveling alone.

Q. Okay. Other than the trade show time, did Henri ever come to -- while you were at Culinary Masters, did Henri ever come to Atlanta to visit y'all

Page 35

with another travel companion?

A. Not that I recall. No, sir.

Q. Okay. Do you know if Henri is married?

A. Yes, I do.

Q. Was he married at that time?

A. Yes, he was.

Q. Do you know his wife's name?

A. Ruth.

Q. Do you -- have you ever met her?

A. Yes.

Q. When was the first time you met her?

A. It would have had to have been in 2007.

Q. Okay. And why do you say, "It would have had to have been"?

A. 2007, 2008. Because that's when I started consulting for them, in 2007.

Q. Okay. So, when you left Culinary Masters and started your own consulting business in 2006, who was your -- who were your clients at that time?

A. I started my corporation in 2006. I started consulting the beginning of the second quarter of 2007.

Q. Okay. And who was your client at that time?

A. I had several clients locally.

Q. Okay. And was Edible a client at that time?

A. Yes, on a part-time basis.

Page 36

Q. Okay. And who were your local clients?

A. Diamax Industries, Ever Clear Window Cleaning, Wayne's Auto. I had a marble guy, Gus. I'm forgetting the name of his marble company. And I picked up clients from a CPA called Ledger Plus.

Q. Okay. At what point did Edible essentially become your sole client?

A. I transitioned around 2009.

Q. Did you leave Culinary Masters on good terms?

A. Culinary Masters was purchased by another company.

Q. Who were they purchased by?

A. Atlanta Foods International.

Q. And did they decide to retain you, or what happened?

A. Yes. I stayed on through the transition.

Q. Okay. And then what were the terms of your separation?

A. I chose to separate.

Q. Okay. Between 2007 when you first started working and doing work on your own and 2009 when you transitioned into working almost exclusively with Edible, did you have in-person meetings with Henri?

A. Yes.

Q. Would you travel to Houston at that point?

9 (Pages 33 to 36)

Electronically signed by Amy Doubenmier (201-083-983-5249)
75b08e32-ddf1-4f70-ab20-067220224a62

## Page 37

A. I traveled to Houston. Yes.

Q. Okay. And would he travel to Atlanta?

A. No.

Q. Okay. Would you go on any other business trips with Henri at that time?

A. Yes.

Q. Between 2007 and 2009, how often would you accompany Henri on business trips?

A. I can't give you an exact number.

Q. Once a month?

A. It could have been.

Q. Okay. And what was your role when you accompanied him on the business trips?

A. Business analyst and the -- we would go to do -- business analyst and training and that kind of stuff.

Q. Okay. So, you would assist in meeting with potential clients or existing clients?

A. Yes.

Q. And you would assist in analyzing a potential client's business to see how Edible could assist them?

A. Yes.

Q. You would also assist with making sure existing clients were doing well and implemented the software and using it correctly?

## Page 38

A. Correct.

Q. Okay. And I don't want to -- well, how were you being paid at that time?

A. I invoiced the company.

Q. Okay. I mean, is it weekly, hourly, salary? How -- what's the structure?

A. I have an agreed amount retainer.

Q. Okay. I mean, is that per business trip or per month or --

A. Per month.

Q. Okay. So, each month y'all have a retainer?

A. (Witness nods.)

Q. And then do you bill by the hour against that retainer?

A. No, sir.

Q. Okay. How do you bill -- do you bill against the retainer, or you just --

A. I have a flat retainer.

Q. Okay. And that flat retainer, one month if you work, you know, ridiculous hours, it's still that flat amount?

A. Yes, sir.

Q. And if the next month you don't work as much and only do one business trip, it's still the flat retainer?

## Page 39

A. Yes, sir.

Q. And what is that flat retainer amount?

A. Currently?

Q. During 2007.

A. That I don't recall exactly.

Q. Okay.

A. Probably around three -- on a part-time basis it was probably around three to $4,000.

Q. Per month?

A. Per month.

Q. Okay. What about '08?

A. I believe it changed a little bit. I don't recall the exact retainer amount. So, it's in the -- it was still in the $4,000 range --

Q. Okay.

A. -- $5,000 range. The rates changed a couple of times. I apologize. I just don't recall.

Q. I'm just trying to get a general idea.

A. Yeah. It's --

Q. I'm not going to cross-examine you at trial and say, "You were $10 off."

A. Yeah.

Q. So, I assume in '09 it changed because you transitioned.

A. It changed in '09 and '10. And I'm sorry. I

## Page 40

don't recall the exact. There was a significant change in rate around that 2009 area, because I was going full-time.

Q. Okay.

A. I want to say it was probably around $6,000 a month --

Q. Okay.

A. -- give or take.

Q. And this is 2009?

A. '8 or '9, yeah.

Q. Okay. And then what about '10?

A. In '10 it went to approximately 8,000 a month.

Q. Okay. And what about '11?

A. It's been constant give or take a couple hundred bucks since 2010.

Q. Okay. And that's up until present?

A. Correct.

Q. Okay. Can you tell me how Edible Software is doing since Henri's arrest?

A. We are doing very well.

Q. Okay. I mean, it hasn't changed the business?

A. No, sir.

Q. I mean, other than, obviously, you know, Trevor is the CEO. I just mean financially y'all -- Edible Software is still doing really well?

FOX REPORTING
(713) 622.1580

Electronically signed by Amy Doubenmier (201-083-983-5249)

75b08e32-ddf1-4f70-ab20-067220224a62

Page 49

A. No.

Q. Okay.

A. Currently, no.

Q. Okay. Has it ever been anything more than a professional relationship?

A. Yes.

Q. Okay. How so?

A. I've had a personal relationship with Mr. Morris.

Q. "Personal" meaning y'all have done non-work vacations or visits or personal in what way?

A. I had a personal relationship with Mr. Morris.

Q. When did -- when would you say your relationship with Mr. Morris became personal?

A. My relationship with Mr. Morris became personal in late 2005 or somewhere in 2005.

Q. Okay. And that -- so, that was while you were still working with Culinary Masters?

A. That is correct.

Q. And when you say, "personal" does that mean intimate?

A. Yes.

Q. Did you and Henri have a physical relationship?

A. Yes.

Page 50

Q. Did you and Henri have a sexual relationship?

A. Yes.

Q. Did that include sexual intercourse?

A. Yes.

Q. Were you married at the time?

A. Yes.

Q. Was he married at the time?

A. Yes.

Q. Had you -- was your husband aware of this sexual relationship?

A. No.

Q. Is he aware now?

A. Yes.

Q. Do you know if Henri's wife was aware of this relationship?

A. Was or is?

Q. Was.

A. Not to my knowledge. No.

Q. Is she now?

A. Yes.

Q. When did your husband become aware of the relationship?

A. Last year.

Q. Okay. Do you know when Ruth became aware of the relationship?

Page 51

A. Last year.

Q. I take it Trevor is aware of this relationship.

A. Yes.

Q. And he didn't become aware of that here in this room today. Is that correct?

A. That is correct.

Q. Do you know when he became aware of the relationship?

A. Last year.

Q. And who told him?

A. I'm not certain.

Q. Was it you?

A. No, sir. I did not.

Q. Were you the one that told Ruth?

A. No, sir.

Q. Is Allan aware of the relationship?

A. I do not know.

Q. What about Mr. Butler?

A. I do not believe so.

Q. And this physical, sexual relationship started in 2005?

A. Yes.

Q. And how long did that relationship continue?

A. Through approximately 2011.

Page 52

Q. Okay. And what happened in 2011 for it to cease?

A. It was my personal choice and Henri's personal choice.

Q. Okay. Are you all right to go forward?

THE VIDEOGRAPHER: Can we take just a real quick break?

THE WITNESS: I would like to take a break. Yes.

THE VIDEOGRAPHER: The time is 10:54 a.m., and we're off the record.

(Short break taken from 10:54 a.m. to 11:06 a.m.)

THE VIDEOGRAPHER: The time is 11:06 a.m., and we're back on the record.

Q. (BY MR. TODD) Okay. Are you ready to continue?

A. Yes, sir.

Q. Okay. And I apologize for delving into all of these details. But because of the allegations in this case, I'm obligated to kind of try and talk to you about it and kind of figure out what all, you know, occurred between you and Henri. Okay?

A. Uh-huh. That's a "Yes." I'm sorry.

Q. And because of how folks, namely President

FOX REPORTING
(713) 622.1580

Electronically signed by Amy Doubenmier (201-083-983-5249)

75b08e32-ddf1-4f70-ab20-067220224a62

Page 53

Clinton, minced words and things like that, I may have to use some terminology that isn't the most polite. But when we talk about sexual intercourse, did Henri ever penetrate you?

A. Yes.

Q. Okay. And did he ever penetrate you with his fingers?

A. Yes.

Q. Did he ever penetrate you with his fingers when you were unconscious?

A. No.

Q. Did he ever penetrate you otherwise when you were unconscious?

A. No.

Q. Did he ever have any sexual relationship with you when you were unconscious?

A. No.

Q. Did Henri ever take pictures of you when you were unconscious?

A. No.

Q. Has Henri ever taken pictures of you undressed, as far as you know?

A. Yes.

Q. When did -- has Henri taken pictures of you?

A. There were several times. The exact dates I

Page 54

don't recall, but over a period of time.

Q. On various business trips?

A. Yes.

Q. And hotel rooms?

A. Yes.

Q. When you and Henri would travel together, would y'all stay in separate rooms or the same room?

A. We had two separate rooms.

Q. And how frequent would y'all engage in sexual intercourse?

A. Mr. Todd, I can't give you an exact number. Not every time we stayed together, not necessarily.

Q. Okay. The pictures that we've talked about, were those done with your consent?

A. Absolutely.

Q. And what was the reason for taking the pictures of you? You were naked?

A. Yes, sir. I was naked.

Q. Were y'all in the pictures together?

A. No.

Q. They were just pictures of you?

A. They were just pictures of me.

Q. Full body shots?

A. No. There's -- my face is concealed.

Q. Why is that?

Page 55

A. Because I didn't want to be able to tell who the person was.

Q. What did he take the pictures with?

A. His cell phone.

Q. Do you -- did he just retain them on his cell phone or download them to a flash drive or a hard drive?

A. He has downloaded them. Yes.

Q. And what was the purpose of taking these pictures?

A. The purpose of taking those pictures was at my suggestion, because he was having arousal issues at home with his wife, and I suggested that these may help.

Q. Okay. So -- and I'm not going to, you know, argue with you or quibble. I just want to understand. So, Henri was having arousal problems?

A. Yes.

Q. Would you consider that -- was Henri impotent, as far as you knew?

A. No.

Q. Did he utilize any medications to help him with his arousal problems?

A. He did not have an arousal problem with me.

Q. Okay. But he was having an arousal problem

Page 56

with his spouse?

A. My understanding.

Q. And did he ever have to take any medication to assist him with his arousal problems with his wife?

A. It was not discussed with me.

Q. Okay. Have you ever seen Henri take any medications?

A. He takes heart medicine.

Q. Okay. Any other medications, to your knowledge?

A. Not that I'm aware of, no.

Q. Okay. Have you ever -- well, strike that. Back to the purpose of the pictures and assisting him with his arousal problems: Was your intent that he would look at the pictures to get aroused and then go have relations with his wife?

A. Would you repeat your question, please?

Q. Yeah. I'm just trying to understand the intent there. I mean, you suggested it. So, you're the one that thought, "This may help you." Did you have any inkling that pictures of a naked person helped Henri get aroused?

A. I had no -- I had no reason to believe. No. I had no knowledge.

Q. Had you ever let anyone else take pictures of

14 (Pages 53 to 56)

Electronically signed by Amy Doubenmier (201-083-983-5249)

76b08e32-ddf1-4f70-ab20-067220224a62

Page 57

you naked?

A. No.

Q. Henri is the only person that's taken pictures of you naked?

A. Yes.

Q. Is your husband aware of the pictures?

A. I told him. Yes.

Q. Okay. And you suggested that he take these pictures to assist him with his arousal problems. What were you thinking he would use the pictures for?

A. Would you break down your question?

Q. Yeah, because I'm missing something. I'll just go into detail. Did you think that he would be in bed with his wife and pull out the pictures to get excited?

A. Sir, I really didn't -- this was a private conversation between Henri and I that transpired. And that's his personal business. I didn't really think about how he or when he would, but, obviously, I suggested it, because I thought it might help him. I can't give you any more detail than that.

Q. I mean, you weren't saying it in jest; were you?

A. No.

Q. You were seriously attempting to help him with

Page 58

his arousal problems?

A. Yes, sir.

Q. Okay. And you made the suggestion. In your mind, what were you thinking these pictures would do?

A. Help him get an erection.

Q. Okay. And he needed an erection at the time he was going to have relations with his wife, correct? Right?

A. Yes.

Q. I mean --

A. I would assume.

Q. -- it would do him no good to be aroused with his wife, to be in Atlanta looking at the pictures, when she's here in Houston, Texas. Is that correct?

A. I'm sorry. Can you repeat what you just said?

Q. Yes.

A. And I'm not trying to be difficult. I'm sorry.

Q. I understand. I told you I would ask you confusing questions. Because I am honestly just -- it makes absolutely no sense to me.

A. Well, I'm sorry for that.

Q. But everybody is different. That's why I'm just trying to figure out the thinking. You thought -- you understood he was having arousal problems with his

Page 59

wife, correct?

A. My understanding, yes.

Q. And, so, you suggested to him, "Take these pictures of me with a concealed face. Take these naked pictures of me, and it will help you, or it may help you with your arousal problems."

A. I suggested it, Mr. Todd.

Q. Okay. So, the next step is: How is it going to actually help him with his arousal problems? Because his arousal problems are at the time he's trying to have relations with his wife. Is that correct?

A. Well, perhaps he -- I mean, sir, I didn't give -- you're asking me to answer a question on a presumption. I'm sorry. My thought was: If it would help him, it would help him.

Q. Right.

A. If he can look at the pictures beforehand, it might help him. Okay?

Q. That's what I'm getting at.

A. Okay. That is my intent. I'm sorry. I'm not trying to be difficult.

Q. No. No. I mean, you made the suggestion. So, I'm thinking you thought in your mind --

A. My -- if he can look at this, he can, perhaps,

Page 60

get aroused or whatever. I mean, I'm -- that was my thinking.

Q. That's the clarity I'm seeking.

A. Okay.

Q. When you said, "Hey, maybe you should take these pictures of me. It may help you with arousal," your thought process was, you know, "Just beforehand you look at these -- you get aroused when you're with me. So, you would get aroused by looking at these pictures just beforehand, and then go in and do your thing." Is that --

A. I mean, I wouldn't -- I'm not going to accept your words, but my intent was for him to be able to look at the pictures and hopefully be aroused. Yes.

Q. Do you know if he ever utilized the pictures for that purpose?

A. My understanding, yes.

Q. And did it have its intended effect?

A. Sometimes, I think.

Q. Okay.

A. But I don't know exactly. Sometimes.

Q. Do you have copies of those pictures?

A. No, sir, I do not.

Q. Did he ever give you copies of those pictures?

A. No, sir, he did not.

Electronically signed by Amy Doubenmier (201-083-983-5249)

75b08e32-ddf1-4f70-ab20-067220224a62

## Page 61

Q. Does he still have those pictures?

A. They -- I don't know that.

Q. Okay. I mean, do you know if they were deleted or if they exist in any form or fashion?

A. I do know they exist.

Q. Okay. And how do you know they exist?

A. Because the FBI has them.

Q. Okay. Do you know if Henri has taken pictures of any other females, other than yourself, while being naked?

A. Yes.

Q. Who else?

A. Andrea Farmer.

Q. Have you seen those pictures?

A. No, sir. I have not seen those pictures.

Q. How did you become aware of those pictures?

A. Henri told me about it.

Q. When?

A. Last year.

Q. Do you recall the date that Henri was arrested?

A. April 9th, 2012.

Q. Did he tell you about the pictures of Andrea Farmer before or after that date?

A. I believe it was before, but I don't recall

## Page 62

exactly, Mr. Todd.

Q. Okay. And the -- one of the things that I think has been kind of the source of confusion in some of these depositions is: I think there was a time where he was in the airport, and he was taken into custody. Are you aware of that?

A. Yes, sir.

Q. And he wasn't arrested at that time; was he?

A. No, sir.

Q. Okay. Do you know if he was searched at that time?

A. Yes, sir. I believe he was.

Q. Do you know if they found anything on his person, other than his clothes and his bags?

A. What exactly are you referring to?

Q. Did they find any drugs on him?

A. He had his medications on him. Yes.

Q. Just his heart medications that we discussed previously?

A. My understanding is: They're saying there was something else on him, but I don't know what that is.

Q. Okay. You have no personal knowledge yourself?

A. I have no personal knowledge. No.

Q. Okay. Did you see the news report with his

## Page 63

then-attorney discussing --

A. Yes, I did.

Q. Okay. Did -- are you aware of whether or not he had airplane bottles with him?

A. I don't know firsthand.

Q. Okay.

A. I mean --

Q. Have you ever seen Henri travel with airplane bottles of alcohol?

A. Yes. Yes.

Q. And when I talk about "airplane bottles," do you know what I --

A. Minis.

Q. Okay. Do you travel with minis?

A. I used to. Yes.

Q. And when you say, "used to," when did you travel with minis?

A. Well, actually, I still do on occasion. It just depends. Just over the course of time.

Q. Okay. And I take it your minis are vodka.

A. Yes.

Q. What minis did Henri travel with?

A. Vodka or bourbon, that I've seen in the past.

Q. Okay. Can you think of any reason why -- What color is bourbon?

## Page 64

A. It's brown.

Q. Can you think of any reason why bourbon minis would have a clear liquid in them?

A. Because Henri recycles.

Q. Okay. So, he would -- was he pouring vodka into them?

A. Yes.

Q. Okay. Would there be any reason for it to have just water in it?

A. No.

Q. I mean, has Henri told you any reason why he may have minis that don't have alcohol in them?

A. No. And --

Q. Can you think of any reason why someone would travel with minis that don't have alcohol in them?

A. Are you -- if you're asking me a question, I've never seen him with minis with just water. Are you insinuating there is? I'm not certain of how to answer the question.

Q. I don't know. I don't know the answer to that question.

A. Okay.

Q. I'm asking: Do you know if he had minis that didn't have alcohol in them?

A. He's never had minis, to my knowledge, that

FOX REPORTING
(713) 622.1580

Electronically signed by Amy Doubenmier (201-083-983-5249)

75b08e32-ddf1-4f70-ab20-067220224a62

Page 65

did not have alcohol in them.

Q. Okay. Have you heard from anyone whether he had minis that did not contain alcohol?

A. It's my understanding the legal documentation indicated that. But it's also my understanding that that is not the case. But I've never seen him with minis with water.

Q. Okay. Have you ever asked Henri to add alcohol to your drinks so that you wouldn't have to order a double in front of others?

A. Absolutely not.

Q. Okay. Are you aware of Andrea Farmer's testimony concerning the Chicago business trip?

A. I am aware of Andrea Farmer's statement. Yes.

Q. Okay.

A. Regarding me, I should say.

Q. And very good words, because there's a difference between statement and testimony. You were at the deposition, but I think you had left by the time --

A. Uh-huh.

Q. And I may be wrong. I don't remember at what point you left. But -- and I haven't seen her statement, but I was there for her deposition. She talked about the trip to Chicago.

Page 66

A. Uh-huh.

Q. She testified that y'all had been walking around, and that y'all were going to go to the -- or you weren't with them. She was with Trevor. They went to a Cubs game. They happened upon Henri outside.

A. Okay.

Q. And they decided they wanted to go to, I believe it's called, the Hancock building.

A. Uh-huh.

MR. ROSENBERG: Is that a "Yes"?

A. I'm sorry. "Yes," sir. I'm sorry.

Q. (BY MR. TODD) I should have caught that myself.

A. Sorry.

Q. And that Trevor called you. Do you recall that?

A. Actually, yes, I do.

Q. Okay. And that he was saying, "Go to the bar with us, and, no, Henri is not with us." Is that your recollection?

A. That is factually inaccurate.

Q. Okay. What do you recall the conversation to entail?

A. Here's what transpired. Henri called me. He said, "We're going to go to the Hancock building.

Page 67

Would you like to come?"

"No, thank you. I'm getting ready for bed."

Q. Okay.

A. Immediately following that, Trevor Morris, who is sitting across from you, picked up the phone and would not take "No" for an answer, which is typically what he says to me.

Q. Okay.

A. And I put my clothes back on, and I walked over to the John Hancock building.

Q. But --

A. And he never said, "Henri is not there. Don't worry about it," or whatever you just stated.

Q. Okay. And, so, you disagree with Andrea Farmer's testimony in that respect?

A. One hundred percent.

Q. Okay. And you go to the bar?

A. I did.

Q. Did you order a vodka cranberry?

A. Yes, I did.

Q. Did Henri ask y'all to all look out the window at some point?

A. No. We all walked over to the window together at some point.

Q. Okay. Who is "all" of us?

Page 68

A. Andrea, Trevor, myself and Henri.

Q. And did you have your drinks in hand?

A. I don't recall that.

Q. Do you know whether Henri added alcohol to your drink that night?

A. Yes. Actually, we did order another neat vodka from the waitress.

Q. Okay. But did Henri add alcohol to your drink?

A. I don't know if he poured it or I poured it. I can't -- I can't speak to that.

Q. Have you been on business trips where Henri made drinks for others?

A. Actually, I have.

Q. And has he made drinks for you?

A. Yes.

Q. Have you ever gone unconscious when you've been with Henri?

A. No.

Q. Have you ever had blackouts when you've been with Henri?

A. No.

Q. Have you ever had gaps in your memory when you've been with Henri?

A. No.

17 (Pages 65 to 68)

Electronically signed by Amy Doubenmier (201-083-983-5249)

75b08e32-ddf1-4f70-ab20-067220224a62

Page 129

SIGNATURE PAGE

I, BETH JACKSON, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted on the correction page.

_____
BETH JACKSON

THE STATE OF TEXAS
COUNTY OF _____

Before me _____ on this day personally appeared _____ known to me [or proved to me on the oath of _____ or through _____ (description of identity card or other document)] to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _____ day of _____, 2013.

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF T E X A S

My Commission Expires:
_____

Page 131

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

JEFFREY N. TODD - ATTORNEY FOR PLAINTIFFS
GREGG M. ROSENBERG - ATTORNEY FOR DEFENDANTS

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Further certification requirements pursuant to Rule 203 of TRCP will be certified to after they have occurred.

Certified to by me this 2nd day of August, 2013.

_____
Amy J. Doubenmier, CSR
CSR NO. 7361; Expiration Date: 12-31-13
FOX Reporting
Firm Registration No. 530
4550 Post Oak Place, Suite 201
Houston, Texas 77027
713.622.1580

Page 130

NO. 2012-65503

KERI HILL and MICHELLE BARNETT * IN THE DISTRICT COURT OF

V. * HARRIS COUNTY, TEXAS

HENRI MORRIS and SOLID SOFTWARE SOLUTIONS, INC., d/b/a EDIBLE SOFTWARE * 55TH JUDICIAL DISTRICT

REPORTER'S CERTIFICATION
VIDEOTAPED DEPOSITION OF BETH JACKSON
TAKEN JULY 24, 2013

I, Amy J. Doubenmier, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, BETH JACKSON, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on _____ to the witness or to the attorney for the witness for examination, signature and returned to me within 20 days;

That the amount of time used by each party at the deposition is as follows:
JEFFREY N. TODD - 2:14
GREGG M. ROSENBERG - 0:0

Page 132

FURTHER CERTIFICATION UNDER RULE 203 TRCP

The original deposition ( ) was ( )was not returned to the deposition officer within 20 days;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to Jeffrey N. Todd, Custodial Attorney;

That $ _____ is the deposition officer's charges to Plaintiffs for preparing the original deposition transcript and any copies of exhibits;

That the deposition was delivered in accordance with Rule 203.3 and that a copy of this certificate was served on all parties shown herein and filed with the Clerk.

Certified to by me this _____ day of _____, 2013.

_____
Amy J. Doubenmier, CSR
CSR NO. 7361; Expiration Date: 12-31-13
FOX Reporting
Firm Registration No. 530
4550 Post Oak Place, Suite 201
Houston, Texas 77027
713.622.1580

33 (Pages 129 to 132)

Electronically signed by Amy Doubenmier (201-083-983-5249)
75b08e32-ddf1-4f70-ab20-067220224a62